# 23-0521-cv(L), 23-0522-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

MARIAM DAVITASHVILI, individually and on behalf of all others
similarly situated, ADAM BENSIMON, individually and on behalf
of all others similarly situated,

*Plaintiffs-Appellees,*

PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY,

*Consolidated Plaintiffs-Appellees,*

MIA SAPIENZA, MALIK DREWEY,

*Plaintiffs,*

– v. –

GRUBHUB INC., DBA Seamless, POSTMATES INC., UBER
TECHNOLOGIES, INC., in its own right and as parent
of wholly owned subsidiary Uber Eats,

*Defendants-Appellants,*

DOORDASH INC.,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX

DAVID J. LENDER
ERIC S. HOCHSTADT
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

ZACHARY D. TRIPP
  *Counsel of Record*
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
zack.tripp@weil.com

*Attorneys for Defendant-Appellant Grubhub Inc.*

*(For Continuation of Appearances See Inside Cover)*

DEVIN FREEDMAN
FREEDMAN NORMAND FRIEDLAND LLP
One Southeast Third Avenue, Suite 1240
Miami, Florida 33131
(786) 924-2900

*Attorney for Plaintiffs-Appellees*

ELIZABETH B. DEUTSCH
ADAM G. UNIKOWSKY
JENNER & BLOCK LLP
1099 New York Avenue, NW,
　Suite 900
Washington, DC 20001
(202) 639-6000

*Attorneys for Defendants-Appellants*
　*Postmates Inc. and*
　*Uber Technologies, Inc.*

**i**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries ................................... | A-1 |
| Amended Consolidated Class Action Complaint, dated August 19, 2020 ............................. | A-20 |
| Memorandum Opinion of the Honorable Lewis A. Kaplan, dated March 30, 2022............................... | A-75 |
| Declaration of Thomas J. Koreis, for Defendant Grubhub Inc., in Support of Motion to Compel Arbitration of Certain Named Plaintiffs' Claims, dated August 26, 2022 ......................... | A-112 |
| Exhibit B to Koreis Declaration – Screenshots depicting the Grubhub Inc. Checkout Page (Mobile Application).................................... | A-119 |
| Exhibit C to Koreis Declaration – Screenshots depicting the Grubhub Inc. Checkout Page (Website) ........................................................ | A-121 |
| Exhibit D to Koreis Declaration – Grubhub Inc. Terms of Use, adopted on December 14, 2021 ................................................ | A-123 |
| Exhibit E to Koreis Declaration – The Pop-Up Alerting Customers to the Grubhub Inc. Updated Terms of Use (Website)................... | A-149 |
| Exhibit F to Koreis Declaration – The Pop-Up Alerting Customers to the Grubhub Inc. Updated Terms of Use (Mobile Web)............. | A-151 |
| Exhibit G to Koreis Declaration – E-mail sent to Grubhub Inc. Customers, dated December 14, 2021 ................................................ | A-153 |

ii

**Page**

Declaration of Eric S. Hochstadt, for Defendant
  Grubhub Inc., in Support of Motion to Compel
  Arbitration of Certain Named Plaintiffs' Claims,
  dated August 26, 2022 ........................................... A-155

Exhibit B to Hochstadt Declaration –
  Plaintiffs' Responses and Objections to
  Defendants' First Set of Interrogatories, dated
  June 27, 2022 ......................................................... A-157

Declaration of Jennifer Sullivan, for Defendants
  Uber Technologies, Inc. and Postmates, LLC, in
  Support of Motion to Compel Arbitration, dated
  August 26, 2022 ..................................................... A-165

Exhibit D to Sullivan Declaration –
  Uber Technologies, Inc. Sign-Up and Consent
  Information ............................................................. A-184

Exhibit F to Sullivan Declaration –
  Uber Technologies, Inc. Terms of Use.................. A-191

Plaintiffs' Memorandum of Law in Opposition to
  Defendants' Motions to Compel Arbitration,
  dated September 16, 2022 (Excerpts).................... A-213

Declaration of Edward Normand, for Plaintiffs, in
  Opposition to Defendants' Motions to Compel
  Arbitration, dated September 16, 2022.................. A-222

Exhibit A to Normand Declaration –
  C*rain's Chicago Business* Article "GrubHub
  Sued Over Menu Prices", dated May 18, 2011...... A-224

Exhibit B to Normand Declaration –
  Grubhub Inc. Terms of Use, archived
  May 18, 2011 ......................................................... A-227

**iii**

| | Page |
|---|---|
| Memorandum Opinion of the Honorable Lewis A. Kaplan, dated March 16, 2023 | A-237 |
| Notice of Appeal, by Defendants Uber Technologies, Inc. and Postmates, LLC, dated April 7, 2023 | A-267 |
| Notice of Appeal, by Defendant Grubhub Inc., dated April 7, 2023 | A-270 |

APPEAL,CASREF,ECF,LEAD

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:20-cv-03000-LAK-JW

| | |
|---|---|
| Davitashvili et al v. Grubhub Inc. et al | Date Filed: 04/13/2020 |
| Assigned to: Judge Lewis A. Kaplan | Jury Demand: Both |
| Referred to: Magistrate Judge Jennifer E Willis | Nature of Suit: 410 Anti-Trust |
| Related Case: 1:20-cv-05134-LAK | Jurisdiction: Federal Question |
| Cause: 15:15 Antitrust Litigation | |

**Plaintiff**

**Mariam Davitashvili**
*individually and on behalf of all others
similarly situated*

represented by **Devin Freedman**
Freedman Normand Friedland LLP
1 SE 3rd Ave.
Suite 1240
Miami, FL 33131
305-306-9211
Email: vel@fnf.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward John Normand**
Freedman Normand Friedland LLP
99 Park Avenue
Suite 1910
New York, NY 10016
646-350-0527
Email: tnormand@fnf.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle William Roche**
Kyle Roche P.A.
260 Madison Avenue
8th Floor
New York, NY 10016
716-348-6003
Email: kyle@kyleroche.law
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

**Asher Hawkins**
Frank LLP
305 Broadway
Ste 700
New York, NY 10007
212-682-1853
Fax: 212-682-1892
Email: ahawkins@frankllp.com

*ATTORNEY TO BE NOTICED*

**Marvin Lawrence Frank**
Frank LLP
305 Broadway
Ste 700
New York, NY 10007
212-682-1853
Fax: 212-682-1892
Email: mfrank@frankllp.com
*ATTORNEY TO BE NOTICED*

**Gregory Alan Frank**
Frank LLP
305 Broadway
Ste 700
New York, NY 10007
212-682-1853
Fax: 212-682-1892
Email: GFRANK@FRANKLLP.COM
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Adam Bensimon**
*individually and on behalf of all others similarly situated*

represented by **Devin Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward John Normand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle William Roche**
(See above for address)
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

**Asher Hawkins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marvin Lawrence Frank**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Alan Frank**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mia Sapienza**
*individually and on behalf of all others similarly situated*

represented by **Kyle William Roche**
(See above for address)
*TERMINATED: 09/02/2022*

*LEAD ATTORNEY*

**Asher Hawkins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marvin Lawrence Frank**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Alan Frank**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Consolidated Plaintiff</u>**

**Philip Eliades**                     represented by **Devin Freedman**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Edward John Normand**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Kyle William Roche**
                                        (See above for address)
                                        *TERMINATED: 09/02/2022*
                                        *LEAD ATTORNEY*

                                        **Stephen Lagos**
                                        Freedman Normand Friedland LLP
                                        99 Park Avenue, Suite 1910
                                        New York, NY 10016
                                        646-350-0527
                                        Email: slagos@fnf.law
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**<u>Consolidated Plaintiff</u>**

**Jonathan Swaby**                     represented by **Devin Freedman**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Edward John Normand**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Kyle William Roche**

(See above for address)
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

**Stephen Lagos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**John Boisi**                    represented by **Devin Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward John Normand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle William Roche**
(See above for address)
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

**Stephen Lagos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Nathan Obey**                    represented by **Devin Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward John Normand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle William Roche**
(See above for address)
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

**Stephen Lagos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Malik Drewey**
                                           represented by **Devin Freedman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward John Normand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle William Roche**
(See above for address)
*TERMINATED: 09/02/2022*
*LEAD ATTORNEY*

V.

**Defendant**

**Grubhub Inc.**
*TERMINATED: 09/15/2022*
*doing business as*
Seamless
*TERMINATED: 09/15/2022*
                                          represented by **David Lender**
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue
New York, NY 10153
2123108000
Fax: 2128333148
Email: david.lender@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Shaun Hochstadt**
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue
New York, NY 10153
(212)-310-8538
Fax: (212) 310-8007
Email: eric.hochstadt@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luna Ngan Barrington**
Weil, Gotshal & Manges LLP (NYC)
767 Fifth Avenue
New York, NY 10153
(212)-310-8421
Fax: (212)-310-8007
Email: luna.barrington@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DoorDash Inc.**
*TERMINATED: 09/01/2020*

**Defendant**

**Postmates Inc.**
*TERMINATED: 09/15/2022*

represented by **Luna Ngan Barrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Craig Sunshine**
Skadden, Arps, Slate, Meagher & Flom
LLP (DC)
1440 New York Avenue N.W.
Washington, DC 20005
(202) 371-7000 x7860
Email: steve.sunshine@skadden.com
*TERMINATED: 04/26/2022*
*LEAD ATTORNEY*

**Andrew Arthur Ruffino**
Covington & Burling LLP (NYC)
620 Eighth Avenue
New York, NY 10018-1405
212-841-1000
Fax: 212-841-1010
Email: aruffino@cov.com
*ATTORNEY TO BE NOTICED*

**Derek Ludwin**
Covington & Burling LLP
1201 Pennsylvania Ave. Nw
Washington, DC 20004
(202)-662-5429
Fax: (202)-778-5429
Email: dludwin@cov.com
*ATTORNEY TO BE NOTICED*

**Evan Kreiner**
Skadden, Arps, Slate, Meagher & Flom
LLP
One Manhattan West
New York, NY 10001-8602
212-735-2491
Email: evan.kreiner@skadden.com
*TERMINATED: 04/26/2022*

**Karen Hoffman Lent**
Skadden, Arps, Slate, Meagher & Flom
LLP
One Manhattan West
New York, NY 10001-8602
212-735-3000
Email: karen.lent@skadden.com
*TERMINATED: 04/26/2022*

**Stacey Kamya Grigsby**
Executive Office of the President
17th & Pennsylvania Ave., NW

Washington, DC 20503
703-823-1681
Email: skamya@hotmail.com
*TERMINATED: 06/01/2022*

**Defendant**

**Uber Technologies, Inc.**
*in its own right*
*TERMINATED: 09/15/2022*

represented by **Andrew Arthur Ruffino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Derek Ludwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacey Kamya Grigsby**
(See above for address)
*TERMINATED: 06/01/2022*

**Defendant**

**Uber Technologies, Inc.**
*as parent of wholly owned subsidiary Uber
Eats*
*TERMINATED: 09/15/2022*

represented by **Andrew Arthur Ruffino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Derek Ludwin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacey Kamya Grigsby**
(See above for address)
*TERMINATED: 06/01/2022*

**Defendant**

**Slice Solutions, Inc.**

represented by **Andrew Fiorella**
Benesch Friedlander Coplan & Aronoff
200 Public Square
Ste 2300
Cleveland, OH 44144
216-280-6449
Email: afiorella@beneschlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Cheeseboat Group LLC**

represented by **Gregory Alan Frank**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/13/2020 | 1 | COMPLAINT against DoorDash Inc., Grubhub Inc., Postmates Inc., Uber Eats, Uber Technologies, Inc.. (Filing Fee $ 400.00, Receipt Number ANYSDC- |

| | | |
|---|---|---|
| | | 19426436)Document filed by Mariam Davitashvili, Mia Sapienza, Adam Bensimon.. (Frank, Gregory) (Entered: 04/13/2020) |
| 04/13/2020 | 2 | CIVIL COVER SHEET filed..(Frank, Gregory) (Entered: 04/13/2020) |
| 04/14/2020 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lewis A. Kaplan. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pne) (Entered: 04/14/2020) |
| 04/14/2020 | | Magistrate Judge Kevin Nathaniel Fox is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pne) (Entered: 04/14/2020) |
| 04/14/2020 | | Case Designated ECF. (pne) (Entered: 04/14/2020) |
| 04/14/2020 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Gregory Alan Frank. The party information for the following party/parties has been modified: Mariam Davitashvili, Mia Sapienza, Adam Bensimon, Uber Technologies, Inc., Uber Technologies, Inc., Grubhub Inc.. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party text was omitted; party text contained a typographical error; alias party information was entered incorrectly as party text. (pne) (Entered: 04/14/2020) |
| 05/21/2020 | 3 | WAIVER OF SERVICE RETURNED EXECUTED. Grubhub Inc. waiver sent on 5/20/2020, answer due 7/20/2020. Document filed by Mia Sapienza; Adam Bensimon; Mariam Davitashvili..(Frank, Gregory) (Entered: 05/21/2020) |
| 05/21/2020 | 4 | WAIVER OF SERVICE RETURNED EXECUTED. DoorDash Inc. waiver sent on 5/20/2020, answer due 7/20/2020. Document filed by Mia Sapienza; Adam Bensimon; Mariam Davitashvili..(Frank, Gregory) (Entered: 05/21/2020) |
| 05/21/2020 | 5 | WAIVER OF SERVICE RETURNED EXECUTED. Postmates Inc. waiver sent on 5/20/2020, answer due 7/20/2020. Document filed by Mia Sapienza; Adam Bensimon; Mariam Davitashvili..(Frank, Gregory) (Entered: 05/21/2020) |
| 05/21/2020 | 6 | WAIVER OF SERVICE RETURNED EXECUTED. Uber Technologies, Inc.(in its own right ) waiver sent on 5/20/2020, answer due 7/20/2020; Uber Technologies, Inc. (as parent of wholly owned subsidiary Uber Eats) waiver sent on 5/20/2020, answer due 7/20/2020. Document filed by Mia Sapienza; Adam Bensimon; Mariam Davitashvili..(Frank, Gregory) (Entered: 05/21/2020) |
| 05/26/2020 | 7 | NOTICE OF APPEARANCE by Derek Ludwin on behalf of Uber Technologies, Inc. (in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Ludwin, Derek) (Entered: 05/26/2020) |
| 05/26/2020 | 8 | NOTICE OF APPEARANCE by Andrew Arthur Ruffino on behalf of Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Ruffino, Andrew) (Entered: 05/26/2020) |
| 05/26/2020 | 9 | NOTICE OF APPEARANCE by Stacey Kamya Grigsby on behalf of Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly |

| | | |
|---|---|---|
| | | owned subsidiary Uber Eats)..(Grigsby, Stacey) (Entered: 05/26/2020) |
| 05/26/2020 | 10 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate SoftBank Group Corp., Other Affiliate SB Cayman 2 Ltd. for Uber Technologies, Inc., Uber Technologies, Inc.. Document filed by Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Grigsby, Stacey) (Entered: 05/26/2020) |
| 05/26/2020 | 11 | NOTICE OF APPEARANCE by Marvin Lawrence Frank on behalf of Adam Bensimon, Mariam Davitashvili, Mia Sapienza..(Frank, Marvin) (Entered: 05/26/2020) |
| 05/26/2020 | 12 | NOTICE OF APPEARANCE by Asher Hawkins on behalf of Adam Bensimon, Mariam Davitashvili, Mia Sapienza..(Hawkins, Asher) (Entered: 05/26/2020) |
| 05/27/2020 | 13 | NOTICE OF APPEARANCE by David Lender on behalf of Grubhub Inc...(Lender, David) (Entered: 05/27/2020) |
| 05/27/2020 | 14 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Grubhub Inc...(Lender, David) (Entered: 05/27/2020) |
| 05/27/2020 | 15 | NOTICE OF APPEARANCE by Eric Shaun Hochstadt on behalf of Grubhub Inc... (Hochstadt, Eric) (Entered: 05/27/2020) |
| 07/10/2020 | 16 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE: The teleconference can be reached by calling 888-363-4749 and using access code 7664205. (And as further set forth herein.) Initial Conference set for 8/4/2020 at 10:30 AM before Judge Lewis A. Kaplan. (Signed by Judge Lewis A. Kaplan on 7/10/2020) (jca) (Entered: 07/10/2020) |
| 07/16/2020 | 17 | CONSENT LETTER MOTION for Extension of Time *re Responding to the Complaint* addressed to Judge Lewis A. Kaplan from Gregory A. Frank dated July 16, 2020. Document filed by Adam Bensimon, Mariam Davitashvili, Mia Sapienza. (Attachments: # 1 Joint Stipulation and Proposed Order).(Frank, Gregory) (Entered: 07/16/2020) |
| 07/17/2020 | 18 | MOTION to Consolidate Cases 1:20-cv-05134 *and for Appointment of Interim Lead Counsel*. Document filed by Adam Bensimon, Mariam Davitashvili, Mia Sapienza. (Attachments: # 1 Text of Proposed Order).(Frank, Gregory) (Entered: 07/17/2020) |
| 07/17/2020 | 19 | MEMORANDUM OF LAW in Support re: 18 MOTION to Consolidate Cases 1:20-cv-05134 *and for Appointment of Interim Lead Counsel*. . Document filed by Adam Bensimon, Mariam Davitashvili, Mia Sapienza..(Frank, Gregory) (Entered: 07/17/2020) |
| 07/18/2020 | 20 | DECLARATION of Kyle W. Roche in Support re: 18 MOTION to Consolidate Cases 1:20-cv-05134 *and for Appointment of Interim Lead Counsel*.. Document filed by Adam Bensimon, Mariam Davitashvili, Mia Sapienza. (Attachments: # 1 Exhibit 1 -- Firm Resume of Roche Cyrulnik Freedman).(Frank, Gregory) (Entered: 07/18/2020) |
| 07/18/2020 | 21 | DECLARATION of Gregory A. Frank in Support re: 18 MOTION to Consolidate Cases 1:20-cv-05134 *and for Appointment of Interim Lead Counsel*.. Document filed by Adam Bensimon, Mariam Davitashvili, Mia Sapienza..(Frank, Gregory) (Entered: 07/18/2020) |
| 07/20/2020 | 22 | ORDER granting in part and denying in part 18 MOTION to Consolidate Cases 1:20-cv-05134 and for Appointment of Interim Lead Counsel. Plaintiffs' motions to consolidate these actions and appoint their counsel as interim class counsel is granted to the extent that the actions are consolidated and denied in all other respects. There is simply no need or justification to appoint anyone as interim class counsel, at least at |

| | | |
|---|---|---|
| | | this point in the 1itigation. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/18/2020) (jca) (Entered: 07/20/2020) |
| 07/20/2020 | 23 | ORDER terminating (17) Letter Motion for Extension of Time in case 1:20-cv-03000-LAK. Plaintiffs in this consolidated action may file an amended class complaint on or before August 19, 2020. Defendants shall answer, move, or otherwise respond to any such amended complaint within 60 days after the amended complaint has been filed. If defendants move to dismiss the amended complaint, plaintiffs shall file their opposition within 60 days after the filing of the motion to dismiss. Defendants shall file their reply, if any, within 30 days. The initial pretrial conference is scheduled for August 4, 2020. (20-cv-3000, Dkt 16.) This conference is adjourned until after the defendants' motion to dismiss is decided or, if no such motion is filed, until after defendants respond to the amended complaint. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 7/20/20) Filed In Associated Cases: 1:20-cv-03000-LAK, 1:20-cv-05134-LAK (yv) (Entered: 07/21/2020) |
| 07/20/2020 | | Set/Reset Deadlines: Amended Pleadings due by 8/19/2020. Associated Cases: 1:20-cv-03000-LAK, 1:20-cv-05134-LAK(yv) (Entered: 07/21/2020) |
| 08/19/2020 | 24 | **FILING ERROR - PDF ERROR -** AMENDED COMPLAINT amending 1 Complaint against DoorDash Inc., Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats) with JURY DEMAND.Document filed by Mia Sapienza, Nathan Obey, Philip Eliades, Adam Bensimon, Jonathan Swaby, Mariam Davitashvili, John Boisi, Malik Drewey. Related document: 1 Complaint..(Roche, Kyle) Modified on 8/20/2020 (jgo). (Entered: 08/19/2020) |
| 08/20/2020 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Kyle William Roche to RE-FILE re: Document No. 24 Amended Complaint. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the pleading is not correct; all of the parties whom the pleading is against are not listed on the PDF case caption; add them to the caption OR do not select them as parties whom the pleading is against; due to deficient filing on the due date, Court's leave must be granted. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. File the Exhibit to Pleading event found under the event list Other Documents and attach either opposing party's written consent or Court's leave. (jgo)** (Entered: 08/20/2020) |
| 08/20/2020 | 25 | MOTION for Leave to File the Amended Consolidated Class Action Complaint . Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Mia Sapienza, Jonathan Swaby..(Roche, Kyle) (Entered: 08/20/2020) |
| 08/24/2020 | 26 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) DoorDash Inc.. Document filed by Mia Sapienza, Nathan Obey, Philip Eliades, Malik Drewey, Adam Bensimon, Jonathan Swaby, Mariam Davitashvili, John Boisi. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)...**(Roche, Kyle) (Entered: 08/24/2020) |
| 08/25/2020 | | **\*\*\*NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 26 Notice of Voluntary Dismissal was reviewed and** |

| | | |
|---|---|---|
| | | **referred to Judge Lewis A. Kaplan for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (km)** (Entered: 08/25/2020) |
| 08/31/2020 | 27 | MEMO ENDORSEMENT granting 25 MOTION for Leave to File the Amended Consolidated Class Action Complaint. ENDORSEMENT: GRANTED. (Signed by Judge Lewis A. Kaplan on 8/31/2020) (jca) (Entered: 08/31/2020) |
| 08/31/2020 | 28 | AMENDED COMPLAINT amending 1 Complaint against Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats) with JURY DEMAND.Document filed by Mia Sapienza, Nathan Obey, Philip Eliades, Malik Drewey, Adam Bensimon, Jonathan Swaby, Mariam Davitashvili, John Boisi. Related document: 1 Complaint..(Roche, Kyle) (Entered: 08/31/2020) |
| 08/31/2020 | 29 | EXHIBIT TO PLEADING re: 28 Amended Complaint,. Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Mia Sapienza, Jonathan Swaby..(Roche, Kyle) (Entered: 08/31/2020) |
| 10/04/2020 | 30 | NOTICE OF CHANGE OF ADDRESS by Gregory Alan Frank on behalf of Adam Bensimon, Mariam Davitashvili, Mia Sapienza. New Address: Frank LLP, 305 Broadway, Ste. 700, New York CIty, NY, United States 10007, 12126821853..(Frank, Gregory) (Entered: 10/04/2020) |
| 10/04/2020 | 31 | NOTICE OF CHANGE OF ADDRESS by Asher Hawkins on behalf of Adam Bensimon, Mariam Davitashvili, Mia Sapienza. New Address: Frank LLP, 305 Broadway, Ste. 700, New York CIty, NY, United States 10007, 12126821853.. (Hawkins, Asher) (Entered: 10/04/2020) |
| 10/04/2020 | 32 | NOTICE OF CHANGE OF ADDRESS by Marvin Lawrence Frank on behalf of Adam Bensimon, Mariam Davitashvili, Mia Sapienza. New Address: Frank LLP, 305 Broadway, Ste. 700, New York CIty, NY, United States 10007, 12126821853..(Frank, Marvin) (Entered: 10/04/2020) |
| 10/15/2020 | 33 | NOTICE OF APPEARANCE by Steven Craig Sunshine on behalf of Postmates Inc... (Sunshine, Steven) (Entered: 10/15/2020) |
| 10/15/2020 | 34 | NOTICE OF APPEARANCE by Karen Hoffman Lent on behalf of Postmates Inc... (Lent, Karen) (Entered: 10/15/2020) |
| 10/15/2020 | 35 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Postmates Inc...(Lent, Karen) (Entered: 10/15/2020) |
| 10/16/2020 | 36 | NOTICE OF APPEARANCE by Evan Kreiner on behalf of Postmates Inc...(Kreiner, Evan) (Entered: 10/16/2020) |
| 10/19/2020 | 37 | JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*. Document filed by Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats).. (Sunshine, Steven) (Entered: 10/19/2020) |
| 10/19/2020 | 38 | JOINT MEMORANDUM OF LAW in Support re: 37 JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*. . Document filed by Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Sunshine, Steven) (Entered: 10/19/2020) |
| 10/19/2020 | 39 | DECLARATION of Steven C. Sunshine in Support re: 37 JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*.. Document filed by |

| | | |
|---|---|---|
| | | Postmates Inc.. (Attachments: # 1 Exhibit 1 - Amended Consolidated Class Action Complaint, # 2 Exhibit 2 - Class Action Complaint).(Sunshine, Steven) (Entered: 10/19/2020) |
| 12/18/2020 | 40 | MEMORANDUM OF LAW in Opposition re: 37 JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*. . Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Mia Sapienza, Jonathan Swaby..(Roche, Kyle) (Entered: 12/18/2020) |
| 01/15/2021 | 41 | SUPPLEMENTAL RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Uber Technologies, Inc. for Postmates Inc.. Document filed by Postmates Inc...(Lent, Karen) (Entered: 01/15/2021) |
| 01/19/2021 | 42 | JOINT REPLY MEMORANDUM OF LAW in Support re: 37 JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*. . Document filed by Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Sunshine, Steven) (Entered: 01/19/2021) |
| 05/11/2021 | 43 | NOTICE OF PARTIAL VOLUNTARY DISMISSAL: Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs in the above-captioned action, by their undersigned attorneys, hereby give notice of voluntary dismissal of all claims against Defendant DoorDash Inc. ("DoorDash") without prejudice. DoorDash was named in the initial complaint filed in this action, ECF No. 1, but was not named in Eliades et al. v. Grubhub Inc. et al., No. 1:20-cv-5134, which has been consolidated with this action, and is not named in Plaintiffs' Amended Consolidated Class Action Complaint, ECF No. 24. As of the date of this notice, Door Dash has not served an answer or a motion for summary judgment in response to any complaint in the above-captioned action. (Signed by Judge Lewis A. Kaplan on 8/25/2020) (mro) (Entered: 05/11/2021) |
| 06/28/2021 | 44 | AMENDED RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Just Eat Takeaway.com N.V. for Grubhub Inc.. Document filed by Grubhub Inc...(Lender, David) (Entered: 06/28/2021) |
| 07/01/2021 | 45 | ORDER. I hereby irrevocably waive, disclaim and renounce any and all claims, causes of action, or interests I now have, or might hereafter have, of any kind whatsoever, individually or as a member of any class (including any putative class) in this action and any action now or hereafter pending in any court arising out of any of the matters alleged in the consolidated amended complaint herein. The purpose of this renunciation is to remove any possible conflict of interest that might cause my disqualification under 28 U.S.C. § 455, or otherwise. (Signed by Judge Lewis A. Kaplan on 7/1/21) Filed In Associated Cases: 1:20-cv-03000-LAK, 1:20-cv-05134-LAK (yv) (Entered: 07/02/2021) |
| 02/07/2022 | | Magistrate Judge Jennifer Willis is so redesignated. (wb) (Entered: 02/07/2022) |
| 03/30/2022 | 46 | MEMORANDUM OPINION re: (37 in 1:20-cv-03000-LAK) JOINT MOTION to Dismiss *the Amended Consolidated Class Action Complaint*. filed by Grubhub Inc., Postmates Inc., Uber Technologies, Inc. For the foregoing reasons, Defendants' motion to dismiss (Dkt. 37) is denied in its entirety. (Signed by Judge Lewis A. Kaplan on 3/30/2022) Filed In Associated Cases: 1:20-cv-03000-LAK, 1:20-cv-05134-LAK (ate) (Entered: 03/30/2022) |
| 04/07/2022 | 47 | CONSENT LETTER MOTION for Extension of Time to File Answer *to Plaintiffs' Amended Complaint* addressed to Judge Lewis A. Kaplan from Eric S. Hochstadt dated April 7, 2022. Document filed by DoorDash Inc., Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly |

| | | |
|---|---|---|
| | | owned subsidiary Uber Eats). (Attachments: # 1 Text of Proposed Order Joint Stipulation and [Proposed] Order).(Hochstadt, Eric) (Entered: 04/07/2022) |
| 04/12/2022 | 48 | ORDER granting 47 Letter Motion for Extension of Time to Answer re 47 CONSENT LETTER MOTION for Extension of Time to File Answer *to Plaintiffs' Amended Complaint* addressed to Judge Lewis A. Kaplan from Eric S. Hochstadt dated April 7, 2022., 28 Amended Complaint. Granted. SO ORDERED. Grubhub Inc. answer due 4/29/2022; Postmates Inc. answer due 4/29/2022; Uber Technologies, Inc.(in its own right ) answer due 4/29/2022; Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats) answer due 4/29/2022. (Signed by Judge Lewis A. Kaplan on 4/12/2022) (rro) (Entered: 04/12/2022) |
| 04/14/2022 | 49 | NOTICE OF APPEARANCE by Stacey Kamya Grigsby on behalf of Postmates Inc... (Grigsby, Stacey) (Entered: 04/14/2022) |
| 04/14/2022 | 50 | NOTICE OF APPEARANCE by Derek Ludwin on behalf of Postmates Inc...(Ludwin, Derek) (Entered: 04/14/2022) |
| 04/14/2022 | 51 | NOTICE OF APPEARANCE by Andrew Arthur Ruffino on behalf of Postmates Inc... (Ruffino, Andrew) (Entered: 04/14/2022) |
| 04/25/2022 | 52 | MOTION for Karen Hoffman Lent to Withdraw as Attorney . Document filed by Postmates Inc.. (Attachments: # 1 Proposed Order).(Lent, Karen) (Entered: 04/25/2022) |
| 04/25/2022 | 53 | MOTION for Steven Craig Sunshine to Withdraw as Attorney . Document filed by Postmates Inc.. (Attachments: # 1 Proposed Order).(Sunshine, Steven) (Entered: 04/25/2022) |
| 04/25/2022 | 54 | MOTION for Evan Kreiner to Withdraw as Attorney . Document filed by Postmates Inc.. (Attachments: # 1 Proposed Order).(Kreiner, Evan) (Entered: 04/25/2022) |
| 04/26/2022 | 55 | ORDER granting 52 Motion to Withdraw as Attorney. The motion of Karen Hoffman Lent for leave to withdraw as counsel for defendant Postmates Inc. is GRANTED. SO ORDERED. (Attorney Karen Hoffman Lent terminated.) (Signed by Judge Lewis A. Kaplan on 4/26/22) (yv) (Entered: 04/26/2022) |
| 04/26/2022 | 56 | ORDER granting 53 Motion to Withdraw as Attorney. The motion of Steven Craig Sunshine for leave to withdraw as counsel for defendant Postmates Inc. is GRANTED. SO ORDERED. (Attorney Steven Craig Sunshine terminated.) (Signed by Judge Lewis A. Kaplan on 4/26/22) (yv) (Entered: 04/26/2022) |
| 04/26/2022 | 57 | ORDER granting 54 Motion to Withdraw as Attorney. The motion of Evan Kreiner for leave to withdraw as counsel for defendant Postmates Inc. is GRANTED. SO ORDERED. (Attorney Evan Kreiner terminated.) (Signed by Judge Lewis A. Kaplan on 4/26/22) (yv) (Entered: 04/26/2022) |
| 04/29/2022 | 58 | ANSWER to 28 Amended Complaint,. Document filed by Grubhub Inc...(Hochstadt, Eric) (Entered: 04/29/2022) |
| 04/29/2022 | 59 | ANSWER to 28 Amended Complaint, with JURY DEMAND. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right )..(Grigsby, Stacey) (Entered: 04/29/2022) |
| 05/27/2022 | 60 | RULE 26(f) DISCOVERY PLAN REPORT.Document filed by Grubhub Inc... (Hochstadt, Eric) (Entered: 05/27/2022) |
| 05/31/2022 | 61 | MOTION for Stacey Kamya Grigsby to Withdraw as Attorney . Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as |

| | | parent of wholly owned subsidiary Uber Eats). (Attachments: # 1 Text of Proposed Order Proposed Order).(Grigsby, Stacey) (Entered: 05/31/2022) |
|---|---|---|
| 06/01/2022 | 62 | ORDER granting 61 Motion to Withdraw as Attorney. The motion of Stacey Kam ya Grigsby for leave to withdraw as counsel for defendants Uber Technologies, Inc. and Postmates, LLC is GRANTED. SO ORDERED. (Attorney Stacey Kamya Grigsby terminated.) (Signed by Judge Lewis A. Kaplan on 5/31/22) (yv) (Entered: 06/01/2022) |
| 06/01/2022 | 63 | ORDER: The Court will hold a scheduling conference by video-conference on June 8, 2022. Counsel of record will be sent invites by email. A public dial in number for listening by audio only will be posted on ECF. (Signed by Judge Lewis A. Kaplan on 6/1/2022) (rro) (Entered: 06/01/2022) |
| 06/03/2022 | | Pretrial Conference set for 6/8/2022 at 02:30 PM before Judge Lewis A. Kaplan via video-conference. Public and press may dial-in to listen at +1 917-933-2166,Phone Conference ID: 623 939 719#. Listeners may use the dial-in with the instruction that they mute their phones upon joining. All callers are reminded that recording or re-broadcasting of the conference in whole or in part is against Court Rules. (Mohan, Andrew) (Entered: 06/03/2022) |
| 06/08/2022 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan via video-conference: Interim Pretrial Conference held on 6/8/2022. Court declined to approve the Joint Rule 26(f) Report and Discovery Plan (DI 60) and directed the parties to submit a new plan by 6/15/2022. There was not a court reporter present. (Mohan, Andrew) (Entered: 06/08/2022) |
| 06/15/2022 | 64 | RULE 26(f) DISCOVERY PLAN REPORT.Document filed by Grubhub Inc... (Hochstadt, Eric) (Entered: 06/15/2022) |
| 06/16/2022 | 65 | JOINT RULE 26(f) REPORT AND DISCOVERY PLAN: Any motion to compel arbitration with respect to one or more named plaintiffs' claims August 26, 2022. Pre-class certification stage fact discovery cutoff March 17, 2023. Plaintiffs' motion for class certification March 17, 2023. Discovery cutoff regarding Plaintiffs' class certification expert report(s) May 23, 2023. Defendants' opposition to Plaintiffs' motion for class certification June 6, 2023. Discovery cutoff regarding Defendants' class certification expert report(s) July 20, 2023. Plaintiffs' reply in support of their motion for class certification August 3, 2023. Defendants' motions for summary judgment October 5, 2023. Discovery cutoff regarding Defendants' merit expert report(s) November 1, 2023. Plaintiffs' opposition to Defendants' motions for summary judgment November 15, 2023. Discovery cutoff regarding Plaintiffs' merit expert report(s) December 6, 2023. Defendants' reply in support of their motions for summary judgment December 15, 2023. Schedule approved. The parties shall assume that it will not be extended. SO ORDERED. Motions due by 10/5/2023. Responses due by 11/15/2023 Replies due by 12/15/2023. Fact Discovery due by 3/17/2023. Discovery due by 12/6/2023. (Signed by Judge Lewis A. Kaplan on 6/16/2022) (mml) (Entered: 06/16/2022) |
| 07/19/2022 | 66 | NOTICE OF APPEARANCE by Luna Ngan Barrington on behalf of Grubhub Inc... (Barrington, Luna) (Entered: 07/19/2022) |
| 08/03/2022 | 67 | PROPOSED PROTECTIVE ORDER. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right )..(Ludwin, Derek) (Entered: 08/03/2022) |
| 08/03/2022 | 68 | PROPOSED STIPULATION AND ORDER. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right )..(Ludwin, Derek) (Entered: 08/03/2022) |
| 08/04/2022 | 69 | STIPULATED PROTECTIVE ORDER...regarding procedures to be followed that shall govern the handling of confidential material...SO ORDERED. (Signed by Judge |

| | | |
|---|---|---|
| | | Lewis A. Kaplan on 8/4/22) (yv) (Entered: 08/04/2022) |
| 08/04/2022 | 70 | STIPULATION AND ORDER REGARDING DISCOVERY OF ELECTRONICALLY STORED INFORMATION. ("ESI Order"). The following terms and conditions shall govern the collection and production of ESI requested or produced in this matter (the "Litigation"). The failure of this ESI Order to address any particular issue is without prejudice to any position that a Party may take on that issue. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 8/4/22) (yv) (Entered: 08/04/2022) |
| 08/26/2022 | 71 | **FILING ERROR - DEFICIENT DOCKET ENTRY - SIGNATURE ERROR -** STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ) and without costs pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by Mia Sapienza. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)...**(Roche, Kyle) Modified on 8/29/2022 (nd). (Entered: 08/26/2022) |
| 08/26/2022 | 72 | MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*. Document filed by Grubhub Inc...(Hochstadt, Eric) (Entered: 08/26/2022) |
| 08/26/2022 | 73 | MEMORANDUM OF LAW in Support re: 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*. . Document filed by Grubhub Inc.. (Attachments: # 1 Appendix /Compendium of Unreported Cases Not on Westlaw in Support of Memorandum of Law in Support of Motion to Compel Arbitration).(Hochstadt, Eric) (Entered: 08/26/2022) |
| 08/26/2022 | 74 | DECLARATION of Thomas J. Koreis in Support re: 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*.. Document filed by Grubhub Inc.. (Attachments: # 1 Exhibit A - Grubhubs January 2020 Terms of Use, # 2 Exhibit B - Grubhub Checkout Page (Mobile Application), # 3 Exhibit C - Grubhub Checkout Page (Website), # 4 Exhibit D - Grubhubs December 2021 Terms of Use, # 5 Exhibit E - Grubhub Terms of Use Update Pop-up (Website), # 6 Exhibit F - Grubhub Checkout Page (Mobile Application), # 7 Exhibit G - Grubhub Email Informing Customers of Updated Terms of Use).(Hochstadt, Eric) (Entered: 08/26/2022) |
| 08/26/2022 | 75 | DECLARATION of Eric S. Hochstadt in Support re: 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*.. Document filed by Grubhub Inc.. (Attachments: # 1 Exhibit A - Consolidated Amended Class Action Complaint (ECF No. 28), # 2 Exhibit B - Plaintiffs Responses and Objections to Defendants First Set of Interrogatories (June 27, 2022)).(Hochstadt, Eric) (Entered: 08/26/2022) |
| 08/26/2022 | 76 | MOTION to Compel Arbitration . Document filed by Postmates Inc., Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats)..(Ruffino, Andrew) (Entered: 08/26/2022) |
| 08/26/2022 | 77 | MEMORANDUM OF LAW in Support re: 76 MOTION to Compel Arbitration . . Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right ). (Attachments: # 1 Appendix : Unreported Cases Cited in Memorandum of Law). (Ruffino, Andrew) (Entered: 08/26/2022) |
| 08/26/2022 | 78 | DECLARATION of Andrew A. Ruffino in Support re: 76 MOTION to Compel Arbitration .. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right )..(Ruffino, Andrew) (Entered: 08/26/2022) |
| 08/26/2022 | 79 | DECLARATION of Jennifer Sullivan in Support re: 76 MOTION to Compel Arbitration .. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own |

| | | |
|---|---|---|
| | | right ). (Attachments: # 1 Exhibit A - Postmates Sign-Up Information, # 2 Exhibit B - Postmates Terms of Service, # 3 Exhibit C - Postmates Terms Update Email, # 4 Exhibit D - Uber Sign-Up and Consent Information, # 5 Exhibit E - Uber Sign-Up Terms, # 6 Exhibit F - Uber Terms of Use, # 7 Exhibit G - Uber Checkbox Consent, # 8 Exhibit H - Uber Account Use History).(Ruffino, Andrew) (Entered: 08/26/2022) |
| 08/29/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT VOLUNTARY DISMISSAL. Notice to Attorney Kyle Roche. RE-FILE Document No. 71 Stipulation of Voluntary Dismissal,,. The filing is deficient for the following reason(s): the stipulation of voluntary dismissal was not signed (ink signatures) by all parties who have appeared;. Re-file the document using the event type Stipulation of Voluntary Dismissal found under the event list Other Documents - select the correct filer/filers - select the correct party/parties the voluntary dismissal is against - and attach the correct signed (scanned signature image) PDF. (nd)** (Entered: 08/29/2022) |
| 09/01/2022 | 80 | MOTION for Kyle W. Roche to Withdraw as Attorney . Document filed by Adam Bensimon, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Mia Sapienza, Jonathan Swaby..(Roche, Kyle) (Entered: 09/01/2022) |
| 09/01/2022 | 81 | NOTICE OF APPEARANCE by Devin Freedman on behalf of Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Jonathan Swaby..(Freedman, Devin) (Entered: 09/01/2022) |
| 09/02/2022 | 82 | PROPOSED STIPULATION AND ORDER. Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Mia Sapienza, Jonathan Swaby..(Normand, Edward) (Entered: 09/02/2022) |
| 09/02/2022 | 83 | JOINT STIPULATION AND ORDER REGARDING THE BRIEFING SCHEDULE FOR DEFENDANTS MOTIONS TO COMPEL ARBITRATION, Set Deadlines/Hearing as to 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*., 76 MOTION to Compel Arbitration . IT IS ACCORDINGLY STIPULATED, by and between the undersigned counsel for the Parties, subject to the Court's approval, as follows: 1. Plaintiffs shall file their opposition to Defendants' motions to compel arbitration on or before September 16, 2022. 2. Defendants shall file their replies in support of their respective motions to compel arbitration on or before September 30, 2022. SO ORDERED: ( Responses due by 9/16/2022, Replies due by 9/30/2022.) (Signed by Judge Lewis A. Kaplan on 9/2/22) (yv) Modified on 9/6/2022 (yv). (Entered: 09/06/2022) |
| 09/02/2022 | 84 | MEMO ENDORSEMENT granting 80 Motion to Withdraw as Attorney. ENDORSEMENT: SO ORDERED this 2nd day of September, 2022. Attorney Kyle William Roche terminated. (Signed by Judge Lewis A. Kaplan on 9/2/2022) (vfr) (Entered: 09/06/2022) |
| 09/14/2022 | 85 | STIPULATION OF VOLUNTARY DISMISSAL It is hereby stipulated and agreed by and between the parties and/or their respective counsel(s) that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) Grubhub Inc., Postmates Inc., Uber Technologies, Inc.(in its own right ) and without costs pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Document filed by Mia Sapienza. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)...**(Normand, Edward) (Entered: 09/14/2022) |
| 09/15/2022 | | **\*\*\*NOTICE TO COURT REGARDING STIPULATION OF VOLUNTARY DISMISSAL Document No. 85 Stipulation of Voluntary Dismissal, was reviewed and referred to Judge Lewis A. Kaplan for approval for the following reason(s):** |

| | | |
|---|---|---|
| | | **the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (tp)** (Entered: 09/15/2022) |
| 09/15/2022 | 86 | STIPULATION OF OF PARTIAL VOLUNTARY DISMISSAL PURSUANT TO FED. R. CIV. P. 41: Pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(ii), the parties, by their undersigned counsel, hereby stipulate that Plaintiff Mia Sapienza's claims against Defendants Grubhub Inc., Uber Technologies, Inc., and Postmates, LLC shall be dismissed without prejudice and without costs or attorneys' fees to any party. For the avoidance of doubt, this stipulation has no bearing on the remaining Plaintiffs' claims against Defendants. SO ORDERED., ( Uber Technologies, Inc. (in its own right ), Uber Technologies, Inc. (as parent of wholly owned subsidiary Uber Eats), Grubhub Inc. and Postmates Inc. terminated.) (Signed by Judge Lewis A. Kaplan on 9/15/22) (yv) (Entered: 09/15/2022) |
| 09/16/2022 | 87 | MEMORANDUM OF LAW in Opposition re: 76 MOTION to Compel Arbitration ., 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*. . Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Jonathan Swaby..(Normand, Edward) (Entered: 09/16/2022) |
| 09/16/2022 | 88 | DECLARATION of Edward Normand in Opposition re: 76 MOTION to Compel Arbitration ., 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*.. Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Jonathan Swaby. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Normand, Edward) (Entered: 09/16/2022) |
| 09/30/2022 | 89 | REPLY MEMORANDUM OF LAW in Support re: 72 MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims*. . Document filed by Grubhub Inc... (Hochstadt, Eric) (Entered: 09/30/2022) |
| 09/30/2022 | 90 | REPLY MEMORANDUM OF LAW in Support re: 76 MOTION to Compel Arbitration . . Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats).. (Ruffino, Andrew) (Entered: 09/30/2022) |
| 10/26/2022 | 91 | NOTICE of CHANGE OF FIRM. Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Jonathan Swaby.. (Normand, Edward) (Entered: 10/26/2022) |
| 11/18/2022 | 92 | LETTER MOTION to Compel Cheeseboat LLC to produce documents addressed to Judge Lewis A. Kaplan from Luna N. Barrington dated November 18, 2022. Document filed by Grubhub Inc., Postmates Inc.. (Attachments: # 1 Exhibit A - Rule 45 Subpoena).(Barrington, Luna) (Entered: 11/18/2022) |
| 11/22/2022 | 93 | LETTER RESPONSE in Opposition to Motion addressed to Judge Lewis A. Kaplan from Gregory A. Frank, on behalf of Non-Party Cheeseboat dated Nov. 22, 2022 re: 92 LETTER MOTION to Compel Cheeseboat LLC to produce documents addressed to Judge Lewis A. Kaplan from Luna N. Barrington dated November 18, 2022. . Document filed by Cheeseboat Group LLC..(Frank, Gregory) (Entered: 11/22/2022) |
| 11/22/2022 | 94 | NOTICE OF APPEARANCE by Gregory Alan Frank on behalf of Cheeseboat Group LLC..(Frank, Gregory) (Entered: 11/22/2022) |
| 11/28/2022 | 95 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non-Dispositive Motion/Dispute. Dkt. 92. Referred to Magistrate Judge Jennifer E Willis. |

| | | Motions referred to Jennifer E Willis. (Signed by Judge Lewis A. Kaplan on 11/28/2022) (kv) (Entered: 11/28/2022) |
|---|---|---|
| 11/30/2022 | 96 | ORDER: The parties must meet and confer regarding docket numbers 92 and 93 by December 7, 2022. By December 7, 2022, the parties shall file a joint letter no longer than five pages outlining any remaining discovery requests at issue and the parties' respective positions on each request. SO ORDERED. (Signed by Magistrate Judge Jennifer E Willis on 11/30/2022) (tg) (Entered: 11/30/2022) |
| 12/14/2022 | 97 | JOINT LETTER addressed to Magistrate Judge Jennifer Willis from Luna N. Barrington dated December 14, 2022 re: updating the Court pursuant to Honorable Willis' November 30, 2022 Order. Document filed by Grubhub Inc...(Barrington, Luna) (Entered: 12/14/2022) |
| 01/24/2023 | 98 | LETTER addressed to Judge Lewis A. Kaplan from Edward Normand dated January 24, 2023 re: Modification of the Scheduling Order. Document filed by Adam Bensimon, John Boisi, Mariam Davitashvili, Malik Drewey, Philip Eliades, Nathan Obey, Jonathan Swaby. (Attachments: # 1 Exhibit A).(Normand, Edward) (Entered: 01/24/2023) |
| 01/26/2023 | 99 | LETTER addressed to Judge Lewis A. Kaplan from Eric S. Hochstadt dated January 26, 2023 re: Opposition to Plaintiffs' January 24, 2023 Letter regarding Modification of the Scheduling Order (ECF No. 98). Document filed by Grubhub Inc.. (Attachments: # 1 Exhibit A - Defendants' Proposed Modified Schedule).(Hochstadt, Eric) (Entered: 01/26/2023) |
| 01/27/2023 | 100 | MEMO ENDORSEMENT on re: 98 Letter Modification of the Scheduling Order, filed by Malik Drewey, Mariam Davitashvili, Philip Eliades, Jonathan Swaby, Nathan Obey, Adam Bensimon, John Boisi. ENDORSEMENT: While the Court appreciates some of defendants' points, the overall situation strongly favors plaintiffs' application. I find good cause for the requested modification of the scheduling order. The prior scheduling order is amended to conform to that attached as Exhibit A to Dkt 98. SO ORDERED., ( Discovery due by 3/11/2024., Motions due by 1/15/2024., Replies due by 3/20/2024., Responses due by 2/19/2024) (Signed by Judge Lewis A. Kaplan on 1/27/23) (yv) (Entered: 01/27/2023) |
| 01/27/2023 | | Set/Reset Deadlines: Discovery due by 3/11/2024. Fact Discovery due by 7/31/2023. Motions due by 1/15/2024. Responses due by 2/19/2024 Replies due by 3/20/2024. (yv) (Entered: 02/28/2023) |
| 02/09/2023 | 101 | LETTER MOTION for Extension of Time *to review Plaintiffs' expert reports* addressed to Judge Lewis A. Kaplan from Eric S. Hochstadt dated February 9, 2023. Document filed by Grubhub Inc...(Hochstadt, Eric) (Entered: 02/09/2023) |
| 03/06/2023 | 102 | JOINT STIPULATION AND ORDER REGARDING THE PARTIES' MODIFIED SCHEDULING ORDER, IT IS ACCORDINGLY STIPULATED, by and between the undersigned counsel for the Parties, subject to the Court's approval, as follows: All Parties agree to and propose the below, corrected modified schedule for the Court's consideration. Discovery due by 4/24/2024., Fact Discovery due by 7/31/2023., Motions due by 2/22/2024., Replies due by 5/3/2024., Responses due by 4/3/2024. The Clerk shall terminate Dkt. 101. SO ORDERED., (Motions terminated: 101 LETTER MOTION for Extension of Time *to review Plaintiffs' expert reports* addressed to Judge Lewis A. Kaplan from Eric S. Hochstadt dated February 9, 2023. filed by Grubhub Inc. ) (Signed by Judge Lewis A. Kaplan on 3/6/23) (yv) (Entered: 03/06/2023) |
| 03/16/2023 | 103 | MEMORANDUM OPINION re: (76 in 1:20-cv-03000-LAK-JW) MOTION to Compel Arbitration . filed by Postmates Inc., Uber Technologies, Inc., (72 in 1:20-cv- |

| | | |
|---|---|---|
| | | 03000-LAK-JW) MOTION to Compel Arbitration *of Certain Named Plaintiffs' Claims.* filed by Grubhub Inc. For the foregoing reasons, defendants' motions to compel arbitration (Dkt 72; Dkt 76) are denied in their entirety. Uber's motion to stay this action pursuant to 9 U.S.C. § 3 is denied as moot. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/16/23) Filed In Associated Cases: 1:20-cv-03000-LAK-JW, 1:20-cv-05134-LAK (yv) (Entered: 03/16/2023) |
| 04/07/2023 | 104 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - NOTICE OF APPEAL from 103 Memorandum & Opinion,,. Document filed by Grubhub Inc.. Filing fee $ 505.00, receipt number ANYSDC-27576880. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A - Memorandum and Opinion).(Lender, David) Modified on 4/7/2023 (nd). (Entered: 04/07/2023) |
| 04/07/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney David Lender to RE-FILE Document No. 104 Notice of Appeal,,. The filing is deficient for the following reason(s): the wrong event type was used to file the appeal;. Re-file the appeal using the event type Notice of Interlocutory Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd)** (Entered: 04/07/2023) |
| 04/07/2023 | 105 | NOTICE OF INTERLOCUTORY APPEAL from 103 Memorandum & Opinion,,. Document filed by Postmates Inc., Uber Technologies, Inc.(in its own right ), Uber Technologies, Inc.(as parent of wholly owned subsidiary Uber Eats). Filing fee $ 505.00, receipt number ANYSDC-27577258. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Ruffino, Andrew) (Entered: 04/07/2023) |
| 04/07/2023 | 106 | NOTICE OF INTERLOCUTORY APPEAL from 103 Memorandum & Opinion,,. Document filed by Grubhub Inc.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit A - Memorandum and Opinion).(Lender, David) (Entered: 04/07/2023) |
| 04/07/2023 | | Appeal Fee Paid electronically via Pay.gov for: 106 Notice of Interlocutory Appeal by Grubhub Inc. Filing fee $ 505.00. Pay.gov receipt number ANYSDC-27576880, paid on 4/7/2023..(nd) (Entered: 04/07/2023) |
| 04/07/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 106 Notice of Interlocutory Appeal,..(nd) (Entered: 04/07/2023) |
| 04/07/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 106 Notice of Interlocutory Appeal filed by Grubhub Inc. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 04/07/2023) |
| 04/07/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 105 Notice of Interlocutory Appeal,..(nd) (Entered: 04/07/2023) |
| 04/07/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 105 Notice of Interlocutory Appeal, filed by Postmates Inc., Uber Technologies, Inc. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 04/07/2023) |

A-20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |
|---|---|
| MARIAM DAVITASHVILI, ADAM BENSIMON, MIA SAPIENZA, PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY, and MALIK DREWEY, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GRUBHUB INC., UBER TECHNOLOGIES, INC., and POSTMATES INC.,<br><br>        Defendants. | Civ. No. 1:20-cv-03000-LAK<br><br>**JURY TRIAL DEMANDED** |

## <u>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs, Mariam Davitashvili, Adam Bensimon, Mia Sapienza, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, and Malik Drewey, individually and on behalf of all others similarly situated, bring this action against Grubhub Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber"), and Postmates Inc. ("Postmates") and allege as follows:

**I.     <u>INTRODUCTION</u>**

1.     Defendants have violated Section 1 of the Sherman Act and its state analogues by exploiting, without procompetitive justification, their dominant position in the market for delivery and takeout through internet-based platforms that aggregate the offerings of multiple restaurants.

2.     Over the past decade, as smart phones have become ubiquitous, the popularity of these platforms has skyrocketed. Because most restaurants face low profit margins, they require

significant volume to cover their costs.  To achieve such volume, restaurants must sell through Defendants' platforms, which each have tens of millions of active users.

3.      Defendants use their market power to force any restaurant that sells goods on Defendants' platforms to pay unreasonable commissions, typically equal to 30% of every order, each time a consumer orders from that restaurant through the platform.  These commissions are so large that, when restaurants sell through Defendants' platforms, they must increase their prices just to avoid losing money on each sale.

4.      In a freely competitive market, these restaurants could offset these increased costs by increasing prices for consumers who choose the convenience of Defendants' platforms, while maintaining lower prices for consumers who order directly from the restaurants.  That is, these restaurants would offer their customers different prices depending on whether they used Defendants' platforms or placed orders directly through the restaurant.

5.      Insulating their platforms, however, each Defendant *prevents* the restaurants by contract from offering lower prices for sales *outside* its platform.  For each Defendant, these restrictions apply to direct orders from the restaurants for takeout, delivery, or dine-in meals, even if those consumers do no business with Defendants.  Grubhub and Uber apply these contractual restrictions most broadly by also preventing restaurants from charging lower prices for orders through similar platforms, such as Doordash.

6.      Defendants do this because if the restaurants were to offer consumers lower prices for sales *outside* each Defendant's platform, then the restaurants' sales *on* the platform would decrease, and Defendants' supracompetitive profits would be threatened.

7.      The contractual restrictions that Defendants impose on restaurants thus prevent both restaurants and other platforms from competing on price with Defendants.  As a result of

Defendants' conduct, any restaurant using any Defendant's platform charges *all* of its customers supracompetitive prices.

8.       These agreements thereby cause substantial anticompetitive harm that, including with respect to the millions of consumers who are not even using Defendants' platforms, lacks procompetitive justification.  Indeed, although the courts in this country have not yet had occasion to do so, European regulators have repeatedly concluded that nearly identical contractual restrictions cause anticompetitive harm.  In fact, bans on such provisions have resulted in lower prices for consumers.

9.       Accordingly, on behalf of a nationwide class of the customers of restaurants using these platforms, Plaintiffs seek to redress and enjoin Defendants' unlawful conduct, occurring from April 13, 2016, to the present (the "Class Period").

## II.    PARTIES

### a.  Plaintiffs

10.      Plaintiff Mariam Davitashvili is a resident and citizen of New York.  Over the relevant period, she has ordered meals for takeout, delivery, and dine-in directly from restaurants that sell their goods through Defendants' platforms.

11.      Plaintiff Adam Bensimon is a resident and citizen of New York.  Over the relevant period, he has ordered meals for takeout, delivery, and dine-in directly from restaurants that sell their goods through Defendants' platforms.

12.      Plaintiff Mia Sapienza is a resident and citizen of New York.  Over the relevant period, she has ordered meals for takeout, delivery, and dine-in directly from restaurants that sell their goods through Defendants' platforms.

13.     Plaintiff Phil Eliades is a resident of New York, New York, and a citizen of New York.  Over the relevant period, he has placed orders for takeout, delivery, and dine-in directly from restaurants that sell their goods through each Defendant's platform, and indirectly from such restaurants through Doordash.

14.     Plaintiff Jonathan Swaby is a resident of New York, New York, and a citizen of New York.  Over the relevant period, he has placed orders for takeout, delivery, and dine-in directly from restaurants that sell their goods through each Defendant's platform, and indirectly from such restaurants through Doordash.

15.     Plaintiff John Boisi is a resident of Brooklyn, New York, and a citizen of New York. Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub and Postmates, and indirectly from such restaurants through Caviar and Doordash.

16.     Plaintiff Nate Obey is a resident of Brooklyn, New York, and a citizen of New York. Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub, and indirectly from such restaurants through Caviar.

17.     Plaintiff Malik Drewey is a resident of Queens, New York, and a citizen of New York.  Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants that sell their goods through each Defendant's platform, but he has not used any of those platforms.

### b. Defendants

18.     Defendant Grubhub is a Delaware corporation with its principal place of business in Chicago, Illinois.  Grubhub says it "connects more than 300,000 restaurants with hungry diners

4

in thousands of cities across the United States and is focused on transforming the takeout experience." Grubhub's 2019 revenues were $1.31 billion.

19.     Defendant Uber is a Delaware corporation with a principal place of business in San Francisco, California. Uber says its Uber Eats service "allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered." Uber's 2019 revenues from this service were $2.5 billion.

20.     Defendant Postmates is a Delaware corporation with a principal place of business in San Francisco, California. Postmates says it is "transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver anything from your favorite restaurant or retailer within minutes." Postmates is not a public company; its reported valuation is approximately $2.4 billion.

21.     On July 6, 2020, Uber announced an agreement to acquire Postmates in a $2.65 billion all-stock takeover.

### III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

23.     Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

24.     This Court has personal jurisdiction over Defendants because this action arises out of Defendants' conduct in this District.

## IV.   FACTUAL ALLEGATIONS

### a.   The Relevant Product Markets

25.     Coupled with the already increasing frequency with which restaurants had come to offer takeout and delivery service, the advent of the internet even further changed the food industry.  Instead of calling a restaurant to place an order for takeout or delivery, customers could order on a restaurant's website menu.

26.     Defendant Grubhub was one of the first companies to build and operate an online platform through which restaurant menus in a particular region are aggregated to allow consumers to view available pickup or delivery options all at once.

27.     These "Restaurant Platforms" enable consumers to search for participating restaurants in a particular locality and order food for takeout or delivery from those restaurants. Restaurant Platforms also deliver food for participating restaurants that do not want to provide delivery themselves.

28.     In aggregating the offerings of multiple restaurants in a single place, Restaurant Platforms provide a service distinct from a restaurant's website or app (*e.g.*, a Domino's pizza app), which simply allow a consumer to place an order from a single restaurant.

29.     Restaurant Platforms thus compete with each other in the product market for takeout and delivery orders from Restaurant Platforms (the "Restaurant Platform Market").

30.     For purposes of this action, two additional product markets are also relevant.  First, in addition to offering meals for takeout and delivery through Restaurant Platforms, restaurants also sell meals directly to consumers for takeout and delivery (the "Direct Takeout and Delivery

Market").  In the Direct Takeout and Delivery Market, a consumer may order directly from a restaurant for takeout or delivery by, for example, calling the restaurant's phone number or by visiting the restaurant's website.  Second, consumers may also order meals to be eaten at a restaurant directly from that restaurant (the "Dine-In Market").  In the Dine-In Market, a consumer may order a meal from a restaurant and eat the meal at that restaurant, as opposed to taking that meal to eat elsewhere.  These markets, in addition to the Restaurant Platform Market, are described in more detail below.

### b. The Restaurant Platform Market

31.     Although a number of firms participate in the Restaurant Platform Market, the market is dominated by just four firms:  Doordash, Grubhub, Uber, and Postmates.

32.     According to data compiled by Vox, these firms control a remarkable 98% of the Restaurant Platform Market in the United States.

33.     Vox found that as of November 2019, Doordash's national share of the market was 37%, Grubhub's share was 31%, Uber's share was 20%, and Postmates' share was 10%.  This data underestimates Uber's market share, because beginning in May 2019, some Uber Eats transactions became indistinguishable from Uber Rides transactions.

34.     These market shares vary across metropolitan areas.  As *The Atlantic* has observed, Restaurant Platforms have "split their dominance regionally, like cable companies."  Grubhub, for example, controls 67% of the market in all of New York City, 4.5 times as much as its closest competitor in that market.  Vox has summarized estimated shares in other markets:

| Local Market | Grubhub Share | Uber Share | Postmates Share |
|---|---|---|---|
| New York City | 67% | 14% | 4% |
| SF Bay Area | 16% | 13% | 8% |

| Miami | 11% | 55% | 19% |
|---|---|---|---|
| Houston | 9% | 29% | 4% |
| Phoenix | 15% | 23% | 23% |
| Dallas-Fort Worth | 12% | 32% | 4% |
| Washington, D.C. | 22% | 28% | 7% |
| Boston | 41% | 26% | 4% |
| Los Angeles | 19% | 15% | 37% |
| Chicago | 37% | 24% | 6% |
| Philadelphia | 42% | 16% | 3% |
| Atlanta | 12% | 40% | 10% |

35.     This result is the natural consequence not only of so-called indirect network effects, as explained below, but also of Defendants' anticompetitive conduct.

### c. The Business of Restaurant Platforms

36.     Restaurant Platforms are two-sided platforms, acting as an intermediary to connect restaurants and consumers to the benefit of both.

37.     In its most recent 10-K, Grubhub describes its business as follows:  "The Company connects more than 300,000 restaurants with hungry diners in thousands of cities across the United States and is focused on transforming the takeout experience."

38.     In its most recent 10-K, Uber similarly describes its business as follows:  "Our Eats offering allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered."

39.     Postmates, on its website, likewise describes itself as follows:  "Postmates is transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver nearly anything from your favorite restaurant or retailer in minutes."

40.     Grubhub, Uber, and Postmates, like other Restaurant Platforms, not only connect restaurants and consumers, but also derive revenue from both restaurants and consumers.

41.     <u>Restaurant Commission</u>.  When a consumer orders from a restaurant through a Restaurant Platform, the platform typically charges the restaurant a commission (the "Restaurant Commission").  The Restaurant Commission is typically equal to a rate (the "Restaurant Commission Rate") multiplied by the total price of the order.

42.     If the restaurant does not provide its own delivery, the total price is the listed price of the goods ordered (*e.g.*, the total price of two burgers, one order of fries, and a soda).  Those prices, which are typically chosen by the restaurant, are referred to as the Restaurant List Prices. If the restaurant provides its own delivery, the total price is the sum of the Restaurant List Prices for the goods ordered, plus the delivery fees the restaurant charges.  Defendants typically charge a 30% Restaurant Commission Rate to restaurants that do not provide their own delivery, and a lower Restaurant Commission Rate for restaurants that do provide their own delivery.

43.     <u>Consumer Commission</u>.  A Restaurant Platform also charges consumers a service fee (the "Consumer Commission").  The Consumer Commission is typically equal to a commission rate (the "Consumer Commission Rate") multiplied by the total listed price of the order.  The Consumer Commission Rate is typically between 5% and 10%.  In some cases, Restaurant Platforms charge no Consumer Commission Rates for orders from restaurants that provide their own deliveries and for takeout orders.

44.    <u>Consumer Delivery Fee</u>.  Restaurant Platforms also typically charge the consumer a delivery fee for orders from restaurants that do not provide their own delivery (the "Consumer Delivery Fee").  The Consumer Delivery Fee is typically about 5%.

45.    The following is an example of the fees that Restaurant Platforms charge:

| | Scenario A: Restaurant Platform provides delivery | Scenario B: Restaurant provides delivery | Scenario C: Takeout orders |
|---|---|---|---|
| Restaurant List Price | $50.00 | $50.00 | $50.00 |
| Restaurant's delivery price | n/a | $2.00 | n/a |
| Restaurant Commission Rate | 30% | 20% | 15% |
| Restaurant Commission | $15.00 | $10.40 | $7.50 |
| Consumer Commission Rate | 5% | 0% | 0% |
| Consumer Commission | $2.50 | $0.00 | $0.00 |
| Consumer Delivery Fee | $2.50 | $0.00 | $0.00 |
| Total Charged to Consumer | $55.00 | $52.00 | $50.00 |
| Total Revenue for Restaurant Platform | $20.00 | $10.40 | $7.50 |

46.    The Restaurant Platform Market is a separate product market from both the Direct Takeout and Delivery Market and the Dine-In Market.  This is because a hypothetical Restaurant Platform monopolist could profitably increase prices, as measured by the fees charged to both restaurants and consumers, above competitive levels.

47.    Although consumers may order meals for takeout or delivery in the Restaurant Platform Market or the Direct Takeout and Delivery Market, direct orders from restaurants (*i.e.*,

orders in the Direct Takeout and Delivery Market) are not reasonably interchangeable with orders from Restaurant Platforms.  This is the case for several reasons.

48.     *First*, Restaurant Platforms offer services that restaurants do not offer.  Restaurant Platforms list different restaurants that offer takeout and delivery in a particular area and thus allow the user to choose a restaurant based on her preferences, including based on reviews provided by other users of the Restaurant Platform.  In allowing consumers to rate and review restaurants that they have ordered from, Restaurant Platforms allow consumers to share their experiences.  In contrast, restaurants in the Direct Takeout and Delivery Market simply offer consumers the ability to place an order after the consumer has already decided to order from that restaurant.

49.     For example, Grubhub has a five-star rating system that allows its users to rate an individual restaurant, leave a review, and inform others what they ordered from the restaurant:



50.     *Second*, Restaurant Platforms allow consumers to place orders through mobile apps and websites, without speaking with a person.  Once a consumer has provided a Restaurant

Platform with her payment information, then she can place future orders without providing that information again.  Restaurants do not necessarily offer the same services; indeed, the vast majority of restaurants do not offer their own mobile apps and many do not offer online ordering.

51.     *Third*, as discussed in more detail below, Restaurant Platforms are "sticky," meaning that consumers who become familiar with platforms are unlikely to switch to any other service, whether that other service is a competing Restaurant Platform or a restaurant website or mobile app.  This means that a hypothetical Restaurant Platform monopolist could raise prices to a degree that it otherwise could not without seeing decreased profits.

52.     *Fourth*, although different consumers use Restaurant Platforms, they are especially popular among young professionals in major cities.  This is a distinct group of consumers with distinct sensitivities to price changes and distinct preferences.

53.     These distinctions demonstrate that, if a hypothetical Restaurant Platform monopolist increased prices to 5% above competitive levels, not enough consumers would switch away from that platform to make that price increase unprofitable.  As further support for this analysis, commentators and politicians have identified the Restaurant Platform Market as a distinct market, characterizing it as an oligopoly and calling for antitrust scrutiny of potential mergers in that market.

54.     Although (for purposes of antitrust law) the Restaurant Platform Market is distinct from the Direct Takeout and Delivery Market and the Dine-In Market, there is some cross-elasticity between the Restaurant Platform Market and those markets.  If a hypothetical Restaurant Platform monopolist increased prices, some consumers would switch to ordering in the Direct Takeout and Delivery Market or the Dine-In Market.  For example, it would not necessarily be profitable for a hypothetical Restaurant Platform monopolist to increase prices to more than 5%

12

above competitive levels.  Put differently, a hypothetical Restaurant Platform monopolist that is already charging supracompetitive prices to restaurants and consumers may be unable, absent some other restrictive mechanism, to profitably increase those prices further.

### d.  Defendants Contractually Restrict Restaurant Prices

55.     Defendants have leveraged their position in the relevant markets to force restaurants to enter into agreements that include clauses requiring uniform prices for restaurants' menu items (the "No Price Competition Clause" or "NPCC").

56.     In general, the NPCCs prohibit a supplier that sells through that platform from charging lower prices when that supplier sells through other channels.  NPCCs may be broadly categorized as "narrow" or "wide."  In a "narrow NPCC," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells to consumers directly, as opposed to through the platform or some other non-direct channel.  In a "wide NPCC," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells through *any* channel other than through the platform.

57.     Postmates imposes narrow NPCCs on restaurants that sell through Postmates.  Postmates's NPCC states:  "Pricing shall be consistent with Merchant's in-store pricing."  That is, "Postmates insists on price parity between in-store and online menus."

58.     As a result, any restaurant that sells goods through Postmates is contractually prohibited from selling those goods at a lower price to consumers who purchase directly from that restaurant, regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal was ordered online, by phone, or in person.  The restaurant may, however, charge a lower price when it sells its goods through a competing platform, such as Doordash.

59.     Grubhub and Uber both impose wide NPCCs.  Like Postmates's NPCC, these provisions prohibit restaurants from selling at lower prices directly to consumers (regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal is ordered online, on the phone, or in person).  But unlike Postmates's NPCC, Grubhub's and Uber's wide NPCCs also prohibit restaurants from selling at lower prices to consumers through any competing Restaurant Platform.  For a restaurant that sells through Grubhub or Uber, the restaurant's Restaurant List Price on those platforms is the *lowest price* the restaurant is permitted to charge in selling its goods.

60.     Grubhub's NPCC states:  "The item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service."  Consistent with this provision, Grubhub boasts (in its 2019 10-K) that it offers "menu price parity with any other online ordering option."

61.     Uber's NPCC states:  "Merchant may not make any Item available to Customers through the Eats App at a price that is higher than the price that Merchant charges in-store for similar Items.  Merchant agrees that you will not make an Item available under this Agreement at a price higher than the amount Merchant is charging for similar Items through any comparable platform for food delivery services."

62.     The Restaurant Platform industry as a whole demonstrates that Defendants' NPCCs are not a necessary element of their business.  Doordash, for example, does not impose these restrictions on restaurants that sell through its platform.  Public reporting on Doordash highlights this distinction:

> For a very long time GrubHub forced stores to sell at the exact same menu price that they offered in store – exactly what you're mentioning.  But then DoorDash came out and said, "Hey restaurant, you do whatever you want for your pricing, if you want

to sell it on DoorDash at 10%, 15% higher, so forth."  So, lot[s] of restaurant clients really liked DoorDash as they could increase their prices to recover commission costs.

Another publication characterized this fact as a key "differentiator" for Doordash, explaining that Doordash's lack of NPCC was "a big win for restaurants" because it allows them to "increase prices on that platform to offset the delivery app's commission fees, without increasing the in-house restaurant list price."

63.    A 2016 *Bloomberg* article similarly reported:  "An explanation for DoorDash's price discrepancies can be found in a support document within the help section of the company's website.  It says partner restaurants may choose to charge customers more to make up for commissions paid to the delivery company."

64.    Defendants' NPCCs have forced consumers who purchase from restaurants directly or from other Restaurant Platforms to pay supracompetitive prices; have enabled Defendants to continue offering subpar technology and service; and have caused Restaurant Commission Rates to increase to such a degree that restaurants have been forced out of business.  Defendants' NPCCs are anticompetitive and do not have any procompetitive justification.

   **e.   Competition in the Restaurant Platform Market**

65.    Restaurant Platforms compete with each other for both delivery and takeout orders. For an order to occur, a Restaurant Platform needs to match a consumer and a restaurant.  As a result, in competing for orders, Restaurant Platforms compete with each other for both consumers and restaurants.

66.    Restaurant Platforms exhibit indirect network effects, in that the value that they offer to one side of the platform is a function of the extent of the use of the other side of the platform.  A Restaurant Platform that more consumers use is more valuable to restaurants, because

the platform connects those restaurants with more consumers.  Conversely, a Restaurant Platform that more restaurants use is more valuable to consumers, because that platform connects those consumers to more restaurants.

67.     These indirect network effects thus create a positive feedback loop for a market-leading Restaurant Platform.  A Restaurant Platform that is popular with consumers is more attractive to restaurants and will therefore succeed in attracting more restaurants to the platform.  Once more restaurants agree to use the platform, the platform becomes even more attractive to new consumers, who will also use that platform.

68.     In producing significant benefits to a market-leading Restaurant Platform, however, this positive feedback loop imposes significant barriers for smaller firms and new entrants.  A small or new entrant cannot reasonably compete with larger Restaurant Platforms unless it can offer consumers a sufficient number of restaurants from which to choose.  Conversely, the small or new entrant cannot realistically attract restaurants unless it can provide those restaurants with access to a sufficient number of consumers.  Indirect network effects thus simultaneously make it easier for a market-leading firm to maintain its dominance and more difficult for a new entrant or smaller firm to establish a foothold.

69.     Even Amazon, for example, was unable successfully to break into the Restaurant Platform Market.  As the *New York Times* explained:  "Since it started in Seattle in 2015, Amazon Restaurants has struggled to gain a foothold in the restaurant delivery market," where "nearly 80 percent" of the market is controlled by "UberEats, Grubhub and DoorDash."  Accordingly, in June 2019, Amazon Restaurants shut down.

70.     Indirect network effects alone, however, do not necessarily preclude new entrants or smaller firms from taking market share away from a market-leading firm.  For example, one

journalist explained that Doordash was able to take market share away from Grubhub by expanding the services that it offered.

> Grubhub's original model was a marketplace for consumers to order food from independent restaurants that already had their own delivery fleets. Though this was a game-changer for consumers, it constrained supply to only listing restaurants that could perform their own deliveries. This was a mistake.
>
> Postmates and DoorDash were the first to realize that if they could provide the broader group of restaurants that did *not* do delivery with the ability to do deliveries, they could dramatically increase the number of restaurants that could exist in the marketplace, thereby leapfrogging Grubhub's selection (and liquidity).
>
> Once they realized this Achilles heel, Postmates and DoorDash raced to exploit the vulnerability with a growth-at-all costs mentality. Grubhub was caught backfooted. Grubhub thought that they had saturated the market, but they had only saturated a subsection of the market—independent restaurants that made their own deliveries. Meanwhile, DoorDash, Postmates, Uber Eats, and all other food delivery startups were racing to capitalize on the newer, bigger definition of the category.

71.    In addition to increasing the size of the market, Restaurant Platforms have also sought to gain and protect their market shares in a number of other ways.

72.    On the restaurant side, for example, Restaurant Platforms have sought to prevent competitors from signing up additional restaurants by entering into exclusive agreements with those restaurants. For example, Grubhub has an exclusive deal with Yum Brands (KFC and Taco Bell), Doordash has an exclusive deal with Chili's and the Cheesecake Factory, and Uber used to have an exclusive deal with McDonald's.

73.    On the consumer side, Restaurant Platforms have sought to discourage consumers from using more than one Restaurant Platform, or "multihoming," by offering packages waiving the monthly service fee that have the economic effect of volume discounts.

74.     Restaurant Platforms could also compete by offering consumers and restaurants better technology or better service, by offering restaurants lower Restaurant Commission Rates, and by offering consumers lower Consumer Commission Rates.  Defendants' conduct, however, including their NPCCs, has limited such forms of competition.

**f.   Competition in the Direct Takeout and Delivery Market**

75.     The restaurant industry is notoriously challenging.   In 2018, there were approximately 650,000 restaurants in the United States, with about 60,000 opening and 50,000 closing every year.  As this turnover indicates, the profit margins of restaurants are typically thin.  According to Upserve, a company that provides restaurant-management software, restaurant profit margins generally range from 0% to 15%.  Because of these thin profit margins, restaurants generally need a significant number of sales to cover their fixed costs.

76.     In addition to sales through Restaurant Platforms, restaurants generate revenue by selling through both the Direct Takeout and Delivery Market and the Dine-In Market.  These markets are distinct from each other because, for a consumer who wants to eat at home, a meal at a restaurant is not reasonably interchangeable with a takeout or delivery order.  Likewise, for a consumer who wants to eat at a restaurant, a meal at home is not reasonably interchangeable with a meal at a restaurant.  Consistent with this intuition, industry publications recognize a separate "off-premise market."

77.     Over the past several years, an increasing number of restaurants' takeout and delivery sales have been placed through Restaurant Platforms, such that the Restaurant Platform market is cannibalizing the Direct Takeout and Delivery Market.  Analysis from Cowen indicates that the share of delivery orders placed online increased from approximately 26% in 2012 to 46% in 2017, with the prediction that they would rise to 73% by 2022.  Morgan Stanley's research

indicates that much of this growth occurred, and will continue to occur, on Restaurant Platforms: the proportion of online delivery orders through Restaurant Platforms increased from 41% in 2015 to 68% in 2018.  Morgan Stanley projects that this number will increase to 87% by 2025.

78.     These market conditions mean that restaurants must work with Defendants, which each have a significant share of the fast-growing Restaurant Platform Market, to generate sufficient sales to turn a profit.  As one restaurant owner has explained:  "These delivery companies were never something I wanted to work with, but we have to. . . .  We are a fast-casual restaurant.  We are dependent upon volume to make any money."  Another restaurant owner explained to *Forbes*: "These platforms are growing exponentially and have developed a primary relationship with customers.  They are not providing a service; they are growing a network.  If you 'own' the customer, you can charge whatever you want, which is what they are doing."

79.     These are not mere anecdotes.  The *New York Times* has explained that Restaurant Platforms are so popular with consumers that "few restaurants can afford to opt out."  *Buzzfeed News* has explained that restaurants "have no choice to use them if they want to retain customers." *Food & Wine* has concluded:  "Most restaurant owners don't feel like they have a choice but to work with these platforms to survive."

80.     Accordingly, the vast majority of restaurants that offer takeout and delivery in the United States sell through Restaurant Platforms.  A survey from *Restaurant Owner* indicates that nearly 80% of independent restaurants that offer delivery do so through a third-party delivery service.

81.     The same survey indicates that nearly 60% of independent restaurants in the United States offer delivery.   Applying that percentage to all restaurants in the United States, approximately 390,000 restaurants in the United States (60% of 650,000 restaurants) offer

delivery.  Approximately 300,000 of those 390,000 restaurants are on Grubhub; approximately 100,000 of those 390,000 restaurants are on Uber; and approximately 115,000 of those restaurants sell through Postmates.  In other words, approximately 77% of all restaurants in the United States that offer delivery do so through Grubhub, and more than a quarter of all restaurants in the United States that offer delivery do so through Uber and Postmates.

82.    In some markets, Restaurant Platforms have an especially strong stranglehold on restaurants.  In fact, even when *all* restaurants are considered (as opposed to just those that offer takeout and delivery), more than half of the restaurants in each Local Market (defined below) are on Grubhub.  Similarly, more than half of all restaurants in San Francisco, Miami, Dallas, and Atlanta are on Uber.

| Local Market | Total Restaurants | Restaurants on Grubhub | Restaurants on Uber |
|---|---|---|---|
| New York | 24,000 | 15,000 *(63%)* | 6,900 *(29%)* |
| Chicago | 8,700 | 7,300 *(84%)* | 2,300 *(26%)* |
| Los Angeles | 11,600 | 11,000 *(95%)* | 2,200 *(19%)* |
| San Francisco | 4,400 | 4,000 *(91%)* | 4,100 *(93%)* |
| Miami | 6,000 | 4,300 *(72%)* | 5,100 *(85%)* |
| Phoenix | 5,000 | 4,100 *(82%)* | n/a |
| Dallas | 6,000 | 5,700 *(95%)* | 4,000 *(67%)* |

| | | | |
|---|---|---|---|
| Washington, DC | 3,000 | 1,500 (*50%*) | n/a |
| Boston | 3,000 | 2,500 (*83%*) | n/a |
| Philadelphia | 6,000 | 3,900 (*65%*) | n/a |
| Houston | 10,000 | 7,200 (*72%*) | n/a |
| Atlanta | 3,500 | 3,400 (*97%*) | 3,000 (*86%*) |

Although data for Uber is more limited, it is reasonable to infer that more restaurants use Uber in markets where Uber's sales exceed Grubhub's, such as Houston, Washington, D.C., and Phoenix. As a result, it is likely that more than 72% of all restaurants in Houston, 50% of all restaurants in Washington, D.C., and 82% of all restaurants in Phoenix are on Uber.

83.     Data for Postmates is not publicly available, but information that is available indicates that, throughout the United States, roughly as many restaurants are on Postmates as Uber. Moreover, it is reasonable to infer that in Los Angeles, a market where Postmates outsells Grubhub two-to-one, more restaurants use Postmates than Grubhub. The same is true with respect to Miami and Phoenix, where Postmates's sales also exceed Grubhub's. As a result, it is likely that more than 95% of all restaurants in Los Angeles, more than 72% of all restaurants in Miami, and more than 82% of all restaurants in Phoenix use Postmates.

84.     Defendants have even added restaurants to Defendants' platforms without their consent, forcing the restaurants to deal with them. One restaurant owner described her experience with Grubhub as follows:

> "If we don't sign up for this 'partnership' you pirate our menus off our website and take orders from customers anyway," continues

21

Wade in the letter. "The pre-charged payment cards sometimes don't work and everything we made languishes, unpaid for. We field angry calls from customers who think it's our fault they didn't get the food they ordered. When my manager called customer service to tell you how unfair it is that we are paying for your mistakes, he was told 'Well, none of this would happen if you would just sign up with us.' Which sounds a lot like what the mob boss says after they burn down your house."

85.    Not only are restaurants forced to sell through a Restaurant Platform, they are typically compelled to sell through multiple Restaurant Platforms. This is because, in order to reach enough consumers to cover their costs, restaurants need to access consumers that use different Restaurant Platforms.

86.    For example, Grubhub has over 22 million active users, Uber has at least 15 million, and Postmates has at least 10 million. Although users of each platform are not mutually exclusive, there are many individuals who use only a single platform. For example, nearly half of Grubhub users use only Grubhub. The only way that a restaurant can access those consumers is to sell through Grubhub. Likewise, 40% of Uber users use only Uber, and approximately 20% of Postmates users use only Postmates.

87.    The fact that many consumers are loyal to a single Restaurant Platform is not surprising and has little to do with platform quality. One study from McKinsey concluded that Restaurant Platforms are "sticky," meaning that many consumers who sign up "never or rarely leave for another platform." Various commentators have attributed this "stickiness" to high switching costs associated with online platforms. *Yale Law Journal* has noted: "Although competition for online services may seem to be 'just one click away,' research drawing on behavioral tendencies shows that the 'switching cost' of changing web services can, in fact, be quite high." *Wired* has explained: "As tech platforms amass more and more data to personally

tailor their experience to a consumer, 'there is a pretty decent cost to switching.'" *Vanderbilt Law Review* has highlighted platform "users' aversion to the cognitive costs of switching."

88.　　Due to this "stickiness," Restaurant Platforms grow their networks of consumers primarily by buying up other Restaurant Platforms—not by winning new consumers over with a superior product.  For example, over the past ten years, Grubhub has acquired Dotmenu, Seamless, DiningIn, Restaurants on the Run, Delivered Dish, Eat24, Foodler, LevelUp, Tapingo, and OrderUp.  Likewise, Uber recently acquired Postmates.

89.　　In addition to having to work with multiple Restaurant Platforms, restaurants are also forced to watch the growing Restaurant Platform Market cannibalize their sales in the Direct Takeout and Delivery Market.　For example, a New York City Hospitality Alliance survey indicates that, for 2 out of 3 restaurants, customers who previously ordered directly now order through Grubhub.  As *The New Yorker* has explained:

> Companies like GrubHub maintain that the revenue they bring restaurants is "incremental"—the cherry on top, so to speak, of whatever sales the place would have done on its own.  They also argue that delivery orders are a form of marketing, exposing potential new customers who might convert to lucrative in-restaurant patrons.  The problem is that as consumers use services like Uber Eats and Seamless for a greater share of their meals, delivery orders are beginning to replace some restaurants' core business instead of complementing it. . . .  And, as delivery orders replace profitable takeout or sit-down sales with less profitable ones—ostensibly giving restaurants business but effectively taking it away—the "incremental" argument no longer holds.  "It's total bullshit, and you can quote me on that," Justin Rosenberg, the C.E.O. of the Philadelphia-based fast-causal chain Honeygrow, told me.  "I've spoken to C.F.O.s of bigger fast-casuals, and they've said the same thing."

In other words, Restaurant Platforms have cannibalized restaurants' existing business by redirecting orders that used to flow to restaurants directly to instead flow through Restaurant

Platforms.  As a result, Restaurant Platforms have increased restaurant costs without adding revenue, placing further pressure on restaurants to increase menu prices.

### g.  Competition in the Dine-In Market

90.    In addition to competing for orders in the Direct Takeout and Delivery Market, restaurants also compete for sales in the Dine-In Market.  Based on data from *Restaurant Owner*, approximately 60% of restaurants offer delivery (either themselves or through a Restaurant Platform) and thus compete in both markets.

91.    Sales in the Dine-In Market are more profitable to restaurants than sales in the Direct Takeout and Delivery Market.  As Thanx, a company specializing in customer engagement, has concisely explained, "Delivery profit margins aren't as high as dine-in margins."  This is because "[c]ustomers usually skip drinks when ordering in, which automatically cuts profits.  Plus, labor, packaging, and delivery fees are all higher, which eats into the profits."  *CNN* has likewise explained that consumers are "less likely to ask for menu items that carry higher margins— including soda and alcoholic drinks—when they order in, cutting deeper into profit from delivery." And the *Wall Street Journal* has noted:  "Delivery and packaging fees take a big cut of restaurant profits, and deliveries often don't include beverages, which provide high margins."

92.    Sales in the Dine-In Market are thus essential for a restaurant's survival, but Restaurant Platforms have jeopardized those sales.  Restaurant Platforms do not compete in the Dine-In Market, but they have nevertheless cannibalized sales in that market.  Research from Morgan Stanley indicates that, in 2017, "43% of consumers who ordered food for delivery say it replaced a meal at a restaurant."  According to the NPD Group, since 2014, "total visits to restaurants have declined more than 700 million visits."  And data from TDN2K Black Box Research shows that in-store traffic has steadily fallen at restaurants.

93.     Restaurant owners tell a similar story.  The *New York Times* provides an example:

> The major delivery companies have long argued that apps expose restaurants to new customers, allowing small businesses to tap into a network of tens of millions of online users and to benefit from the advertising muscle of multibillion-dollar companies.  Katie Norris, a Grubhub spokeswoman, said the service drove "incremental sales"—bringing in customers who would otherwise stay home and cook.
>
> "The incremental sales and traffic with higher average checks more than offset commission rates," she said.
>
> But that has not been the experience of Anil Bathwal, who runs the Kati Roll Company, a New York-based chain specializing in Indian street food.
>
> Mr. Bathwal did not have a large-scale delivery operation when his chain signed up with Seamless, and he said the service had initially brought him new business.  But over the years, third-party delivery has grown to account for as much as 30 percent of his sales, as existing customers—*those who used to eat at the restaurant*—have started using Seamless instead.
>
> "As time goes by, more and more of my existing customers are being cannibalized," said Mr. Bathwal, who estimates the delivery service has reduced his overall profits by 2 to 5 percent.

Based on this contrast between (i) Restaurant Platforms' promises to restaurants of more orders and (ii) the reality that the platforms cannibalize restaurants' dine-in business, one New York City councilman has characterized Restaurant Platforms as a "trojan horse" for restaurants.

**h.  Geographic Markets**

94.     The relevant geographic markets regarding Defendants' conduct are the nationwide market (the "National Market") and the local markets described below, because Restaurant Platforms compete in the Restaurant Platform Market throughout the United States, at both the national and local level.

95.     Restaurant Platforms compete in the National Market because they compete nationwide to build a national network of consumers to offer restaurants, and a national network of restaurants to offer consumers.  Grubhub asserted in its most recent 10-K, for example, that its acquisition of Eat24 "expanded the breadth and depth of [its] national network of restaurant partners and active diners."

96.     Indeed, Restaurant Platforms (i) advertise their services nationwide; (ii) operate nationwide; (iii) charge restaurants the same Restaurant Commission Rates nationwide; (iv) charge the same Consumer Commission Rates nationwide; (v) provide the same exact services nationwide through the same exact websites and mobile apps; and (vi) impose the same contractual restrictions—including, with respect to Defendants, the same NPCCs—on restaurants and consumers nationwide.  Put simply, a consumer can use the same Restaurant Platform app regardless of whether he or she is in New York or San Francisco that day, and that app will operate, and affect the consumer and restaurant, in the exact same way.

97.     In addition, Restaurant Platforms compete for important partnerships with national restaurant chains, such as McDonald's, Starbucks, and Chick-Fil-A, which they attempt to leverage to attract consumers who order from those restaurants to their platforms.  A Restaurant Platform that successfully obtains an agreement with a popular chain may, for example, be able to attract that chain's consumers throughout the country and therefore increase its revenues.

98.     Restaurant Platforms also compete locally in the Restaurant Platform Market.  In particular, Restaurant Platforms compete with each other for both (i) listings from restaurants and (ii) delivery and takeout orders from consumers.  Such competition is local because a consumer in one metropolitan area is highly unlikely to order food through a Restaurant Platform from a restaurant in a far-away metropolitan area, and because both Restaurant Platforms' and restaurants'

delivery ranges are limited.  To take an obvious example, for a consumer located in New York City, a takeout order from a restaurant in San Francisco is not a reasonable substitute for a takeout order from a restaurant in New York City.  For the same reason, the relevant geographic market for the Direct Takeout and Delivery Market and the Dine-In Market is local.  Indeed, restaurants generally compete with other restaurants in the same city, not with restaurants in far-away cities.

99.     The local markets in which Restaurant Platforms compete in the Restaurant Platform Market, and the local markets in which restaurants compete in the Direct Takeout and Delivery Market and the Dine-In Market (the "Local Markets"), include New York City, Los Angeles, Chicago, Dallas-Fort Worth, Houston, Washington, Miami, Philadelphia, Atlanta, Boston, Phoenix, and the San Francisco Bay Area.

     **i.   Defendants' Market Power**

100.    <u>Defendants' High Market Shares</u>.  Defendants' high market shares evidence their market power in the Restaurant Platform Market.  Grubhub's market share is 31% nationwide and 67% in New York City.  Uber's market share is at least 20% nationwide and much higher in some local markets, such as Miami, where its market share is at least 55%.  Postmates' market share in Los Angeles, the second-largest city in the United States, is 37%.

101.    <u>Defendants' Network of Restaurants</u>.   Defendants' market power is also demonstrated by the sheer number of restaurants that have no choice but to sell through Defendants' platforms.  Nearly half of all restaurants in the United States sell through Grubhub, and a much larger share of restaurants that offer delivery do so through Grubhub.  Similarly, more than 15% of all restaurants in the United States, and over a quarter of restaurants that offer delivery, sell through Uber and Postmates.

102.    The numbers are even more striking in certain large Local Markets, such as New York City (nearly 65% of all restaurants sell through Grubhub), Chicago (approximately 85% of all restaurants sell through Grubhub), Dallas (approximately 95% of all restaurants sell through Grubhub), Philadelphia (approximately 65% of all restaurants sell through Grubhub), Boston (approximately 83% of all restaurants sell through Grubhub), Atlanta (approximately 97% of all restaurants sell through Grubhub), San Francisco (approximately 93% of all restaurants sell through Uber), Miami (approximately 85% of all restaurants sell through Uber), Houston (more than 72% of all restaurants sell through Uber), Washington, D.C. (more than 50% of all restaurants sell through Uber), Phoenix (more than 82% of all restaurants sell through Uber and Postmates), and Los Angeles (more than 95% of all restaurants sell through Postmates).

103.    In addition to demonstrating that restaurants have no choice but to sell through Defendants' platforms, the size of each Defendant's network of restaurants also gives each Defendant the ability to impose supracompetitive pricing and substandard service on consumers.

104.    <u>Defendants' Network of Consumers</u>.   Defendants' market power is further demonstrated by the number of consumers that use Defendants' platforms.  More than 22 million people use Grubhub, more than 15 million use Uber, and approximately 10 million use Postmates. As explained above, to access these consumers, restaurants have no choice but to sell through Defendants' platforms.

105.    <u>Network effects</u>.   Indirect network effects further increase Defendants' market power.   In particular, Defendants' massive networks of restaurants and consumers create significant indirect network effects that inhibit smaller platforms from gaining market share.  For example, in a market where Grubhub is the market-leading platform, smaller platforms in that market cannot readily attract additional restaurants and consumers because, even if Grubhub

28

increased its prices on both sides of the platform, consumers may be unwilling to switch to a platform with fewer restaurants, and restaurants may be unwilling to switch to a platform with fewer consumers. Thus, a smaller platform's ability to constrain the behavior of a market-leading platform through competition is limited.

106.    <u>Platform stickiness</u>. Defendants' market power is compounded by the "stickiness" of their platforms. As explained above, once a consumer becomes familiar with a Restaurant Platform, he or she is very unlikely to leave that platform for a competing service. This enables Defendants to charge higher prices and offer lower quality service to those consumers without losing their business.

107.    Because Defendants' platforms are "sticky," consumers remain loyal to a particular Defendant's platform. As a result, restaurants must sell through multiple platforms in order to access consumers who use those platforms. This dynamic enables even a platform that does not have the largest market share to impose supracompetitive pricing on restaurants and consumers.

108.    <u>Defendants' Supracompetitive Pricing for Restaurants</u>. Defendants' ability to charge supracompetitive prices to restaurants without losing them as customers and without losing out on profit further demonstrates their market power in the relevant markets.

109.    Defendants charge a Restaurant Commission Rate between 15% and 30%, depending on the service being offered (*e.g.*, takeout, delivery orders that the restaurant delivers, or delivery orders that the platform delivers). When Defendants provide delivery, they typically charge 30% Restaurant Commission Rates. Uber charges restaurants 15% Restaurant Commission Rates even for customers who order only for pickup. Similarly, Grubhub's own advertising material indicates that restaurants that rely on Grubhub for delivery can expect to pay more than 33% Restaurant Commission Rates. And even in the face of legislation that prohibits Restaurant

Platforms from charging Restaurant Commission Rates exceeding 15% during the COVID-19 pandemic, Postmates has reportedly "continue[d] to charge restaurants between 20 and 33 percent of each order."

110.    Lesser-known Restaurant Platforms that provide the same service as Defendants— allowing consumers to search for and order from restaurants in their area—charge significantly less.  For example, Foodetective provides the same exact service but, instead of charging sky-high commissions, charges only a "modest monthly subscription fee."  Similarly, Slice charges only a small flat fee per order ($1.95), while Fare does not charge restaurants at all.  And smaller Restaurant Platforms—*i.e.*, those other than Doordash and Defendants—that have adopted Defendants' commission model still charge more modest Restaurant Commission Rates than Defendants:  Waitr charges between 15% and 25%, and Delivery.com charges 15%.

111.    Defendants have not always charged the high Restaurant Commission Rates that they charge today.  Instead, as Defendants have become more essential to restaurants' very survival, and as their share of the restaurants' revenue has increased, Defendants have leveraged their market power over restaurants to substantially increase their Restaurant Commission Rates.

112.    Restaurant Platforms initially charged Restaurant Commission Rates between 10% and 12%.  When it started in 2004, for example, Grubhub charged a 10% Restaurant Commission Rate.  By 2015, Restaurant Platforms were "reportedly" charging Restaurant Commission Rates "as large as 18%."  By that point, as noted, over 40% of online delivery orders were being placed through Restaurant Platforms.  The following year, 2016, Grubhub charged between 12% and 24%, still significantly less than the current rate, but also much more than its initial 10% rate.

113.    With 80% of online delivery orders now placed through Restaurant Platforms, however, Defendants' Restaurant Commission Rates today are approximately 30%, or triple what

they were initially.  Basic principles of economics suggest that a firm that triples its price should *lose* revenue as restaurants and consumers flock to lower-price competitors.  But Defendants' price increases have *not* resulted in Defendants losing market share or losing profit.

114.    Over the period from 2016 to 2019, Grubhub's revenue increased from approximately $500 million to over $1.3 billion.  Uber's revenue from its Uber Eats brand more than quadrupled between 2017 and 2019.  And Uber agreed to purchase Postmates for $2.65 billion in July 2020.

115.    Defendants have been able to substantially raise prices on restaurants without losing those restaurants or profit because, as explained above, market conditions compel restaurants to work with them.  For example, over 90% of restaurants surveyed that sell through Grubhub believe that Grubhub's fees are "unreasonable."  Defendants Uber and Postmates charge these same "unreasonable" fees.

116.    <u>Defendants' Supracompetitive Pricing for Consumers</u>.  Defendants' ability to charge supracompetitive prices to consumers further demonstrates their market power.  The *New York Times* has found, for example, that the markup for delivery orders through Defendants' Restaurant Platforms (*i.e.*, the difference between (i) the total price to the consumer when ordering through a platform, including fees imposed by Defendants, and (ii) the total price to the consumer when ordering directly from the restaurant) ranged from between 25% to 91%.  The author aptly characterized these prices as "downright egregious."  In particular, the *Times* found that the markup was 25% to 37% on Grubhub, 45% to 63% on Postmates, and 49% to 91% on Uber.

117.    Similarly, *Tech Crunch* found that, based on data from thirty restaurants in Los Angeles, New York, and San Francisco, consumers who ordered delivery from Postmates pay over

40% more than if they were to just order directly from the restaurant for takeout. The markup was nearly 30% for Uber, and nearly 20% for Grubhub's Seamless brand.

118.   Moreover, although publicly available information regarding trends in fees imposed by Defendants on consumers is hard to come by, available data suggests that those fees, just like Defendants' Restaurant Commission Rates, have risen over time. For example, data included in Grubhub's SEC filings indicates that, from 2014 through 2019, the *total commission rate* that Grubhub imposed on restaurants and consumers for using its platform increased by a staggering 156%.

119.   This does not even take into account the fact that restaurants that sell on Defendants' platforms typically need to increase their Restaurant List Prices—*i.e.*, the prices that they charge consumers for their food. As explained below, Defendants' Restaurant Commission Rates are so high that restaurants typically must increase the prices that they charge on those platforms just to avoid losing money on every transaction. These are costs that all restaurant consumers bear.

120.   Defendants' Profit Margins. Consistent with the supracompetitive pricing that Defendants impose on both restaurants and consumers, Defendants see profit margins that restaurants could never attain. For example, in a recent letter to shareholders, Grubhub indicated that its margins are nearly 40% when it provides delivery on behalf of independent restaurants. Previous filings from Grubhub show that its margins approach 80% when the restaurants provide their own delivery. The same would be true when consumers order for takeout through Grubhub.

121.   Although the same information is not available for Uber and Postmates, the only reason that their margins would be lower than Grubhub's would be if they were less efficient.

122.    The fact that Defendants' margins are unreasonably high is confirmed by the fact that, as explained above, smaller platforms charge considerably lower fees.  Moreover, websites such as Google, Yelp, and Tripadvisor—which also enable consumers to search for and review restaurants—are free to both consumers and restaurants.

123.    <u>Defendants' NPCCs</u>.  Defendants' ability to impose their NPCCs on restaurants also demonstrates their market power.  These provisions, as explained just below, harm restaurants by limiting their ability to compete with Defendants.

124.    <u>Defendants' Ability to Control Prices</u>.  Combined with the significant number of restaurants that are forced to accept Defendants' NPCCs and the supracompetitive Restaurant Commission Rates that Defendants charge, these NPCCs enable Defendants to control, or at minimum substantially affect, the prices charged by restaurants in the Direct Takeout and Delivery Market and the Dine-In Market.

**j.   Anticompetitive Purpose and Effects of Defendants' NPCCs**

*i.   Grubhub and Uber's NPCCs Prevent Restaurant Platforms from Competing on Price and Insulate Them from Competition*

125.    Grubhub and Uber's NPCCs limit price competition in the Restaurant Platform Market by fixing a key (and, in some cases, the only) component of the end-price paid by consumers for goods ordered through Restaurant Platforms, and by removing a powerful incentive for Restaurant Platforms to reduce Restaurant Commission Rates.

126.    Grubhub and Uber's NPCCs, as explained above, prohibit restaurants from listing their menu items on competing platforms for a lower price.  This restriction is significant, "especially since many restaurants feel the need to list on more than one app."  Grubhub thus recently touted that it offers "menu price parity with any other online ordering option."

127.    Given that Restaurant Platforms exhibit indirect network effects, as also explained above, Restaurant Platforms must attract a sufficient number of consumers and restaurants in order to survive.   Ordinarily, like any platform, a Restaurant Platform could attract consumers by offering them lower prices—that is, lower Restaurant List Prices.   Likewise, ordinarily, a Restaurant Platform could attract restaurants by offering them lower prices—that is, lower Restaurant Commission Rates.

128.    Absent Grubhub and Uber's NPCCs, given the limits of stickiness, a competing Restaurant Platform could thus attract consumers by offering restaurants lower Restaurant Commission Rates to induce those restaurants to provide lower Restaurant List Prices.   For example, a restaurant may be willing to offer a lower Restaurant List Price to a Restaurant Platform that charges a 15% Restaurant Commission Rate, instead of a 30% Restaurant Commission Rate (like Defendants).

129.    If successful, this pricing strategy would make the competing platform more attractive to consumers because it would provide them with lower Restaurant List Prices, which are a key component of the end-price that they pay for delivery and takeout orders.   In fact, for orders for which Restaurant Platforms do not charge delivery fees or commissions to consumers, Restaurant List Prices *are* the end-prices that consumers pay.   Accordingly, reducing that price would draw more consumers to the platform.   This pricing strategy would make the platform more attractive to restaurants as well, because it would provide them with lower Restaurant Commission Rates.   All else equal, a restaurant would prefer to sell on a Restaurant Platform that charges a 15% Restaurant Commission Rate as opposed to a Restaurant Platform that (like Defendants) charges a 30% Restaurant Commission Rate.

130.    Grubhub and Uber's NPCCs, however, eliminate even the possibility of a competing platform engaging in this strategy.  Because these NPCCs prohibit restaurants from providing competing platforms with lower Restaurant List Prices, competing platforms have no incentive to offer restaurants lower Restaurant Commission Rates to induce those restaurants to lower their Restaurant List Prices.  Grubhub and Uber's NPCCs thus discourage competing platforms from reducing their Restaurant Commission Rates.  For this reason, Restaurant Commission Rates are essentially uniform (30%) among the largest Restaurant Platforms.

131.    At the same time, Grubhub and Uber's NPCCs create an incentive for Grubhub and Uber to continually increase their Restaurant Commission Rates, as they have over the past fifteen years.  By increasing their Restaurant Commission Rates, Grubhub and Uber can increase their revenue without any concern that consumers will flee to a competing platform with lower Restaurant List Prices.

132.    The most fundamental and anticompetitive feature of Grubhub and Uber's NPCCs is that they prevent a restaurant from choosing—for *any reason*—to charge a lower Restaurant List Price on a competing platform.  As a result, Grubhub and Uber's NPCCs flatly eliminate competition among Restaurant Platforms on Restaurant List Prices, thereby preventing competing platforms from offering lower Restaurant List Prices to consumers.  For many consumers, as noted, Restaurant List Prices are the end-prices consumers pay.  Grubhub and Uber's NPCCs thus effectively fix the end-price that consumers pay when they order through Restaurant Platforms.

133.    Grubhub and Uber's NPCCs serve to insulate them from competition on *both* sides of the market, by fixing the Restaurant List Price, which is a key component of the price paid by consumers, and by discouraging competing Restaurant Platforms from offering lower Restaurant Commission Rates.  This insulation has enabled Grubhub and Uber to hike up Restaurant

Commission Rates, forcing consumers and restaurants alike to pay higher prices, without fear of being undercut by competing Restaurant Platforms. Without the ability to offer lower Restaurant List Prices, competing platforms are blocked from creating the positive feedback loop needed to survive in the Restaurant Platform Market because they lose the primary (and to many consumers, only) means of attracting consumers to their platform and as a result are unable to attract more restaurants. Anyone with an understanding of the market is unlikely to even attempt to enter.

134.    This is an intended and predictable consequence of Grubhub and Uber's NPCCs. As the *Yale Law Journal* has reported: "The leading theoretical analysis by economists Andre Boik and Kenneth Corts finds that platform [NPCCs] lead to higher platform fees, drive up retail prices, and discourage entry by firms with lower cost business models."

135.    In addition to enabling Grubhub and Uber to increase Restaurant Commission Rates, this insulation resulting from Grubhub's and Uber's NPCCs has also stalled technological development in the Restaurant Platform Market. *Tech Crunch* has reported, for example, that "the primary differentiation between delivery apps today is not based on innovations that meaningfully impact user experience." The *Tribeca Citizen*, in an article titled "Why Restaurants Hate GrubHub Seamless," characterized the state of technology in the Restaurant Platform Market as follows: "The technology stinks." By 2016, Grubhub "still [hadn't] found a way to integrate their current technology into restaurant point-of-sale systems—or even a single tablet."

136.    Similarly, Grubhub and Uber offer very poor service to restaurants. As the *Washington Post* recently explained: "Virtually every restaurant person has a nightmare story about the apps botching their menus and hours of operations." One survey indicated that less than 10% of responding restaurants had "a positive experience with Grubhub/Seamless."

137.     Grubhub and Uber perform no better for consumers.  According to SiteJabber, a website that allows consumers to rate businesses, Grubhub "ranks 95th among Food Delivery sites," with an average "rating of 1.18 stars from 2,666 reviews."  Uber is only slightly better—it "ranks 73rd among Food Delivery sites," with an average rating of 1.76 stars.  These overwhelmingly negative reviews are hardly shocking in light of recent survey results that show that *more than 25%* of delivery drivers for Restaurant Platforms have sampled customers' food before delivering it.

138.     A recent study by Zion & Zion identified a litany of other issues that consumers experience with Restaurant Platforms.  Nearly 30% of the time, the food arrives at the wrong temperature; 28% of the time the food is unacceptably late; and another 21% of the time, consumers receive the wrong dish.  According to the study, more than half of consumers that receive the wrong dish or receive their food late are "very frustrated."

139.     Moreover, the high Restaurant Commission Rates—which flow directly from Defendants' NPCCs—reduce consumer choice.  Because the Restaurant Commission Rates are so high, restaurants are unable to offer lower-margin items through Defendants' platforms.  As one industry expert explained:  "Restaurants, in response, will continue to rethink delivery in 2019 by creating separate menus with higher margin food items—items that are inexpensive to make, like French fries, but cost the customer more."  This is precisely what has happened, as many restaurants now offer a limited menu for delivery.

> ii.   *Defendants' NPCCs Preclude Restaurants from Competing on Price with Defendants in the Direct Takeout and Delivery Market and the Dine-In Market*

140.     While only Grubhub and Uber restrict price competition across Restaurant Platforms, all of Defendants' NPCCs have both the purpose and effect of precluding restaurants

from competing directly on price with Defendants in the Direct Takeout and Delivery Market and the Dine-In Market.

141.    Defendants' NPCCs prohibit restaurants from selling menu items at a lower price to consumers who order directly from restaurants, regardless of whether those orders are for takeout, delivery, or dine-in, and regardless of whether those orders are made online, in person, or over the phone.  Under these NPCCs, for example, a restaurant that lists an item on Defendants' platform for $10 is contractually prohibited from selling that item for $9 to a consumer who calls the restaurant to order that item for takeout.

142.    It is easy to see why a restaurant would want to offer lower prices to consumers who order directly from the restaurant than to consumers who order through Defendants' platforms.  Whenever a restaurant sells through Defendants' platforms, the restaurant must pay a hefty Restaurant Commission Rate.  In fact, Defendants' Restaurant Commission Rates often *exceed* restaurants' profit margins.  As a result, restaurants cannot make any money selling through Defendants' platforms unless restaurants increase the prices of their menu items.  As one Colorado restaurant owner explained, the "[c]ommissions are too high to maintain a profit," so restaurants are "forced to either raise prices to maintain a profit or lose money on delivery orders."

143.    With respect to Uber and its 30% Restaurant Commission Rate, for instance, *Forbes* has explained as follows:

> The problem here is that the average profit margin for a restaurant is under 30%.  Fast food such as McDonalds reported profit margins about 22% in 2017.  Casual dining or family style restaurants have a profit margin between 5% to 10%.  Lastly, full-service restaurants such as fine-dining have average profit margins of about 6.1%.
>
> Based on the average profit margins above, every restaurant that engages Uber Eats will lose money on every order they take.  The more orders coming from Uber Eats, the more money a restaurant would lose.

144. The natural and predictable result of Defendants' NPCCs is that restaurants must increase their prices when they sell on Defendants' platforms.  For example, in 2019 the New York City Hospitality Alliance found that 64.1% of restaurants either raised menu prices or considered raising menu prices to offset fees from Grubhub.

145. This data is supported by countless anecdotes.  In Milwaukee, "Alexa Afaro of the Filipino restaurant and food truck Meat on the Street said they've had to raise prices to help off set some of the additional costs of delivery commissions."  In San Francisco, as reported by the SFist in 2015, another restaurant owner explained that he would be forced to raise prices in response to high commissions.  *Restaurant Business* provides another example:

> When the Habit Burger Grill began offering delivery to its customers last year, the company did something a bit different.
>
> It upcharged delivery orders by 25%.
>
> "At the end of the day, with the commission structures the way they are, someone has to pay for that convenience," CEO Russ Bendel said on an upcoming episode of *Restaurant Business'* podcast, "A Deeper Dive."
>
> It's an increasingly common strategy.  Chains, eager to jump on board to an increasingly popular service but worried about the impact such fees can have on their business, have started charging delivery customers higher prices.

*Tech Crunch* interviews with restaurant owners likewise indicate that many restaurants "increase on-app list prices when selling through delivery apps as a way of offsetting the up to 30% fee the delivery apps charge."

146. This strategy of increasing "on-app list prices when selling through delivery apps" is unavoidable for any restaurant with profit margins below Defendants' Restaurant Commission Rates.  For example, a restaurant with a 10% profit margin can ordinarily make $2 whenever it

sells $20 in food.  But if the restaurant is also forced to pay a 30% Restaurant Commission Rate on top of its existing costs, then the restaurant would *lose* $4 whenever it sold the same items for $20.  Just to break even, the restaurant would need to increase its prices from $20 to $26.  To make the same $2, the restaurant would have to increase its prices from $20 to $29.

147.   Defendants' Restaurant Commission Rates thus force restaurants to increase the prices of items listed on Defendants' platforms.  Compounding the anticompetitive effect, Defendants' NPCCs force restaurants to charge consumers who buy directly from restaurants, or through a competing Restaurant Platform, *those same inflated prices*.

148.   If restaurants do not raise their prices in response to Defendants' commissions, moreover, Defendants' NPCCs still result in higher prices for consumers who buy from those restaurants in the Direct Takeout and Delivery Market and the Dine-In Market.  Absent Defendants' NPCCs, restaurants would be motivated to encourage consumers to buy directly from them (where restaurants' profit margins are higher), as opposed to ordering through Defendants' platforms (where restaurants are required to pay substantial commissions).  Restaurants could achieve this goal by charging lower prices in the Direct Takeout and Delivery Market and the Dine-In Market than through Defendants' platforms.  Because there is *some* cross-elasticity between these markets, this strategy would likely be successful.  For example, Thanx—a company specializing in consumer engagement—has characterized this strategy as a "powerful" way for restaurants to increase their profitability.  Yet this strategy is foreclosed by Defendants' NPCCs.

149.   In sum, coupled with their exorbitant Restaurant Commission Rates, Defendants' NPCCs prevent restaurants from charging consumers who buy directly from restaurants (or through competing Restaurant Platforms) lower prices, *even though* restaurants *would* charge

lower prices to consumers who buy directly from restaurants (or through competing Restaurant Platforms) but for Defendants' NPCCs.  In short, the NPCCs force consumers to pay higher prices.

150.    The impact of Defendants' NPCCs in the Direct Takeout and Delivery Market and Dine-In Market is not limited to increased prices for consumers.  These NPCCs have insulated Defendants from competition and enabled them to increase their Restaurant Commission Rates with impunity.  These rates are so high that they are driving many restaurants out of business, thereby reducing consumer choice.  As the *New York Times* has reported:

> For Paul Geffner, the growing popularity of food-delivery apps has hurt.  He has run Escape from New York Pizza, a small restaurant chain in the Bay Area, for three decades, relying on delivery orders as a major source of revenue.
>
> After he offered delivery through the apps in 2016, his business teetered.  Two of his five pizzerias, which together had generated annual profits of $50,000 to $100,000, lost as much as $40,000 a year as customers who had ordered directly from Escape From New York switched to the apps.  That forced Mr. Geffner to pay the commissions.
>
> "We saw a direct correlation between the delivery services and the reduction of our income," Mr. Geffner said.  "It was like death by a thousand cuts."

*NPR* provides a similar example:  "With already thin profit margins further diluted by the app fees, Bathwal could not justify keeping his six locations open.  He temporarily shuttered all of his restaurants with hopes of reopening, when he can, on a pared-down menu emphasizing items that are the most affordable to make."

### iii.  Defendants Use Their NPCCs to Control Prices in the Direct Takeout and Delivery Market and Dine-In Market

151.    Although Defendants do not directly participate in the Direct Takeout and Delivery Market or the Dine-In Market, they use their NPCCs to directly restrain and manipulate prices in those markets.

152.     Each Defendant's NPCC forces restaurants that operate in those markets to charge the same price as they charge when they sell meals in the Restaurant Platform Market through Defendants' platforms.  As explained above, these provisions prevent restaurants from competing on price with Defendants.  Thus, once consumers move from the Direct Takeout and Delivery Market and Dine-In Market to Defendants' platforms, restaurants cannot pull those consumers back to the former markets by offering those consumers lower prices.  It is therefore no surprise that the Restaurant Platform Market has, for years, cannibalized sales from both the Direct Takeout and Delivery Market and the Dine-In Market.

153.     Of course, this is precisely the intent of Defendants' NPCCs—to increase the size of the Restaurant Platform Market, and to guard against consumers leaving that market, even if it comes at the cost of harming the Direct Takeout and Delivery Market and the Dine-In Market.

154.     The fact that the Restaurant Platform Market is, for antitrust purposes, a separate market from the Direct Takeout and Delivery Market and the Dine-In Market is not inconsistent with that intent.  There is some cross-elasticity between these markets and the Restaurant Platform Market, and that cross-elasticity is higher (*i.e.*, there is more switching between markets) when, as is the case now, Restaurant Platforms are already charging supracompetitive prices.  Indeed, Defendants' NPCCs are at their most useful to Defendants when they are charging supracompetitive prices to consumers and restaurants.  Under such circumstances, consumers would be, absent the NPCCs, especially willing to switch back to the Direct Takeout and Delivery Market and the Dine-In Market.

155.     In addition to directly restraining prices in the Direct Takeout and Delivery Market and the Dine-In Market, Defendants drive the prices charged by restaurants in those markets.  In

particular, the *amount* that restaurants increase prices in those markets is driven by Defendants, who set the Restaurant Commission Rates.

156.    Accordingly, in tandem with the Restaurant Commission Rates, Defendants' NPCCs both drive and substantially affect the prices in the Direct Takeout and Delivery Market and the Dine-In Market.  The fact that Defendants are able to achieve such results demonstrates that Defendants possess the ability to control prices in both the Direct Takeout and Delivery Market and the Dine-In Market.

### iv.  Defendants' NPCCs Restrict Interbrand Competition in the Direct Takeout and Delivery Market and the Dine-In Market

157.    Defendants' NPCCs are so pervasive that they do far more than inhibit intrabrand competition (*i.e.*, competition for sales of goods from a particular restaurant).  Those NPCCs inhibit *interbrand* competition in the Direct Takeout and Delivery Market and the Dine-In Market.  As explained above, a significant portion of *all* restaurants in the United States are bound by Defendants' NPCCs.  An even higher percentage of restaurants that offer delivery in the United States are bound by Defendants' NPCCs.

158.    Defendants' NPCCs make it more difficult for restaurants bound by those provisions to compete on price in the Direct Takeout and Delivery Market and the Dine-In Market.  As explained above, restaurants bound by Defendants' NPCCs typically need to increase their prices in the Direct Takeout and Delivery Market and the Dine-In Market in order to avoid losing money on each transaction in the Restaurant Platform Market.  But that is not the only way in which Defendants' NPCCs inhibit restaurant pricing in the Direct Takeout and Delivery Market and the Dine-In Market.

159.    Importantly, even if restaurants *do not* raise their prices in response to Defendants' Restaurant Commission Rates, Defendants' NPCCs *still* result in higher prices for consumers who

buy from those restaurants.  This is because, absent the NPCCs, restaurants would compete freely with each other on price in the Direct Takeout and Delivery Market and Dine-In Market, including by offering discounted menu item prices to attract additional consumers.  Defendants' NPCCs discourage those restaurants from offering any discounts in those markets because, if the restaurant reduces its prices to consumers in those markets, then the restaurant would have to also reduce its prices on Defendants' platforms.  For a restaurant that has not already raised its prices in response to Defendants' commissions, this would only compound that restaurant's losses for its sales on Defendants' platforms.

160.    This result—less discounting in the Direct Takeout and Delivery Market and Dine-In Market—is entirely predictable.  As the Department of Justice explained nearly five years ago, "Under an [NPCC] the low price offered on a particular contract becomes not just a one-time opportunity for the firm offering the discount to gain some incremental sales volume, but rather an occasion for across-the-board revenue losses as many of the firm's contract prices are reset." In other words, NPCCs make discounting more expensive, and therefore less attractive, for would-be discounters.

161.    Defendants' NPCCs thus force restaurants to increase their prices in the Direct Takeout and Delivery Market and the Dine-In Market, while also discouraging restaurants from offering discounted menu items in those markets.

162.    Because such a large percentage of restaurants in the Direct Takeout and Delivery Market and the Dine-In Market are bound by Defendants' NPCCs, and therefore encouraged to increase their prices and discouraged from offering discounted menu items, Defendants' NPCCs reduce price competition *between* restaurants in both the Direct Takeout and Delivery Market and the Dine-In Market.  For example, in New York, almost 65% of *all* restaurants are on Grubhub.

These restaurants are forced to increase their prices in the Takeout and Deliver Market and the Dine-In Market or are, in effect, precluded from offering discounts to consumers in those markets.

### v.   The Substantial Anticompetitive Costs of Defendants' NPCCs Outweigh Any Procompetitive Benefits

163.   The anticompetitive costs of Defendants' conduct, as shown, are substantial.  As a direct result of Defendants' conduct, consumers are forced to pay supracompetitive prices for goods from any restaurant that must use Defendants' platforms; consumers and restaurants must use Restaurant Platforms that offer inferior technology and service; and consumers are left with fewer restaurants from which to choose.

164.   Consistent with empirical research from economists regarding NPCCs generally, Defendants' NPCCs harm consumers and competition.  Consumer prices fell, as just one example, when European countries banned online travel agencies from using NPCCs.

165.   These substantial anticompetitive costs outweigh any procompetitive justification. Defendants' NPCCs, for example, do not protect Defendants from free-riding.  With very few exceptions, consumers who use Defendants' platforms do so because the platforms are convenient, not to discover new restaurants and then order directly from those restaurants.  The notion that such consumers would be willing to spend more time than necessary to place an order for takeout or delivery is unreasonable and unsupported.  Doordash's ability to compete with Defendants without such NPCCs is proof that such restrictions are not necessary for Restaurant Platforms to offer consumers the benefits of their platform.

166.   In prohibiting restaurants from charging lower prices to consumers who purchase directly from restaurants in the Direct Takeout and Delivery Market and Dine-In Market, moreover, Defendants' NPCCs directly restrain prices in markets in which Defendants do not even participate.  There can be no procompetitive justification for this type of restraint.

45

167.    In addition, no rationale concerning free-riding can explain why Grubhub and Uber's NPCCs prohibit restaurants from offering lower Restaurant List Prices on competing Restaurant Platforms.

168.    As the *Yale Law Journal* has reported, in scrutinizing provisions that are nearly identical to those imposed by Defendants here, European regulators have repeatedly concluded that the provisions are anticompetitive and have banned them—resulting in lower prices for consumers.  Restaurant consumers in the United States deserve the same result.

## V.    CLASS INJURY AND STANDING

169.    Plaintiffs and each class have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' act unlawful.

170.    Plaintiffs and each class allege that Defendants' anticompetitive conduct has caused them to pay supracompetitive prices.  Such an injury is plainly of the type the antitrust laws were intended to prevent.

171.    Defendants' misconduct has directly caused this injury to Plaintiffs and each class. Plaintiffs and each class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supracompetitive prices.

## VI.    CLASS ALLEGATIONS

172.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of three classes, which may comprise subclasses, to be defined based on discovery.

173.    The first class comprises all persons or entities in the United States who have purchased goods, for takeout from or delivery by the restaurant, directly from a restaurant subject to any Defendant's NPCC (the "Direct Takeout and Delivery Class").

174.    The second class comprises all persons or entities in the United States who have purchased goods, for dining in the restaurant, from a restaurant subject to any Defendant's NPCC (the "Dine-In Class").

175.    The third class comprises all persons or entities in the United States who have purchased goods, through a non-Defendant Restaurant Platform, from a restaurant subject to Grubhub's or Uber's NPCCs (the "Restaurant Platform Class").

176.    These classes exclude (i) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

177.    Plaintiffs reserve the right to amend any of these class definitions if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

178.    The members of each class are so numerous that joinder of all members is impracticable.  The precise number of members of each class is unknown to Plaintiffs at this time, but it is believed to be in the millions.

179.    Defendants have acted on grounds that apply generally to the members of each class, so that final injunctive relief is appropriate respecting each class as a whole.

180.    Common questions of law and fact exist as to all members of each class and predominate over any questions solely affecting individual members of each class.  Such common issues include:

(a) Whether each Defendant has market power in the Restaurant Platform Market;

    (b) Whether each Defendant's NPCC produces substantial anticompetitive effects, without procompetitive justification, in the Restaurant Platform Market, the Direct Takeout and Delivery Market, and the Dine-In Market;

    (c) Whether any procompetitive efficiencies from each Defendant's NPCC could be achieved through less anticompetitive means; and

    (d) Whether, and to what extent, each Defendant's NPCC caused Plaintiffs to suffer antitrust injury.

181.    Plaintiffs' claims are typical of the claims of the other members of each class they seek to represent.  Defendants' practices have targeted and affected all members of each class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

182.    Plaintiffs will continue to fully and adequately protect the interests of the members of each class.  Plaintiffs have retained counsel competent and experienced in antitrust class actions.  Plaintiffs have no interests in conflict with those of any class.

183.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

184.    The prosecution of separate actions by individual members of each class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the classes.

185.    A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

186.    The interests of the members of each class in individually controlling the prosecution of separate actions are theoretical rather than practical.  The classes each have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  As the damages suffered by some of the individual class members may be

relatively small, the expense and burden of individual litigation makes it impossible for members of each class to individually redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

187.    WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that Roche Cyrulnik Freedman LLP and Frank LLP be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to each class.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 1 of the Sherman Act
### With Respect to the Direct Takeout and Delivery Market and the Dine-In Market
### (by the Direct Takeout and Delivery Class and the Dine-In Class)
### (Against Defendants)

188.    Plaintiffs incorporate the allegations above.

189.    At all times throughout the Class Period, Defendants possessed (i) market power in the Restaurant Platform Market in the National Market and the Local Markets, and (ii) market power in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets.

190.    This market power is demonstrated by Defendants' ability to profitably impose supracompetitive pricing on both restaurants and consumers in these markets.

191.    Under section 1 of the Sherman Act, Defendants' NPCCs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

192.    Defendants' NPCCs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Direct Takeout and Delivery Market and the Dine-In Market in the Local Markets without procompetitive justification.

193.    Defendants' NPCCs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and, in the case of Grubhub and Uber, prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

194.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

195.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

196.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

**COUNT II**
**Violations of Section 1 of the Sherman Act**
**With Respect to the Restaurant Platform Market**
**(by the Restaurant Platform Class)**
**(Against Grubhub and Uber)**

197.    Plaintiffs incorporate the allegations above.

198.    At all times throughout the Class Period, Grubhub and Uber possessed market power in the Restaurant Platform Market in both the National Market and the Local Markets.

199.    This market power is demonstrated by Grubhub and Uber's share of the Restaurant Platform Market in these geographic markets, as well as, among other things, their ability to profitably impose supracompetitive pricing on both restaurants and consumers in those markets.

200.    Under section 1 of the Sherman Act, Grubhub and Uber's NPCCs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

201.    Grubhub and Uber's NPCCs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Restaurant Platform Market in both the National Market and Local Markets without procompetitive justification.

202.    Grubhub and Uber's NPCCs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and by prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

203.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

204.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

205.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

**COUNT III**
**Violations of State Antitrust Laws – Agreement in Restraint of Trade**
**With Respect to the Direct Takeout and Delivery Market and the Dine-In Market**
**(by the Direct Takeout and Delivery Class and Dine-In Class)**
**(Against Defendants)**

206.    Plaintiffs incorporate the allegations above.

207.    At all times throughout the Class Period, Defendants possessed (i) market power in the Restaurant Platform Market in the National Market and the Local Markets, and (ii) market power in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets.

208.    Defendants' NPCCs constitute vertical agreements with restaurants in restraint of trade.  These agreements unreasonably restrain trade by producing substantial anticompetitive

effects in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets without procompetitive justification.

209.    Such conduct violates the following state antitrust laws:

a.  Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

b.  Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

c.  D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

d.  Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

e.  740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

f.  Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and

g.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

210.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

211.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

**COUNT IV**
**Violations of State Antitrust Laws – Agreement in Restraint of Trade**
**With Respect to the Restaurant Platform Market**
**(by the Restaurant Platform Class)**
**(Against Grubhub and Uber)**

212.    Plaintiffs incorporate the allegations above.

213.    At all times throughout the Class Period, Grubhub and Uber possessed market power in the Restaurant Platform Market in the National Market and Local Markets; their NPCCs

are anticompetitive agreements that unreasonably restrain trade in those markets; and their anticompetitive conduct has proximately harmed Plaintiffs.

214.    Such conduct violates the following state antitrust laws:

a.    Ala. Code § 6-5-60 *et seq.*, which respect to purchases in Alabama;

b.    Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska;

c.    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

d.    Ark. Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas;

e.    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

f.    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

g.    Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

h.    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii;

i.    740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

j.    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa;

k.    Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas;

l.    Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts;

m.    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine;

n.    Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan;

o.    Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota;

p.    Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Mississippi;

q.    Missouri Stat. § 416.011, *et seq.*, with respect to purchases in Missouri;

r.    Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska;

s.    Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada;

t.   N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire;

u.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico;

v.   N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

w.   N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina;

x.   N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota;

y.   Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon;

z.   P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico;

aa. R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island;

bb. S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota;

cc. Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee;

dd. Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah;

ee. Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont;

ff. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and

gg. Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin.

215.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

216.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

**DEMAND FOR JURY TRIAL**

217.    Plaintiffs respectfully demand a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the classes;

(b) Require Defendants to pay for sending notice to the certified classes;

(c) Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(d) Issue an injunction to enjoin Defendants from continuing to engage in the anticompetitive conduct alleged in this Complaint;

(e) Award compensatory damages to Plaintiffs and the proposed classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.


Dated:  August 19, 2020


By: */s/ Gregory A. Frank*              */s/ Kyle W. Roche*
Gregory A. Frank (GF0531)              Kyle W. Roche
Marvin L. Frank (MF1436)              Edward Normand
Asher Hawkins (AH2333)              Stephen Lagos
FRANK LLP                            ROCHE CYRULNIK FREEDMAN LLP
370 Lexington Avenue, Suite 1706      99 Park Avenue, 19th Floor
New York, New York 10017              New York, NY 10016
Tel: (212) 682-1853                   kyle@rcfllp.com
Fax: (212) 682-1892                   tnormand@rcfllp.com
info@frankllp.com                     slagos@rcfllp.com

                                     *Attorneys for Plaintiffs*

A-75

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARIAM DAVITASHVILI, *et al.*,

                Plaintiffs,

        v.

GRUBHUB INC., *et al.*,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3 / 30 / 2022
```

20-cv-3000 (LAK)
and consolidated case

**MEMORANDUM OPINION**

Appearances:

      Gregory A. Frank
      Marvin L. Frank
      Asher Hawkins
      FRANK LLP

      Kyle W. Roche
      Edward Normand
      Stephen Lagos
      ROCHE CYRULNIK FREEDMAN LLP

      *Attorneys for Plaintiffs*

      Steven C. Sunshine
      Karen M. Lent
      Evan Kreiner
      SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP
      *Attorneys for Defendant Postmates Inc.*

      Derek Ludwin
      Stacey K. Grigsby
      Andrew A. Ruffino
      COVINGTON & BURLING LLP
      *Attorneys for Defendant Uber Technologies, Inc.*

David J. Lender
Eric S. Hochstadt
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendant Grubhub Inc.*

LEWIS A. KAPLAN, *District Judge.*

      This putative class action involves the contractual relationships between restaurants and online platforms for restaurant meals.  The amended complaint alleges that three defendants – Grubhub, Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber" or "Uber Eats"), and Postmates Inc. ("Postmates") (together, "Defendants") – each unlawfully has fixed prices for restaurant meals by entering into restrictive agreements with restaurants that preclude those restaurants from charging lower prices off-platform, *i.e.*, in the "direct" markets for restaurant meals and/or on other restaurant platforms.  Plaintiffs claim that Defendants thus have caused them to pay artificially high prices for restaurant meals.[1]  They seek damages and injunctive relief under Section 1 of the Sherman Act and its state analogues on behalf of themselves and three nationwide classes of others similarly situated.

      Before the Court is Defendants' joint motion to dismiss the amended complaint.  Defendants contend that the contracts at issue do not fix prices in a manner sufficient to state an antitrust claim.  For the following reasons, the motion is denied.

### *Facts*

      The relevant facts alleged in the amended complaint are deemed true for purposes of this motion.  They are summarized as follows:

---

[1]    Am. Compl. (Dkt. 28) ¶¶ 1, 188-216.  All docket citations are to No. 20-cv-3000 (LAK).

A-77

3

*Background*

Defendants operate electronic, internet based meal ordering platforms, which allow customers to order restaurant food online.[2]  They are "two-sided platforms, acting as . . . intermediar[ies] to connect restaurants and consumers."[3]  Along with the rise of the internet, such platforms have become increasingly popular means of buying and selling restaurant food, especially since the early 2010s.[4]  They aggregate the menus of participating restaurants within pick up or delivery range of the user and permit the user to view and compare offerings before placing an order from a single restaurant.[5]  In exchange for their services, restaurant platforms collect commissions and fees on each transaction from both their restaurant and consumer customers.  At issue in this lawsuit is Defendants' practice of imposing contractual "no price competition clauses" ("NPCCs") on listed restaurants.  All three Defendants' NPCCs prevent their restaurant customers from charging lower list prices to consumers who dine in person or who order food takeout or delivery directly from the restaurant.  Grubhub and Uber have more expansive NPCCs, which prevent their restaurant customers from charging lower prices to consumers who purchase their meals on rival restaurant platforms.

The amended complaint pleads four counts of vertical price fixing stemming from these arrangements.  Counts I and III charge Defendants with unlawfully setting minimum prices

---

[2]  *Id.* ¶¶ 25-28.

[3]  *Id.* ¶ 36.

[4]  *Id.* ¶¶ 2, 25.

[5]  *Id.* ¶¶ 25-28.

4

in the local direct markets for restaurant meals (*i.e.*, for dine-in meals and for meals for takeout and delivery coordinated through the restaurant).  Counts II and IV claim that defendants Grubhub and Uber similarly have set unlawful minimum prices throughout the restaurant platform market, both on the national and local levels.  Because restaurant platform commissions force restaurants to raise their list prices to make money – or even break even – on each transaction, Plaintiffs allege that Defendants' NPCCs have caused anticompetitive effects in the relevant markets and harmed Plaintiffs directly by causing them to pay supracompetitive prices for restaurant meals.

*The Parties*

    A.    *Plaintiffs*

        There are eight named plaintiffs in this case.  Each is a natural person who resides in and is a citizen of the State of New York.[6]  Over the relevant period, plaintiffs Mariam Davitashvili, Adam Bensimon, and Mia Sapienza have ordered meals for "takeout, delivery, and dine-in directly from restaurants that sell their goods through Defendants' platforms."[7]  Plaintiffs Phil Eliades and Jonathan Swaby have done the same, but also have ordered "indirectly from such restaurants through Doordash."[8]  Plaintiff John Boisi "has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub and Postmates, and indirectly from

---

[6]    *Id.* ¶¶ 10-17.

[7]    *Id.* ¶¶ 10-12.

[8]    *Id.* ¶¶ 13-14.

such restaurants through Caviar and Doordash."[9]  Plaintiff Nate Obey "has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub, and indirectly from such restaurants through Caviar."[10]  Meanwhile, plaintiff Malik Drewey "has placed orders for takeout and dine-in directly from restaurants that sell their goods through each Defendant's platform, but he has not used any of those platforms."[11]

Plaintiffs purport to represent three classes of similarly-situated consumers.  *First*, the Direct Takeout and Delivery Class, which "comprises all persons or entities in the United States who have purchased goods, for takeout or delivery by the restaurant, directly from a restaurant subject to any Defendant's NPCC."[12]  *Second*, the Dine-In Class which "comprises all persons or entities in the United States who have purchased goods, for dining in the restaurant, from a restaurant subject to any Defendant's NPCC."[13]  *Third*, the Restaurant Platform Class which "comprises all persons or entities in the United States who have purchased goods, through a non-Defendant Restaurant Platform, from a restaurant subject to Grubhub's or Uber's NPCCs."[14]

---

[9]
 *Id.* ¶ 15.

[10]
 *Id.* ¶ 16.

[11]
 *Id.* ¶ 17.

[12]
 *Id.* ¶ 173.

[13]
 *Id.* ¶ 174.

[14]
 *Id.* ¶ 175.

B.      *Defendants*

Defendants Grubhub, Uber, and Postmates are horizontal competitors that operate platforms for restaurant takeout and delivery orders. Each operates throughout the United States.

*The Relevant Markets*

Plaintiffs have pleaded three separate product markets. *First,* they allege a Restaurant Platform Market in which Defendants compete for restaurant meal transactions.[15] In this market, consumers can "search for participating restaurants in a locality and order food for takeout and delivery, through the same platform from those restaurants."[16] *Second,* Plaintiffs allege a Direct Takeout and Delivery Market, in which "a consumer may order directly from a restaurant for takeout or delivery by, for example, calling the restaurant's phone number or by visiting the restaurant's website."[17] *Third,* they allege a Dine-In Market, in which a consumer may order and eat a meal at a restaurant.[18]

In addition, Plaintiffs plead both national and local geographic markets. Plaintiffs' alleged Restaurant Platform Market encompasses platform business throughout the United States. The Direct Takeout and Delivery Market and the Dine-In Market are inherently local because consumers realistically will order food from or visit only a restaurant that is relatively close by.

---

[15]     *Id.* ¶¶ 29, 46.

[16]     Pl. Mem. (Dkt. 40) at 3.

[17]     Am. Compl. ¶ 30.

[18]     *Id.*

7

Plaintiffs allege also that Defendants compete locally in the Restaurant Platform Market, both for "listings from restaurants" and "delivery and takeout orders from consumers."[19]   The local markets include New York City, Los Angeles, Chicago, Dallas-Fort Worth, Houston, Miami, Philadelphia, Atlanta, Boston, Phoenix, and the San Francisco Bay Area.[20]

*Market Shares*

Four restaurant platforms – Doordash and Defendants Grubhub, Uber, and Postmates – account for 98 percent of the market for meals purchased through restaurant platforms in the United States.[21]   As of November 2019, Doordash was the national leader with a market share of 37 percent, while Defendants Grubhub, Uber, and Postmates held respective national market shares of 31 percent, 20 percent, and 10 percent.[22]   Defendants' local market shares vary by region, but Plaintiffs allege that each Defendant is dominant in at least one metropolitan area.  For example, Grubhub holds 67 percent of the restaurant platform market in New York City, Uber holds 55 percent of the market in Miami, and Postmates holds 37 percent of the market in Los Angeles.[23]   In July 2020, it was announced that Uber would acquire Postmates.[24]

---

[19]     *Id.* ¶ 98.

[20]     *Id.* ¶ 99.

[21]     *Id.* ¶¶ 31-32.

[22]     *Id.* ¶ 33.

[23]     *Id.* ¶ 34.

[24]     *Id.* ¶¶ 21, 39.

A-82

8

Plaintiffs offer several explanations for this concentration. Indirect network effects are at work in the restaurant platform markets because "the value that [the restaurant platforms] offer to one side of the platform is a function of the extent of the use of the other side of the platform."[25] In other words, a restaurant platform is more attractive to a given user if it lists many restaurants and more valuable to a given restaurant if it is used by many prospective customers. Indirect network effects thus reinforce the dominant positions of the few platforms that can offer access to the largest networks of restaurants and consumers. This might explain also why the platforms "split their dominance regionally," with one restaurant platform usually dominant in each metropolitan area.[26] Restaurant platforms are also "sticky," meaning consumers – for a variety of reasons, including familiarity and convenience – are unlikely to switch platforms.[27] In addition, as explained below, Plaintiffs allege that Defendants' anticompetitive conduct contributes to their market dominance by preventing restaurants and other restaurant platforms from competing with them on price.

*Commissions and Fees*

In exchange for connecting restaurants to consumers, restaurant platforms charge commissions and fees on both sides of each transaction.[28] *First*, the platforms charge a restaurant commission, which is typically calculated as a certain rate multiplied by the total price of the

---

[25]

  *Id.* ¶ 66.

[26]

  *See id.* ¶ 34 (listing Defendants' respective market shares in each local market).

[27]

  *Id.* ¶¶ 87, 106-107.

[28]

  *Id.* ¶¶ 40-45.

customer's order plus any delivery fee charged by the restaurant.[29]   According to the amended complaint, Defendants typically charge a 30 percent commission rate to restaurants that do not provide their own delivery and a lower rate to restaurants that do provide their own delivery.

*Second*, restaurant platforms charge service fees to the consumer.  Like the restaurant commission, the service fee is generally equal to a rate multiplied by the total list price of the customer's order.  Plaintiffs allege that the service fee is typically between 5 percent and 10 percent, but they concede that in certain cases – including for pick up orders and cases in which the restaurant does its own delivery – no service fee is charged.[30]

*Third*, the platforms generally charge a 5 percent delivery fee to customers in cases where the restaurant uses the platform's delivery services.[31]

Plaintiffs contend that these rates are supracompetitive.   Defendants' current commission rates – at least, when the platform is providing delivery – are "triple what they were in 2004 and almost double what they were in 2015."[32]  Other platforms provide the same services at lower rates.[33]  Plaintiffs point to Defendants' alleged market power and indirect network effects as

---

[29]     *Id.* ¶¶ 41-42.

[30]     *Id.* ¶ 43.

[31]     *Id.* ¶ 44.

[32]     Pl. Mem. at 4; Am. Compl. ¶¶ 109, 112-13, 115, 118.

[33]     Am. Compl. ¶ 110.

the primary economic reasons why Defendants are able to impose rates which, according to one survey, 90 percent of restaurants have deemed subjectively "unreasonable."[34]

*The Alleged Restraints*

At the heart of this dispute is Plaintiffs' allegation that each of these defendants requires each restaurant listed on its platform to enter into a restrictive agreement – an NPCC – which prevents the restaurant from offering the same menu items directly to consumers or, in some cases, on other restaurant platforms at a lower price than the restaurant charges on the defendant's platform.[35] A "narrow" NPCC prohibits the product's sale at a lower price only when the restaurant sells to consumers directly.[36] A "wide" NPCC prohibits restaurants from selling products *anywhere* at a price lower than that charged on the restaurant platform in question. This includes prices for direct sales and on other restaurant platforms.[37]

Postmates imposes a narrow NPCC that requires restaurants that use its platform to maintain "price parity between in-store and online menus."[38] This means that

> "any restaurant that sells goods through Postmates is contractually prohibited from selling those goods at a lower price to consumers who purchase directly from that restaurant, regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal was ordered online, by phone, or in person. The

---

[34]   *Id.* ¶ 115.

[35]   *Id.* ¶¶ 55-56.

[36]   *Id.* ¶ 56.

[37]   *Id.*

[38]   *Id.* ¶ 57.

restaurant may, however, charge a lower price when it sells its goods through a competing platform, such as Doordash."[39]

Grubhub and Uber, however, both impose wide NPCCs that prohibit restaurants from selling meals at lower prices "through any competing restaurant platform" or through direct orders placed by consumers.[40]  Grubhub's NPCC states that

> "[t]he item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service,"[41]

and Uber's NPCC provides that a

> "Merchant may not make any Item available to Customers through the [Uber] Eats App at a price that is higher than the price that Merchant charges in-store for similar Items . . . [nor] at a price higher than the amount Merchant is charging for similar Items through any comparable platform for food delivery services."[42]

Plaintiffs note that DoorDash, the market leader, does not impose an NPCC on restaurants that sell on its platform.  Instead, it allows restaurants to "increase prices on that platform to offset the delivery app's commission fees, without increasing the in-house restaurant list price."[43]

Plaintiffs allege that Defendants' NPCCs are designed to inhibit competition and in fact have significant anticompetitive effects.  Restaurants make very low profit margins, usually

---

[39]  *Id.* ¶ 58.

[40]  *Id.* ¶ 59.

[41]  *Id.* ¶ 60.

[42]  *Id.* ¶ 61.

[43]  *Id.* ¶ 62.

below 15 percent.[44] This means that a restaurant typically must make a high volume of sales to stay afloat. It means also that restaurants cannot realistically forgo listing their menus on Defendants' platforms, even though restaurant commission rates – which can reach up to 30 percent – are likely to swallow most restaurants' profits.

The platforms' reach is hard to overstate. Restaurant platforms now capture 80 percent of online orders for meal delivery.[45] Millions of customers order food through one or more platforms.[46] And because restaurant platforms are "sticky" and many consumers use only one platform, most restaurants contract with multiple platforms in order to reach as many potential customers as possible.[47] Defendants are the second, third, and fourth largest restaurant platforms nationally and each dominates at least one of the local markets. Accordingly, it is exceedingly difficult for restaurants to avoid being bound by Defendants' NPCCs. And once they are so bound, restaurants cannot lower their list prices – either for direct purchases or on platforms that charge lower commissions or fees – in order to offset the costs they incur on Defendants' platforms. Given these pressures, it makes sense that restaurants have been forced to raise prices to counteract Defendants' high commission rates.

---

[44]      *Id.* ¶ 75.

[45]      *Id.* ¶¶ 113.

[46]      *Id.* ¶¶ 78-79, 104.

[47]      *Id.* ¶¶ 85-88, 126.

## *Discussion*

*Legal Standard*

### A.     *Motion to Dismiss*

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to "state a claim to relief that is plausible on its face."[48] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[49] The Court accepts as true all factual allegations made in the complaint, but does not credit "mere conclusory statements" nor "threadbare recitals of the elements of a cause of action."[50] The Court considers also any documents attached to the complaint or incorporated therein by reference.[51]

### B.     *Relevant Antitrust Principles*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."[52]

---

[48]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[49]  *Id.*

[50]  *Id.*

[51]  *DiFolco v. MSNBC Cable L.L.C.*, 662 F.3d 104, 111 (2d Cir. 2010).

[52]  15 U.S.C. § 1.

14

"A violation of Section 1 generally requires a combination or other form of concerted action between two legally distinct entities resulting in an unreasonable restraint on trade."[53]

Combinations, conspiracies and agreements "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" commonly are referred to as price-fixing arrangements.[54]  Agreements between or among competitors are characterized as "horizontal" while those between or among entities at different levels of distribution – e.g., manufacturer and wholesaler or wholesaler and retailer – are referred to as "vertical." Horizontal restraints on competition – notably but not exclusively price fixing – are unlawful *per se*.  Vertical restraints, including resale price restraints, are evaluated according to the rule of reason.[55]  As plaintiffs contend that Defendants' NPCCs are vertical price-fixing arrangements, they come under the rule of reason.  So we come to the question of what is required in order to state a legally sufficient claim.

As a general matter, a private plaintiff bringing a claim under the Sherman Act must "(1) define the relevant market, (2) allege an antitrust injury, and (3) allege conduct in violation of the antitrust laws."[56]  So here Plaintiffs must allege facts which, assuming their truth and drawing

---

[53]    *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006).

[54]    *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 171 n.212 (S.D.N.Y. 2018) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

[55]    *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881 (2007).

[56]    *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (internal citation omitted).

    The qualification relates to the fact that definition of a relevant market typically is unnecessary in a case alleging a *per se* antitrust violation such as horizontal price fixing.

15

from them all reasonable and favorable inferences, would suffice to permit a finding of relevant market or markets and an antitrust injury.  In order to satisfy the requirement of pleading conduct in violation of the antitrust laws, they must allege also the concerted action essential to stating a Sherman Act Section 1 claim, which they obviously have done by alleging Defendants' agreements with restaurants, and that Defendants' conduct otherwise violates the antitrust laws.

### 1.    Market Definition

A plaintiff bringing a claim under the rule of reason must plead facts that plausibly support its proposed definition of the relevant market.[57]  A relevant market has two components: a relevant product and a relevant geographic scope.[58]  The boundaries of the alleged product market must be rationally related to an "analysis of the interchangeability of use or the cross-elasticity of demand."[59]  A geographic market is normally the geographic "area of effective competition," which courts measure "by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."[60]  Market definition is a "deeply fact-

---

[57]  *E.g.*, *In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001) ("[R]equiring market definition . . . in all cases would undermine the presumption of anticompetitive effect in the context of *per se* antitrust violations.") (citing *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000)).

[58]  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018).

[59]  *Concord Assocs.*, 817 F.3d at 52 (citing *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)).

[60]  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal citation omitted).

*Concord Assocs.*, 817 F.3d at 53 (internal citations omitted).

intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market."[61] This Court nonetheless should dismiss Plaintiffs' claims if their proposed market definition is not plausible.[62]

### 2.     Anticompetitive Effects

In rule of reason cases, the legality of a challenged restraint ultimately – *i.e.,* on summary judgment or at trial – is evaluated in accordance with a three-step burden-shifting framework.

> "First, a plaintiff bears the initial burden of demonstrating that a defendant's challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market.' *Capital Imaging,* 996 F.2d at 543. Examples of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing. *See Tops Mkts.,* 142 F.3d at 96; *Capital Imaging,* 996 F.2d at 546–47.

> "If the plaintiff cannot establish anticompetitive effects directly by showing an actual adverse effect on competition as a whole within the relevant market, he or she nevertheless may establish anticompetitive effects indirectly by showing that the defendant has 'sufficient market power to cause an adverse effect on competition.' *Tops Mkts.,* 142 F.3d at 96; *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir. 1995) ("'[W]here the plaintiff is unable to demonstrate [an actual adverse effect on competition,] . . . it must at least establish that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide.' (quoting *Capital Imaging,* 996 F.2d at 546)). Because '[m]arket power is but a "surrogate for detrimental effects,"' *Tops Mkts.,* 142 F.3d at 96 (quoting *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 461, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)), '[a] plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market,' *id.* at 97.

---

[61]   *Todd*, 275 F.3d at 199 (internal citation omitted).

[62]   *See id.* at 200-201.

A-91

17

"Once the plaintiff satisfies its initial burden to prove anticompetitive effects, the burden shifts to the defendant to offer evidence of any procompetitive effects of the restraint at issue. *See Geneva Pharms.*[*Tech. Corp. v. Barr Lab'ys. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)]. If the defendant can provide such proof, then 'the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits offered by defendant[ ] could have been achieved through less restrictive means.' *Id.* (citing *Capital Imaging,* 996 F.2d at 543)."[63]

But at the pleading stage, only the first step of this framework is material, as consideration of alleged procompetitive effects of defendants' actions and the ultimate judgment of whether any procompetitive effects "outweigh" any anticompetitive effects is inappropriate on a motion addressed to the sufficiency of the complaint.[64] As Judge Rakoff aptly has put it when a defendant opposed a motion to dismiss a rule of reason antitrust claim on the basis that its actions had procompetitive benefits:

"Defendant counters that [it] provides many pro-competitive benefits [citation omitted] and also disputes the conclusions that plaintiff purports to draw from the . . . studies [plaintiff cited]. [Citation omitted] Defendant's counter-assertions, while certainly worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss. The Court hence determines that plaintiff has plausibly pleaded adverse effects in the relevant market. Consequently, the Court finds that plaintiff has presented a plausible claim of a vertical conspiracy under Section 1 of the Sherman Act."[65]

---

[63]

*United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

[64]

*See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (quoting *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014)).

[65]

*Meyer v. Kalanick,* 174 F. Supp.2d 817, 828 (S.D.N.Y. 2016).

3.      *Antitrust Standing*

Section 4 of the Clayton Act creates a private cause of action for damages under the antitrust laws, including Section 1 of the Sherman Act.[66] Section provides also for injunctive relief "against threatened loss or damage by a violation of the antitrust laws."[67] A private plaintiff who brings a case under these provisions, in addition to pleading adequately the other elements of his or her claim, must plead constitutional standing under Article III and antitrust standing.[68]

Defendants have not challenged Plaintiffs' Article III standing on this motion to dismiss.  Nor do they argue explicitly that Plaintiffs lack antitrust standing to bring suit.  Nonetheless, because the principles of antitrust standing underlie Defendants' arguments regarding Plaintiffs' purported failure to plead antitrust injury in the relevant markets, the Court will briefly explain the law that governs its analysis.

Courts evaluating antitrust standing must determine that a plaintiff plausibly has alleged (a) injury in fact, (b) antitrust injury, and (c) that he or she is an acceptable plaintiff to pursue the violation, or, in other words, that he or she would be an efficient enforcer of the antitrust laws.[69]

---

[66]     *See* 15 U.S.C. §§ 15(a), 26.

[67]     *See* 15 U.S.C. § 26.

Unlike Section 4, which in general requires a private plaintiff to prove actual loss in order to recover damages, a plaintiff seeking injunctive relief under Section 16 "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 130 (1969).

[68]     *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983).

[69]     *Id.*

In deciding whether the plaintiff has pleaded antitrust injury, the Second Circuit requires that we

> "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury. First, the party asserting that it has been injured by an illegal anticompetitive practice must 'identify[] the practice complained of and the reasons such a practice is or might be anticompetitive.' *Port Dock [& Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007)]. Next, we identify the 'actual injury the plaintiff alleges.' *Id.* This requires us to look to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977). Finally, we 'compar[e]' the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.' *Port Dock*, 507 F.3d at 122. It is not enough for the actual injury to be 'causally linked' to the asserted violation. *Brunswick*, 429 U.S. at 489 . . . . Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.' *Daniel [v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)] (internal quotation marks omitted)."[70]

In addition, the plaintiff must allege plausibly that he or she would be an efficient enforcer of the antitrust laws. On this point we consider

> "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."[71]

"[T]he weight to be given these various factors will necessarily vary with the circumstances of particular cases."[72]

---

[70]      *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

[71]      *Id.* (quoting *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006) (internal citation omitted)).

[72]      *Paycom*, 467 F.3d at 291 (quoting *Daniel*, 428 F.3d at 443).

Finally, in addressing both antitrust injury and whether a plaintiff is an efficient enforcer of the antitrust laws, "a court must analyze whether a plaintiff's alleged injury constitutes injury to the competitive process . . . ."[73] The general rule is that "only those that are participants in the defendants' market can be said to have suffered antitrust injury."[74] This makes intuitive sense. Competitors and consumers have the clearest connection to a given defendant's anticompetitive conduct because they unlawfully may be forced to pay higher prices for the defendant's goods or services, deprived of their own business opportunities, or excluded from the market.   But, as explained in more detail below, others who are injured as a result of anticompetitive conduct may also have standing to sue.[75]

*Sufficiency of Relevant Market Allegations*

Defendants argue that Plaintiffs have failed plausibly to allege the relevant markets. They challenge the distinctions among Plaintiffs' alleged product markets, arguing that they "fail to plausibly suggest that ordering from a restaurant (or a restaurant receiving an order) is not a substitute for ordering the same meal from a restaurant (or a restaurant receiving an order) via Defendants' platforms."[76] This argument is without merit for purposes of this motion.

---

[73]     *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 359 (S.D.N.Y. 2016).

[74]     *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (internal citation omitted).

[75]     *Id.*

[76]     Def. Mem. (Dkt. 38) at 24.

Defendants do not challenge Plaintiffs' proposed distinction between the Takeout and

A-95

21

The Supreme Court recently held that "[o]nly other two-sided platforms can compete with a two-sided platform for transactions."[77]  Even if this did not settle the matter, Plaintiffs have pleaded facts adequately supporting the separate product markets.

Defendants contend that the cross-elasticity "between and among orders placed on platforms and direct delivery" dooms Plaintiffs' proposed market definition.[78]  Plaintiffs correctly point out that Defendants' argument on this point fails to account for the so-called *Cellophane* fallacy.[79]  But perhaps more importantly, the pertinent question is not whether there are any cross-elasticities at all between the separate markets, but whether the cross-elasticity of demand is *sufficient* to require viewing the purportedly separate markets as a single, unified market.[80]  Given the fact-intensive nature of this inquiry, courts, perhaps especially at the pleading stage, look also to "practical indicia" of the relevant market, including "industry or public recognition . . . , the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[81]

---

Delivery Market and the Dine-In Market.  Even if they had, the Court is inclined to agree with Plaintiffs that a meal at a restaurant is not an interchangeable substitute for a takeout or delivery meal that a consumer will eat elsewhere.  *See* Am. Compl. ¶ 30.

[77]  *See Am. Express*, 138 S. Ct. at 2287.

[78]  Def. Mem. at 25.

[79]  Pl. Mem. at 13.

[80]  *See Todd*, 275 F.3d at 201.

[81]  *See Geneva Pharms.*, 386 F.3d at 496 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

These practical indicia support separate treatment for the proposed Restaurant Platform Market for substantially the reasons that Plaintiffs suggest. The amended complaint alleges plausibly that restaurant platforms "provide a service distinct from a restaurant's website or app (*e.g.*, a Domino's pizza app)" first and foremost because they aggregate the offerings of many restaurants in one place.[82] They also provide functionalities that restaurants do not, including search, the ability to write and read reviews, and automated recommendations based on the user's "preferences and other consumer reviews."[83] Restaurant platforms are "especially popular" with urban young professionals, "a distinct group of consumers with distinct preferences."[84] And industry analysts have characterized the Restaurant Platform Market as a separate market, indeed, characterizing it as "an oligopoly and calling for antitrust scrutiny."[85]

Moreover, Defendants' cited cases to the contrary are inapposite. While it indeed may be true that courts "have not hesitated to define separate markets based on how the same product reached the consumer," it does not follow that this Court therefore should decline to find well-pleaded Plaintiffs' alleged separate product markets for restaurant platform services and meals purchased directly from a restaurant. For example, the holding that "print books are an obvious substitute for e-books" in *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*[86] would be

---

[82]     Am. Compl. ¶ 28.

[83]     Pl. Mem. at 4; Am. Compl. ¶¶ 48-50.

[84]     Pl. Mem. at 4; Am. Compl. ¶ 52.

[85]     Am. Compl. ¶ 53.

[86]     985 F. Supp. 2d 612 (S.D.N.Y. 2013).

persuasive if, instead of comparing print books to e-books, the Court had found print books an obvious substitute for online book platforms.

Plaintiffs' allegations of national and local Restaurant Platform Markets also are sufficient. Defendants contend that the national market is implausible because they do not "compete for transactions" on a national basis.[87] But the facts alleged suggest that Defendants do compete nationally, and courts have recognized the existence of national markets even when market participants in some sense operate locally.[88] Defendants allegedly "compete to build a national network of consumers to offer restaurants, and a national network to offer consumers."[89] They also advertise, operate, charge the same commissions to restaurants and consumers, provide the same services on their websites and mobile apps, and impose the same NPCCs throughout the country.[90] They compete also for partnerships with national restaurant chains.[91]

*New York v. Deutsche Telekom AG*[92] is instructive. There the parties agreed on a national market for retail mobile wireless communications services, but disagreed over the existence of separate local markets. The court determined that both geographic markets were present. Although a consumer in one city is unlikely to seek wireless services provided out of another city,

---

[87]    Def. Mem. at 27.

[88]    *See United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966).

[89]    Am. Compl. ¶ 94.

[90]    *Id.* ¶ 95.

[91]    *Id.* ¶ 97.

[92]    439 F. Supp. 3d 179 (S.D.N.Y. 2020).

24

that carriers make decisions and set prices on a national basis is persuasive evidence of a national market that coexists with local markets.[93]

Having concluded that Plaintiffs have alleged sufficiently the relevant product markets, the Court proceeds to consider Plaintiffs' antitrust claims.

*Counts I and III*

Counts I and III allege that Defendants' NPCCs unreasonably restrain trade in the Direct Takeout and Delivery Market and the Dine-In Market in violation of Section 1 of the Sherman Act (Count I) and its state antitrust law analogues[94] (Count III).

A.    *Anticompetitive Effects*

Plaintiffs have alleged plausibly facts that, if proven, would be direct evidence of anticompetitive effects in the direct markets resulting from Defendants' NPCCs. This evidence is especially strong in regard to supracompetitive prices.[95]

---

[93]

*Id.* at 205.

[94]

Am. Compl. ¶ 209 (alleging Defendants' conduct violates Ariz Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona; Cal Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California; D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia; Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida; 740 Ill. Comp. Stat. 10/1[,] *et seq.*, with respect to purchases in Illinois; Mass Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York).

[95]

*Am. Express*, 838 F.3d at 194.

Plaintiffs analogize Defendants' conduct to that at issue in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,[96] in which Leegin, a leather goods manufacturer, imposed minimum resale prices on retailers that sold its products. The Supreme Court held that this type of arrangement is subject to the rule of reason and offered certain considerations that may render vertical price restraints anticompetitive. They include whether the restraints are imposed by the retailer rather than by the manufacturer, whether the retailer's market power is such that manufacturers cannot avoid them by "sell[ing] their goods through rival retailers," whether the restraint would prevent rival retailers "with better distribution systems and lower cost structures . . . from charging lower prices," and whether a large proportion of manufacturers is bound by the restraint or restraints.[97]

Although Plaintiffs' comparison of retailers to restaurant platforms and manufacturers to restaurants is somewhat strained, the facts Plaintiffs allege in support of their *Leegin* analysis paint a plausible picture of the anticompetitive effects allegedly caused by Defendants' NPCCs. The NPCCs were propounded by Defendants,[98] who are not retailers but nonetheless consolidate and offer to their customers products from wide arrays of restaurants. Defendants therefore allegedly hold power over restaurants comparable to that which a retailer might wield over a manufacturer in the sense that both Defendants and a theoretical retailer serve as conduits through which the restaurant or manufacturer can offer its goods to consumers. The amended complaint also alleges plausibly that restaurants cannot feasibly avoid doing business with

---

[96]     551 U.S. 877 (2007).

[97]     *Id.* at 892-94, 897-99.

[98]     Am. Compl. ¶¶ 55-61.

Defendants because restaurants need access to the platforms' customers – many of whom use only one platform due to platform "stickiness" – in order to generate sufficient sales to make up for their low margins.[99]  The NPCCs explicitly prevent restaurants from selling their goods at lower prices through "distribution systems with lower cost structures," *i.e.*, in the direct markets, where costs are lower because no commission rates are added to the list prices of restaurant meals.[100]  And Plaintiffs have pleaded facts supporting the proposition that "one or more Defendants' NPCCs restrain[s] more than half of the Direct Markets."[101]

All of this, together with Plaintiffs' well-pleaded allegation that Defendants' commission rates match or exceed most restaurants' profit margins, supports the reasonable inference that restaurants – being foreclosed from lowering prices in the direct markets to attract sales – have had no choice but to raise prices in both the platform and direct markets.  Plaintiffs' anecdotal and survey evidence permits an inference or conclusion that restaurant owners have done just that.[102]

---

[99]     *Id.* ¶¶ 75-80, 85-86.

[100]     *Id.* ¶¶ 140-41.

[101]     Pl. Mem. at 23; *see* Am. Compl. ¶¶ 82-83.

[102]     *See, e.g.*, Am. Compl. ¶¶ 142 ("As one Colorado restaurant owner explained, the '[c]ommissions are too high to maintain a profit,' so restaurants are forced to either raise prices to maintain a profit or lose money on delivery orders."); 144 ("[I]n 2019 the New York City Hospitality Alliance found that 64.1 [percent] of restaurants either raised menu prices or considered raising menu prices to offset fees from Grubhub."); 145 ("In Milwaukee, 'Alexa Afaro of the Filipino restaurant and food truck Meat on the Street said they've had to raise prices to help off set some of the additional costs of delivery commissions.'").

A-101

27

B.      *Antitrust Standing*

In order to bring their claims under Counts I and III, Plaintiffs must plead facts that allege plausibly that the direct classes have sustained antitrust injury and that they are acceptable plaintiffs to pursue the violation.[103]  Defendants contend that Plaintiffs have not adequately pleaded antitrust injury on behalf of the direct classes because any injury they suffered by purchasing meals at supracompetitive prices in the direct markets cannot be traced to Defendants' conduct in the Restaurant Platform Market.  According to Defendants, this is fatal because "a challenged restraint must harm competition in a market in which defendants compete."[104]  But in *Blue Shield of Virginia v. McCready*,[105] the Supreme Court held that the antitrust laws protect "parties whose injuries are 'inextricably intertwined' with the injuries of market participants."[106]

The *McCready* case arose from an alleged conspiracy entered into by Blue Shield and an association of psychiatrists to make psychologists ineligible for compensation for the provision of psychotherapy under Blue Shield's health insurance plans.  Plaintiff, an individual who was covered by Blue Shield health insurance, sued after her requests that Blue Shield reimburse her for a psychologist's services were denied.  The district court granted defendants' motion to dismiss because, in its view, McCready's injury "was to[o] indirect and remote to be considered 'antitrust

---

[103]

*AGC*, 459 U.S. at 535 n.31.

[104]

Def. Mem. at 10 (citing *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003)).

[105]

457 U.S. 465 (1982).

[106]

*Aluminum*, 833 F.3d at 158 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999)).

injury.'"[107]   The Court of Appeals reversed and the Supreme Court affirmed, holding that the plaintiff had antitrust standing because, despite being neither a competitor nor a direct customer of Blue Shield or its coconspirators (her employer purchased the insurance coverage on the group market, and she did not participate in the market for psychiatric services), she sustained antitrust injury when she was forced to pay for psychotherapy that would have been reimbursable absent defendants' anticompetitive conduct.[108]

The Court emphasized that the plain language and policy underlying Section 4 of the Clayton Act made clear that the statute "provides a remedy to '[a]ny person' injured 'by reason of' anything prohibited by the antitrust laws."[109]   Section 4 nonetheless may not apply in cases that present the danger of "duplicative recovery" or when the injury is "too remote" to be proximately caused by the violation at issue.   But the Court found no potential for duplicative recovery in McCready's case because she already had paid the psychologist, and her injury was not too remote because it was "clearly foreseeable" to the alleged conspirators and, in fact, was "a necessary step in effecting the ends of the alleged illegal conspiracy."[110]   McCready's alleged injury therefore was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," and cognizable under the antitrust laws.[111]

---

[107]     *McCready*, 457 U.S. at 470-71 (internal citation omitted).

[108]     *Id.* at 483-84.

[109]     *Id.* at 484-85.

[110]     *Id.* at 479.

[111]     *Id.* at 484.

The Second Circuit has applied and reaffirmed the *McCready* rule in various cases. In *Crimpers Promotions Inc. v. Home Box Office, Inc.*,[112] the Second Circuit held that an organizer who claimed the defendant coordinated a boycott of its trade shows in order to prevent the defendant's suppliers and competitors from meeting and transacting business suffered antitrust injury. The Court noted that, like Blue Shield and the organization of psychiatrists harmed McCready in order to harm the psychologists, HBO destroyed plaintiff's trade show as a "means to eliminate [its] competition."[113] And in *In re Aluminum Antitrust Litigation*,[114] the Second Circuit agreed that "the thrust of *McCready* is that the plaintiff was a participant in 'the very market directly distorted by the antitrust violation.'"[115] The "upshot" is that "sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."[116]

The amended complaint alleges plausibly that the direct classes' injuries in the direct markets similarly are "inextricably intertwined" with Defendants' allegedly unlawful anticompetitive conduct in the Restaurant Platform Market. Plaintiffs plead that Defendants' NPCCs were designed to restrict competition that could result from restaurants offering lower prices

---

[112]    724 F.2d 290 (2d Cir. 1983).

[113]    *Id.* at 292.

[114]    833 F.3d 151 (2d Cir. 2016).

[115]    *Id.* at 160 (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995)).

[116]    *Id.* at 161.

in the direct markets. Defendants allegedly force consumers to pay supracompetitive prices in the direct markets as a "means to eliminate competition" that would threaten their business.[117]

Thus, the Court holds that the direct classes have adequately alleged facts that support their claims against Defendants. They plausibly have alleged antitrust injury under the Second Circuit's three-step analysis.[118] They identify Defendants' imposition of NPCCs as vertical restraints of trade in violation of the Sherman Act, and they allege actual injury in the form of supracompetitive prices. This injury is "of the type the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful."[119] The Court holds also that the direct classes would be efficient enforcers of the antitrust laws. The injury they sustained by paying supracompetitive prices was direct. Their interest in obtaining damages and/or injunctive relief against Defendants' anticompetitive practices likely would motivate them to pursue enforcement. Their alleged injury is not impermissibly speculative, and there is no danger of duplicative recoveries to direct and indirect victims, as Plaintiffs are the direct victims of the alleged restraint and have already paid for their meals.

---

[117]    *Crimpers*, 724 F.2d at 292.

[118]    *Gatt*, 711 F.3d at 76.

[119]    *Id.* (quoting *Daniel*, 428 F.3d at 438).

A-105

31

*Counts II and IV*

On behalf of the Restaurant Platform Class, Plaintiffs allege that defendants Grubub and Uber's NPCCs unreasonably restrain trade in the Restaurant Platform Market in violation of Section 1 of the Sherman Act (Count II) and its state antitrust law analogues[120] (Count IV).

---

[120] Am. Compl. ¶ 214 (alleging Defendants' conduct violates Ala. Code § 6-5-60[,] *et seq.*, which [*sic*] respect to purchases in Alabama; Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska; Ariz Rev. Stat §§ 44-1401, *et seq.*, with respect to purchases in Arizona; Ark Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas; Cal Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California; D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia; Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida; Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii; 740 Ill. Comp. Stat. 10/1[,] *et seq.*, with respect to purchases in Illinois; Iowa Code §§ 553[,] *et seq.*, with respect to purchases made in Iowa; Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas; Mass Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine; Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan; Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota; Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Missouri; Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska; Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada; N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire; N.M. Stat. Ann. §§ 57-A-A, *et seq.*, with respect to purchases in New Mexico; N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York; N.C. Gen Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina; N.D. Cent. Code §§51-08.1, *et seq.*, with respect to purchases in North Dakota; Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon; P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico; R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island; S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota; Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee; Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah; Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont; W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin).

A.     *Anticompetitive Effects*

We begin by examining Plaintiffs' allegations of anticompetitive effects in the Restaurant Platform Market stemming from Grubhub and Uber's "wide" NPCCs, which set minimum prices *anywhere* restaurants sell meals, including on other restaurant platforms. The Court is persuaded by Plaintiffs' contention that the amended complaint sufficiently pleads direct evidence of anticompetitive effects in the platform market. Because this is a two-sided transaction market, Plaintiffs must allege anticompetitive effects resulting from the challenged restraint both for the Defendants' consumer and restaurant customers.[121]

The amended complaint alleges plausibly that Grubhub and Uber's NPCCs create supracompetitive prices for consumers. The distinction here is between restaurant list prices and platform commissions. Wide NPCCs prevent restaurants from offering lower list prices on other platforms. Because these list prices allegedly are "a key (and, in some cases, the only) component of the end-price paid by customers for goods ordered through Restaurant Platforms,"[122] it is plausible that Grubhub and Uber's conduct prevents restaurants from charging lower prices through less expensive channels of distribution.[123] It is reasonable to infer that the list prices consumers pay for platform orders are supracompetitive.[124]

---

[121]       *See Am. Express*, 138 S. Ct. at 2287.

[122]       Am. Compl. ¶¶ 59-61.

[123]       *See Leegin*, 551 U.S. at 893.

[124]       *See id.* ¶ 130.

33

Defendants' papers understandably highlight competition by other restaurant platforms. But despite challenges by new entrants and Doordash's position as the largest platform in the national market, Grubhub and Uber are alleged to have continued to raise their commission rates over time. According to its SEC filings, Grubhub's commission rate increased 156 percent between 2014 and 2019.[125] Plaintiffs allege that both Grubhub and Uber make profit margins of between 40 percent and 80 percent, depending on whether or not the restaurant provides its own delivery.[126] The Court does not decide whether Defendants have raised their rates and become more profitable because of improved services to customers or because of their alleged anticompetitive conduct. At the pleading stage, courts "may not pick and choose among plausible explanations" for these effects.[127]

In addition to supracompetitive prices, Plaintiffs allege plausibly that consumer choice has decreased due to Grubhub and Uber's NPCCs. High restaurant commission rates – which "flow" from the NPCCs – allegedly make it impossible for restaurants to "offer lower-margin items through Defendants' platforms."[128] Plaintiffs plead also that these restraints shield Grubhub and

---

[125]     *Id.* ¶ 118.

[126]     *Id.* ¶¶ 120-21.

[127]     *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 669-72 (S.D.N.Y. 2016).

[128]     Am. Compl. ¶ 139.

Uber from competitive pressures to improve their technology[129] and offer quality customer service.[130]

Plaintiffs plead facts that support their claim that these anticompetitive effects are felt throughout the relevant markets. Because the NPCCs allegedly bind all restaurants that list their menus on Grubhub and Uber regardless of what volume of transactions they do on each platform, the relevant metric through which to assess the agreements' impact is how many restaurants in each market are listed on the platforms. Plaintiffs plead ample facts suggesting that very large numbers of restaurants are listed on Grubhub and Uber, at both the national and local levels. "[A]pproximately 77 [percent] of all restaurants in the United States that offer delivery do so through Grubhub, and more than a quarter . . . do so through Uber and Postmates."[131] "[M]ore than half of the restaurants in each Local Market . . . are on Grubhub."[132] And for the local markets for which Uber data is available, the lowest percentage of total restaurants on Uber is 19 percent in Los Angeles, and in San Francisco it reaches 93 percent.[133] Plaintiffs contend that these percentages

---

[129]      *Id.* ¶ 135.

[130]      *Id.* ¶¶ 137-38. Plaintiffs allege also that Grubhub and Uber provide poor service to restaurants. *Id.* ¶ 136.

[131]      *Id.* ¶ 81.

[132]      *Id.* ¶ 82.

[133]      *Id.*

would be even higher in a sample of restaurants that included only restaurants that list their products on restaurant platforms.[134]

Plaintiffs also plead direct evidence of harm to restaurants in the form of supracompetitive prices. For much the same reasons as described above, it is plausible that Grubhub and Uber's NPCCs both discourage rival restaurant platforms from offering lower commissions and allow Grubhub and Uber cover to raise their own rates. And because of indirect network effects, platform "stickiness," and the restaurants' need to access as many potential customers as possible in order to stay in business, it is reasonable to infer that restaurants have no choice but to accept Grubhub and Uber's NPCCs.

B.      *Antitrust Standing*

Defendants have not challenged Plaintiffs' antitrust standing to bring suit on behalf of the Restaurant Platform Class against Grubhub and Uber on Counts II and IV. But the Court addresses the issue for the sake of completeness. Plaintiffs who have purchased meals from restaurant platforms in the relevant markets are alleged to have suffered injury in fact and antitrust injury because they paid supracompetitive prices – an injury "of the type the antitrust laws were intended to prevent and that flows from" defendants' unlawful acts[135] – due to Grubhub and Uber's unlawful restraints. The amended complaint alleges plausibly also that Plaintiffs are likely to be efficient enforcers of the antitrust laws because they suffered direct pecuniary injury that will

---

[134]
      *Id.*

[135]
      *Gatt*, 711 F.3d at 76 (quoting *Daniel*, 428 F.3d at 438).

motivate them "to vindicate the public interest in antitrust enforcement,"[136] their injury is concrete rather than speculative, and Plaintiffs' status as direct victims of the unlawful restraint who have already paid for the products at issue would likely mitigate any potential for duplicative recoveries.

The Court, having concluded that Plaintiffs plausibly have alleged claims under Counts II and IV, considers Defendants' arguments in favor of dismissing Plaintiffs' state law claims under Counts III and IV.

*State Law Antitrust Claims*

In Counts III and IV, Plaintiffs allege state law antitrust violations under the laws of 32 states and U.S. territories.[137] Defendants contend that these claims should be dismissed because Plaintiffs have failed to state a claim under the Sherman Act, their "pleading is completely devoid of any allegations concerning *26 of the jurisdictions* under whose laws they purport to sue," and Plaintiffs "have not sufficiently alleged that they can bring a claim in their individual capacities for violation of any of the state laws listed in Counts III and IV."[138]

Defendants' first argument fails because the Court holds that Plaintiffs have plausibly alleged their federal claims. And Defendants' additional arguments misapprehend the law. The amended complaint alleges unlawful activity in every relevant jurisdiction, and indeed throughout

---

[136]

*Id.*

[137]

Am. Compl. ¶¶ 209, 214.

[138]

Def. Mem. at 27-29.

the country.[139] "[W]hether a plaintiff can bring a class action under the state laws of multiple states is a [class certification] question . . . not a question of standing . . . ."[140] It therefore does not affect the outcome of this motion that Plaintiffs have alleged only the purchase of restaurant meals in New York.[141] The Court concludes that Plaintiffs' state law claims survive the motion to dismiss.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 37) is denied in its entirety.

SO ORDERED.

Dated: March 30, 2022

_____
Lewis A. Kaplan
United States District Judge

---

[139]  Am. Compl. ¶¶ 31-34.

[140]  *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018).

[141]  The Court accepts Plaintiffs' contention that it can be reasonably inferred from the amended complaint that Plaintiffs purchased meals "in at least New York," given they all reside in that state. *See* Pl. Mem. at 34.

A-112

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARIAM DAVITASHVILI, *et al.*, | No. 1:20-cv-03000-LAK |
| Plaintiffs, | |
| v. | **ECF Case** |
| GRUBHUB INC., *et al.*, | **Electronically filed** |
| Defendants. | |

## DECLARATION OF THOMAS J. KOREIS IN SUPPORT OF
## DEFENDANT GRUBHUB INC.'S MOTION TO COMPEL ARBITRATION OF
## <u>CERTAIN NAMED PLAINTIFFS' CLAIMS</u>

I, Thomas J. Koreis, declare the following:

1.      I have personal knowledge of the facts set forth in this declaration, or I have knowledge of such facts based on my review and knowledge of the business records and files of Defendant Grubhub Inc. ("Grubhub"), and could testify to the same if called as a witness in this matter.  I make this declaration in support of Grubhub's Motion to Compel Arbitration of Certain Named Plaintiffs' Claims, dated August 26, 2022.

2.      I am currently the Senior Director of Pricing for Grubhub Inc.  Grubhub Inc. is a wholly owned subsidiary of Just Eat Takeaway.com N.V.

3.      Grubhub is an online and mobile platform for restaurant pickup and delivery orders.  Through its website and mobile application, Grubhub connects its customers to over 320,000 restaurants.

4.      In August 2013, Grubhub merged with Seamless North America LLC ("Seamless"), another online and mobile platform for restaurant pickup and delivery orders.  In or around October 2014, the Seamless Terms of Use were integrated into Grubhub's Terms of Use and since then, Grubhub's Terms of Use have governed all orders placed on both Seamless and Grubhub.

5.      I reviewed Grubhub's transactional records and it shows that Mariam Davitashvili, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, and Nathan Obey have each opened an account with either Grubhub or Seamless.

6.      Each of these plaintiffs opened their Grubhub or Seamless account prior to filing this case against Grubhub on April 13, 2020.

7.      Each of these plaintiffs placed orders on Grubhub or Seamless prior to filing this case on April 13, 2020.

8.      The Terms of Use in effect at the time the case was filed included an arbitration provision and a class action waiver. Attached hereto as **Exhibit A** is a true and correct copy of Grubhub's Terms of Use dated January 1, 2020.

9.      Before this case was filed and during the pendency of the litigation, Grubhub has published its Terms of Use on its website at https://www.grubhub.com/legal/terms-of-use.  The Terms of Use govern Grubhub's relationship with all customers.

10.     Grubhub requires customers, including plaintiffs, to agree to its Terms of Use each time the customer places a pick-up or delivery order.  Screenshots depicting the Grubhub checkout page are attached hereto as **Exhibit B** (mobile application) and **Exhibit C** (website).  The language "[b]y placing your order, you agree to Grubhub's terms of use" appears immediately below the checkout button, and on the mobile application, is visible at all times on the checkout page, regardless of where a customer scrolls on the page.  The language also indicates when the Terms of Use were last updated.  In addition, on both the mobile application and website, the phrase "terms of use" has been hyperlinked to the full text of the Terms of Use so that the customer could readily access and review the Terms of Use before clicking the button to place their order.

11.     Grubhub periodically updates its Terms of Use.  A copy of Grubhub's current Terms of Use, adopted on December 14, 2021, is attached hereto as **Exhibit D**.  It provides that the "Updated Terms will govern any disputes between you and Grubhub, even if the dispute arises or involves facts dated before the 'Effective' date of the Updated Terms."

12.     Grubhub has a pop-up alerting customers to the updated Terms of Use. The pop-up on https://www.grubhub.com/legal/terms-of-use, attached hereto as **Exhibit E** (website) and **Exhibit F** (mobile web), directs customers to click either "Got it" or to close the pop-up in order to proceed to the Terms of Use page.  The popup is still active today for any first time visitor to

the site.  In addition, Grubhub emailed customers, including each plaintiff, to inform them of the updated Terms of Use.  A true and correct copy of the email sent to customers to inform them of the updated terms is attached hereto as **Exhibit G**.  It explicitly states that Grubhub "made changes to . . . our dispute resolution and arbitration agreement, which explains how legal disputes are handled."

13.    Each of these plaintiffs have placed orders on Grubhub since the Terms of Use were updated on December 14, 2021.  The plaintiffs each placed orders on the following dates:

- **Mariam Davitashvili:** August 24, 2022
- **Adam Bensimon:** March 12, 2022
- **Philip Eliades:** August 23, 2022
- **Jonathan Swaby:** May 9, 2022
- **John Boisi:** August 22, 2022
- **Nathan Obey:** August 23, 2022

14.    The Grubhub Terms of Use include an arbitration agreement and class action waiver.  The Terms of Use contain the following advisory, in all capital letters, on the first page, informing customers that the Terms of Use contain a binding arbitration provision:

> IMPORTANT: PLEASE REVIEW THE "DISPUTE RESOLUTION" SECTION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH GRUBHUB, NO MATTER WHEN ARISING OR ASSERTED, THROUGH BINDING INDIVIDUAL ARBITRATION. YOU ACKNOWLEDGE AND AGREE THAT YOU AND GRUBHUB EACH WAIVE THE RIGHT TO A TRIAL BY JURY. IN ARBITRATION, THERE IS NO JUDGE OR JURY AND THERE IS MORE CIRCUMSCRIBED DISCOVERY AND APPELLATE REVIEW THAN THERE WOULD BE IN COURT. YOU ALSO WAIVE YOUR RIGHT TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING AGAINST GRUBHUB, WHETHER NOW PENDING OR FILED IN THE FUTURE. THERE ARE PROPOSED CLASS ACTIONS OR REPRESENTATIVE ACTION PROCEEDINGS PENDING AGAINST GRUBHUB, AND THIS AGREEMENT APPLIES TO THEM UNLESS YOU OPT OUT AS DESCRIBED IN THE "DISPUTE RESOLUTION" SECTION BELOW.

The Dispute Resolution Section of the Terms of Use, which itself appears with an enlarged heading in bold and all capitals, begins with the following advisory in all capital letters:

> **PLEASE READ THIS "DISPUTE RESOLUTION" SECTION CAREFULLY. IT LIMITS THE WAYS YOU CAN SEEK RELIEF FROM GRUBHUB AND REQUIRES YOU TO ARBITRATE DISPUTES ON AN INDIVIDUAL BASIS.**

The arbitration provision is as follows:

> II. Mutual Arbitration Agreement. You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, or any other dispute with Grubhub, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a "Dispute") shall be submitted exclusively to binding arbitration. Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the termination of this Agreement. This Mutual Arbitration Agreement is intended to be broadly interpreted.

Immediately following the arbitration provision appears the following language, in all capital letters, which further explains the import of binding arbitration:

> ARBITRATION MEANS THAT AN ARBITRATOR AND NOT A JUDGE OR JURY WILL DECIDE THE DISPUTE. RIGHTS TO PREHEARING EXCHANGE OF INFORMATION AND APPEALS MAY BE LIMITED IN ARBITRATION. YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU AND GRUBHUB ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY TO THE MAXIMUM EXTENT PERMITTED BY LAW.

The class action waiver provision also appears in all capital letters:

> YOU ACKNOWLEDGE AND AGREE THAT, TO THE MAXIMUM EXTENT ALLOWED BY LAW, EXCEPT AS SET OUT IN SECTION VII BELOW, THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE ARBITRATED OR LITIGATED ON A CLASS, JOINT, COLLECTIVE OR CONSOLIDATED BASIS OR IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OR AS A PRIVATE ATTORNEY GENERAL OR

FOR PUBLIC INJUNCTIVE RELIEF. UNLESS BOTH YOU AND GRUBHUB OTHERWISE AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS (EXCEPT AS SET OUT IN SECTION VII BELOW), AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF ANY CLASS, JOINT, COLLECTIVE OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY AWARD RELIEF (INCLUDING ANY DECLARATORY OR INJUNCTIVE RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO RESOLVE AN INDIVIDUAL PARTY'S CLAIM. THE ARBITRATOR MAY NOT AWARD RELIEF FOR OR AGAINST ANYONE WHO IS NOT A PARTY TO THE PROCEEDING.

Grubhub's Terms of Use provide users with the opportunity to opt out of the arbitration agreement:

X. Right to Opt-Out of Arbitration.  Grubhub's updates to this Agreement do not provide you with a new opportunity to opt out of the Mutual Arbitration Agreement if you previously agreed to an Agreement and did not validly opt out of arbitration. Grubhub will continue to honor any valid opt outs if you opted out of the Arbitration Agreement in a prior version of the Agreement. If you create a Grubhub account for the first time on or after December 14, 2021, you may opt out of this Mutual Arbitration Agreement. To opt out, you must notify Grubhub in writing no later than 30 days after first becoming subject to this Mutual Arbitration Agreement. Your notice must include your name and address, the email address you currently use to access your Grubhub Account (if you have one), and a clear statement that you want to opt out of this Mutual Arbitration Agreement. You must send your opt-out notice to: disputeresolution@grubhub.com. If you opt out of this Arbitration Agreement, all other parts of this Agreement will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may have entered into with Grubhub or may enter into in the future with Grubhub.

15.    None of these plaintiffs opted out of the arbitration agreement.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct.

EXECUTED this 26 day of August 2022, at Lake Forest Park, Washington.

Thomas J. Koreis

6

# EXHIBIT B



# EXHIBIT C

A-122

GRUBHUB
2
Review and place delivery order
Review address, payments, and tip to complete your purchase
Your order settings
Delivery, ASAP
Delivered in 50–60 mins
34 Plaza St W Brooklyn, NY 11238 Change
Delivery instructions
Contact-free delivery: On
Drop-off location: Front door of my house/apartment unit
Notification: Text me
Change
Notes for the driver
Add special instructions for a smooth delivery (e.g. Don't ring the doorbell)
Payment information
+ Pay with a gift card
+ Add a promo code
Credit card
PayPal™
Card number
Expires on
MM/YY
Security code
Postal code
Save credit card
Add a tip for your driver
15%
20%
25%
30%
Custom tip
Amount
Donate the change
Donate $0.68 to Grubhub Community Fund. By checking this box you agree to the Donate the Change Terms of Use. Learn more
Place your delivery order
By placing your order, you agree to Grubhub's terms of use and privacy policy (both UPDATED on 12/14/2021).
Invite friends and order together
Your order from
Olde Brooklyn Bagel Shoppe
1 Coffee $2.50
Large, Half and Half
1 Fugetaboutit Sandwich $8.99
Rye Bread
Items subtotal $11.49
Delivery fee $0.00
Service fee $1.00
Sales tax $1.11
Tip $2.72
Total $16.32
Modify your order
TOTAL $16.32

A-123

# EXHIBIT D

Terms Of Use

**Effective: December 14, 2021**

**Welcome! We're so happy you're here, and we can't wait to deliver you food happiness, but before you use our Platform, please read these Terms of Use (the "Agreement") carefully.**

Grubhub Holdings Inc. and its subsidiaries and affiliates ("Grubhub," "we," "our," or "us") own and operate certain websites, including related subdomains; our mobile, tablet and other smart device applications; application program interfaces; in-store kiosks or other online services; other tools, technology and programs (collectively, the "Platform") and all associated services (collectively, the "Services"); in each case, that reference and incorporate this Agreement. This Agreement does not cover or address certain end user services provided by our affiliate SCVNGR, Inc. d/b/a LevelUp ("LevelUp") on behalf of its merchant clients; please see the LevelUp User Terms of Service for more information.

This Agreement constitutes a contract between you and us that governs your access and use of the Platform and Services. What does that mean? It means that by accessing and/or using the Platform or our Services, or by clicking a button or checking a box marked "I Agree" (or something similar), you agree to all the terms and conditions of this Agreement. If you do not agree, do not access and/or use the Platform or Services. As used in this Agreement, "you" means any visitor, user, or other person who accesses our Platform or Services, whether or not such person registered for an Account (as defined below). Unless otherwise agreed by Grubhub in a separate written agreement with you or your authorized representative, the Platform is made available solely for your personal, non-commercial use.

IMPORTANT: PLEASE REVIEW THE "DISPUTE RESOLUTION" SECTION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH GRUBHUB, NO MATTER WHEN ARISING OR ASSERTED, THROUGH BINDING INDIVIDUAL ARBITRATION. YOU ACKNOWLEDGE AND AGREE THAT YOU AND GRUBHUB EACH WAIVE THE RIGHT TO A TRIAL BY JURY. IN ARBITRATION, THERE IS NO JUDGE OR JURY AND THERE IS MORE CIRCUMSCRIBED DISCOVERY AND APPELLATE REVIEW THAN THERE WOULD BE IN COURT. YOU ALSO WAIVE YOUR RIGHT TO PARTICIPATE AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING AGAINST GRUBHUB, WHETHER NOW PENDING OR FILED IN THE FUTURE. THERE ARE PROPOSED CLASS ACTIONS OR REPRESENTATIVE ACTION PROCEEDINGS PENDING AGAINST GRUBHUB, AND THIS AGREEMENT APPLIES TO THEM UNLESS YOU OPT OUT AS DESCRIBED IN THE "DISPUTE RESOLUTION" SECTION BELOW. BY ENTERING THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTOOD, AND AGREE TO BE BOUND BY, ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.

## II.    ABOUT GRUBHUB

Grubhub is a virtual marketplace Platform that connects hungry diners with third-party service providers, including local merchants and independent delivery service providers. You may order food through the Platform to be delivered from particular merchants, including their authorized licensees and franchisees, or other purveyors of food in cities throughout the United States and other territories where Grubhub provides such Services (collectively, the "Merchants").

Grubhub is not a restaurant or food preparation entity. The Merchants available on our Platform operate independently of Grubhub. Merchants are required to comply with federal, state, and local laws, rules, regulations, and standards pertaining to the preparation, sale, and marketing of food, including, without limitation, food preparation and safety and menu disclosure. Grubhub is not liable or responsible for Merchants' food preparation or safety and does not verify their compliance with all applicable laws. In addition, Grubhub does not guarantee the quality of what the Merchants sell, nor does it guarantee the services provided by them, including, without limitation, in those cases where they provide the delivery services or engage another third-party delivery service. Grubhub does not independently verify, and is not liable for, representations made by Merchants regarding their food, including, without limitation, any menu- or Merchant-level descriptors, disclosures, photographs or images displayed through the Platform reflecting the food prepared by the Merchants and/or delivered by Delivery Partners (defined below). By accessing the Platform, you agree and acknowledge that Merchants are solely responsible for, and Grubhub shall not be liable or responsible for, the services provided to you by any Merchant or any subcontractor of any Merchant, nor shall Grubhub be responsible for any acts, omissions, errors or misrepresentations made by any Merchant or any subcontractor of any Merchant.

Grubhub is not a delivery company or a common carrier. Some deliveries are provided by Grubhub's network of independent delivery service providers ("Delivery Partners"). Delivery Partners are not actual agents, apparent agents, ostensible agents, or employees of Grubhub in any way. Rather, Delivery Partners have entered into agreements with Grubhub which require them to comply with all applicable federal, state, and local laws, rules and regulations, including, without limitation, traffic laws, requirements of the applicable motor vehicle agency, and applicable insurance requirements. By accessing the Platform, you agree and acknowledge that Delivery Partners are solely responsible for, and Grubhub shall not be liable or responsible for, the delivery services provided to you by any Delivery Partner or any subcontractors of Delivery Partners, or any acts, omissions, errors or misrepresentations made by any Delivery Partner.

## III.    USING GRUBHUB

You may only create and hold one account on each of the separately branded properties on the Platforms (each, an "Account") for your personal use. You may have another Account if you are using the Platform for business purposes, including as part of an enterprise Account, pursuant to a separate agreement with Grubhub. In consideration of the use of the Platform and the Services, you agree that you are able to create a binding legal obligation with Grubhub, and you also agree to: (a) provide true, accurate, current, and complete information about yourself, and (b) maintain and

A-126

promptly update the personal information you provide to keep it true, accurate, current, and complete.

The Platform may permit you to use the Services without an Account or without logging in to your Account (e.g. on our in-store kiosks, through our assisted phone ordering feature, or as a guest with our group order feature). If you use the Service in this manner, we may create an Account for you based on the information you provide to us in connection with the transaction (e.g., your payment information, name, phone number, email address, and other transaction information). If you are a minor in the jurisdiction in which you reside (generally under the age of 18), you must have the permission of, and be directly supervised by, your parent or legal guardian to use the Platform, and your parent or legal guardian must read and agree to this Agreement on your behalf prior to your using the Platform. Notwithstanding the foregoing, you are not authorized to use the Platform or otherwise access the Services if you are under the age of 16. If you are using the Platform on behalf of an entity, organization, or company, you represent and warrant that you have the authority to bind that organization to this Agreement and you agree to be bound by this Agreement on behalf of that entity, organization, or company. If you provide any information that is untrue, inaccurate, not current or incomplete, including, without limitation, having an invalid or expired payment method on file, or if Grubhub has reasonable grounds to suspect that any information you provide is untrue, inaccurate, not current or incomplete, or if we believe that you have breached this Agreement, Grubhub has the right to immediately block your current or future use of the Platform and/or the Services (or any portion thereof) and/or terminate this Agreement with you. If your Account is terminated for any or no reason, you may forfeit any pending, current, or future account credits, Perks (defined below) or other promotional offers, and any other forms of unredeemed value in or associated with your Account without prior notice to you.

You are responsible for maintaining the confidentiality and security of your Account including your password and, if applicable, any password for Facebook, Google, or other third party login. You are also responsible for all activities or any other actions that occur under or that are taken in connection with your Account. You agree to: (a) immediately notify Grubhub of any known or suspected unauthorized use(s) of your password or Account, or any known or suspected breach of security, including, without limitation, loss, theft, or unauthorized disclosure of your password or credit card information; and (b) ensure that you exit from your Account at the end of each session. Grubhub will not be liable for any injury, loss, or damage of any kind arising from or relating to your failure to comply with (a) and/or (b) or for any acts or omissions by you or someone else who is using your Account and/or password.

## IV.  OUR ALCOHOLIC BEVERAGES POLICY

Some jurisdictions permit the ordering and delivery of alcoholic beverages. In such jurisdictions, if you place an order that includes any alcoholic beverage, you represent and warrant that you are at least 21 years of age. Upon delivery or pickup, as applicable, you shall present a government-issued identification card, evidencing your age, consistent with applicable legal requirements. The Delivery Partner may electronically scan the identification card of the individual receiving the order to confirm that the recipient is at least 21 years of age and the delivery may be completed. You

also agree that our Delivery Partners may withhold delivery of the alcoholic beverages if you appear or the recipient of the delivery appears intoxicated when receiving delivery of such products. If you do not comply with these terms, you agree that the alcoholic beverage(s) will not be released to you, you may forfeit the cost of such beverages, and you may be responsible for restocking fees.

## V.   PAYMENT AND OUR CREDIT POLICY

Certain features of the Platform, including, without limitation, the placing or receipt of orders, may require you to make certain payments, including commissions or other fees. When paid by you, these payments are final and non-refundable, unless otherwise determined by Grubhub. Grubhub, in its sole discretion, may offer credits or refunds on a case-by-case basis including, by way of example, in the event of an error with your order or in the amounts you were charged.

Grubhub will charge, and you authorize Grubhub to charge, the payment method you specify at the time of purchase. If you pay any amounts with a credit card, Grubhub may seek pre-authorization of your credit card account prior to your purchase to verify that the credit card is valid and has credit available for your intended purchase. In the event Grubhub advances payment for any of your orders placed via the Platform (e.g., if your corporate account has a line of credit), Grubhub may separately send you invoices for payment of those advanced amounts. In the event that you fail to pay such invoices within thirty (30) days of the date of such invoice (the "Payment Due Date"), you grant Grubhub the right, but not the obligation, to charge the credit card you provide with your Account at any time after any Payment Due Date, unless prohibited by law.

Please note, you are unable to complete checkout with only gift card information. In all events, you are required to provide another form of payment to submit an order, even if this payment method is not charged. Also, if you are a campus user and you opt to pay for a purchase with your stored-value card, on certain campuses, (i) Grubhub will charge such purchase to your stored-value card and will charge any applicable fees to either your credit card or other payment on file with us, and (ii) you agree that Grubhub may be unable to refund a purchase to your stored-value card and may, in its discretion, provide a refund through an alternative method.

Grubhub reserves the right to establish, remove, and/or revise prices, fees, taxes, and/or surcharges for any or all services or goods obtained through the use of the Services at any time, and further reserves the right to consolidate or otherwise incorporate fees and/or surcharges into the prices listed for Merchant food and beverage items. You understand that the prices for menu items displayed through the Services may differ from the prices offered or published by Merchants for the same menu items, whether offered by the Merchant directly or on third-party websites. You also understand that such prices may not be the lowest prices at which the menu items are sold. Grubhub's white label convenience menus source products from select third party providers, including existing Merchants on the Grubhub Platform. Prices may vary between the existing Merchant menu and the Grubhub white label convenience menu. For example, the same menu item may be available at both the existing merchant and Grubhub's white label convenience, but the price on the existing merchant's menu may be higher than the price on Grubhub's white label convenience menu.

A-128

For certain transactions, the subtotals shown at checkout are estimates that may be higher or lower than the total amount due. Regardless of the cause, Grubhub reserves the right to charge the final price after checkout, including without limitation all applicable transaction taxes. Grubhub may also, in its sole discretion, make Perks or other promotional offers with different features and different rates available to any or all of our users. Unless made available to you, these Perks and promotional offers will have no bearing on your obligation to pay the amounts charged. For more information on these offers, please see the "Perks" section below.

The provider of Services is set forth herein. If you are a California resident, in accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting them in writing at 1625 North Market Blvd., Suite N 112 Sacramento, CA 95834, or by telephone at (800) 952-5210 or (916) 445-1254.

## VI.   OUR MATERIALS AND LICENSE TO YOU

With the exception of Your Content (defined below), the Platform and everything on it, including, without limitation, text, photos, videos, graphics and software, (collectively, the "Materials") is owned by or licensed to Grubhub. The Platform and the Materials are protected by copyright, trademark, trade dress, domain name, patent, trade secret, international treaties, and/or other intellectual or proprietary rights and laws of the United States and other countries. Except as otherwise indicated on the Platform and except for the intellectual property of other companies that are displayed on the Platform, all intellectual property, such as trademarks, service marks, logos, trade dress, and trade names are proprietary to Grubhub, including, without limitation, GH; GRUBHUB; Grubhub for Work; SEAMLESS; Grubhub for Restaurants; Eat24; AllMenus; MenuPages; Yummy Rummy; and the Eat24.com, Grubhub.com, and Seamless.com trade dress. Accordingly, you are not authorized to download, remove, transmit, alter, reproduce, modify, distribute, exploit, sell, lease, obscure, decompile, reverse engineer, or disassemble, any content or any trademark or copyright notice from the Platform, including, without limitation, the Materials. If you do any of the aforementioned, Grubhub will not be responsible in any way for any damage to your computer system or loss of data that results from such download. Please also be advised that Grubhub enforces its intellectual property rights to the fullest extent of the law.

Subject to your compliance with this Agreement, we grant you a limited, non-exclusive, non-transferable, non-sublicensable, and revocable license to access and use the Platform for your personal and noncommercial use, solely as expressly permitted by this Agreement and subject to all the terms and conditions of this Agreement, all applicable intellectual property laws, and any Additional Terms (as defined below) contained on the Platform. Any other use of the Platform is strictly prohibited. Nothing contained on the Platform and/or Materials should be interpreted as granting to you any license or right to use any of the Materials (other than as provided herein) and/or third-party proprietary content on the Platform without the express written permission of Grubhub or the relevant third-party owner, as applicable. Any rights not expressly granted herein are reserved by Grubhub and Grubhub's licensors.

A-129

## VII.   YOUR CONTENT AND CONDUCT

I. Your Conduct

By accessing the Platform or the Services, you agree:

- to comply with the Agreement and all applicable laws, rules and regulations in connection with your use of the Platform and Services, including, without limitation, laws regarding online conduct and Your Content (as defined below);
- not to use the Platform or Services for any commercial or other purposes that are not expressly permitted by this Agreement or in a manner that falsely implies our endorsement, partnership or otherwise misleads others as to your affiliation with us;
- not to access the Platform or Services using a third party's account/registration without the express consent of the Account holder and not to attempt to impersonate another user or person;
- not to avoid, bypass, remove, deactivate, impair, descramble, or attempt, through any means, to circumvent any technological measure implemented by Grubhub to protect the Platform, or otherwise attempt to gain unauthorized access to any part of the Platform and/or any Service, other Account, computer system, and/or network connected to any Grubhub server;
- not to use the Platform or Services in any manner that could damage, disable, overburden, and/or impair the Platform, any Grubhub server, or the network(s) connected to any Grubhub server, and/or interfere with any other party's use and enjoyment of the Platform;
- not to advertise to, or solicit, any user, Merchant, or other business to buy or sell any products or services, or use any information obtained from the Platform or the Services in order to contact, solicit, or advertise or sell to any user, Merchant, or other business, in each case, unless specifically authorized in writing by Grubhub;
- not to deep-link to or frame the Platform and/or access the Platform manually and/or with any robot, spider, web crawler, extraction software, automated process, and/or device or other means to scrape, copy, and/or monitor any portion of the Platform and/or any Materials and/or other content on the Platform, unless specifically authorized in writing by Grubhub;
- not to conduct any scraping, indexing, surveying, data mining, or any other kind of systematic retrieval of data or other content from the Platform;
- not to create or compile, directly or indirectly, any collection, compilation, database, or directory from the Platform or Materials;
- not to create Merchant reviews or blog entries for or with any commercial or other purpose or intent that does not in good faith comport with the purpose or spirit of the Platform;
- not to copy, publish, or redistribute any coupon or discount code or act in bad faith in an attempt to manipulate or gain an unintended commercial benefit from incentive offers;
- not to harass, annoy, intimidate, threaten or engage in any racist, sexist, or other behavior that Grubhub finds objectionable to any Grubhub employees, contractors, or agents engaged in providing any portion of the Services and not

41

to engage in any other behavior that Grubhub deems inappropriate when using the Platform or Services;

- not to engage in any criminal or tortious activity, including, without limitation, fraud, spamming (e.g. by email or instant message), sending of viruses or other harmful files, harassment, stalking, copyright infringement, patent infringement, or theft of trade secrets or otherwise deleting the copyright or other proprietary rights notice from any of the Materials or from any portion of the Platform or the Services;

- not to rent, lease, redistribute, sell, sublicense, decompile, reverse engineer, disassemble, or otherwise reduce the Platform and/or the Materials, in whole or in part, to a human-perceivable form for any purpose, including, without limitation, to build a product and/or service competitive with the Platform and its Services; and

- not to disrupt, interfere with, or otherwise harm or violate the security of the Platform, or any Services, system resources, accounts, passwords, servers or networks connected to or accessible through the Platform or affiliated or linked sites (including, without limitation, those of our Merchant).

You agree to comply with the above conduct requirements and agree not assist or permit any person in engaging in any conduct that does not comply with the above conduct. In the event that Grubhub believes that you have breached any of the above conduct requirements, Grubhub reserves the right to suspend and/or permanently terminate your Account at our sole discretion. Further, you agree that the consequences of commercial use or re-publication of Your Content (defined below) or Materials from the Platform or other violations of the foregoing proscriptions may be so serious and incalculable that monetary compensation may not be a sufficient or appropriate remedy, and that Grubhub will be entitled to temporary and permanent injunctive relief to prohibit such use or activity without the need to prove damages.

II. Your Content

Grubhub may provide you with interactive opportunities (i) on the Platform, including, without limitation, features such as user ratings and reviews, saved favorites, liked items and bookmarked Merchants, user profiles and pictures, (ii) on social media pages maintained by Grubhub, as well as (iii) through other communications with you, including, without limitation, through text ("SMS") or multimedia ("MMS") messages (collectively, "Interactive Areas"). You represent and warrant that you are the owner of and/or otherwise have the right to provide all information, comments, reviews, ratings, photographs and/or other materials and/or content that you submit, upload, post, publish, and/or otherwise make available to Grubhub through the Platform or otherwise in connection with your use of our Services, including, without limitation, information and materials provided or made available in connection with any Facebook, Google, or other third party login ("Your Content"). Your Content includes, without limitation, your username and/or other user profile information such as your ratings history and how long you have been a Grubhub diner, textual, visual, or audio content and information, whether transmitted via the Platform, SMS or MMS message, or otherwise.

A-131

III. Use of Your Content

You grant Grubhub an irrevocable, transferable, paid up, royalty-free, perpetual, non-exclusive worldwide sublicensable license to use, copy, display, publish, modify, remove, publicly perform, translate, create derivative works from, distribute, and/or otherwise use Your Content in all forms of media now known or hereafter invented for the purpose of operating, promoting, and improving our Site, business, products and services, and developing new ones (collectively, the "Uses"). The Uses include, without limitation, use of your username and/or other user profile information such as your ratings history and how long you have been a Grubhub diner, to attribute Your Content to you on the Platform, including in Interactive Areas and other public areas on our Platform, or otherwise in connection with our Services. All Uses will be made without notification to and/or approval by you and without the requirement of payment to you or any other person or entity. Further, you hereby grant Grubhub a royalty-free, perpetual, irrevocable, transferable, sublicensable, worldwide, nonexclusive license to incorporate and use any of your suggestions, input, or other feedback relating to the Platform or the Services (collectively, the "Feedback") for any purpose without notice to, approval by, or compensation to you.

You further understand and agree that you may be exposed to third-party content that is inaccurate, objectionable, inappropriate for children, or otherwise unsuited to your purpose. Grubhub and its parents, subsidiaries, affiliates, and each of their officers, directors, employees, successors, assigns, licensors, licensees, designees, business partners, contractors, agents and representatives (collectively, the "Released Parties") will not be responsible for, and you hereby expressly release the Released Parties from any and all liability for the action of any and all third parties with respect to Your Content, or for any damages you allege to incur as a result of or relating to any third-party content.

IV. Conduct within Interactive Areas

By transmitting Your Content, you agree to follow the standards of conduct below, and any additional standards that may be stated on the Platform. We expect your cooperation in upholding our standards. You are responsible for all of Your Content. You agree that Your Content will not:

- be unlawful, harmful to adults or minors, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, profane, offensive, invasive of another's privacy, hateful, and/or racially, ethnically, and/or otherwise objectionable;
- have a commercial, political, or religious purpose;
- be false, misleading, and/or not written in good faith;
- infringe any patent, trademark, trade secret, copyright, right of privacy and/or publicity, and/or other proprietary rights of any person and/or entity;
- be illegal and/or promote illegal activity;
- contain confidential information belonging to a third party;
- contain unauthorized advertising and/or solicits users to a business other than those on the Platform; and/or
- be intended to interrupt, destroy, or limit the functionality or integrity of any computer software, hardware, or Materials on the Platform or other websites.

We do our best to encourage civility and discourage disruptive communication on the Platform. We also do our best to discourage communications that incite others to violate our standards. Grubhub may monitor any and all use of the Platform, including, without limitation, interactions between our users; however, we are under no obligation to do so. We may manage the Platform in a manner intended to protect our property and rights and to facilitate the proper functioning of the Platform. If any of Your Content or conduct on our Platform violates our standards, or any other terms of this Agreement; or interferes with other peoples' enjoyment of the Materials or our Platform or Services; or is inappropriate in our judgment; we reserve the right, in our sole discretion and without notice to you, (i) to change, delete or remove, in part or in full, any of Your Content, (ii) to terminate or suspend access to any Interactive Areas or any other part of our Platform, and/or (iii) to terminate or suspend your Account; in each case, with or without notice. Grubhub will cooperate with local, state, and/or federal authorities to the extent required by applicable law in connection with Your Content.

V. Ratings and Reviews

The Platform and other Interactive Areas may allow you to rate (each, a "Rating") and post reviews (each, a "Review") of Merchants. Such Ratings and Reviews are considered Your Content and are governed by the terms and conditions of this Agreement. Ratings and Reviews are not endorsed by Grubhub, and do not represent the views of Grubhub or of any affiliate or partner of Grubhub. Grubhub does not assume liability for Ratings and Reviews or for any claims, liabilities, or losses resulting from any Ratings and Reviews. We strive to maintain a high level of integrity with our Ratings and Reviews and other aspects of Your Content. Therefore, all Ratings and Reviews must comply with the following criteria, in addition to and without limiting other requirements applicable to Your Content as set forth in these Terms: (1) before posting a Rating or Review, you must have had recent first-hand experience with the Merchant; (2) you may not have a proprietary or other affiliation with either the Merchant or any of its competitors; (3) you may not draw any legal conclusions regarding the Merchants' products, services, or conduct; (4) your Review must otherwise comply with the terms of this Agreement as well as all applicable laws, rules, and regulations, including without limitation the Federal Trade Commission's Guides Concerning the Use of Endorsements and Testimonials in Advertising (which may be found at http://www.ftc.gov/os/2009/10/091005revisedendorsementguides.pdf), including that your Review must disclose any "material connection" you may have with Grubhub or the Merchant; and (5) you will not submit a Rating or Review in exchange for payment, free food or beverage items, or other benefits from any Merchant or third party. Any Rating and/or Review that we determine, in our sole discretion, could diminish the integrity of the Ratings and Reviews, the Materials and/or the Platform may be removed or excluded by us without notice.

## VIII.   COMMUNICATIONS & TEXT MESSAGES

When you use the Services, or send emails, text messages, and other communications from your desktop or mobile device to us, you may be communicating with us electronically. You consent to receive communications from us or on our behalf electronically, such as e-mails, texts, mobile push notices, or notices and messages through the Services, and you agree that all agreements, notices, disclosures, and other

communications that we provide to you electronically satisfy any legal requirement that such communications be in writing. You agree to keep your contact information, including email address, current. This subparagraph does not affect your statutory rights.

Your voluntary provision to Grubhub of your cell phone number represents your consent that Grubhub may contact you by telephone, SMS, or MMS messages at that phone number, and your consent to receiving such communications for transactional, operational, or informational purposes. When you provide your phone number to Grubhub, you warrant that you are the current subscriber or authorized user of the relevant account. You understand and agree that such messages may be sent using automated technology. You may unsubscribe from receiving text messages from Grubhub at any time. To revoke your consent to receiving SMS or MMS messages from Grubhub, you agree to follow the unsubscribe procedures described below.

When placing orders through the Platform, you may receive order status messages from Grubhub about each order. To unsubscribe from order-related messages, just reply "STOP" to the number sending the message. To resubscribe, text "START" to the same number from the phone number associated with your account. If you need assistance, text "HELP". Please note that unsubscribing from one of the branded properties in our Platform will not automatically unsubscribe you from another separately branded property in our Platform. For example, if you unsubscribe from Grubhub order-related messages, you may still receive order-related messages when you place an order through Seamless, unless you also unsubscribe from Seamless order-related messages.

Additionally, you may receive messages from Grubhub following receipt of a completed order soliciting feedback and/or other information relating to the order. You may unsubscribe from all such feedback messages by replying "STOP" to the number sending the feedback messages. To resubscribe, text "START" to the number sending the feedback messages using the phone number associated with your account. Please note that unsubscribing from such feedback texts will not prevent you from receiving texts from Grubhub, the Merchant, or your delivery person regarding your order or its delivery unless you also text "STOP" to the number sending the order-related messages, and even in such event, you may still receive individual texts from the Merchant or your delivery person to enable successful delivery of your order.

You may also receive text messages in response to certain Customer Care requests. To unsubscribe from Customer Care messages, just reply to the message by texting "STOP" to the number sending the message.

If you unsubscribe from receiving text messages from Grubhub through the process described above, you may continue to receive text messages for a short period while Grubhub processes your request(s). If you change or deactivate the phone number you provided to Grubhub, you have an affirmative obligation to immediately update your account information and the phone number(s) attached to your account to prevent us from inadvertently communicating with anyone who acquires any phone number(s) previously attributed to you, and any new phone number(s) you attach to your Account

may receive Grubhub's standard SMS or MMS messages unless you also unsubscribe via the above procedures.

Standard data and message rates may apply for SMS and MMS alerts, whether you send or receive such messages. Please contact your mobile phone carrier for details. Your mobile phone carrier (e.g. T-Mobile, AT&T, Verizon, etc.) is not liable for delayed or undelivered messages. If you require assistance, please call our Customer Care team at 1-877-585-7878.

## IX.    ADDITIONAL TERMS FOR MOBILE APPLICATIONS

We may make available software to access Grubhub's websites, technology platforms, and related online and mobile services via a mobile device ("Mobile Applications"). To use any Mobile Application, you must use a mobile device that is compatible with that Mobile Application. Grubhub does not warrant that any Mobile Application will be compatible with your mobile device. You may use mobile data in connection with the Mobile Applications and may incur additional charges from your wireless provider for these services. You agree that you are solely responsible for any such charges. Grubhub hereby grants you a non-exclusive, non-transferable, revocable license to use a compiled code copy of the Mobile Applications for one Account on a mobile device owned or leased solely by you, for your personal use. You acknowledge that Grubhub may from time to time issue upgraded versions of the Mobile Applications, and may automatically electronically upgrade the version of any Mobile Applications that you are using on your mobile device. You consent to such automatic upgrading on your mobile device and agree to timely upgrade the Mobile Application in the event there is no automatic update. Please upgrade to the latest version of the Mobile Applications in order to view the most up-to-date information on the Platform regarding Merchants featured on the Mobile Applications. You further agree that the terms and conditions of this Agreement will apply to all upgrades to the Mobile Applications. Any third-party code that may be incorporated in the Mobile Applications is covered by the applicable open source or third-party license EULA, if any, authorizing use of such code. The foregoing license grant is not a sale of the Mobile Applications or any copy thereof, and Grubhub or its third-party partners or suppliers retain all right, title, and interest in the Mobile Applications (and any copy thereof). Any attempt by you to transfer any of the rights, duties, or obligations hereunder, except as expressly provided for in this Agreement, is void. Grubhub reserves all rights not expressly granted under this Agreement with respect to the Mobile Applications and otherwise. If any Mobile Application is being acquired on behalf of the United States Government, then the following provision applies: The Mobile Application will be deemed to be "commercial computer software" and "commercial computer software documentation," respectively, pursuant to DFAR § 227.7202 and FAR § 12.212, as applicable. Any use, reproduction, release, performance, display, or disclosure of the Platform and any accompanying documentation by the U.S. Government will be governed solely by this Agreement and is prohibited except to the extent expressly permitted by this Agreement. The Mobile Applications originate in the United States and are subject to United States export laws and regulations. The Mobile Applications may not be exported or re-exported to certain countries or those persons or entities prohibited from receiving exports from the United States. In addition, the Mobile Applications may be subject to the import and export laws

of other countries. You agree to comply with all United States and foreign laws related to use of the Mobile Applications and the Platform.

The following applies to any Mobile Application you acquire from the Apple App Store ("Apple-Sourced Software"): You acknowledge and agree that this Agreement is solely between you and Grubhub, not Apple, Inc. ("Apple") and that Apple has no responsibility for the Apple-Sourced Software or content thereof. Your use of the Apple-Sourced Software must comply with the App Store Terms of Service. You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the Apple-Sourced Software. In the event of any failure of the Apple-Sourced Software to conform to any applicable warranty, you may notify Apple, and Apple will refund to you the purchase price for the Apple-Sourced Software; to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the Apple-Sourced Software, and any other claims, losses, liabilities, damages, costs, or expenses attributable to any failure to conform to any warranty will be solely governed by this Agreement and any law applicable to Grubhub as provider of the software. You acknowledge that Apple is not responsible for addressing any of your claims or those of any third party relating to the Apple-Sourced Software or your possession and/or use of the Apple-Sourced Software, including, but not limited to: (i) product liability claims; (ii) any claim that the Apple-Sourced Software fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection, privacy or similar legislation; and all such claims are governed solely by this Agreement and any law applicable to Grubhub as provider of the software. You acknowledge that, in the event of any third-party claim that the Apple-Sourced Software or your possession and use of that Apple-Sourced Software infringes that third party's intellectual property rights, Grubhub, not Apple, will be solely responsible for the investigation, defense, settlement, and discharge of any such intellectual property infringement claim to the extent required by this Agreement. You and Grubhub acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries of this Agreement as it relates to your license of the Apple-Sourced Software, and that, upon your acceptance of the terms and conditions of this Agreement, Apple will have the right (and will be deemed to have accepted the right) to enforce this Agreement against you as a third-party beneficiary as it relates to your license of the Apple-Sourced Software.

The following applies to any Mobile Applications you acquire from the Google Play Store ("Google-Sourced Software"): (i) you acknowledge that the Agreement is solely between you and Grubhub only, and not with Google, Inc. ("Google"); (ii) your use of Google-Sourced Software must comply with Google's then-current Google Play Store Terms of Service; (iii) Google is only a provider of the Google Play Store where you obtained the Google-Sourced Software; (iv) Grubhub, and not Google, is solely responsible for its Google-Sourced Software; (v) Google has no obligation or liability to you with respect to Google-Sourced Software or the Agreement; and (vi) you acknowledge and agree that Google is a third-party beneficiary to the Agreement as it relates to Grubhub's Google-Sourced Software.

## X.    DISCLAIMER

THE PLATFORM, THE SERVICES, THE MATERIALS, AND ALL OTHER CONTENT ON THE PLATFORM ARE PROVIDED "AS IS" AND "AS AVAILABLE" AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, UNLESS OTHERWISE SPECIFIED IN WRITING. TO THE FULLEST EXTENT PERMISSIBLE BY APPLICABLE LAW, GRUBHUB DISCLAIMS, WITH RESPECT TO THE SERVICES, THE PLATFORM, THE MATERIALS AND ALL OTHER CONTENT ON THE PLATFORM, ALL WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. GRUBHUB DOES NOT REPRESENT OR WARRANT THAT THE PLATFORM, THE SERVICES, THE MATERIALS AND/OR THE OTHER CONTENT ON THE PLATFORM WILL BE SECURE, UNINTERRUPTED, AND/OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, AND/OR THAT THE PLATFORM, THE SERVICES, THE MATERIALS, AND/OR OTHER CONTENT ON THE PLATFORM ARE FREE FROM VIRUSES OR OTHER HARMFUL COMPONENTS. GRUBHUB DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE PLATFORM, THE SERVICES, THE MATERIALS, AND/OR ANY OTHER CONTENT ON THE PLATFORM IN TERMS OF THEIR CORRECTNESS, ACCURACY, RELIABILITY, TIMELINESS, COMPLETENESS, CURRENTNESS, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE SAFETY, QUALITY, AND/OR TIMING OF A DELIVERY ORDERED ON THE PLATFORM, AND/OR THE FOOD OR OTHER PRODUCTS DELIVERED. YOU (AND NOT GRUBHUB) ASSUME THE ENTIRE COST OF USING THE SITE. APPLICABLE LAW MAY NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT FULLY APPLY TO YOU.

GRUBHUB SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND GRUBHUB'S REASONABLE CONTROL, INCLUDING, WITHOUT LIMITATION, DELAYS AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS. GRUBHUB IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

GRUBHUB RELIES UPON MERCHANTS TO PROVIDE ACCURATE ALLERGEN AND DIETARY INFORMATION AND GENERAL PRODUCT SAFETY. GRUBHUB DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION ACCESSIBLE THROUGH THE SERVICE IS ACCURATE, COMPLETE, RELIABLE, CURRENT, OR ERROR-FREE, INCLUDING, WITHOUT LIMITATION, MENUS, NUTRITIONAL AND ALLERGEN INFORMATION, PHOTOS, FOOD QUALITY OR DESCRIPTIONS, PRICING, HOURS OF OPERATION, OR REVIEWS. ALL CONTENT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE RELIANCE ON ANY INFORMATION PROVIDED THROUGH THE SERVICE IS SOLELY AT YOUR OWN RISK, INCLUDING, WITHOUT LIMITATION, NUTRITIONAL AND ALLERGEN INFORMATION.

A-137

## XI.    LIMITATION OF LIABILITY

TO THE FULLEST EXTENT PERMISSIBLE BY APPLICABLE LAW, IN NO EVENT SHALL GRUBHUB BE LIABLE TO YOU FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OR DAMAGES WHATSOEVER (INCLUDING PERSONAL INJURY, PAIN AND SUFFERING, EMOTIONAL DISTRESS, LOSS OF DATA, REVENUE, PROFITS, REPUTATION, USE, OR OTHER ECONOMIC ADVANTAGE), EVEN IF GRUBHUB HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF A WARRANTY, CONTRACT, NEGLIGENCE, TORT, OR ANY OTHER ACTION OF ANY TYPE THAT IN ANY MANNER ARISES OUT OF OR IN CONNECTION WITH THE PLATFORM OR THE SERVICES PROVIDED ON OR THROUGH THE PLATFORM OR BY GRUBHUB.

GRUBHUB ASSUMES NO RESPONSIBILITY AND SHALL NOT BE LIABLE FOR ANY DAMAGES TO, OR VIRUSES THAT MAY INFECT, YOUR COMPUTER EQUIPMENT OR OTHER PROPERTY ON ACCOUNT OF YOUR ACCESS TO, USE OF, BROWSING OF, OR DOWNLOADING OF ANY MATERIAL FROM THE PLATFORM. GRUBHUB ASSUMES NO RESPONSIBILITY OR LIABILITY IN ANY MANNER ARISING OUT OF OR IN CONNECTION WITH ANY INFORMATION, CONTENT, PRODUCTS, SERVICES, OR MATERIAL AVAILABLE ON OR THROUGH THE PLATFORM, AS WELL AS ANY THIRD-PARTY WEBSITE PAGES OR ADDITIONAL WEBSITES LINKED TO THIS PLATFORM, FOR ANY ERROR, DEFAMATION, LIBEL, SLANDER, OMISSION, FALSEHOOD, OBSCENITY, PORNOGRAPHY, PROFANITY, DANGER, INACCURACY CONTAINED THEREIN, OR HARM TO PERSON OR PROPERTY CAUSED THEREBY. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

IN NO EVENT SHALL GRUBHUB'S TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION, WHETHER IN WARRANTY, CONTRACT, NEGLIGENCE, TORT OR ANY OTHER ACTION OF ANY TYPE EXCEED IN THE AGGREGATE (A) THE AMOUNT PAID BY YOU TO GRUBHUB OR A MERCHANT IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM, IF ANY, OR (B) $1,000 (WHICHEVER IS LESS). BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH JURISDICTIONS LIABILITY IS LIMITED TO THE GREATEST EXTENT PROVIDED BY LAW.

YOU AND GRUBHUB AGREE THAT THE WARRANTY DISCLAIMERS AND LIMITATIONS OF LIABILITY IN THIS AGREEMENT ARE MATERIAL, BARGAINED-FOR BASES OF THIS AGREEMENT, AND THAT THEY HAVE BEEN TAKEN INTO ACCOUNT IN DETERMINING THE CONSIDERATION TO BE GIVEN BY EACH PARTY UNDER THIS AGREEMENT AND IN THE DECISION BY EACH PARTY TO ENTER INTO THIS AGREEMENT. YOU AND GRUBHUB AGREE THAT THE WARRANTY DISCLAIMERS AND LIMITATIONS OF LIABILITY IN THIS AGREEMENT ARE FAIR AND REASONABLE. EXCEPT AS MAY BE OTHERWISE PROVIDED FOR IN THIS SECTION, YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY DAMAGE

ARISING OUT OF YOUR USE OF THE SITE IS TO DISCONTINUE USING THE PLATFORM AND SERVICES, WHICH YOU MAY DO AT ANY TIME.

**IMPORTANT NOTE TO NEW JERSEY CONSUMERS**

IF YOU ARE A CONSUMER RESIDING IN NEW JERSEY, THE FOLLOWING PROVISIONS OF THIS AGREEMENT DO NOT APPLY TO YOU (AND DO NOT LIMIT ANY RIGHTS THAT YOU MAY HAVE) TO THE EXTENT THAT THEY ARE UNENFORCEABLE UNDER NEW JERSEY LAW: (A) THE DISCLAIMER OF LIABILITY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OF ANY KIND (FOR EXAMPLE, TO THE EXTENT UNENFORCEABLE UNDER THE NEW JERSEY PUNITIVE DAMAGES ACT, NEW JERSEY PRODUCTS LIABILITY ACT, NEW JERSEY UNIFORM COMMERCIAL CODE, AND NEW JERSEY CONSUMER FRAUD ACT); (B) THE LIMITATION ON LIABILITY FOR LOST PROFITS OR LOSS OR MISUSE OF ANY DATA (FOR EXAMPLE, TO THE EXTENT UNENFORCEABLE UNDER THE NEW JERSEY IDENTITY THEFT PROTECTION ACT AND NEW JERSEY CONSUMER FRAUD ACT); (C) APPLICATION OF THE LIMITATIONS OF LIABILITY TO THE RECOVERY OF DAMAGES THAT ARISE UNDER CONTRACT AND TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORY (FOR EXAMPLE, TO THE EXTENT SUCH DAMAGES ARE RECOVERABLE BY A CONSUMER UNDER NEW JERSEY LAW, INCLUDING, WITHOUT LIMITATION, THE NEW JERSEY PRODUCTS LIABILITY ACT); AND (D) THE NEW YORK GOVERNING LAW PROVISION (FOR EXAMPLE, TO THE EXTENT THAT YOUR RIGHTS AS A CONSUMER RESIDING IN NEW JERSEY ARE REQUIRED TO BE GOVERNED BY NEW JERSEY LAW).

## XII.   THIRD PARTY LINKS

The Platform may contain links to websites that are owned, controlled, developed, sponsored and/or maintained by third parties and which may be subject to additional terms and conditions ("Third Party Websites"). If you click on a link to a Third Party Website, Grubhub will not warn you that you have left the Services or Platform or that you are subject to the terms and conditions of another website or third party service provider. Grubhub does not review, monitor, operate and/or control the Third Party Websites and Grubhub makes no guarantees, representations, and/or warranties as to, and shall have no liability for, the content, products or services available on or through and/or the functioning of the Third Party Websites. By providing access to Third Party Websites, Grubhub is not recommending and/or otherwise endorsing the products and/or services provided by the sponsors and/or owners of those websites. Your access to and/or use of the Third Party Websites, including, without limitation, providing information, materials and/or other content to the Third Party Websites, is entirely at your own risk. Grubhub reserves the right to discontinue links to any Third Party Websites at any time and for any reason, without notice.

## XIII.   ADDITIONAL TERMS

Your use of the Platform is subject to any and all additional terms, policies, rules, or guidelines applicable to the Services or certain features of the Platform that we may post or link to on the Platform (collectively, the "Additional Terms"), such as end-user

license agreements, or other agreements or rules applicable to particular features, promotions, or content on the Platform, including, without limitation, the Google Maps/Google Earth Additional Terms of Service located at https://maps.google.com/help/terms_maps.html and the Google Privacy Policy located at https://www.google.com/intl/ALL/policies/privacy/index.html. All such Additional Terms are hereby incorporated into this Agreement by reference.

## XIV.  PERKS

By participating in perks, which includes all promotions, discounts, coupons or loyalty programs available on the Platform (collectively, "Perks"), you agree to this Agreement and the additional Perks Terms of Use.

Please note, we may also give you the option on the Platform to register with a specific Merchant's promotional or loyalty programs that are not operated by or associated with Grubhub or Perks. If you do register with the Merchant's promotional or loyalty program, you understand that you may be required to agree to additional terms and conditions provided by the Merchant and/or you may be directed to a Third Party Website. You also understand that you will need to contact the Merchant separately if you have any questions regarding your participation in their promotional or loyalty program and/or cancellation of your account with them directly. Grubhub does not own, operate or otherwise control such separate Merchant promotional or loyalty programs and therefore shall have no liability for those separate programs, including without limitation your participation therein.

## XV.  GRUBHUB+

By purchasing or using a Grubhub membership subscription service (including Grubhub+ and Seamless+), you agree to this Agreement and the additional Membership Terms of Use.

## XVI.  DONATE THE CHANGE

By electing to make a Donation (defined in the Donate the Change Terms of Use) and participating in the Grubhub Donate the Change program, you agree to this Agreement and the additional Donate the Change Terms of Use.

## XVII.  GIFT CARDS

Grubhub may provide you with the option to purchase e-gift cards in connection with your use of the Platform. The terms and conditions for e-gift card use are located at https://grubhub.cashstar.com/about/terms_and_conditions and the privacy policy for gift cards is located at https://grubhub.cashstar.com/about/privacy_policy; and both are incorporated into this Agreement by reference.

Grubhub also makes physical gift cards available for purchase. The terms and conditions stated on the physical card apply.

## XVIII.  PRIVACY POLICY

The terms and conditions of the Privacy Policy are incorporated into this Agreement by reference.

A-140

## XIX.   COPYRIGHT POLICY

Grubhub respects the intellectual property of others, and we ask all of our users to do the same. If you believe that your copyrighted work has been copied and is accessible on the Platform or a website through which our Services may be accessed in a way that constitutes copyright infringement, please provide Grubhub's Copyright Agent (as set forth below) with notification containing the following information required by the Digital Millennium Copyright Act, 17 U.S.C. §512 ("DMCA"):

1. A physical or electronic signature of a person authorized to act on behalf of the copyright owner of the work that allegedly has been infringed;
2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works allegedly have been infringed, then a representative list of such copyrighted works;
3. Identification of the material that is claimed to be infringing and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit us to locate the allegedly infringing material, e.g., the specific web page address on the Platform;
4. Information reasonably sufficient to permit us to contact the party alleging infringement, including an email address;
5. A statement that the party alleging infringement has a good-faith belief that use of the copyrighted work in the manner complained of is not authorized by the copyright owner or its agent, or is not otherwise permitted under the law; and
6. A statement that the information in the notification is accurate, and under penalty of perjury, that the party alleging infringement is authorized to act on behalf of the copyright owner of the work that allegedly has been infringed.

Please send this notification to our copyright agent at: Grubhub Holdings Inc., Attention: Copyright Agent, 111 West Washington Street, Suite 2100, Chicago, Illinois 60602.

UNDER FEDERAL LAW, IF YOU KNOWINGLY MISREPRESENT THAT ONLINE MATERIAL IS INFRINGING, YOU MAY BE SUBJECT TO CRIMINAL PROSECUTION FOR PERJURY AND CIVIL PENALTIES, INCLUDING MONETARY DAMAGES, COURT COSTS, AND ATTORNEYS' FEES.

Please note that this procedure is exclusively for notifying Grubhub and its affiliates that your copyrighted material has been infringed. The preceding requirements are intended to comply with Grubhub's rights and obligations under the DMCA, including 17 U.S.C. §512(c), but do not constitute legal advice. It may be advisable to contact an attorney regarding your rights and obligations under the DMCA and other applicable laws.

In accordance with the DMCA and other applicable law, Grubhub has adopted a policy of terminating, in appropriate circumstances, users who are deemed to be repeat infringers. Grubhub may also in its sole discretion limit access to the Platform, the Services and/or terminate the Accounts of any users who infringe any intellectual property rights of others, whether or not there is any repeat infringement.

## XX.    TERMINATION AND VIOLATIONS OF THE AGREEMENT

Your rights under this Agreement will terminate automatically without notice if you fail to comply with any term of this Agreement. Further, Grubhub reserves the right, in its sole and absolute discretion, to modify, suspend, or discontinue at any time, with or without notice, the Platform and/or Services offered on or through the Platform (or any part thereof), including but not limited to the Platform's features, look and feel, and functional elements and related Services. We will have no liability whatsoever on account of any change to the Platform or any suspension or termination of your access to or use of the Platform. You may terminate this Agreement at any time by closing your Account, uninstalling all Mobile Application(s) (if applicable) and ceasing use of the Platform and Services provided herein.

Upon termination of this Agreement for any reason or no reason: (1) your access rights will terminate and you must immediately cease all use of the Platform and Services; and (2) any provision of this Agreement that contemplates or governs performance or observance subsequent to termination of this Agreement will survive the termination of this Agreement, including without limitation the following sections: (i) "Your Content and Conduct;" (ii) "Disclaimer;" (iii) "Limitation of Liability;" (iv) "Important Note to New Jersey Consumers;" (v) "Termination and Violations of this Agreement;" (vi) "Dispute Resolution;" (vii) "Indemnification" and (viii) "Waiver and Severability."

Grubhub reserves the right to seek all remedies available at law and in equity for violations of the Agreement, including, without limitation, the right to block access to the Platform and/or Services from a particular Account, device and/or IP address.

You may not assign or transfer this Agreement or your rights under this Agreement, in whole or in part, by operation of law or otherwise, without our prior written consent. We may assign this Agreement in whole or in part at any time to any entity without your notice or consent. Any purported assignment by you in violation of this section shall be null and void. This Agreement binds and inures to the benefit of each party and the party's successors and permitted assigns.

## XXI.    INDEMNIFICATION

You agree to indemnify and hold harmless Grubhub and its officers, directors, employees, agents, and affiliates (each, an "Indemnified Party") from and against any losses, liabilities, claims, actions, costs, damages, penalties, fines and expenses, including without limitation attorneys' and experts' fees and expenses, that may be incurred by an Indemnified Party arising out of or in connection with: (i) Grubhub's use of your User Content; (ii) your unauthorized use of the Services, (iii) your breach of this Agreement; (iv) your actual or alleged violation of any law, rule or regulation; (v) any third party's access or use of the Services using your Grubhub Account; or (vi) any dispute or issue between you and any third party, including without limitation any Delivery Partner or Merchant.

## XXII.    CHANGES TO THE AGREEMENT

We may change this Agreement from time to time and without prior notice to you. If we make a change to this Agreement, it will be effective as soon as we post it and the most current version of this Agreement will always be posted under the "Terms of Use" link available on our Platform ("Updated Terms"). In addition to posting the Updated Terms,

we may elect to provide additional notice to you of the Updated Terms, such as by sending an email to you or providing a notice through the Platform and/or Services. You agree that you will review this Agreement periodically and check the "Effective" date in this Agreement to stay aware of any changes. By continuing to access and/or use the Platform and/or Services after we post Updated Terms, you agree to be bound by the Updated Terms, and if you do not agree to the Updated Terms, you will stop using the Platform and/or accessing the Services. Except as otherwise provided in the "Dispute Resolution" section, the Updated Terms will govern any disputes between you and Grubhub, even if the dispute arises or involves facts dated before the "Effective" date of the Updated Terms.

## XXIII.  GOVERNING LAW

Except for the "Dispute Resolution" section below, the terms, conditions, and policies contained in this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its choice or conflict of laws principles. The Federal Arbitration Act will govern the interpretation and enforcement of the "Dispute Resolution" section.

Also, regardless of any statute or law to the contrary (and to the fullest extent permitted by law), you must provide notice to Grubhub, pursuant to the procedures in the "Dispute Resolution" section below, of any claim within one year of its accrual, or your claim will be waived and barred.

Venue

You and Grubhub agree that to the extent any dispute, claim, or controversy is permitted to proceed in court (except for small claims court), it shall be brought and heard exclusively in the state and federal courts of New York County, New York.

The foregoing Governing Law and Venue provisions do not apply to the "Dispute Resolution" section, and we refer you to that section for the applicable provisions for such disputes.

## XXIV.  DISPUTE RESOLUTION

PLEASE READ THIS "DISPUTE RESOLUTION" SECTION CAREFULLY. IT LIMITS THE WAYS YOU CAN SEEK RELIEF FROM GRUBHUB AND REQUIRES YOU TO ARBITRATE DISPUTES ON AN INDIVIDUAL BASIS. IN ARBITRATION, THERE IS NO JUDGE OR JURY AND THERE IS MORE CIRCUMSCRIBED DISCOVERY AND APPELLATE REVIEW THAN THERE IS IN COURT.

I. Informal Dispute Resolution Procedure.

There might be instances when a Dispute (as defined below) arises between you and Grubhub. In those instances, Grubhub is committed to working with you to reach a reasonable resolution; however, we can only do this if we know about and understand each other's concerns. Therefore, for any Dispute that arises between you and Grubhub, both parties acknowledge and agree that they will first make a good faith effort to resolve it informally before initiating any formal dispute resolution proceeding in arbitration or otherwise. This includes first sending a written description of the Dispute to the other party. For any Dispute you initiate, you agree to send the written description of the Dispute along with the email address associated with your account to the following

email address: disputeresolution@grubhub.com. Your written description must be on an individual basis and also provide at least the following information: your name; a detailed description of the nature and basis of the Dispute, including any transaction details; and the specific relief sought and how it was calculated. Your written description must be personally signed by you. For any Dispute that Grubhub raises, we will send our written description of the Dispute to the email address associated with your account.

You and Grubhub then agree to negotiate in good faith about the Dispute. This might include an informal telephonic dispute resolution conference between you and Grubhub if such a conference is requested by Grubhub. If such an informal telephonic dispute resolution conference takes place, it shall be individualized such that a separate conference must be held each time either party intends to commence individual arbitration; multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference. If either party is represented by counsel, that party's counsel may participate in the informal telephonic dispute resolution conference, but the party also must appear at and participate in the conference. This should lead to resolution, but if for some reason the Dispute is not resolved satisfactorily within sixty (60) days after receipt of the complete written description of the Dispute, you and Grubhub agree to the further dispute resolution provisions below.

To reiterate, this informal dispute resolution process is a prerequisite and condition precedent to commencing any formal dispute resolution proceeding. The parties agree that any relevant limitations period and filing fee or other deadlines will be tolled while the parties engage in this informal dispute resolution process. A court shall have the authority to enjoin the filing or prosecution of arbitrations based on a failure to comply with this Informal Dispute Resolution Procedure. A party may raise non-compliance with this Informal Dispute Resolution Procedure in court and/or in connection with the arbitration.

II. Mutual Arbitration Agreement.

You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, or any other dispute with Grubhub, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a "Dispute") shall be submitted exclusively to binding arbitration. Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the termination of this Agreement. This Mutual Arbitration Agreement is intended to be broadly interpreted.

Notwithstanding the foregoing, issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide. Also, each party retains the right to (1) elect (at any time prior to the appointment of an arbitrator) to have any claims heard in small claims court on an individual basis for disputes and actions within the scope of such court's jurisdiction, provided the proceeding remains in small claims court and is not removed or appealed to a court of general jurisdiction, and (2) seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or

threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other confidential or proprietary information or intellectual property rights. For clarity, this "Dispute Resolution" section does not alter, amend, or affect any of the rights or obligations of the parties to any Grubhub Delivery Partner Agreement.

ARBITRATION MEANS THAT AN ARBITRATOR AND NOT A JUDGE OR JURY WILL DECIDE THE DISPUTE. RIGHTS TO PREHEARING EXCHANGE OF INFORMATION AND APPEALS MAY BE LIMITED IN ARBITRATION. YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU AND GRUBHUB ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY TO THE MAXIMUM EXTENT PERMITTED BY LAW.

III. Class Action and Collective Relief Waiver.

YOU ACKNOWLEDGE AND AGREE THAT, TO THE MAXIMUM EXTENT ALLOWED BY LAW, EXCEPT AS SET OUT IN SECTION VII BELOW, THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE ARBITRATED OR LITIGATED ON A CLASS, JOINT, COLLECTIVE OR CONSOLIDATED BASIS OR IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OR AS A PRIVATE ATTORNEY GENERAL OR FOR PUBLIC INJUNCTIVE RELIEF. UNLESS BOTH YOU AND GRUBHUB OTHERWISE AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS (EXCEPT AS SET OUT IN SECTION VII BELOW), AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF ANY CLASS, JOINT, COLLECTIVE OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY AWARD RELIEF (INCLUDING ANY DECLARATORY OR INJUNCTIVE RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO RESOLVE AN INDIVIDUAL PARTY'S CLAIM. THE ARBITRATOR MAY NOT AWARD RELIEF FOR OR AGAINST ANYONE WHO IS NOT A PARTY TO THE PROCEEDING.

THIS CLASS ACTION AND COLLECTIVE RELIEF WAIVER IS AN ESSENTIAL PART OF THIS "DISPUTE RESOLUTION" SECTION, AND IF IT IS DEEMED INVALID OR UNENFORCEABLE WITH RESPECT TO A PARTICULAR CLAIM OR DISPUTE, NEITHER YOU NOR GRUBHUB IS ENTITLED TO ARBITRATION OF SUCH CLAIM OR DISPUTE. NOTWITHSTANDING THE FOREGOING, IF A COURT DETERMINES THAT THE CLASS ACTION AND COLLECTIVE RELIEF WAIVER IS NOT ENFORCEABLE AS TO A PARTICULAR CLAIM OR REQUEST FOR RELIEF OR A REQUEST FOR PUBLIC INJUNCTIVE RELIEF AND ALL APPEALS FROM THAT DECISION HAVE BEEN EXHAUSTED (OR THE DECISION IS OTHERWISE FINAL), THEN THE PARTIES AGREE THAT THAT PARTICULAR CLAIM OR REQUEST FOR RELIEF MAY PROCEED IN COURT BUT SHALL BE STAYED PENDING ARBITRATION OF THE REMAINING CLAIMS AND REQUESTS FOR RELIEF.

IV. Arbitration Rules.

The arbitration will be administered by the American Arbitration Association ("AAA"). Except as modified by this "Dispute Resolution" section, the AAA will administer the arbitration in accordance with either (A) the Commercial Arbitration Rules then in effect, or (B) the Consumer Arbitration Rules then in effect if the matter involves a "consumer"

agreement as defined by Consumer Arbitration Rule R-1 (together, the "Applicable AAA Rules"). The Applicable AAA Rules are available at https://www.adr.org/Rules or by calling the AAA at 1-800-778-7879. If AAA is unavailable or unwilling to administer an arbitration consistent with this "Dispute Resolution" section as written, the parties will select an alternative arbitration provider that will administer the arbitration consistent with this "Dispute Resolution" section as written. If the parties cannot agree on an alternative arbitration provider, the parties shall mutually petition a court of appropriate jurisdiction to appoint an arbitration provider that will administer an arbitration consistent with this "Dispute Resolution" section as written.

V. Arbitration Process.

If after sixty (60) days the Informal Dispute Resolution Procedure above is unsuccessful in resolving the parties' dispute, a party who desires to initiate arbitration must provide the other party with a written Demand for Arbitration as specified in the Applicable AAA Rules. (The AAA provides applicable forms for Demands for Arbitration available at https://www.adr.org/sites/default/files/Demand_for_Arbitration_0.pdf (Commercial Arbitration Rules) and https://www.adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf (Consumer Arbitration Rules), and a separate affidavit for waiver of fees for California residents only is available at https://adr.org/sites/default/files/Waiver_of_Fees_CA_Only.pdf.) If you initiate arbitration, you shall certify that you have complied with the Informal Dispute Resolution Procedure above and personally sign your Demand for Arbitration. The arbitration will be conducted by a single arbitrator. The arbitrator will be either a retired judge or an attorney licensed to practice law in the state or county in which you reside. The parties will first attempt to agree on an arbitrator. If the parties are unable to agree upon an arbitrator within twenty-one (21) days of receiving the AAA's list of eligible neutrals, then the AAA will appoint the arbitrator in accordance with the AAA Rules.

VI. Arbitration Location and Procedure.

Unless you and Grubhub otherwise agree, the arbitration will be conducted in the county where you reside. If the amount in controversy does not exceed $10,000 and you do not seek injunctive or declaratory relief, then the arbitration will be conducted solely on the basis of documents you and Grubhub submit to the arbitrator, unless a party requests a hearing and the arbitrator determines that a hearing is necessary. If the amount in controversy exceeds $10,000 or seeks declaratory or injunctive relief, the right to a hearing will be determined by the Applicable AAA Rules. Subject to the Applicable AAA Rules, the arbitrator will have the discretion to direct a reasonable exchange of information by the parties, consistent with the expedited nature of the arbitration. Unless otherwise prohibited by law or agreed by the parties, all arbitration proceedings and all related records will be confidential and closed to the public and any parties other than you and Grubhub, except as necessary to obtain court confirmation of the arbitration award.

VII. Batch Arbitration.

To increase the efficiency of administration and resolution of arbitrations, in the event 100 or more similar arbitration demands presented by or with the assistance or

coordination of the same law firm or organization are submitted to AAA or another arbitration provider (if AAA is unavailable) against Grubhub, the arbitration provider shall (i) administer the arbitration demands in batches of 100 demands per batch (to the extent there are fewer than 100 arbitration demands left over after the batching described above, a final batch will consist of the remaining demands); (ii) designate a single, different arbitrator for each batch (unless the parties agree otherwise); and (iii) provide for a single filing set of fees (for example, if AAA is the arbitration provider, one filing fee, case management fee, and arbitrator compensation fee) due per side per batch. You agree to cooperate in good faith with Grubhub and the arbitration provider to implement such a "batch approach" or other similar approach to provide for an efficient resolution of claims, including the payment of single filing and administrative fees for batches of claims. This "Batch Arbitrations" provision shall in no way be interpreted as authorizing class arbitration of any kind. Grubhub expressly reserves its right to raise unique defenses as to each claimant in connection with this process.

VIII. Arbitrator's Decision.

The arbitrator will render an award within the time frame specified in the applicable AAA Rules. The arbitrator's decision will include the essential findings and conclusions upon which the arbitrator based the award. Judgment on the arbitration award may be entered in any court having jurisdiction thereof. The arbitrator will have the authority to award monetary damages on an individual basis and to grant, on an individual basis, any non-monetary remedy or relief available to an individual to the extent available under applicable law, the arbitral forum's rules, and this Agreement. The arbitrator's award of damages and/or other relief must be consistent with section III above and also must be consistent with the terms of the "Limitation of Liability" section above as to the types and the amounts of damages or other relief for which a party may be held liable. The arbitrator's award shall be binding only between the parties to the arbitration proceeding and shall have no preclusive effect in any other arbitration or other proceeding involving a different party.

Attorneys' fees will be available to the prevailing party in the arbitration only if authorized under applicable substantive law governing the claims in the arbitration. The arbitrator shall apply the provisions of Federal Rule of Civil Procedure 68 after the arbitration award is entered. If the arbitrator finds that either the substance of a claim or the relief sought in a Demand for Arbitration was frivolous or was brought for harassment or an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), the arbitrator may award attorneys' fees, costs and expenses in favor of a party.

IX. Fees.

Your responsibility to pay any AAA filing, administrative, and/or arbitrator fees will be solely as set forth in the applicable AAA Rules (as modified by section VII above). If, however, you are able to demonstrate that the costs of arbitration will be prohibitive for you as compared to the costs of litigation, Grubhub will reimburse as much of the filing, administration, and/or arbitrator fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive to you.

X. Right to Opt-Out of Arbitration.

Grubhub's updates to this Agreement do not provide you with a new opportunity to opt out of the Mutual Arbitration Agreement if you previously agreed to an Agreement and did not validly opt out of arbitration. Grubhub will continue to honor any valid opt outs if you opted out of the Arbitration Agreement in a prior version of the Agreement. If you create a Grubhub account for the first time on or after December 14, 2021, you may opt out of this Mutual Arbitration Agreement. To opt out, you must notify Grubhub in writing no later than 30 days after first becoming subject to this Mutual Arbitration Agreement. Your notice must include your name and address, the email address you currently use to access your Grubhub Account (if you have one), and a clear statement that you want to opt out of this Mutual Arbitration Agreement. You must send your opt-out notice to: disputeresolution@grubhub.com. If you opt out of this Arbitration Agreement, all other parts of this Agreement will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may have entered into with Grubhub or may enter into in the future with Grubhub.

XI. Changes.

Grubhub reserves the right to change this "Dispute Resolution" section. If Grubhub changes this "Dispute Resolution" section after the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement), you agree that your continued use of the Platform or Services after such change will be deemed acceptance of those changes. If you do not agree to such change, you may reject any such change by providing Grubhub written notice of such rejection by mail or hand delivery to: Grubhub, Attn: Dispute Resolutions, 111 West Washington Street, Suite 2100, Chicago, Illinois 60602, or by email from the email address associated with your account to: disputeresolution@grubhub.com, within 30 days of the date such change became effective, as indicated in the "Effective" date above. In order to be effective, the notice must include your full name and clearly indicate your intent to reject changes to this "Dispute Resolution" section. By rejecting changes, you are agreeing that you will arbitrate any dispute between you and Grubhub in accordance with the provisions of this "Dispute Resolution" section as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement, as applicable).

## XXV.  WAIVER AND SEVERABILITY

Any waiver by Grubhub of any term of this Agreement must be in writing. Except as otherwise provided in this Agreement (see "Dispute Resolution" section III), if any portion of this Agreement is found to be void, invalid, or otherwise unenforceable, then that portion shall be deemed to be severable and, if possible, modified or replaced by a valid, enforceable provision that matches the intent of the original provision as closely as possible. The remainder of this Agreement shall continue to be enforceable and valid according to the terms contained herein.

## XXVI.  ENTIRE AGREEMENT

This Agreement, together with any amendments and any additional agreements you may enter into with Grubhub in connection with the Platform and the Services hereunder, shall constitute the entire agreement between you and Grubhub concerning the Platform, any orders placed through the Platform, and the Services hereunder.

**XXVII. CONTACT**

If you have any questions regarding this Agreement or the Platform, please visit our "Help" page for answers and our contact information.

# EXHIBIT E



# EXHIBIT F

A-152



A-153

# EXHIBIT G

**Privacy Policy Update Email** – 12/14/21

**Subject:** We're updating our Terms of Use and Privacy Policy

## GRUBHUB

Hi,

We're emailing to fill you in on updates to our Terms of Use and Privacy Policy and encourage you to read through both.

**Terms of Use** – We made changes to reflect updated age restrictions on the use of our services, liability for misuse of our services, and information about our dispute resolution and arbitration agreement, which explains how legal disputes are handled.

**Privacy Policy** – We have updated our Privacy Policy and, for California residents, our CA Privacy Notice to give you the latest information on how we collect and use your personal data when you use our apps and websites.

The updates will go into effect December 14, 2021. **Your continued use of Grubhub will confirm that you have reviewed and agreed to the updated Terms of Use and Privacy Policy.**

See you at your next order!



   

This is a one-time notice and will not result in additional emails.

(c) 2022 Grubhub. This email was sent by Grubhub. 111 W. Washington St., Suite 2100, Chicago, IL, 60602, USA

This email was sent to the address . You're receiving this legal, transactional, or administrative email based on your past use of Grubhub.

A-155

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAM DAVITASHVILI, *et al.*, | No. 1:20-cv-03000-LAK |
| Plaintiffs, | |
| v. | **ECF Case** |
| GRUBHUB INC., *et al.*, | **Electronically filed** |
| Defendants. | |

**DECLARATION OF ERIC S. HOCHSTADT IN SUPPORT OF DEFENDANT
GRUBHUB INC.'S MOTION TO COMPEL ARBITRATION OF CERTAIN NAMED
PLAINTIFFS' CLAIMS**

I, Eric S. Hochstadt, declare as follows:

1.      I am an attorney licensed to practice in New York, NY.  I am a partner with the law firm Weil, Gotshal & Manges LLP, and counsel for Grubhub Inc. ("Grubhub") in the above-captioned action.  I submit this declaration in connection with the Memorandum of Law in Support of Defendant Grubhub's Motion to Compel Arbitration of Certain Named Plaintiffs' Claims and to transmit true and correct copies of the following documents.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the operative complaint in the above-captioned action, the Amended Consolidated Class Action Complaint (ECF No. 28), filed on August 31, 2020.

2.      Attached hereto as **Exhibit B** is a true and correct copy of Plaintiffs' verified interrogatory responses served on Defendants in the above-captioned action on June 27, 2022.

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 26 day of August, 2022, at New York, New York.

*/s/ Eric S. Hochstadt*
Eric S. Hochstadt
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
eric.hochstadt@weil.com

*Counsel for Defendant Grubhub Inc.*

1

A-157

# EXHIBIT B

A-158

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIAM DAVITASHVILI, ADAM BEN-
SIMON, MIA SAPIENZA, PHILIP ELI-
ADES, JONATHAN SWABY, JOHN BOISI,
NATHAN OBEY, and MALIK DREWEY,
individually and on behalf of all others simi-
larly situated,

      Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

      Defendants.

Civ. No. 1:20-cv-03000-LAK

---

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO**
**DEFENDANTS' FIRST SET OF INTERROGATORIES**

      Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiffs Mariam Davitashvili,

Adam Bensimon, Mia Sapienza, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, and

Malik Drewey hereby respond to Defendants' First Set of Interrogatories.

**GENERAL OBJECTIONS**

      1.    Plaintiffs object to each definition, instruction, or Interrogatory to the extent it

seeks to impose obligations on Plaintiffs beyond those required by the Federal Rules of Civil

Procedure and the Court's Local Rules.

      2.    Plaintiffs object to each definition, instruction, or Interrogatory to the extent it

calls for discovery that is not relevant to any party's claims or defenses or that is not proportional

to the needs of the case.

3.      Plaintiffs object to each definition, instruction, or Interrogatory to the extent it seeks information beyond the scope permitted by Local Civil Rule 33.3.

4.      Plaintiffs object to each definition, instruction, or Interrogatory to the extent it seeks identification of documents that Defendants have produced themselves, and thus for which the burden on Plaintiffs is equal to or greater than that of Defendants in identifying the requested documents.

5.      Plaintiffs object to each definition, instruction, or Interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney work product protection, or any other applicable privilege, protection, exemption, or immunity provided for under the Federal Rules of Civil Procedure or applicable law.

6.      Plaintiffs' identification of documents and individuals in response to these Interrogatories is made without waiving or intending to waive (i) any objections as to the competence, relevance, materiality, privileged status, or admissibility in evidence, for any purpose, of any document identified or the testimony of the individuals identified in response to the Interrogatories; (ii) the right to object on any ground to the use at any hearing or trial of the documents identified or testimony from the individuals identified in response to the Interrogatories; or (iii) the right to object on any ground at any time to any further Interrogatories.

7.      Plaintiffs object to any factual assumptions, implications, and explicit or implicit characterization of facts, events, circumstances, or issues in the Interrogatories, and do not concede the accuracy of any such assumptions, implications, or characterizations.

8.      Plaintiffs object to the Interrogatories to the extent that they call for responses that depend on fact and/or expert discovery that is yet to be completed.

9.      Plaintiffs reserve the right to amend their responses based on ongoing discovery.

2

A-160

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

10.     Plaintiffs object to Definitions 1, 2, 5, 6, 7, and 11, because the proposed definitions are broader than those required by Local Civil Rule 26.3. Plaintiffs will interpret the defined terms in accordance with the applicable Local Civil Rules.

11.     Plaintiffs object to Instructions 4, 6, 7, 8, 9, 10, 11, 14, 15, and 16, because they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure and the Court's Local Rules.

## SPECIFIC RESPONSES AND OBJECTIONS

1.     Identify any member of Your immediate family or household (including yourself) that owns, operates, or is employed by any restaurant; state the restaurant with which each such person is associated; describe how each such Person is associated with each such restaurant; and provide the dates of each such association.

**RESPONSE**: Plaintiffs object to this Interrogatory because it seeks information not relevant to any party's claims or defenses.

2.     Identify any member of Your household (including yourself) that placed any order through any Meal Order Platform at any point during the Class Period, provide the names of each such Person, and identify the Meal Order Platforms through which each such Person placed such orders.

**RESPONSE**: Plaintiffs object to this Interrogatory to the extent that it seeks information regarding orders placed by individuals other than them, because such information is not relevant to any party's claims or defenses. Plaintiffs further object to this Interrogatory to the extent that it seeks information in Defendants' possession, custody, or control. Plaintiffs also object to this Interrogatory because it seeks information beyond that contemplated by Local Civil Rule 33.3(a).

Subject to and without waiver of any of their Objections, and with respect to their own orders, Plaintiffs respond that they have placed orders through the following Restaurant Platforms during the Class Period:

Mariam Davitashvili: Grubhub, Uber

Adam Bensimon: Grubhub

Mia Sapienza: Grubhub, Uber, Postmates

Philip Eliades: Grubhub, Uber, Doordash, and Caviar

Jonathan Swaby: Grubhub, Uber, Postmates, Ritual, and Allset

John Boisi: Grubhub, Uber, Postmates, Doordash, and Caviar

Nathan Obey: Grubhub, Uber, Postmates (but not for a meal), and Caviar

Malik Drewey: None

3.      Identify each category of damages you are seeking, state the amount of your claimed damages for each such category, and describe the basis for each such category and amount of damages.

**RESPONSE**: Plaintiffs object to this Interrogatory because, with respect to Defendants' request for a description of "the basis for each such category and amount of damages," it constitutes a premature contention interrogatory under Local Civil Rule 33.3(c). *Cf. New Haven Temple SDA Church v. Consol. Edison Corp.*, 1995 WL 358788, at *5 (S.D.N.Y. June 13, 1995). Plaintiffs further object to this Interrogatory as premature and subject to both expert testimony and information that is outside of their possession, custody, and control. Subject to and without waiver of any of their Objections, Plaintiffs respectfully refer Defendants to page 8 of their Initial Disclosures, dated May 27, 2022.

4.      For each and every meal on the basis of which You are claiming any relief in this action, state: (i) the date of that meal; (ii) the restaurant that provided that meal; (iii) the identity of the Person who placed the order for that meal or whose account was used to pay for the meal; (iv) the identity of the Person whose method of payment was used to pay for that meal; (v) all menu items included in that meal and the cost of each such item; (vi) the total price paid for the meal; (vii) the amount of any fees or taxes associated with the meal, including any platform fees, taxes, tips, delivery fees, and any other added charges; (viii) whether the meal was a dine-in meal, a delivery meal, a takeout meal, or whether you obtained that meal in some other way; and, (ix) if not a dine- in meal or direct purchase from the restaurant, which Meal Order Platform or other service was used to obtain that meal.

**RESPONSE**: Plaintiffs object to this Interrogatory as beyond the scope of Local Civil Rule 33.3, including because the information sought can more efficiently be obtained through document discovery. Indeed, Defendants have requested such information in their First Set of Requests for Production, and Plaintiffs have indicated that they will produce it.

Dated:  June 27, 2022

_/s/ Kyle W. Roche_____
Kyle W. Roche
Edward Normand
Stephen Lagos
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rochefreedman.com
tnormand@rochefreedman.com
slagos@rochefreedman.com

Gregory A. Frank
Marvin L. Frank
Asher Hawkins
FRANK LLP
305 Broadway, Ste. 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
info@frankllp.com

_Counsel for Plaintiffs_

## VERIFICATION

I do hereby verify that I have read the foregoing **Plaintiffs' Responses and Objections to Defendants' First Set of Interrogatories** and that the information contained in the responses is true and complete to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 27, 2022

_____          _____
Marian Davitashvili                Jonathan Swaby


_____          _____
Adam Bensimon                      John Boisi


_____          _____
Mia Sapienza                       Nathan Obey


_____          _____
Philip Eliades                     Malik Drewey

7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAM DAVITASHVILI, ADAM BENSIMON, MIA SAPIENZA, PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY, and MALIK DREWEY, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GRUBHUB INC., UBER TECHNOLOGIES, INC., and POSTMATES INC., <br><br> Defendants. | Case No. 1:20-cv-03000 (LAK) |

**DECLARATION OF JENNIFER SULLIVAN**

Jennifer Sullivan declares pursuant to 28 U.S.C. § 1746 as follows:

1.      I submit this Declaration in support of the Motion to Compel Arbitration filed by Uber Technologies, Inc. ("Uber") and Postmates, LLC ("Postmates") in the above-referenced action.

**Background**

2.      I am a Senior Paralegal at Uber.  I have worked in this role since August 2019.

3.      Uber Eats is operated by a subsidiary of Uber named Portier, LLC.  Uber acquired Postmates, LLC (f/k/a Postmates Inc.) ("Postmates") on December 1, 2020, and Postmates is now a wholly-owned subsidiary of Uber.

4.      In my role as a Senior Paralegal, I have access to and am familiar with Uber's business records, including business records for Uber Eats.  Following Uber's acquisition of Postmates, I received access to Postmates' business records, including its databases that contain

customer information.  This declaration is based on my personal knowledge, my review of Uber and Postmates' business records, and my experience over the course of my employment at Uber. All statements herein are made to the best of my knowledge as of the date I sign this declaration.

5.      Uber offers online marketplaces called Uber (https://www.uber.com/), Uber Eats (https://www.ubereats.com/), and Postmates (https://postmates.com/) via the internet and mobile applications ("Apps") on which individual users can connect with independent transportation providers or restaurants, retail stores, and other brick-and-mortar merchants to facilitate the purchase of transportation services or goods, including meals.  Independent contractor couriers facilitate the delivery of goods to users.  Postmates provides, among other things, deliveries from restaurants or other merchants.

6.      It is Uber's custom and practice to maintain in its business records copies of both past and present versions of agreements between Uber and users of its services, including the Uber U.S. Terms of Use that apply to Uber and Uber Eats application users.  Since the acquisition of Postmates, Uber also has access to past and present versions of agreements between Postmates and users of Postmates' services, including the Postmates' Terms of Service.

7.      In order to request and pay for services through the Uber or Uber Eats online marketplaces, users must first create an Uber account and agree to Uber's Terms in effect at that time.  Similarly, in order to place orders through the Postmates online marketplace, users must first create a Postmates account and agree to Postmates' Terms in effect at that time.  Users can create Uber or Postmates accounts through the respective websites or Apps.

**Plaintiffs' Postmates Accounts**

8.      I have reviewed Postmates' records that include information regarding user account activity.  That information is recorded contemporaneously at the time of each action and is

2

maintained in the regular course of Postmates' business.  Based on the review of those records, I have confirmed the information set forth below.

Creation of Postmates Accounts

9.      Plaintiffs John Boisi ("Boisi"), Mariam Davitashvili ("Davitashvili"), Nathan Obey ("Obey"), and Jonathan Swaby ("Swaby") created user accounts with Postmates to access the Postmates application as summarized in the following table.  True and correct copies of business records showing the dates on which these users signed up for Postmates user accounts are included in Exhibit A.

| Plaintiff | Sign-Up Date | Exhibit |
|---|---|---|
| John Boisi | May 6, 2015 | Ex. A at p. 2 |
| Mariam Davitashvili | March 25, 2016 | Ex. A at p. 3 |
| Nathan Obey | August 19, 2016 | Ex. A at p. 4 |
| Jonathan Swaby | December 8, 2018 | Ex. A at p. 5 |

Agreement to Postmates Terms of Service

10.      To access the Terms of Service on the Postmates website on or about the times when Boisi, Davitashvili, Obey, and Swaby signed up for their Postmates account ("Postmates Sign-Up Terms"), I accessed and reviewed Uber's business records and also retrieved historical digital downloads from the Internet Archive, which is sometimes referred to as the "Wayback Machine."  The applicable Postmates Sign-Up Terms for these users were as follows, and true and correct copies of these Terms are included in Exhibit B:

| Plaintiff | Sign-Up Date | Postmates Sign-Up Terms | Exhibit |
|---|---|---|---|
| John Boisi | May 6, 2015 | April 2015 Version | Ex. B at pp. 2−7 |
| Mariam Davitashvili | March 25, 2016 | March 2016 Version | Ex. B at pp. 8−15 |
| Nathan Obey | August 19, 2016 | August 2016 Version | Ex. B at pp. 16−28 |

| Plaintiff | Sign-Up Date | Postmates Sign-Up Terms | Exhibit |
|---|---|---|---|
| Jonathan Swaby[1] | December 8, 2018 | July 2018 Version | Ex. B at pp. 29−61 |

11.     The Postmates Sign-Up Terms for Boisi, Davitashvili, Obey, and Swaby included provisions specifying that use of Postmates' services constituted an agreement to be bound by the Terms of Service.  *See* Ex. B at pp. 3, 9, 17, 31.  The Terms also stated that Postmates could modify the Terms of Service at any time, and that continuing to use Postmates' services after any changes to the Terms of Service constituted users' consent to be bound by the modified Terms of Service. *See* Ex. B at pp. 3, 9, 27, 91.

<u>The Postmates Terms of Service Include Arbitration Provisions</u>

12.     The Postmates Sign-Up Terms for Boisi, Davitashvili, Obey, and Swaby included language regarding arbitration of disputes, including waivers of users' abilities to participate in class actions.  *See* Ex. B.

13.     The April 2015 Postmates Sign-Up Terms included the following provision regarding arbitration:

> You and the Company agree that any legal disputes or claims arising out of or related to the Agreement (including but not limited to the use of the Software, or the interpretation, enforceability, revocability, or validity of the Agreement, or the arbitrability of any dispute), that cannot be resolved informally shall be submitted to binding arbitration in the state in which the Agreement was performed.  The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules, or as otherwise mutually agreed by you and the Company.  Any judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Claims shall be brought within the time required by applicable law.  You and the Company agree that any claim, action or proceeding arising out of or related to the Agreement must be brought in your individual capacity, and not as a plaintiff or class member in any purported class, collective, or representative proceeding.  The arbitrator may not consolidate more

---

[1] The record created at the time plaintiff Jonathan Swaby signed-up to Postmates does not include Swaby's first and last name.  However, Uber and Postmates identified Swaby through the email address recently provided by plaintiffs' counsel in discovery in this action.

than one person's claims, and may not otherwise preside over any form of a representative, collective, or class proceeding.

Ex. B at pp. 6–7.  The March 2016 Postmates Sign-Up Terms included an arbitration provision

with identical wording.  Ex. B at p. 15.

14.    The August 2016 Postmates Sign-Up Terms included the following provisions

regarding arbitration:

> In the interest of resolving disputes between you and Postmates in the most expedient and cost effective manner, you and Postmates agree that every dispute arising in connection with these Terms will be resolved by binding arbitration. Arbitration is more informal than a lawsuit in court.  Arbitration uses a neutral arbitrator instead of a judge or jury, may allow for more limited discovery than in court, and can be subject to very limited review by courts.  Arbitrators can award the same damages and relief that a court can award.  Our agreement to arbitrate disputes includes all claims arising out of or relating to any aspect of these Terms, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and regardless of whether a claim arises during or after the termination of these Terms.
>
> YOU UNDERSTAND AND AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND POSTMATES ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION. …
>
> YOU AND POSTMATES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.
>
> Further, unless both you and Postmates agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

Ex. B at pp. 25–26.

15.    The July 2018 Postmates Sign-Up Terms included the following provisions

regarding arbitration:

> In the interest of resolving Disputes between you and Postmates in the most expedient and cost effective manner, you and Postmates agree that every Dispute arising in connection with these Terms will be resolved by binding individual arbitration.  Arbitration is more informal than a lawsuit in court.  Arbitration uses a neutral arbitrator instead of a judge or jury, and can be subject to very limited

review by courts.  While the parties will be permitted to engage in discovery or exchange of non-privileged information relevant to the dispute, arbitration may allow for more limited discovery allowed for in court.  Arbitrators can award the same damages and relief that a court can award.  Our agreement to arbitrate disputes includes all claims arising out of or relating to any aspect of these Terms, the Platform, or your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and regardless of whether a claim arises during or after the termination of these Terms.

YOU UNDERSTAND AND AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND POSTMATES ARE EACH WAIVING THE RIGHT TO GO TO COURT OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION. …

All issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrabilty of this Section. …

YOU AND POSTMATES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

Further, unless both you and Postmates agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

Ex. B at pp. 52−53, 55.

16.     On December 19, 2019, Postmates updated the Terms of Service ("December 2019 Postmates Terms"), and the arbitration provision quoted immediately above was retained with no modifications.  Ex. B at pp. 87−90.  The December 2019 Postmates Terms provided that Postmates could modify the Terms of Service.  Ex. B at p. 91.

<u>2021 Updates to Postmates App Linking Accounts to Uber</u>

17.     On December 1, 2020, Uber acquired Postmates, and Postmates became a wholly-owned subsidiary of Uber.

18.     From Uber's business records, I accessed the Terms of Use that went into effect for Uber users on January 18, 2021, and appeared on the Uber website (the "January 2021 Uber Terms").  Ex. F at pp. 9−21.

19.     The January 2021 Uber Terms included the following text:

These Terms of Use ("Terms") govern your access or use, from within the United States and its territories and possessions, of the multi-sided digital marketplace platform ("Uber Marketplace Platform") and any related content or services (collectively, the "Services," as more fully defined below in Section 3) made available in the United States and its territories and possessions by Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber").  PLEASE READ THESE TERMS CAREFULLY, AS THEY CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND UBER.  In these Terms, the words "including" and "include" mean "including, but not limited to."

By accessing or using the Services, you confirm your agreement to be bound by these Terms.  If you do not agree to these Terms, you may not access or use the Services.  These Terms expressly supersede prior agreements or arrangements with you regarding the use of the Services. …

IMPORTANT: PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT, INCLUDING THE ARBITRATION AGREEMENT (SEE SECTION 2 BELOW).  PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN SECTION 2 BELOW).   BY ENTERING INTO THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION. …

Uber may make changes to these Terms from time to time.  If Uber makes changes, it will provide you with notice of such changes, such as by sending an email, providing a notice through the Services, or updating the date at the top of these Terms.  Unless Uber says otherwise in its notice, the amended Terms will be effective immediately and your continued access to and use of the Services after Uber provides such notice will confirm your acceptance of the changes.  If you do not agree to the amended Terms, you must stop accessing and using the Services.

Ex. F at p. 10.

20.     The January 2021 Uber Terms also included the following provisions regarding

arbitration:

By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this

Arbitration Agreement.  This will preclude you from bringing any class, collective, or representative action against Uber, and also preclude you from participating in or recovering relief under any current or future class, collective, consolidated, or representative action brought against Uber by someone else.  For the avoidance of doubt, this precludes you from bringing or participating in any kind of any class, collective, coordinated, consolidated, representative or other kind of group, multi-plaintiff or joint action against Uber.

(a) Agreement to Binding Arbitration Between You and Uber.

Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof, (ii) your access to or use of the Services at any time, (iii) incidents or accidents resulting in personal injury that you allege occurred in connection with your use of the Services, whether the dispute, claim or controversy occurred or accrued before or after the date you agreed to the Terms, or (iv) your relationship with Uber, will be settled by binding arbitration between you and Uber, and not in a court of law.  This Agreement survives after your relationship with Uber ends.

You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to bring or to participate as a plaintiff or class member in any class, purported class, collective, coordinated, consolidated, or representative proceeding. …

(c) Rules and Governing Law.

The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the AAA's Consumer Arbitration Rules (the "AAA Rules") then in effect, except as modified by this Arbitration Agreement.  The AAA Rules are available at www.adr.org or by calling the AAA at 1-800-778-7879.

The parties agree that the arbitrator ("Arbitrator"), and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including any claim that all or any part of this Arbitration Agreement is void or voidable.  The Arbitrator shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.  If there is a dispute about whether this Arbitration Agreement can be enforced or applies to a dispute, you and Uber agree that the arbitrator will decide that issue.

Notwithstanding any choice of law or other provision in the Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this Arbitration Agreement, and that the FAA and AAA Rules shall preempt all state laws to the fullest extent permitted by law. If the FAA and AAA Rules are found to not apply to any issue regarding the interpretation or enforcement of this Arbitration Agreement, then that issue shall be resolved under the laws of the state where you reside when you accept these Terms.

Ex. F at pp. 11−12.

21.    Between March 17, 2021, and mid-April 2021, Postmates sent emails to Postmates users informing them that the Postmates App had been updated, and that their accounts would be linked with Uber. *See* Ex. C at p. 3. The email contained a blue hyperlink to "Terms of Use," and expressly noted that there were "updates to the Arbitration Agreement." Attached as Exhibit C is a true and correct exemplar of this email. *See* Ex. C at p. 3.

22.    The January 2021 Uber Terms were in effect when Postmates began sending the email update to users linking their accounts to Uber.

23.    Uber updated its Terms of Use on April 14, 2021 ("April 2021 Uber Terms") and again on July 12, 2021 ("July 2021 Uber Terms"). The April 2021 Uber Terms and the July 2021 Uber Terms included an arbitration provision with identical wording to the provision in the January 2021 Uber Terms. Ex. F. at p. 23–25, 36–39. True and correct copies of these January 2021 Uber Terms, April 2021 Uber Terms, and July 2021 Uber Terms are included in Exhibit F.

**Plaintiffs' Uber Accounts**

24.    I have reviewed Uber's records that include information regarding user account activity. That information is recorded contemporaneously at the time of each action and is maintained in the regular course of Uber's business. Based on a review of those records, I have confirmed the information set forth below.

Creation of Uber Accounts

25.    Plaintiffs Adam Bensimon, John Boisi, Mariam Davitashvili, Philip Eliades, Nathan Obey, and Jonathan Swaby created user accounts with Uber to access the Uber Apps as summarized in the following table.  True and correct copies of business records showing the dates on which these users signed up for Uber user accounts are included in Exhibit D.

| Plaintiff | Sign-Up Date | Exhibit |
|---|---|---|
| Adam Bensimon | October 11, 2014 | Ex. D at p. 2 |
| John Boisi | February 2, 2014 | Ex. D at p. 3 |
| Mariam Davitashvili | February 14, 2016 | Ex. D at p. 4 |
| Philip Eliades | June 3, 2014 | Ex. D at p. 5 |
| Nathan Obey[2] | March 7, 2015 | Ex. D at p. 6 |
| Jonathan Swaby[3] | July 14, 2018 | Ex. D at p. 7 |

Agreement to Uber Terms

26.    To access the Terms of Use on the Uber website on or about the times when these six users signed up for their Uber accounts ("Uber Sign-Up Terms"), I accessed and reviewed Uber's business records and also retrieved historical digital downloads from the Internet Archive, which is sometimes referred to as the "Wayback Machine."  The applicable Uber Sign-Up Terms for these users were as follows, and true and correct copies of these Terms are included in Exhibit E:

| Plaintiff | Sign-Up Date | Uber Sign-Up Terms | Exhibit |
|---|---|---|---|
| Adam Bensimon | October 11, 2014 | May 2013 Version | Ex. E at pp. 2−9 |
| John Boisi | February 2, 2014 | May 2013 Version | Ex. E at pp. 2−9 |
| Mariam Davitashvili | February 14, 2016 | January 2016 Version | Ex. E at pp. 19−31 |
| Philip Eliades | June 3, 2014 | May 2013 Version | Ex. E at pp. 2−9 |

[2] Plaintiff Nathan Obey created an account under the alias "Nate Obey."  Ex. D at p. 6.

[3] Plaintiff Jonathan Swaby created an account under the alias "Jon Swaby."  Ex. D at p. 7.

10

| Plaintiff | Sign-Up Date | Uber Sign-Up Terms | Exhibit |
|---|---|---|---|
| Nathan Obey | March 7, 2015 | February 2015 Version | Ex. E at pp. 10−18 |
| Jonathan Swaby | July 14, 2018 | December 2017 Version | Ex. E at pp. 32−42 |

27.     The Uber Sign-Up Terms for all of these users included provisions specifying that use of Uber's services constituted an agreement to be bound by the Terms of Use.  *See* Ex. E at pp. 3, 11, 20, 33.  The Uber Sign-Up Terms also provided that Uber could modify or amend the Terms of Use from time to time, and that continuing to use Uber's services after any changes to the Uber Sign-Up Terms constituted users' consent to be bound by the modified Terms of Use. *See* Ex. E pp. 3, 11, 21, 33.

<u>The Uber Terms of Use Include Arbitration Provisions</u>

28.     The Uber Sign-Up Terms for Bensimon, Boisi, Davitashvili, Eliades, Obey, and Swaby included language regarding arbitration of disputes, including waivers of users' abilities to participate in class actions, as described below.

29.     The May 2013 Uber Sign-Up Terms included the following language regarding arbitration:

> You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, **"Disputes"**) will be settled by binding arbitration, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. **You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**   Further, unless both you and Company otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding.  If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void.  Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of this Agreement.

11

Ex. E at p. 8.

30.     The February 2015 Uber Sign-Up Terms included the following provision regarding arbitration:

> You agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, "Disputes") will be settled by binding arbitration between you and Uber, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights.   You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to participate as a plaintiff or class in any purported class action or representative proceeding.   Further, unless both you and Uber otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding.   If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void.   Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of these Terms.

Ex. E at p. 16.  The January 2016 Uber Sign-Up Terms included an arbitration provision with identical wording.  Ex. E at pp. 28–29.

31.     The December 2017 Uber Sign-Up Terms included the following provisions regarding arbitration:

> IMPORTANT: PLEASE REVIEW THE ARBITRATION AGREEMENT SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. BY ENTERING THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION. …
>
> By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration, as set forth in this Arbitration Agreement.  This will preclude you from bringing any class, collective, or representative action against Uber, and also preclude you from participating in or recovering relief under any current or future class, collective, consolidated, or representative action brought against Uber by someone else.

Agreement to Binding Arbitration Between You and Uber.

You and Uber agree that any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, enforcement, interpretation or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms, will be settled by binding arbitration between you and Uber, and not in a court of law.

You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding. Unless both you and Uber otherwise agree in writing, any arbitration will be conducted only on an individual basis and not in a class, collective, consolidated, or representative proceeding. However, you and Uber each retain the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights.

Rules and Governing Law.

The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the AAA's Consumer Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this Arbitration Agreement. The AAA Rules are available at www.adr.org/arb_med or by calling the AAA at 1-800-778-7879.

The parties agree that the arbitrator ("Arbitrator"), and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including any claim that all or any part of this Arbitration Agreement is void or voidable. The Arbitrator shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the Terms are unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.

Notwithstanding any choice of law or other provision in the Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties that the FAA and AAA Rules shall preempt all state laws to the fullest extent permitted by law. If the FAA and AAA Rules are found to not apply to any issue that arises under this Arbitration Agreement or the enforcement thereof, then that issue shall be resolved under the laws of the state of California.

Ex. E at pp. 33−34.

Plaintiffs Consented to Updated Terms in July and December of 2021

32.     From Uber's business records, I accessed the Terms of Use that went into effect for Uber users on March 17, 2020, and appeared on the Uber website (the "March 2020 Uber Terms"). Ex. F at pp. 2−8.  The March 2020 Uber Terms included modification and arbitration provisions with wording that was substantially similar to the December 2017 Uber Sign-Up Terms quoted immediately above.  Ex. F at pp. 3–4.

33.     From Uber's business records, I accessed the Terms of Use that went into effect for Uber users on July 12, 2021, and appeared on the Uber website (the "July 2021 Uber Terms").  Ex. F at pp. 35−53.  The July 2021 Uber Terms included modification and arbitration provisions with identical wording to the provision in the January 2021 Uber Terms.  Ex. F. at pp. 36–39; ¶¶ 19, 20.

34.     The July 2021 Uber Terms included the following provisions regarding choice of law:

> These Terms shall be governed by and construed in accordance with the laws of the State of California, U.S.A., without regard to the choice or conflict of law principles of any jurisdiction, except as may be otherwise provided in the Arbitration Agreement in Section 2 above or in supplemental terms applicable to your region.

Ex. F at p. 50.

35.     From Uber's business records, I accessed the Terms of Use that went into effect for Uber users on December 16, 2021, and appeared on the Uber website (the "December 2021 Uber Terms").  Ex. F at pp. 54−74.

36.     The December 2021 Uber Terms included the following text:

> These Terms of Use ("Terms") govern your access or use, from within the United States and its territories and possessions, of the Uber Marketplace Platform and any related content or services (collectively, the "Services," as more fully defined below in Section 3) made available in the United States and its territories and possessions by Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber"). …

By accessing or using the Services, you confirm your agreement to be bound by these Terms.  If you do not agree to these Terms, you may not access or use the Services.  These Terms expressly supersede prior agreements or arrangements with you regarding the use of the Services. …

IMPORTANT:   PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT, INCLUDING THE ARBITRATION AGREEMENT (SEE SECTION 2 BELOW).   PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN SECTION 2 BELOW).  BY ENTERING INTO THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION. …

Uber may make changes to these Terms from time to time.  If Uber makes changes, it will provide you with notice of such changes, such as by sending an email, providing a notice through the Services, or updating the date at the top of these Terms.  Unless Uber says otherwise in its notice, the amended Terms will be effective immediately and your continued access to and use of the Services after Uber provides such notice will confirm your acceptance of the changes.  If you do not agree to the amended Terms, you must stop accessing and using the Services.

Ex. F at pp. 54–56.

37.     The December 2021 Uber Terms also included the following provisions regarding

arbitration:

By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement, and not as a class, collective, coordinated, consolidated, mass and/or representative action.  This Arbitration Agreement will preclude you from bringing any class, collective, coordinated, consolidated, mass and/or representative action against Uber, and also preclude you from participating in or recovering relief in any current or future class, collective, coordinated, consolidated, mass and/or representative action brought against Uber by someone else—except as provided below in Section 2(a)(3)(c).  Thus, the parties agree that the Arbitrator shall not conduct any form of class, collective, coordinated, consolidated, mass and/or representative arbitration, nor join, coordinate, or consolidate claims of multiple individuals against Uber in a single proceeding— except as provided below in Section 2(a)(3)(c).  For the avoidance of doubt, except as provided below in Section 2(a)(3)(c), this Arbitration Agreement precludes you from bringing or participating in any kind of class, collective, coordinated,

15

A-180

consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber, other than participating in a classwide, collective, coordinated, consolidated, mass and/or representative settlement of claims.

(a) Agreement to Binding Arbitration Between You and Uber.

(1) Covered Disputes:  Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to the Terms, and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by  binding individual arbitration between you and Uber, and not in a court of law.  This Arbitration Agreement survives after your relationship with Uber ends.

**(2) Class Action Waiver:**  You acknowledge and agree that any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration.  The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, consolidated, and/or representative action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any class, collective, coordinated, consolidated, and/or representative action, or to award relief to anyone but the individual in arbitration.  The parties also expressly waive the right to seek, recover, or obtain any non-individual relief.  Notwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims. …

(4) Delegation Clause:  Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable.  An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel.  However, only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable—except that,

as stated and pursuant to the procedures provided in Section 2(a)(3)(b), an arbitrator or panel of arbitrators shall have authority to determine whether the party bringing any claim has violated the Mass Action Waiver. …

Notwithstanding any choice of law or other provision in these Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto.  It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this Arbitration Agreement, and that the FAA and the applicable arbitration provider's rules shall preempt all state laws to the fullest extent permitted by law.  If the FAA and applicable arbitration provider's rules are found to not apply to any issue regarding the interpretation or enforcement of this Arbitration Agreement, then that issue shall be resolved under the laws of the state where you reside when you accept these Terms.

Ex. F at pp. 55–57, 59–61.

38.     The December 2021 Uber Terms also included the following provisions regarding choice of law:

These Terms shall be governed by and construed in accordance with the laws of the state in which your dispute arises, without regard to the choice or conflict of law principles of any jurisdiction, except as may be otherwise provided in the Arbitration Agreement in Section 2 above or in supplemental terms applicable to your region.

Ex. F at p. 71.

39.     For the December 2021 Uber Terms update, Uber notified users that it had updated the Terms through an in-app blocking pop-up screen that appeared when the user opened an Uber App.  *See* Ex. G pp. 2–3.  The pop-up screen had a header that stated: "We've updated our terms," and, in bigger text, "We encourage you to read our updated Terms in full."  *Id.*  The pop-up screen provided a hyperlink to Uber's Terms of Use, which included the arbitration provision and Uber's Privacy Notice.  *Id.*  The words "Terms of Use" and "Privacy Notice" were displayed in bright blue text that contrasted with the other font colors, indicating they were hyperlinks.  *Id.*  When users clicked either hyperlink, the Terms of Use or Privacy Notice, respectively, were displayed.

To proceed past the pop-up screen, the user was required to affirmatively check a box labeled "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Notice" and click "Confirm."   *Id.*

40.     The attached Exhibit D includes records reflecting the dates on which certain users expressly assented to the December 2021 Uber Terms, as summarized in the following table. These records are true and correct copies of results from a query of records that were kept as a regular practice and custom by knowledgeable company personnel in the ordinary course of regularly conducted business activity and pursuant to a business duty.  The underlying actions signifying consent were recorded in Uber's systems at or near the time of those actions.

| Plaintiff | Date of Checkbox Consent to December 2021 Uber Terms | Exhibit |
|---|---|---|
| John Boisi | January 18, 2022 | Ex. D at p. 3 |
| Mariam Davitashvili | December 20, 2021 | Ex. D at p. 4 |
| Philip Eliades | December 27, 2021 | Ex. D at p. 5 |
| Nathan Obey | January 29, 2022 | Ex. D at p. 6 |
| Jonathan Swaby | January 8, 2022 | Ex. D at p. 7 |

41.     The attached Exhibit H includes records reflecting the dates on which plaintiffs used and accessed the Uber application following the implementation of the July and/or December 2021 Uber Terms, as summarized in the following table.  These records are true and correct copies of results from a query of records that were kept as a regular practice and custom by knowledgeable company personnel in the ordinary course of regularly conducted business activity and pursuant to a business duty.  The underlying actions using the Services and signifying consent were recorded in Uber's systems at or near the time of those actions.

| Plaintiff | Date of Consent to December 2021 Uber Terms | Exhibit |
|---|---|---|
| Adam Bensimon | Used Uber account as recently as November 18, 2021. | Ex. H at p. 3 |

| Plaintiff | Date of Consent to December 2021 Uber Terms | Exhibit |
|---|---|---|
| John Boisi | Used Uber account as recently as August 5, 2022. | Ex. H at p. 9 |
| Mariam Davitashvili | Used Uber account as recently as August 18, 2022. | Ex. H at p. 84 |
| Philip Eliades | Used Uber account as recently as August 1, 2022. | Ex. H at p. 192 |
| Nathan Obey | Used Uber account as recently as July 31, 2022. | Ex. H at p. 200 |
| Jonathan Swaby | Used Uber account as recently as August 15, 2022. | Ex. H at p. 216 |

42.    Uber updated its Terms of use on April 4, 2022 ("April 2022 Uber Terms") and again on August 16, 2022 ("August 2022 Uber Terms").  The April 2022 Uber Terms and the August 2022 Uber Terms included an arbitration provision with identical wording to the provision in the December 2021 Uber Terms.  Ex. F. at pp. 77–87; 102–114.  True and correct copies of these April 2022 Uber Terms and the August 2022 Uber Terms are included in Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2022 in Burlingame, California.

_____
Jennifer Sullivan

A-184

# Exhibit D

A-185

# Rider/Eater Sign Up & Checkbox Consent Analytics - Adam Bensimon

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|------------|-----------|------------------------|---------------|------------------|--------------|-------------------------|----------------|
| Adam | Bensimon | 10/11/14 2:41 PM | android | \N | \N | \N | \N |

2

A-186

# Rider/Eater Sign Up & Checkbox Consent Analytics - John Boisi

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|---|---|---|---|---|---|---|---|
| John | Boisi | 2/2/14 5:33 AM | iphone | Yes | post_signup_checkbox | 4/9/21 6:08 PM | iOS |
| John | Boisi | 2/2/14 5:33 AM | iphone | Yes | post_signup_checkbox | 1/18/22 2:05 PM | iOS |

3

A-187

# Rider/Eater Sign Up & Checkbox Consent Analytics - Mariam Davitashvili

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|---|---|---|---|---|---|---|---|
| Mariam | Davitashvili | 2/14/16 6:13 AM | iphone | Yes | post_signup_checkbox | 1/19/21 4:06 AM | ios |
| Mariam | Davitashvili | 2/14/16 6:13 AM | iphone | Yes | post_signup_checkbox | 4/12/21 9:56 AM | ios |
| Mariam | Davitashvili | 2/14/16 6:13 AM | iphone | Yes | post_signup_checkbox | 12/20/21 11:45 PM | iOS |

4

# Rider/Eater Sign Up & Checkbox Consent Analytics - Philip Eliades

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|---|---|---|---|---|---|---|---|
| Philip | Eliades | 6/3/14 5:25 PM | website_invite | Yes | post_signup_checkbox | 4/4/21 11:33 PM | iOS |
| Philip | Eliades | 6/3/14 5:25 PM | website_invite | Yes | post_signup_checkbox | 12/27/21 12:11 AM | iOS |

A-188

A-189

# Rider/Eater Sign Up & Checkbox Consent Analytics - Nate Obey

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|------------|-----------|------------------------|---------------|------------------|--------------|-------------------------|----------------|
| Nate | Obey | 3/7/15 9:03 AM | iphone | Yes | post_signup_checkbox | 3/27/21 8:35 PM | ios |
| Nate | Obey | 3/7/15 9:03 AM | iphone | Yes | post_signup_checkbox | 1/29/22 12:38 AM | ios |

A-190

# Rider/Eater Sign Up & Checkbox Consent Analytics - Jon Swaby

| First Name | Last Name | Signup Timestamp (UTC) | Signup Method | Consent Checkbox | Consent Type | Consent Timestamp (UTC) | Consent Method |
|---|---|---|---|---|---|---|---|
| Jon | Swaby | 7/14/18 10:58 PM | iphone | Yes | post_signup_checkbox | 3/5/21 4:12 PM | iOS |
| Jon | Swaby | 7/14/18 10:58 PM | iphone | Yes | post_signup_checkbox | 1/8/22 11:29 PM | iOS |

7

A-191

# Exhibit F

A-192

# December 2021 Uber Terms of Use

Uber    Sign up

Select jurisdiction:    Language:

United States ▾    English

Last modified: 12/16/2021

# U.S. Terms of Use

## 1. Contractual Relationship

Uber provides a personalized multipurpose digital marketplace platform ("Uber Marketplace Platform") that enables you to conveniently find, request, or receive transportation, logistics and/or delivery services from third-party providers that meet your needs and interests. These Terms of Use ("Terms") govern your access or use, from within the United States and its territories and possessions, of the Uber Marketplace Platform and any related content or services (collectively, the "Services," as more fully defined below in Section 3) made available in the United States and its territories and possessions by Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber"). PLEASE READ THESE TERMS CAREFULLY, AS THEY CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND UBER. In these Terms, the words "including" and "include" mean "including, but not limited to."

By accessing or using the Services, you confirm your agreement to be bound by these Terms. If you do not agree to these Terms, you may not access or use the Services. These Terms expressly supersede prior agreements or arrangements with you regarding the use of the Services.

Notwithstanding the foregoing, these Terms do not supersede or otherwise impact the enforceability of any agreements you may have with Uber or its subsidiaries regarding driving, delivering and/or providing transportation and/or delivery services (e.g., the Platform Access Agreement, the Technology Services Agreement and/or any similar agreements). To the extent (but only to the extent) any agreement you may have with Uber regarding driving, delivering and/or providing transportation and/or delivery services conflicts with these Terms, those agreements (and not these Terms) will prevail with respect to any disputes arising from you driving, delivering and/or providing transportation and/or delivery services.

Uber may immediately terminate these Terms or any Services with respect to you, or generally cease offering or deny access to the Services or any portion thereof, at any time for any reason.

IMPORTANT: PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT, INCLUDING THE ARBITRATION AGREEMENT (SEE SECTION 2 BELOW). PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN

SECTION 2 BELOW). BY ENTERING INTO THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION.

Supplemental terms may apply to certain options or offers available through the Services, such as policies for a particular ride or logistics option (e.g., Uber Connect), event, program, activity, or promotion. Such supplemental terms will be disclosed to you in connection with the applicable option or offer. Supplemental terms are in addition to, and shall be deemed a part of, the Terms for the purposes of the applicable option or offer. Supplemental terms shall prevail over these Terms in the event of a conflict with respect to the applicable option or offer.

Uber may make changes to these Terms from time to time. If Uber makes changes, it will provide you with notice of such changes, such as by sending an email, providing a notice through the Services, or updating the date at the top of these Terms. Unless Uber says otherwise in its notice, the amended Terms will be effective immediately and your continued access to and use of the Services after Uber provides such notice will confirm your acceptance of the changes. If you do not agree to the amended Terms, you must stop accessing and using the Services.

Uber's collection and use of personal information in connection with the Services is described in Uber's Privacy Notice located at https://www.uber.com/privacy/notice.

# 2. Arbitration Agreement

By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement, and not as a class, collective, coordinated, consolidated, mass and/or representative action. This Arbitration Agreement will preclude you from bringing any class, collective, coordinated, consolidated, mass and/or representative action against Uber, and also preclude you from participating in or recovering relief in any current or future class, collective, coordinated, consolidated, mass and/or representative action brought against Uber by someone else—except as provided below in Section 2(a)(3)(c). Thus, the parties agree that the Arbitrator shall not conduct any form of class, collective, coordinated, consolidated, mass and/or representative arbitration, nor join, coordinate, or consolidate claims of multiple individuals against Uber in a single proceeding—except as provided below in Section 2(a)(3) (c). For the avoidance of doubt, except as provided below in Section 2(a)(3)(c), this Arbitration Agreement precludes you from bringing or participating in any kind of class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber, other than participating in a classwide, collective, coordinated, consolidated, mass and/or representative settlement of claims.

## (a) Agreement to Binding Arbitration Between You and Uber.

**(1)** <u>Covered Disputes</u>: Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued

before or after the date you agreed to the Terms, and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

(2) <u>Class Action Waiver</u>: You acknowledge and agree that any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, consolidated, and/or representative action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any class, collective, coordinated, consolidated, and/or representative action, or to award relief to anyone but the individual in arbitration. The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. Notwithstanding anything else in this agreement, this Class Action Waiver does not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims.

The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and a court may not preside over any action joining, coordinating, or consolidating the claims of multiple individuals against Uber in a single proceeding, except that this Class Action Waiver shall not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims. If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (ii) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (iii) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Agreement; and (iv) severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Agreement or the arbitrability of any remaining claims asserted by you or Uber.

(3) <u>Mass Actions:</u>

a. <u>Mass Action Waiver</u>: You acknowledge and agree that any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration. The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a mass action, and neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any mass action or to award relief to anyone but the individual in arbitration—except as provided below in Section 2(a)(3)(c). The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. The parties agree that the definition of a "Mass Action" includes, but is not limited to, instances in which you or Uber are represented by a law firm or collection of law firms that has filed 50 or more arbitration demands of a substantially similar nature against the other party within 180 days of the arbitration demand filed on your or Uber's behalf, and the law firm or collection of law firms seeks to simultaneously or collectively administer and/or arbitrate all the arbitration demands in the aggregate. Notwithstanding anything else in this agreement, this Mass Action Waiver does not prevent you or Uber from participating in a mass settlement of claims.

b. <u>Dispute Procedure</u>: Notwithstanding any provision to the contrary in the applicable arbitration provider's rules, the arbitrator shall be empowered to determine whether the party bringing any claim

has filed a Mass Action in violation of the Mass Action Waiver. Either party shall raise with the

arbitrator or arbitration provider such a dispute within 15 days of its arising. If such a dispute arises before an arbitrator has been appointed, the parties agree that (i) a panel of three arbitrators shall be appointed to resolve only disputes concerning whether the party bringing any claim has filed a Mass Action in violation of the Mass Action Waiver. Each party shall select one arbitrator from the arbitration provider's roster to serve as a neutral arbitrator, and these arbitrators shall appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the arbitration provider will select the third arbitrator; (ii) Uber shall pay any administrative fees or costs incidental to the appointment of Arbitrators under this provision, as well as any fees or costs that would not be incurred in a court proceeding, such as payment of the fees of the arbitrators, as well as room rental; (iii) the arbitrators shall issue a written decision with findings of fact and conclusions of law; and (iv) any further arbitration proceedings or assessment of arbitration-related fees shall be stayed pending the arbitrators' resolution of the parties' dispute. If the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver, the parties shall have the opportunity to opt out of arbitration within 30 days of the arbitrator's or panel of arbitrator's decision. You may opt out of arbitration by providing written notice of your intention to opt out to the arbitration provider and to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158 via USPS Priority Mail or hand delivery. This written notice must be signed by you, and not any attorney, agent, or other representative of yours. Uber may opt out of arbitration by sending written notice of its intention to opt out to the arbitration provider and to you or your attorney, agent, or representative if you are represented. For the avoidance of doubt, the ability to opt out of arbitration described in this Section 2(a)(3)(b) only applies if the arbitrator or panel of arbitrators determines that you have violated the Mass Action Waiver. If the parties proceed with arbitration, the parties agree that arbitrations will be batched as provided in Section 2(a)(3)(c) below.

**c. <u>Batching</u>:**

i. To increase efficiency of resolution in the event a Mass Action is filed and neither party exercises its right to opt out of arbitration pursuant to Section 2(a)(3)(b) above, the following procedure shall apply. At the request of either party, an arbitrator shall be selected according to the applicable arbitration provider's rules to act as a special master ("Special Master") to resolve threshold disputes regarding the propriety of some or all the arbitration demands submitted in the Mass Action ("Mass Arbitration Demands"). These threshold disputes may include, but are not limited to:

1. Any dispute regarding filing fees owed with respect to the Mass Arbitration Demands, including whether claimants have submitted valid fee waivers;

2. Any dispute regarding whether the applicable arbitration provider has complied with the Arbitration Agreement with respect to processing and administering the Mass Arbitration Demands;

3. Any dispute regarding whether the Mass Arbitration Demands meet the requirements set forth in Section 2(d) below;

4. Whether claimants are barred from proceeding with their claims based on a prior settlement agreement, violation of these Terms, or expiration of the statute of limitations;

5. Any dispute relating to representation of the same claimant by multiple law firms;

6. Any dispute regarding whether the Mass Arbitration Demands were filed with the correct

arbitration provider;

7. Any dispute regarding discovery common to all claims; and

8. Any disputes regarding legal or factual issues common to all claims.

Any such request shall be made within 15 days following the expiration of the opt-out period described in Section 2(a)(3)(b), and may be made by providing written notice to the arbitration provider. Upon the request of either party to appoint a Special Master to resolve the foregoing issues, the applicable arbitration provider shall refrain from further processing any of the Mass Arbitration Demands to which a dispute has been raised. No further payment for filing fees, administrative costs, or arbitrator fees shall be deemed due with respect to any of the Mass Arbitration Demands as to which a dispute has been raised until after the dispute(s) has/have been resolved by the Special Master. Uber shall be responsible for the applicable arbitration provider's and Special Master's fees and costs related to the proceedings before the Special Master.

A Special Master appointed pursuant to this procedure shall have no authority to consolidate cases.

ii. After proceedings before the Special Master have concluded, to the extent any of the Mass Arbitration Demands are permitted to proceed, the parties shall group the Mass Arbitration Demands into batches of no more than 100 demands per batch by state of residence, and then alphabetically by last name (plus, to the extent there are less than 100 arbitration demands left over after the batching described above, a final batch consisting of the remaining demands), and shall inform the arbitration provider of the batches and their compositions within 14 days of the conclusion of proceedings before the Special Master. The arbitration provider shall treat each batch of claims as one case, with each case having one demand for arbitration, one appointed arbitrator, and one set of administrative documents and administrative and filing fees per batch. The parties shall randomly assign sequential numbers to each batch, and only one batch shall proceed to arbitration at a time in the order of the random sequential numbers. A separate arbitrator will be appointed to, and administrative and filing fees assessed for, each batch as the batch proceeds to arbitration. You agree to cooperate in good faith with Uber and the arbitration provider to implement such a batch approach to resolution and fees. Nothing in this provision shall be construed as limiting the right to object that the filing or presentation of multiple arbitration demands by or with the assistance of the same law firm or organization violates any term of this Agreement.

iii. If any Mass Arbitration Demands were originally processed as individual arbitration demands before this batching procedure was commenced, further proceedings, including the assessment of further arbitration filing or administration fees to either party shall be governed by the procedures set forth in this Section 2(a)(3).

**(4)** <u>Delegation Clause</u>: Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. However, only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes

arising out of or relating to the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable—except that, as stated and pursuant to the procedures provided in Section 2(a)(3)(b), an arbitrator or panel of arbitrators shall have authority to determine whether the party bringing any claim has violated the Mass Action Waiver.

(5) <u>Application to Third Parties</u>: This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third parties, including but not limited to your spouses, heirs, third-party beneficiaries and assigns, where their underlying claims arise out of or relate to your use of the Services. To the extent that any third-party beneficiary to this agreement brings claims against the Parties, those claims shall also be subject to this Arbitration Agreement.

## (b) Exceptions to Arbitration.

Notwithstanding the foregoing, this Arbitration Agreement shall not require arbitration of the following claims: (i) individual claims brought in small claims court so long as the matter remains in such court and advances only on an individual basis; (ii) individual claims of sexual assault or sexual harassment occurring in connection with your use of the Services; and/or (iii) injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights.

Such claims may be brought and litigated in a court of competent jurisdiction by you on an individual basis only. On an individual basis means that you cannot bring such claims as a class, collective, coordinated, consolidated, mass and/or representative action against Uber. For the avoidance of doubt, this precludes you from bringing claims as or participating in any kind of any class, collective, coordinated, consolidated, mass and/or representative or other kind of group, multi-plaintiff or joint action against Uber and no action brought by you may be consolidated or joined in any fashion with any other proceeding. Where your claims are brought and litigated to completion on such an individual basis in a court of competent jurisdiction, Uber agrees to honor your election.

The parties' agreement not to require arbitration in these limited instances does not waive the enforceability of this Arbitration Agreement as to any other provision (including, but not limited to, the waivers provided for in Section 2(a), which will continue to apply in court as well as in arbitration), or the enforceability of this Arbitration Agreement as to any other controversy, claim, or dispute.

## (c) Rules and Governing Law.

For disputes arising in California, the arbitration will be administered by ADR Services, Inc. ("ADR") in accordance with ADR's Arbitration Rules (the "ADR Rules") in effect at the time that the claim is brought, unless the parties agree otherwise in writing. The ADR Rules are available at www.adrservices.com or by searching for "ADR Arbitration Rules" using a service such as www.google.com or www.bing.com. The arbitration shall be heard by one arbitrator (the "Arbitrator") selected in accordance with the ADR Rules.

For disputes arising outside of California (or for disputes arising in California only if ADR cannot or will not administer the arbitration), the parties shall be required to meet and confer to select a neutral arbitration provider. Such an arbitration provider shall have operations in the state in which the dispute arises. If the parties are unable to mutually agree upon an arbitration provider, then either

party may invoke 9 U.S.C. § 5 to request that a court of competent jurisdiction appoint an arbitration

provider with operations in the state in which the dispute arises. Any arbitration provider appointed by a court under 9 U.S.C. § 5 shall conduct arbitration solely on an individualized basis as set forth in this Section 2. Once the parties mutually agree upon a neutral arbitration provider, or an arbitrator provider is appointed under 9 U.S.C. § 5, the ensuing arbitration shall commence pursuant to the rules of the designated arbitration provider, except as designated herein. Once an arbitration provider is agreed upon or appointed, an Arbitrator shall be appointed. The Arbitrator will be either (1) a retired judge or (2) an attorney licensed to practice law in the state where the arbitration is conducted with experience in the law underlying the dispute. The Arbitrator will be selected by the parties from the applicable arbitration provider's roster of arbitrators. If the parties are unable to agree upon an Arbitrator after a good faith meet and confer effort, then the applicable arbitration provider will appoint the Arbitrator in accordance with its rules.

Notwithstanding any choice of law or other provision in these Terms, the parties agree and acknowledge that this Arbitration Agreement evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this Arbitration Agreement, and that the FAA and the applicable arbitration provider's rules shall preempt all state laws to the fullest extent permitted by law. If the FAA and applicable arbitration provider's rules are found to not apply to any issue regarding the interpretation or enforcement of this Arbitration Agreement, then that issue shall be resolved under the laws of the state where you reside when you accept these Terms.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to the Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

## (d) Process.

Pre-Arbitration Dispute Resolution and Notification. The parties agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome. The parties therefore agree that, before either party demands arbitration against the other, we will personally meet and confer, via telephone or videoconference, in a good-faith effort to resolve informally any claim covered by this Arbitration Agreement. Multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference. If you are represented by counsel, your counsel may participate in the conference, but you shall also fully participate in the conference. The party initiating the claim must give notice to the other party in writing of their intent to initiate an informal dispute resolution conference, which shall occur within 60 days after the other party receives such notice, unless an extension is mutually agreed upon by the parties. To notify Uber that you intend to initiate an informal dispute resolution conference, write to Uber Technologies, Inc., Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, providing your name, the telephone number(s) associated with your Uber account (if any), the email address(es) associated with your Uber account, and a description of your claim. Engaging in an informal dispute resolution conference is a condition precedent that must be fulfilled before commencing arbitration, and the Arbitrator shall dismiss any arbitration demand filed before

completion of an informal dispute resolution conference. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the informal dispute resolution process required by this paragraph.

Initiating Arbitration. In order to initiate arbitration following the conclusion of the informal dispute resolution process required by this Section, a party must provide the other party with a written demand for arbitration and file the demand with the applicable arbitration provider, as determined by Section 2(c). A party initiating an arbitration against Uber must send the written demand for arbitration to Uber Technologies, Inc., LLC, Attn: Legal Department, 1515 3rd Street, San Francisco, CA 94158, or serve the Demand on Uber's registered agent for service of process, c/o Uber Technologies, Inc. (the name and current contact information for the registered agent in each state are available online here). Additionally, a party initiating arbitration against Uber must send an electronic version of the demand for arbitration to the Arbitration Provider, and must send an electronic version of the as-filed demand to filed-arbitration-demands@uber.com.

By signing the demand for arbitration, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that (i) the demand for arbitration is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (ii) the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (iii) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Arbitrator shall be authorized to afford any relief or impose any sanctions available under Federal Rule of Civil Procedure 11 or any applicable state law for either party's violation of this requirement.

### (e) Location.

Unless you and Uber otherwise agree, the arbitration will be conducted in the county where you reside. Your right to a hearing will be determined by the applicable arbitration provider's rules. Subject to the applicable arbitration provider's rules, the Arbitrator will have the discretion to direct a reasonable exchange of information by the parties, consistent with the expedited nature of the arbitration.

### (f) Offers of Judgment.

At least 10 days before the date set for the arbitration hearing, any party may serve an offer in writing upon the other party to allow judgment on specified terms. If the offer is accepted, the offer with proof of acceptance shall be submitted to the arbitrator, who shall enter judgment accordingly. If the offer is not accepted prior to the arbitration hearing or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the arbitration. If an offer made by one party is not accepted by the other party, and the other party fails to obtain a more favorable award, the other party shall not recover their post-offer costs and shall pay the offering party's costs from the time of the offer.

### (g) Arbitrator's Decision.

The Arbitrator will render an award within the time frame specified in the applicable arbitration provider's rules. Judgment on the arbitration award may be entered in any court of competent

jurisdiction. The Arbitrator may award declaratory or injunctive relief only in favor of the claimant and
only to the extent necessary to provide relief warranted by the claimant's individual claim. An
Arbitrator's decision shall be final and binding on all parties.

The Arbitrator is not bound by decisions reached in separate arbitrations, and the Arbitrator's
decision shall be binding only upon the parties to the arbitration that are the subject of the decision.

The Arbitrator shall award reasonable costs incurred in the arbitration to the prevailing party in
accordance with the law(s) of the state in which arbitration is held.

## (h) Fees.

With the exception of the provisions governing payment of arbitration costs set forth above, your
responsibility to pay any filing, administrative, and arbitrator fees will be solely as set forth in the
applicable arbitration provider's rules and shall be up to the amount you would be required to pay if
you filed a claim in court.

If you have a gross monthly income of less than 300% of the federal poverty guidelines, you are
entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. If you believe that you
meet the requirements to obtain a fee waiver, and your demand for arbitration arises outside of
California, then you may request a fee waiver only by submitting to the arbitration provider AO 240,
Application to Proceed in District Court Without Prepaying Fees or Costs (found here), or a
declaration under oath containing all the information required by AO 240; if your demand for
arbitration arises in California, then you must submit a declaration under oath providing your
monthly income and the number of persons in your household.

Any and all disputes regarding a party's obligation to pay any arbitration fees or costs that arise after
an arbitrator is appointed shall be determined solely by the arbitrator. If such a dispute arises before
an arbitrator has been appointed, and if no Special Master has been requested by either party
pursuant to section 2(a)(3)(c)(i) of these Terms, the parties agree that (i) the due date for any
disputed fees shall be stayed pending resolution of the parties' dispute, (ii) a panel of three arbitrators
shall be appointed to resolve the parties' dispute concerning a party's obligation to pay fees or costs
of arbitration, (iii) the panel of arbitrators shall be appointed by each party selecting one arbitrator
from the arbitration provider's roster to serve as neutral arbitrators, and these arbitrators shall
appoint a third neutral arbitrator. If the parties' arbitrators cannot agree on a third arbitrator, the
arbitration administrator will select the third arbitrator, (iv) Uber shall pay any administrative fees or
costs incidental to the appointment of a panel of arbitrators under this provision, as well as any fees
or costs that would not be incurred in a court proceeding, such as payment of the fees of the
arbitrator(s), as well as room rental, and (v) the arbitrator(s) shall issue a written decision with
findings of fact and conclusions of law. If two or more fee disputes between a claimant and Uber arise
at or around the same time, the disputes may be consolidated for resolution by a single arbitrator or
panel of arbitrators either at the agreement of the parties or the election of the party common to all
such disputes.

## (i) Severability and Survival.

If any portion of this Arbitration Agreement is found to be unenforceable or unlawful for any reason,
(i) the unenforceable or unlawful provision shall be severed from these Terms; (ii) severance of the
unenforceable or unlawful provision shall have no impact whatsoever on the remainder of the

Case 1:20-cv-03000-LAK-JW   Document 79-6   Filed 08/26/22   Page 64 of 124

Arbitration Agreement or the parties' ability to compel arbitration of any remaining claims on an individual basis pursuant to the Arbitration Agreement; and (iii) to the extent that any claims must therefore proceed on a class, collective, consolidated, or representative basis, such claims must be litigated in a civil court of competent jurisdiction and not in arbitration, and the parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

# 3. The Marketplace Platform & Services

Uber operates a personalized multipurpose digital marketplace platform that is accessed in a number of forms, including mobile and/or web-based applications ("Applications"). Among other things, the Uber Marketplace Platform enables you to discover and receive: (i) services rendered by Uber that facilitate your requests to independent third-party providers, including drivers and restaurants ("Third-Party Providers"), for the purchase of services or goods, such as transportation, logistics and/or delivery services from those Third-Party Providers; (ii) related personalized content, including features, recommendations and advertisements for products or services tailored to your needs and interests; and (iii) any supporting services, including payment processing and customer support. The Uber Marketplace Platform, personalized content and supporting services described in this Section are collectively referred to as "the Services." Unless otherwise agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use.

YOU ACKNOWLEDGE THAT YOUR ABILITY TO REQUEST, AND IF APPLICABLE, OBTAIN TRANSPORTATION, LOGISTICS AND/OR DELIVERY SERVICES FROM THIRD-PARTY PROVIDERS IN CONNECTION WITH THE USE OF THE UBER MARKETPLACE PLATFORM AND SERVICES DOES NOT ESTABLISH UBER AS A PROVIDER OF TRANSPORTATION, LOGISTICS OR DELIVERY SERVICES OR AS A TRANSPORTATION OR PROPERTY CARRIER.

UBER IS NOT A COMMON OR MOTOR CARRIER, DOES NOT TRANSPORT YOU, AND USE OF THE UBER MARKETPLACE PLATFORM IS ONLY OPEN TO REGISTERED USERS OF THE UBER MARKETPLACE PLATFORM AND NOT TO THE GENERAL PUBLIC.

YOU ACKNOWLEDGE THAT INDEPENDENT THIRD-PARTY PROVIDERS, INCLUDING DRIVERS, ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER IN ANY WAY.

YOU ALSO ACKNOWLEDGE THAT ANY SAFETY RELATED EFFORT, FEATURE, PROCESS, POLICY, STANDARD OR OTHER EFFORT UNDERTAKEN BY UBER IN THE INTEREST OF PUBLIC SAFETY (WHETHER REQUIRED BY APPLICABLE REGULATIONS OR NOT) IS NOT AN INDICIA OF AN EMPLOYMENT, ACTUAL AGENCY, APPARENT AGENCY, OR OSTENSIBLE AGENCY RELATIONSHIP WITH AN INDEPENDENT THIRD-PARTY DRIVER.

### License.

Subject to your compliance with these Terms, Uber grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferable license to: (i) access and use the Applications on your personal device solely in connection with your use of the Services; and (ii) access and use any content, information and related materials that may be made available through the Services, in each case solely for your personal, noncommercial use. Any rights not expressly granted herein are reserved by Uber and Uber's licensors.

## Restrictions.

You may not: (i) remove any copyright, trademark or other proprietary notices from any portion of the Services; (ii) reproduce, modify, prepare derivative works based upon, distribute, license, lease, sell, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast or otherwise exploit the Services except as expressly permitted by Uber; (iii) decompile, reverse engineer or disassemble the Services except as may be permitted by applicable law; (iv) link to, mirror or frame any portion of the Services; (v) cause or launch any programs or scripts for the purpose of unduly burdening or hindering the operation and/or functionality of any aspect of the Services; or (vi) attempt to gain unauthorized access to or impair any aspect of the Services or its related systems or networks.

## Third-Party Services and Content.

The Services may be made available or accessed in connection with third-party services and content (including advertising) that Uber does not control. Once you click on a link to third-party services or content, you will be subject to the terms and conditions and privacy policy of that website, destination, or third-party service provider. Uber will not warn you that you have left the Services or that you are subject to the terms and conditions (including privacy policies) of another website, destination, or third-party service provider. You use all links in third-party websites and advertisements at your own risk as these are not part of the Services and are not controlled by Uber. You acknowledge that different terms of use and privacy policies may apply to your use of such third-party services and content. Uber does not endorse such third-party services and content and in no event shall Uber be responsible or liable for any products or services of such third-party providers.

## App Stores.

You acknowledge and agree that the availability of the Applications may be dependent on the third-party from which you received the Application's license, e.g., the Apple iPhone or Android app stores ("App Store"). You acknowledge and agree that this Agreement is between you and Uber and not with the App Store and that Uber is responsible for the provision of Services as described in this Agreement. However, if you downloaded the Application from the Apple App Store, Apple and its subsidiaries are third-party beneficiaries of this Agreement. Upon your acceptance of this Agreement, Apple shall have the right (and will be deemed to have accepted the right) to enforce this Agreement against you as a third-party beneficiary thereof. This Agreement incorporates by reference Apple's Licensed Application End User License Agreement, for purposes of which, you are "the end-user." In the event of a conflict in the terms of the Licensed Application End User License Agreement and this Agreement, the terms of this Agreement will control.

## Ownership.

The Services and all rights therein are and shall remain Uber's property or the property of Uber's licensors. Neither these Terms nor your use of the Services convey or grant to you any rights in or related to the Services except for the limited license granted above.

You agree that you will not use Uber's trademarks, service marks, or trade dress or any similar names, marks, or trade dress ("Uber's Marks"), aside from use incidental to your use of the Services, without express, written permission from Uber. This prohibition on using Uber's Marks includes, but is not limited to, use in domain names, websites, and social media accounts.

# 4. Access and Use of the Services

## User Accounts.

In order to use most aspects of the Services, you must register for and maintain an active personal user Services account ("Account"). You must be at least 18 years of age, or the age of legal majority in your jurisdiction (if different than 18), to obtain an Account, unless a specific Service permits otherwise. You cannot register for or maintain an Account if you have previously been banned from accessing or using the Services. Account registration requires you to submit to Uber certain personal information, such as your name, address, mobile phone number and age, as well as at least one valid payment method supported by Uber. For more information regarding Uber's use of your personal information, please see our Privacy Notice currently available at https://privacy.uber.com/policy/. You agree to maintain accurate, complete, and up-to-date information in your Account, including a valid phone number, address and payment method. Your failure to comply with these Terms (including policies and supplemental terms) including, without limitation, your failure to maintain accurate, complete, and up-to-date Account information, including having an invalid or expired payment method on file, may result in your inability to access or use the Services. You are responsible for all activity that occurs under your Account, and you agree to maintain the security and secrecy of your Account username and password at all times. Unless otherwise permitted by Uber in writing, you may only possess one Account.

## User Requirements and Conduct.

You agree to abide by the Uber Community Guidelines, available here. Failure to comply with the Community Guidelines or any violation of these terms may result in the permanent loss of access to the Services.

The Services are not available for use by persons under the age of 18. You may not authorize third-parties to use your Account, and you may not allow persons under the age of 18 to request or receive transportation, delivery or logistics services from Third-Party Providers unless they are accompanied by you. You may not assign or otherwise transfer your Account to any other person or entity. You agree to comply with all applicable laws when accessing or using the Services, and you may only access or use the Services for lawful purposes (e.g., no request for the purpose or intent of transport of unlawful or hazardous materials). You may not in your access or use of the Services cause nuisance, annoyance, inconvenience, or property damage, whether to the Third-Party Provider or any other party. If you request a ride option with a car seat, you acknowledge and agree that neither Uber nor the Third-Party Provider is responsible for the safety of a child restraint/car seat that may be available in the Third-Party Provider's Vehicle. You acknowledge and agree that it is your obligation to ensure that the car seat is installed correctly and that the child is properly secured in the seat. If you request a ride option where a driver agrees to provide you with assistance outside of the vehicle (e.g., Uber Assist), you acknowledge and agree that neither Uber nor the Third-Party Provider is responsible for any injury or incident that may arise out of the assistance provided by the Third-Party Provider. In certain instances, you may be asked to provide proof of age, identity or other method of identity verification to access or use the Services, and you agree that you may be denied access to or use of the Services if you refuse to provide proof of age, identity or other method of identity verification.

Subject to the discretion of a Third-Party Provider, you may be allowed to bring a small animal, such as a dog or cat, on a ride requested through the Uber Marketplace Platform. For such trips, you are

responsible for properly securing the animal with a leash, harness, crate / carrier, or through other means. You are also responsible for ensuring that the animal does not cause damage or a mess in the Third-Party Provider's vehicle. You may be subject to a Charge for Repair or Cleaning under Section 5 for any damage or mess caused by an animal that is transported during a ride requested under your Account. Please note, in accordance with Uber's policies on Service Animals and assistive devices, Service Animals are generally permitted to accompany riders without extra charge, regardless of whether it is a Pet Friendly Trip.

For the purpose of assisting us with our compliance and insurance obligations, you agree to notify us within 24 hours and provide us with all reasonable information relating to any incident or accident that occurs during your use of the Services and you agree to cooperate with any investigation and attempted resolution of such incident.

## Text Messaging and Telephone Calls.

You agree that Uber Technologies, Inc., and its subsidiaries, representatives, affiliates, officers and directors, may contact you by telephone or text messages (including by an automatic telephone dialing system and/or with an artificial or pre-recorded voice) at any of the phone numbers provided by you or on your behalf in connection with an Uber account, including for marketing purposes. You understand that you are not required to provide this consent as a condition of purchasing any property, goods or services. You also understand that you may opt out of receiving text messages from Uber at any time, either by replying "STOP", texting the word "STOP" to 89203 using the mobile device that is receiving the messages, or by contacting help.uber.com. If you do not choose to opt out, Uber may contact you as outlined in its User Privacy Notice, located at https://www.uber.com/privacy/notice.

You agree that Uber may contact you using any of the phone numbers you provided in connection with an Uber account (including via text or voice-recorded message) or your email address in the case of suspected fraud or unlawful activity.

## User Provided Content.

Uber may, in Uber's sole discretion, permit you from time to time to submit, upload, publish or otherwise make available to Uber through the Services textual, audio, and/or visual content and information, and submission of entries for competitions and promotions ("User Content"). Any User Content provided by you remains your property. However, by providing User Content to Uber, you grant Uber a worldwide, perpetual, irrevocable, transferable, royalty-free license, with the right to sublicense, to use, copy, modify, create derivative works of, distribute, publicly display, publicly perform, and otherwise exploit in any manner such User Content in all formats and distribution channels now known or hereafter devised (including in connection with the Services and Uber's business and on third-party sites and services), without further notice to or consent from you, and without the requirement of payment to you or any other person or entity.

You represent and warrant that: (i) you either are the sole and exclusive owner of all User Content or you have all rights, licenses, consents and releases necessary to grant Uber the license to the User Content as set forth above; and (ii) neither the User Content, nor your submission, uploading, publishing or otherwise making available of such User Content, nor Uber's use of the User Content as permitted herein will infringe, misappropriate or violate a third-party's intellectual property or

proprietary rights, or rights of publicity or privacy, or result in the violation of any applicable law

or regulation.

You agree to not provide User Content that is defamatory, libelous, hateful, violent, obscene, pornographic, unlawful, or otherwise offensive, as determined by Uber in its sole discretion, whether or not such material may be protected by law. Uber may, but shall not be obligated to, review, monitor, and remove User Content, at Uber's sole discretion and at any time and for any reason, without notice to you.

### User Feedback.

As Uber respects your rights to your ideas, you agree that you will not submit any confidential ideas, information, or suggestions in any form to Uber or any of its affiliates. For any ideas, information, or suggestions you do submit, regardless of what your communication regarding your submissions says, you understand that your submissions are voluntary and the following terms shall apply to your submissions: (i) your submissions and their contents will automatically become the property of Uber, without any compensation to you; (ii) Uber has no obligation to review your submissions; (iii) Uber may implement and distribute any portion of your submissions and their contents for any purpose in any way, without any compensation to you; and (iv) Uber has no obligation to keep your submissions confidential.

### Network Access and Devices.

You are responsible for obtaining the data network access necessary to use the Services. Your mobile network's data and messaging rates and fees may apply if you access or use the Services from your device. You are responsible for acquiring and updating compatible hardware or devices necessary to access and use the Services and Applications and any updates thereto. Uber does not guarantee that the Services, or any portion thereof, will function on any particular hardware or devices. In addition, the Services may be subject to malfunctions and delays inherent in the use of the Internet and electronic communications.

## 5. Payment

You understand that use of the Services may result in charges to you for the services or goods you receive from Uber and/or from Third-Party Providers ("Charges"). Uber will enable your payment of the applicable Charges for services or goods obtained through your use of the Services. Charges will include applicable taxes where required by law. Charges may include other applicable fees, product return fees, cancellation fees, estimated or actual tolls, and/or surcharges. Further, you acknowledge and agree that Charges applicable in certain geographical areas may increase substantially during times of high demand or due to other marketplace factors.

All Charges and payments will be enabled by Uber using the preferred payment method designated in your Account, after which you will receive a receipt. If your primary Account payment method is determined to be expired, invalid or otherwise not able to be charged, you agree that Uber may use a secondary payment method in your Account, if available. Charges paid by you are final and non-refundable, unless otherwise determined by Uber.

As between you and Uber, Uber reserves the right to establish or adjust Charges for any or all services or goods obtained through the use of the Services at any time. Uber will use reasonable efforts to

inform you of Charges that may apply, provided that you will be responsible for Charges incurred under your Account regardless of your awareness of such Charges or the amounts thereof. Certain users may from time to time receive promotional offers and discounts that may result in different amounts charged for the same or similar services or goods obtained through the use of the Services, and you agree that such promotional offers and discounts, unless also made available to you, shall have no bearing on your use of the Services or the Charges applied to you. Promotional offers and discounts are subject to change or withdrawal at any time and without notice. You may elect to cancel your request for Services at any time prior to the commencement of such Services, in which case you may be charged a cancellation fee on a Third-Party Provider's behalf.

With respect to Third-Party Providers, Charges you incur will be owed directly to Third-Party Providers, and Uber will collect payment of those charges from you, on the Third-Party Provider's behalf as their limited payment collection agent, and payment of the Charges shall be considered the same as payment made directly by you to the Third-Party Provider. In such cases, you retain the right to request lower Charges from a Third-Party Provider for services or goods received by you from such Third-Party Provider at the time you receive such services or goods, and Charges you incur will be owed to the Third-Party Provider. Uber will consider in good faith any request from a Third-Party Provider to modify the Charges for a particular service or good. This payment structure is intended to fully compensate a Third-Party Provider, if applicable, for the services or goods obtained in connection with your use of the Services. Except for amounts provided by you through the Application as part of the "tip" feature, Uber does not designate any portion of your payment as a tip or gratuity to a Third-Party Provider. You understand and agree that, while you are free to provide additional payment as a gratuity to any Third-Party Provider who provides you with services or goods obtained through the Service, you are under no obligation to do so. There also may be certain Charges you incur that will be owed and paid directly to Uber or its affiliates. For the avoidance of doubt, Uber does not charge a fee for a user to access the Uber Marketplace Platform, but retains the right to charge users a fee or any other Charge for accessing Services made available through the Marketplace Platform. Even if not indicated on the Uber Marketplace Platform, you understand that the prices for product or menu items displayed through the Services may differ from the prices offered or published by Third-Party Providers for the same product or menu items and/or from prices available at other third-party websites/mobile applications. Prices for product or menu items displayed through the Services may not be the lowest prices at which the product or menu items are sold. You also understand that product or menu item prices displayed through the Services may vary based on whether you choose to pick up your order or have it delivered.

If you think a correction should be made to any Charge you incurred, you must let Uber know in writing within 30 days after the Charge took place or Uber will have no further responsibility and you waive your right to later dispute the amounts charged.

## Damage, Cleaning, Lost and Found, and Violation of Terms.

Uber may charge you a fee on behalf of Third-Party Providers if, during your use of the Services, you have caused damage to a vehicle or property that requires repair or cleaning ("Repair" or "Cleaning"). The amount of such fee shall be determined, in Uber's sole discretion, based on the type of damage and the severity. Uber reserves the right to verify or otherwise require documentation of damages prior to processing a fee. In the event that a Repair or Cleaning request is verified by Uber in Uber's reasonable discretion, Uber reserves the right to facilitate payment for the reasonable cost of such Repair or Cleaning using your payment method designated in your Account. Such amounts, as well as

those pertaining to lost and found goods, will be transferred by Uber to a Third-Party Provider, if applicable, and are non-refundable.

Additionally, if you fail to comply with these Terms, you may be responsible for Charges, including without limitation, for transactions that could not be completed properly, arising out of or in connection with your failure to comply with these Terms.

# 6. Disclaimers; Limitation of Liability; Indemnity.

### Disclaimer.

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD-PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED OR OBTAINED FROM THIRD-PARTY PROVIDERS IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

UBER DOES NOT CONTROL, MANAGE OR DIRECT ANY THIRD-PARTY PROVIDERS INCLUDING DRIVERS. THIRD-PARTY PROVIDERS ARE NOT ACTUAL AGENTS, APPARENT AGENTS, OSTENSIBLE AGENTS, OR EMPLOYEES OF UBER.

UBER DOES NOT CONTROL, ENDORSE OR TAKE RESPONSIBILITY FOR ANY USER CONTENT OR THIRD-PARTY CONTENT AVAILABLE ON OR LINKED TO BY THE SERVICES. UBER CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE SERVICES OR SERVERS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

### Limitation of Liability.

UBER SHALL NOT BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOST DATA, PERSONAL INJURY, OR PROPERTY DAMAGE RELATED TO, IN CONNECTION WITH, OR OTHERWISE RESULTING FROM ANY USE OF THE SERVICES, REGARDLESS OF THE NEGLIGENCE (EITHER ACTIVE, AFFIRMATIVE, SOLE, OR CONCURRENT) OF UBER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF: (i) YOUR USE OF OR RELIANCE ON THE SERVICES OR YOUR INABILITY TO ACCESS OR USE THE SERVICES; OR (ii) ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD-PARTY PROVIDER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND UBER'S   70 REASONABLE CONTROL. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS PROVIDING

A-209

TRANSPORTATION SERVICES REQUESTED THROUGH SOME UBER SERVICES MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. YOU ACKNOWLEDGE THAT THIRD-PARTY PROVIDERS ARE NOT OSTENSIBLE AGENTS, APPARENT AGENTS, ACTUAL AGENTS, OR EMPLOYEES OF UBER.

THE SERVICES MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS, OR LOGISTICS SERVICES WITH THIRD-PARTY PROVIDERS, BUT YOU AGREE THAT UBER HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS OR LOGISTICS SERVICES PROVIDED TO OR NOT PROVIDED TO YOU BY THIRD-PARTY PROVIDERS OTHER THAN AS EXPRESSLY SET FORTH IN THESE TERMS.

UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF LACK OF OR IMPROPER INSTALLATION OR USE OF CHILD RESTRAINT SYSTEMS FOR GUESTS ON RIDES REQUESTED THROUGH THE SERVICES FOR WHOM A CHILD RESTRAINT SYSTEM IS LEGALLY REQUIRED.

THE LIMITATIONS AND DISCLAIMERS IN THIS SECTION DO NOT PURPORT TO LIMIT LIABILITY OR ALTER YOUR RIGHTS AS A CONSUMER THAT CANNOT BE EXCLUDED UNDER APPLICABLE LAW. BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, UBER'S LIABILITY SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW. THIS PROVISION SHALL HAVE NO EFFECT ON UBER'S CHOICE OF LAW PROVISION SET FORTH BELOW.

### Indemnity.

You agree to indemnify and hold Uber and its affiliates and their officers, directors, employees, and agents harmless from and against any and all actions, claims, demands, losses, liabilities, costs, damages, and expenses (including attorneys' fees), arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third-Party Providers.

# 7. Other Provisions

### Choice of Law.

These Terms shall be governed by and construed in accordance with the laws of the state in which your dispute arises, without regard to the choice or conflict of law principles of any jurisdiction, except as may be otherwise provided in the Arbitration Agreement in Section 2 above or in supplemental terms applicable to your region. This Choice of Law provision applies only to the interpretation of these Terms, and these provisions shall not be interpreted as generally extending any state's law to you if your dispute did not arise in that state.

Any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to the Terms, shall be governed by and construed in accordance with the laws of the state in which the incident or accident occurred.

71

### Choice of Forum.

Case 1:20-cv-03000-LAK-JW   Document 79-6   Filed 08/26/22   Page 72 of 124

Any dispute, claim or controversy arising out of or relating to these Terms or the existence, breach, termination, enforcement, interpretation or validity thereof, shall be brought exclusively in the state and federal courts of the state in which the dispute, claim or controversy arose, notwithstanding that other courts may have jurisdiction over the parties and subject matter, except as may be otherwise provided by the Arbitration Agreement above or in supplemental terms applicable to your region.

Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to incidents or accidents resulting in personal injury (including but not limited to sexual assault or harassment claims) that you allege occurred in connection with your use of the Services, whether before or after the date you agreed to the Terms, shall be brought exclusively in the state or federal courts in the State in which the incident or accident occurred, notwithstanding that other courts may have jurisdiction over the parties and subject matter, and except as may be otherwise provided in the Arbitration Agreement above or in supplemental terms applicable to your region, to the extent permitted by law.

The foregoing Choice of Law and Choice of Forum provisions do not apply to the Arbitration Agreement in Section 2, and we refer you to Section 2 for the applicable provisions for such disputes.

## Claims of Copyright Infringement.

Claims of copyright infringement should be sent to Uber's designated agent. Please visit Uber's web page at https://www.uber.com/legal/intellectual-property/copyright/global for the designated address and additional information.

## Notice.

Uber may give notice by means of a general notice on or through the Services, electronic mail to the email address associated with your Account, telephone or text message to any phone number provided in connection with your account, or by written communication sent by first class mail or pre-paid post to any address connected with your Account. Such notice shall be deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or at the time of sending (if sent by email, telephone, or on or through the Services). You may give notice to Uber, with such notice deemed given when received by Uber, at any time by first class mail or pre-paid post to our registered agent for service of process, c/o Uber Technologies, Inc. The name and current contact information for the registered agent in each state are available online at https://www.wolterskluwer.com/en/solutions/ct-corporation/sop-locations. If another provision of these Terms addresses any specific notice (for example, notice of updates to these Terms, or notice of a dispute or arbitration demand), those specific notice provisions shall prevail to the extent there is any conflict or inconsistency between those provisions and this notice provision.

## General.

You may not assign these Terms without Uber's prior written approval. Uber may assign these Terms without your consent to: (i) a subsidiary or affiliate; (ii) an acquirer of Uber's equity, business or assets; or (iii) a successor by merger. Any purported assignment by you in violation of this section shall be void. No joint venture, partnership, employment, or agency relationship exists between you, Uber or any Third-Party Provider as a result of this Agreement or use of the Services. If any provision of these Terms is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the fullest extent under law. Uber's failure to enforce any right or

provision in these Terms shall not constitute a waiver of such right or provision unless acknowledged

and agreed to by Uber in writing. This provision shall not affect the Severability and Survivability section of the Arbitration Agreement of these Terms.

# Return to Legal Hub→

Uber

Visit Help Center

Do not sell my info (California)

Google Data Policy

Company

About us

Our offerings

Newsroom

Investors

Blog

Careers

AI

Gift cards

Products

Ride

Drive

Deliver

Eat

Uber for Business

Global citizenship

Safety

Diversity and Inclusion

Travel

Airports

Cities

English

San Francisco Bay Area

 

© 2021 Uber Technologies Inc.

Privacy                    Accessibility                Terms

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIAM DAVITASHVILI, ADAM BEN-
SIMON, MIA SAPIENZA, PHILIP ELI-
ADES, JONATHAN SWABY, JOHN BOISI,
NATHAN OBEY, and MALIK DREWEY,
individually and on behalf of all others simi-
larly situated,

      Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

      Defendants.

---

Civ. No. 1:20-cv-03000-LAK

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS TO COMPEL ARBITRATION</u>**

In March 2022, the Court denied Defendants' motion to dismiss these claims. (*See* Dkt. No. 46.) Approximately two months later, Defendants served interrogatories on Plaintiffs, requesting that they "identify the Meal Order Platforms through which" they ordered "at any point during the Class Period." (Hochstadt Decl. Ex. B at 4-5.) In response, the Platform Plaintiffs disclosed that they had used at least some Defendants' platforms, while Plaintiff Drewey disclosed that he had never used those platforms. Based on that information—and not allegations in the operative complaint—Defendants have moved to compel arbitration against the Platform Plaintiffs.

## II.   DEFENDANTS' ARBITRATION PROVISIONS

### A.   The Grubhub TOU

Grubhub merged with Seamless North America LLC ("Seamless") in August 2013. (Koreis Decl. ¶ 4.) Grubhub asserts that, prior to April 2020, each Platform Plaintiff opened an account with either Grubhub or Seamless (*id.* ¶¶ 5-7), and that Grubhub's "Terms of Use" were published on its website "[b]efore this case was filed and during the pendency of the litigation" (*id.* ¶ 8). Grubhub does not submit evidence demonstrating how those terms appeared or could be accessed.

Grubhub states that it requires customers "to agree to its Terms of Use each time the customer places a pick-up or delivery order." (*Id.* ¶ 10.) According to Grubhub, the Platform Plaintiffs have each "placed orders on Grubhub" since December 14, 2021, when Grubhub updated its Terms of Use. (*Id.* ¶ 13.) Although Grubhub has submitted "[s]creenshots depicting the Grubhub checkout page" on both its "mobile application" and "website" (*id.* ¶ 10), it does not claim that these screenshots accurately reflect what the Platform Plaintiffs were shown when they placed orders through Grubhub or that those screenshots were accurate as of the date that the Platform Plaintiffs placed their orders. Grubhub does not, moreover, specify whether the Platform Plaintiffs placed their order through Grubhub's website or mobile application.

TOU or Postmates TOU. Defendants have likewise failed to meet their burden to establish that

Plaintiff Bensimon accepted the Uber TOU.

**B.      Grubhub Fails to Meet Its Burden of Showing That the Platform Plaintiffs Assented to the Grubhub TOU.**

Grubhub has failed to show that any Platform Plaintiff accepted the Grubhub TOU. As an

initial matter, contrary to Grubhub's suggestion (at 8-10), the Grubhub TOU was not presented as

a "clickwrap" agreement. Grubhub's checkout page—where the Platform Plaintiffs supposedly

manifested their assent—does not require users to check a box indicating that they have assented

to, or even read, the Grubhub TOU. (Koreis Decl. ¶ 10); *see Nicosia*, 834 F.3d at 236 ("Notably,

unlike typical 'clickwrap' agreements, clicking 'Place your order' does not specifically manifest

assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to

say 'I agree.'"). Instead, users purportedly assent by placing their order on a page that states, in

fine print, "[b]y placing your order you agree to Grubhub's terms of use." (Koreis Decl. ¶ 10.)[5]

Grubhub also fails to provide sufficient evidence regarding the design and content of its

checkout interface as it appeared to the Platform Plaintiffs. Grubhub submitted "[s]creenshots de-

picting the Grubhub checkout page" for both its "mobile application" and "website" (*id.*), but it

does not say whether the Platform Plaintiffs placed orders through the "mobile application" or

"website." *See Zachman v. Hudson Valley Fed. Credit Union*, 2021 WL 1092508, at *6-7

(S.D.N.Y. Mar. 22, 2021) (denying motion to compel, where court was "unable to assess whether

the relevant language and hyperlink are clear and conspicuous or obscured by advertisements,

---

[5] Grubhub's case law addressing "clickwrap" agreements is thus inapposite. *See, e.g.*, *Aminoff & Co. LLC v. Parcel Pro, Inc.*, 2022 WL 987665, at *3-5 (S.D.N.Y. Apr. 1, 2022); *Sollinger v. SmileDirectClub, LLC*, 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020); *Hidalgo v. Amateur Athletic Union of U.S., Inc.*, 468 F. Supp. 3d 646, 657-58 (S.D.N.Y. 2020); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548-51 (S.D.N.Y. 2018); *Whitt v. Prosper Funding, LLC*, 2015 WL 4254062, at *4-5 (S.D.N.Y. July 14, 2015); *Mallh v. Showtime Networks, Inc.*, 2017 WL 5157247, at *4-5 (S.D.N.Y. Nov. 7, 2017).

colors, links, or other information"); *accord Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330-31 (11th Cir. 2016) (Kaplan, J.) (denying motion to compel where there was "no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"). Nor does Grubhub shed any light as to whether those screenshots are accurate depictions as of the dates on which the Platform Plaintiffs placed their orders. *See Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *4-6 (N.D. Cal. Oct. 19, 2020) ("Eventbrite would only be able to carry its burden if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them.").

In addition, if Grubhub *could* establish that the screenshots it submitted are accurate depictions of the page through which the Platform Plaintiffs placed their orders, Grubhub still would have failed to meet its burden—at least to the extent that those orders were placed through Grubhub's webpage, as opposed to through its mobile application. Grubhub's checkout webpage is nearly identical to the Amazon checkout page at issue *Nicosia*, where the Second Circuit denied a motion to compel arbitration on the grounds that Amazon "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law." 834 F.3d at 238 (applying Washington law); *compare id.* at 241 (Amazon checkout), *with* Koreis Decl. Ex. C (Grubhub checkout webpage). As in *Nicosia*, the link to the Grubhub TOU "is not bold, capitalized, or conspicuous in light of the whole webpage." *Id.* at 237. There are, moreover, "numerous other links on the webpage," in addition to "multiple buttons" and "sufficiently distracting" customer- and order-specific information. *Id.*[6] In short, it cannot accurately be said that the Grubhub TOU "were

---

[6] Grubhub's webpage is thus markedly different from the "uncluttered" webpages addressed in Defendants' cases. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017); *Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *13 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (Kaplan, J.).

presented" to the Platform Plaintiffs "in a way that would put" them "on inquiry notice of such terms." *Starke*, 913 F.3d at 389.

This leaves, as Grubhub's only evidence, the email that it purportedly sent to the Platform Plaintiffs on an unidentified date "to inform them of the updated terms." (Koreis Decl. ¶ 12.) But in contrast to cases that have found notice by email to be sufficient, Grubhub provides no evidence that, at the time the Platform Plaintiffs received the emails, they had assented to a previous iteration of the Gruhbub TOU. *See, e.g.*, *Plazza*, 289 F. Supp. 3d at 548-51 (clickwrap agreements preceded emails). This distinction, courts have recognized, is critical. *See Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 886 n.3 (N.D. Ill. 2020) (distinguishing *Pincaro v. Glassdoor, Inc.*, 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017), cited by Grubhub, and denying motion to compel); *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 273 n.15 (Maine 2022) (same).

**C.  Postmates Fails to Meet Its Burden of Showing That the Platform Plaintiffs Assented to the Postmates TOU.**

If Defendants are arguing that the Platform Plaintiffs are bound by the Postmates TOU, that argument fails. Platform Plaintiffs Bensimon and Eliades have never used Postmates (Sullivan Decl. ¶¶ 9-10), and Defendants offer no explanation as to *how* any Platform Plaintiff assented to the Postmates TOU. *See Hines*, 668 F. Supp. 2d at 367 (denying motion to compel, where movant "crucially" failed to "explain how a site-user such as Plaintiff is made aware of the Terms and Conditions"). Defendants have thus failed to meet their burden.

**D.  Uber Fails to Meet Its Burden of Showing That Plaintiff Bensimon Assented to the Uber TOU.**

Uber has failed to establish that Plaintiff Bensimon accepted the Uber TOU. Uber does not claim that Bensimon ever affirmatively assented to the Uber TOU, either by "clicking" a box or through other means. Nor does Uber claim that Bensimon ever affirmatively assented to any prior version of the Uber TOU. In fact, the declaration submitted by Uber in support of its motion

If interpreted literally, as shown above, infinite arbitration clauses like the Grubhub Arbitration Provision would produce absurd results that would contravene a reasonable person's expectations. *See McFarlane*, 524 F. Supp. 3d at 277 (noting that "it takes little imagination to come up with hypotheticals that make plain the outrageous results that would follow"). Accordingly, to the extent that infinite arbitration clauses are enforceable at all, courts have limited their application to disputes relating to the agreement containing the clause. *See, e.g.*, *id.* at 279 (holding that arbitration provision did not apply to claims "to the extent" that claims "lack any nexus" to the agreement containing that provision); *Wuest*, 2017 WL 6520754, at *3 (agreeing with precedent that "arbitration clause must extend only to claims that 'arise out of or relate to' the contract the Plaintiff signed").

The Court should likewise refuse to apply the Grubhub Arbitration Provision to disputes wholly unrelated to the Grubhub TOU. This narrower interpretation would be consistent with how the Second Circuit has traditionally interpreted "broad" arbitration provisions. *See Louis Dreyfus*, 252 F.3d at 224 ("broad" clause may extend to any claim alleged that "implicates issues of contract construction or the parties' rights and obligations under it") (quoting *Collins & Aikman*, 58 F.3d at 23). It would, moreover, avoid the "absurd results" that other courts have recognized would flow from a literal interpretation.

### B. The Uber Arbitration Provision Is Unenforceable and Inapplicable.

#### 1. The Uber Arbitration Provision Does Not Apply to the Platform Plaintiffs' Claims.

On its own terms, the Uber Arbitration Provision dictates that Uber's motion should be denied. Under that agreement, "only a court of competent jurisdiction, not an arbitrator, shall have exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver." (Sullivan Decl. Ex. F at 59-60.) That agreement further provides that "[i]f there is a final

31

judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason," "any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful provision(s) shall proceed in a court of competent jurisdiction." (*Id.* at 57.) The Platform Plaintiffs' claims, as explained below, are subject to an "unenforceable" and "unlawful" portion of Uber's "Class Action Waiver." Accordingly, by the plain language of the Uber Arbitration Provision, those claims must "proceed" in court.

In particular, the Uber Class Action Waiver contains an infinite arbitration clause *combined* with an infinite class action waiver. That provision states: "You acknowledge and agree that *any and all* disputes, claims, or controversies between the parties shall be resolved only in *individual arbitration*." (*Id.* (emphases added).) With respect to arbitration, this clause is not simply redundant of what is included in the "Covered Disputes" section of the Uber Arbitration Provision. Instead, it expands the scope of claims purportedly subject to arbitration from (i) those relating to a consumer's "relationship with Uber" to (ii) "any and all disputes, claims, or controversies between the parties." (*Id.* at 55-57.)[8]

Uber's infinite arbitration clause is unenforceable for the same reasons that Grubhub's infinite arbitration clause is unenforceable. The Platform Plaintiffs never formed an agreement with Uber to arbitrate any and all possible disputes with Uber, because no reasonable person would have thought accepting the Uber TOU would come with such consequences; Uber's infinite arbitration clause is just as broad and unconscionable as Grubhub's; and even if the Court concluded that Uber's infinite arbitration clause were enforceable to some degree, it would not be enforceable

---

[8] If Uber did not want to use the Class Action Waiver to purportedly expand the scope of disputes subject to arbitration, it could have used the language that Doordash uses in its arbitration clause. *See, e.g.*, *Arkin v. DoorDash, Inc.*, 2020 WL 4937825, at *2 (E.D.N.Y. Aug. 24, 2020) (providing that "[a]ll claims and disputes *within the scope* of this arbitration agreement must be arbitrated on an individual basis and not on a class basis") (emphasis added).

to the extent it purports to cover claims unrelated to the Uber TOU, like the claims that the Platform Plaintiffs assert here. Because the Class Action Waiver is unenforceable as to the Platform Plaintiffs' claims, those claims "shall proceed in a court of competent jurisdiction"—*i.e.*, this Court.

2.     Postmates Cannot Enforce the Uber TOU.

Postmates cannot compel arbitration against the Platform Plaintiffs based on the Uber TOU. "When consumers are not advised of the rights they are forfeiting, enforceability of arbitration clauses may be restricted." *O'Conner*, 444 F. Supp. 3d at 602 (quoting *In re Currency Conversion*, 361 F. Supp. 2d at 250). Indeed, a "party acts unconscionably when it omits material information from a contract regarding the consumers' forfeiture of important protections." *Id.* at 602-03 (quoting *In re Currency Conversion*, 361 F. Supp. 2d at 250). That is what happened here.

Uber and Postmates imposed the Uber TOU on the Platform Plaintiffs during the pendency of this litigation, without providing any notice to Plaintiffs' counsel. Uber, moreover, failed to inform the Platform Plaintiffs that, by accepting those terms, they would (purportedly) be agreeing to arbitrate the claims that they had *already* asserted in this action against *Postmates*, notwithstanding that those claims arose years before Postmates had any relationship with Uber. *See id.* at 603 (arbitration agreement unenforceable, where it did not disclose that, by signing it, "putative plaintiffs would lose their right to participate in this lawsuit"); *cf. O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) ("Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice."). Uber did not even make clear to the Platform Plaintiffs—some of whom have never even used Postmates—that they would be entering an agreement with Postmates; indeed, the Uber TOU does not mention Postmates by name.

The unfairness of allowing Postmates to invoke the Uber TOU against the Platform Plaintiffs is underscored by the fact that there is *no evidence* that any Platform Plaintiff had previously agreed to arbitrate with Postmates. In other words, by imposing the Uber TOU in the midst of this litigation, Uber and Postmates have purported to give Postmates the right to force the Platform Plaintiffs to arbitrate their claims against Postmates, where no such right previously existed. Under the circumstances, it would be unconscionable to permit Postmates to enforce the Uber TOU, or any component thereof,[9] against Plaintiffs. *See Thomas*, 506 F. Supp. 3d at 904 (finding unconscionability, where Cricket was "trying to compel arbitration of Waters' claim against it for the alleged false advertising of its wireless services between 2012 and 2014—before it became an affiliate of AT&T Mobility—based on an entirely separate wireless service agreement that Waters signed with a different wireless service provider—AT&T Mobility—years after she purchased a phone from Cricket.").

## V.   THE ACTION SHOULD NOT BE STAYED IN FULL

In an argument that Grubhub tellingly declines to make, Uber argues (at 17) that the Court should exercise its discretion to "stay the entire action," including with respect to Plaintiff Drewey's claims, even though Plaintiff Drewey has never used any Defendant's platform and is indisputably not bound by any Defendant's arbitration clause. Where, as here, a defendant seeks stay an action pending resolution of arbitration, that party "bears a heavy burden of showing necessity for the stay." *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991); *see also Hard*

---

[9] For the avoidance of doubt, the Platform Plaintiffs challenge the validity of the Delegation Clause itself, on the grounds that it would be unconscionable to permit Postmates to enforce that clause. *See Gingras*, 922 F.3d at 126 (allegation that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent" was "sufficient to make the issue of arbitrability one for a federal court").

A-222

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAM DAVITASHVILI, ADAM BEN-SIMON, MIA SAPIENZA, PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY, and MALIK DREWEY, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>GRUBHUB INC., UBER TECHNOLOGIES, INC., and POSTMATES INC.,<br><br>            Defendants. | Civ. No. 1:20-cv-03000-LAK |

<u>**DECLARATION OF EDWARD NORMAND**</u>

I, Edward Normand, declare as follows:

1.      I am a partner at the law firm Roche Freedman LLP, and counsel for Plaintiffs in this matter. I am fully familiar with the pleadings in this matter and, unless otherwise indicated, I have personal knowledge of the facts herein.

2.      I submit this declaration in support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Compel Arbitration.

3.      Based on Plaintiffs' investigation to date, we understand that Grubhub has imposed the contractual provisions on restaurants at issue in this action, or at least substantially similar provisions (the "NPCCs"), since at least 2011. Attached hereto as Exhibit A is a true and correct copy of an article from *Crain's Chicago Business*, dated May 18, 2011, where Grubhub denies

allegations that a consumer "was charged $1 more for fettuccine alfredo with chicken from the menu on GrubHub's site than [the restaurant's] internal menu."

4.      Based on our investigations to date, we further understand that, as of May 18, 2011, Grubhub's terms of use did not contain an arbitration clause or class action waiver. Attached hereto as Exhibit B is a true and correct copy of Grubhub's terms of use, as we believe they appeared on Grubhub's website during that period. Specifically, using the Wayback Machine, we navigated to Grubhub's homepage as it was captured on May 18, 2011, and then clicked a link to "Legal & Privacy," which included, among other things, an "Email Opt Out," "Return Policy," "Terms of Use," and "Privacy Agreement." We reviewed the "Terms of Use," and found that they did not contain an arbitration provision or class-action waiver.

I declare under penalty of perjury that the above is true and correct.


Dated: New York, New York
          September 16, 2022


                                        /s/ Edward Normand
                                       Edward Normand
                                       **ROCHE FREEDMAN LLP**
                                       99 Park Avenue, 19th Floor
                                       New York, NY 10016
                                       tnormand@rochefreedman.com

                                       *Counsel for Plaintiff*

# EXHIBIT A

GrubHub sued over menu prices | Consumer News | Crain's Business...

The Wayback Machine - https://web.archive.org/web/2011052570/http://www.chicagobusiness.com:80/article/20110518/NEWS07/110519862/grubhub-sued-over-menu-prices

Thursday, May 19th, 2011  | Welcome! | My Settings | Log in | Register Now | Contact Us | Classifieds | Subscribe Now | **CRAIN'S EVENTS** | RSS Feeds

Get Email News Alerts

DAILY NEWS | THIS WEEK'S CRAIN'S | INDUSTRY NEWS | MULTIMEDIA | LISTS | SMALL BUSINESS | BLOGS | GOLF | SOCIETY | REAL ESTATE DAILY

FINANCE | GOVERNMENT | HEALTHCARE | LAW | MANUFACTURING | MARKETING/MEDIA | CONSUMER | TECHNOLOGY | TRANSPORTATION

Home > Industry News > Consumer >

# GrubHub sued over menu prices

By: John Pletz | May 18, 2011

ShareThis | Share          Print | Email | **Comments**

(Crain's) — GrubHub Inc. is being sued by a Chicago law firm that contends the online food-ordering website is violating consumer-fraud statutes because some restaurants charge higher prices to customers without disclosing it.

In its suit filed Tuesday in Cook County Circuit Court, Edelson McGuire LLC points to Cory Miller, who said he ordered a meal from Pompei Pizza on Sept. 3, 2009, and later discovered he was charged $1 more for fettuccini alfredo with chicken from the menu on GrubHub's site than Pompei's internal menu. GrubHub's website, however, said its service is free.

Both GrubHub and Pompei are named in the suit.

GrubHub denied the allegations but declined to comment on the specifics of the suit.

"While we strive to be 100% accurate, we also recognize that there are instances where a restaurant may not have notified us of menu changes or updates," the company said in a statement. "To help us better maintain the menus listed on the site, diners and restaurant owners can report any discrepancy they see."

Other Chicago-based coupon websites have also been taken to court for alleged fraud. Edelson McGuire sued Groupon Inc. a year ago over Illinois laws regarding expiration policies. The Chicago-based daily-deal service settled the suit for undisclosed terms.

It's not clear how many restaurants boost their prices for customers who order through GrubHub, nor is it clear whether GrubHub is liable if some restaurants charge higher fees. GrubHub doesn't charge consumers to use its site but gets a cut from restaurants of the value of orders placed through GrubHub.com.

GrubHub's competitor Seamless Web requires restaurants to charge the same prices online as in the restaurants, notes William Gray, the Edelson McGuire lawyer who filed the suit. His firm hopes to get GrubHub to drop its claim that it doesn't charge higher fees for online ordering, and to recover damages for all customers who have been charged higher prices than those who ordered from restaurants directly.

GrubHub is one of Chicago's fastest-growing online startups, raising more than $30 million from investors since November.

It isn't the first to be accused of a less-than transparent offer. Groupon was criticized for a Valentine's Day offer for flowers from FTD that disgruntled customers said penalized Groupon customers. The deal offered $20 off flowers and instructed Groupon users to a special FTD link. That link, however, showed prices that were $10 higher than special pricing offered on FTD's regular website. Customers also complained of shorter delivery windows and hidden service fees. Groupon scrambled to correct the issue and in the end got FTD to honor the lower pricing and refunded customers the difference if they paid more.

ShareThis | Share          Print | Email | **Comments**

**What do you think?**

RELATED CONTENT

RELATED CONTENT
SPONSORED BY

ADVERTISING

TODAY'S FEATURES          «4 of 6»



Know your company logos?

Each letter in our Focus section cover comes from the logo of a company on Crain's annual list of the largest publicly held companies. Can you guess the company behind the letter?

See More

ADVERTISING

CRAIN'S FACEBOOK ACTIVITY

Most Viewed | Recent Blogs

Today's Most Viewed Headlines

GrubHub sued over menu prices

Groupon launching biggest deal yet, with Quiznos

Allstate buying Esurance, Answer Financial for $1 billion

Oprah draws celebrity crowd to United Center taping

United sorry for reviving Sept. 11 flight numbers

View All of Today's News Headlines

Case 1:20-cv-03000-LAK-JW   Document 88-1   Filed 09/16/22   Page 3 of 3

GrubHub sued over menu prices - Consumer News - Crain's Chicago Business

(Note: Your first name and last initial will appear with your remarks.)

Business News X 2 = One Sweet Deal.
$99 one year print *and* online
Subscribe at ChicagoBusiness.com/SweetDeal.

Advertisement

ADVERTISING

SPECIAL FEATURES







**Market Facts: Exercise**

This month Crain's looks at what communities are most likely to hit the gym.

Full Feature

**Best Places to Work 2011**

Take a tour of offices where team-building, volunteerism, personal growth and profits go hand-in-hand.

Full Feature

**Crain's Dining Guide**

Use our interactive map to pick your next business lunch or power diner. Plus, read all our reviews.

Full Feature

USEFUL LINKS

| REVIEWS | BUSINESS TOOLS | SERVICES | | ALSO IN CRAIN'S | |
|---|---|---|---|---|---|
| Special Car Review: Auto Week | Traffic | Classified | Advertise with Us | Daily News | Industry News |
| Chicago Restaurant Reviews | Weather | Download Top Lists | Contact Us | This Week's Crain's | Small Business |
| | Big Dates | About Us | 2011 Giving Guide | Lists | Society |
| | New Business Licenses | Subscription Center | Events | People on the Move | Real Estate |
| | Bankruptcies | Add Your Event | Crain's Events | | |
| | Federal Tax Liens | Crain's in Social Media | | | |

Privacy Policy | About Us | Contact Us | Back to Top
Copyright © 2011 Crain Communications, Inc.

A-227

# EXHIBIT B

The Wayback Machine - https://web.archive.org/web/20110612013335/http://www.grubhub.com:80/legal/



**Restaurants**
SERVING YOU

**Browse**
BY CITY

**Your GrubHub**
PAST ORDERS, FAVES...

## Find restaurants near you and order online for free.

**WHERE ARE YOU?** (e.g. 2211 N Elston, Chicago)

Street Address, City, State

**WHAT WOULD YOU LIKE?** (optional)

Item, Restaurant, Cuisine

**DELIVERY OR PICKUP?**

Delivery & Pickup

### Legal & Privacy

*Images, copy, and program source are exclusively owned and copyrighted by GrubHub. © 2004 GrubHub, Inc.*

#### Quick Links
Email Opt Out
Return Policy
Terms of Use
Privacy Agreement
GrubHub Advertising Agreement
Guidelines for reviews

#### Email Opt Out
We understand how annoying it is when companies give away or sell your email address, so we're not going to do that. Ever. Having said that, by joining the mailing list, you are agreeing to receive a promotional email here and there. We try to make those as relevant as possible to you (new restaurants that deliver to you, popular joints in your neighborhood, etc.), but if you think we're doing a rotten job, you can unsubscribe at any time.
Type your email address below to unsubscribe.

Remove Email

*Return to top*

#### Return Policy
We're serious about customer satisfaction. If there are problems with your food order, please contact the restaurant directly. In the case of problems with a GrubHub charge to your credit card, contact webmeister@grubhub.com within seven days to receive a full or partial refund. We will perform a review of order history for evidence of fraud prior to issuing refunds.

*Return to top*

#### Terms of Use
GrubHub, Inc. ("GrubHub") operates its website and mobile site, located at www.GrubHub.com, and its blog, located at http://blog.grubhub.com/ ("The Daily Grub")(collectively, the "Sites"). Please read the following Terms of Use carefully before using GrubHub or any of the Sites. For inquiries relating to any food orders, see our Return Policy. For information on advertising or promoting your restaurant through GrubHub, visit GrubHub Advertising Agreement.

  1. Applicability & Acceptance of These Terms of Use

By viewing, using, accessing, browsing, or submitting any content or material on the Sites, you agree to these Terms of

A-229

By viewing, using, accessing, browsing, or submitting any content or material on the Sites, you agree to these Terms of Use as a binding legal agreement between you and GrubHub, without limitation or qualification. The term "you" or "You" shall refer to any person or entity who views, uses, accesses, browses or submits any content or material to the Sites If you do not agree to these Terms of Use, then you may not use the Sites. GrubHub reserves the right to modify these Terms of Use at any time without prior notice. You agree that each visit you make to the Sites shall be subject to the then-current Terms of Use, and continued use of the Sites now or following modifications in these Terms of Use confirms that you have read, accepted, and agreed to be bound by such modifications.

2. User License

    a. Scope. GrubHub grants you permission (which may be revoked at any time for any reason or no reason) to view the Sites and to download, email, share via social networking or print individual pages from the Sites in accordance with these Terms of Use and solely for your own personal, non-commercial use, provided you do not remove any trademark, copyright or other notice contained on such pages. No other use is permitted. You may not, for example, incorporate the information, content, or other material in any database, compilation, archive or cache. You may not modify, copy, distribute, re-publish, transmit, display, perform, reproduce, publish, reuse, resell, license, create derivative works from, transfer, or sell any information, content, material, software, products or services obtained from the Sites, except as specifically noted above. Except as specifically authorized by GrubHub, you may not deep-link to the Sites for any purpose or access the Sites manually or with any robot, spider, web crawler, extraction software, automated process or device to scrape, copy, or monitor any portion of the Sites or any information, content, or material on the Sites. GrubHub reserves all of its statutory and common law rights against any person or entity who violates this paragraph. You may not link or frame to any pages of the Sites or any content contained therein, whether in whole or in part, without prior written consent from GrubHub. You may become a "fan" of the Sites or share links to the Sites via social networking technology reference on the Sites. Any rights not expressly granted herein are reserved.

    b. User Conduct. You agree that your use of the Sites and/or services on the Sites is subject to all applicable local, state and federal laws and regulations. You also agree:

- to comply with US law and local laws or rules regarding online conduct and acceptable material;
- not to use the Sites or their services or submit content to the Sites if you are under the age of 13;
- not to use the Sites to purchase alcohol unless you and the alcohol recipient are 21 or older and present a valid photo identification(s) verifying your age at the time of alcohol delivery;
- not to access the Sites or services using a third-party's account/registration without the express consent of the account holder;
- not to use the Sites for illegal purposes;
- not to commit any acts of infringement on the Sites or with respect to content on the Sites;
- not to use the Sites to engage in commercial activities apart from sanctioned use of GrubHub services;
- not to copy any content, including, but not limited to restaurant menu content and third-party reviews, for republication in print or on-line;
- not to create restaurant reviews or blog entries for or with any commercial or other purpose or intent that does not in good faith comport with the purpose or spirit of the Sites;
- not to attempt to gain unauthorized access to other computer systems from or through the Sites;
- not to interfere with another person's use and enjoyment of the Sites or another entity's use an enjoyment of the Sites;
- not to upload or transmit viruses or other harmful, disruptive or destructive files; and/or
- not to disrupt, interfere with, or otherwise harm or violate the security of the Sites, or any services, system resources, accounts, passwords, servers or networks connected to or accessible through the Sites or affiliated or linked sites (including those of our restaurant partners).

    c. Harm from Commercial Use. You agree that the consequences of commercial use or re-publication of content or information from the Sites may be so serious and incalculable that monetary compensation may not be a sufficient or appropriate remedy and that GrubHub will be entitled to temporary and permanent injunctive relief to prohibit such use.

3. Site Content

    a. Nature of User Material. Some of the services offered by GrubHub on the Sites allow you and others to post, transmit, display, publish, distribute, or otherwise submit public user generated material including, but not limited to, restaurant reviews and blog entries, to the Sites (collectively, "Submissions"). You agree not to create any Submission that:

- contains vulgar, profane, abusive, hateful, or sexually explicit language, epithets or slurs, text in poor taste, inflammatory attacks of a personal, sexual, racial or religious nature, or expressions of bigotry, racism, discrimination or hate;
- is defamatory, threatening, disparaging, inflammatory, false, misleading, deceptive, fraudulent, inaccurate, or

9/16/22, 12:40 PM                    Find Delivery Takeout about 10 cuisines / Grubhub Terms of Use

is defamatory, threatening, disparaging, inflammatory, false, misleading, deceptive, fraudulent, inaccurate, or unfair, contains gross exaggeration or unsubstantiated claims, violates the privacy rights or right of publicity of any third party, is unreasonably harmful or offensive to any individual or community, contains any actionable statement, or tends to mislead or reflect unfairly on any other person, business or entity;

- unfairly interferes with any third party's uninterrupted use and enjoyment of the Sites;
- advertises, disparages, promotes or offers to trade any goods or services in any manner that does not comport with the purpose or spirit of the Sites, including, but not limited to, negative reviews posted by competing restaurants or allegations of health code violations;
- is intended primarily to promote a cause or movement, whether political, religious or other;
- contains copyrighted content (copyrighted articles, illustrations, images, text, or other content) without the express permission of the owner of the copyrights in the content;
- constitutes, promotes or encourages illegal acts, the violation of any right of any individual or entity, the violation of any local, state, national or international law, rule, guideline or regulation, or otherwise creates liability;
- discloses any personal identifying information relating to or images of a minor without consent of a parent, guardian or educational supervisor;
- infringes any copyright, trademark, patent, trade secret, or other intellectual property right;
- contains viruses or other harmful, disruptive or destructive files;
- harms or is inappropriate for minors to view;
- links to any commercial or other website; and/or
- is not otherwise in compliance with these Terms of Use.

b. User Representations and Warranties. Each time you provide a Submission to the Sites, you represent and warrant that you have the right to provide such Submission, which means:

- you are the author of the Submission, or
- the Submission is not protected by copyright law, or
- you have express permission from the copyright owner to use the Submission in connection with the Sites; and
- you have the right to grant GrubHub the license set out in these Terms of Use;
- for restaurant review Submission(s), you have had first hand experience with the subject restaurant; and
- your use of the Sites and Submission(s) do not violate these Terms of Use.

c. User License Grant to GrubHub. You grant GrubHub, its affiliates, and related entities a royalty-free, perpetual, irrevocable, non-exclusive right and license to use, copy, modify, display, archive, store, publish, transmit, perform, distribute, reproduce and create derivative works from all Submissions you provide to GrubHub in any form, media, software or technology of any kind now existing or developed in the future. Without limiting the generality of the previous sentence, you authorize GrubHub to include the Submissions you provide in a searchable format that may be accessed by users of the Sites. You also grant GrubHub and its and related entities the right to use any Personally Identifiable Information (as that term is defined in GrubHub's Privacy Policy) included with any Submission in connection with the use, reproduction or distribution of such Submission. You also grant GrubHub the right to use the Submission and any facts, ideas, concepts, know-how or techniques ("Information") contained in any Submission or communication you send to GrubHub for any purpose whatsoever, including but not limited to, developing, manufacturing, promoting and/or marketing products and services. You grant all rights described in this paragraph in consideration of your use of the Sites, without compensation of any sort to you. GrubHub does not claim ownership of Submissions.

d. Disclaimer of Responsibility for Material. Submissions are not endorsed by GrubHub, and do not represent the views of GrubHub or its parents, subsidiaries and affiliates, agents, officers or directors. You acknowledge and agree that GrubHub does not control all Submissions, and disclaims any responsibility for such Submissions. GrubHub specifically disclaims any duty, obligation, or responsibility, to review, screen, refuse to post, remove, or edit any Submissions. In addition, GrubHub does not represent or warrant that any other content or information accessible via the Sites is accurate, complete, or current, including the menus, pricing or parking accessibility available from its partner restaurants. Price, description, menu content, product/service availability, parking accessibility and restaurant information are subject to change without notice. GrubHub assumes no responsibility or liability for any errors or omissions in the content of the Sites. While GrubHub does not charge you for using its services and does not add any additional charges (other than sales taxes and delivery) to the menu items it receives from its participating restaurants, GrubHub offers some restaurant menus via other services. The price shown on the menu may include a markup by those services. See a menu discrepancy? Click here to report it.

e. Review & Removal of Material. GrubHub reserves the right (but disclaims any duty, obligation or responsibility) to review, screen, refuse to post, remove in their entirety, or edit (at any time and without prior notice) any Submissions that GrubHub believes, in its absolute and sole discretion, may violate Sections 2(b), 3(a), or 3(b) above. You may

A-231

that GrubHub believes, in its absolute and sole discretion, may relate Sections 1(a), 5(a), or 5(b) above. You may contact GrubHub at grubhub@grubhub.com or GrubHub at GrubHub, Inc., 2211 N. Elston Ste. 400, Chicago, Il 60614 to request removal of a Submission. However, GrubHub disclaims any duty, obligation or responsibility to comply with such request except as specifically outlined in this paragraph. GrubHub also reserves the right (but disclaims any duty, obligation, or responsibility) to refuse to post, remove in their entirety, or edit (at any time and without prior notice) any Submissions on the Sites for any reason or no reason whatsoever, in its absolute and sole discretion. The Digital Millennium Copyright Act of 1998 (the "DMCA") provides recourse for copyright owners who believe that material appearing on the Internet infringes their rights under US copyright law. If you believe in good faith that Submissions posted by the Sites infringe your copyright, you (or your agent) may send GrubHub a notice requesting that the Submission(s) be removed from the Site(s), or access to it blocked. The notice must include the following information: (a) a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (b) identification of the copyrighted work claimed to have been infringed (or if multiple copyrighted works located on the Sites are covered by a single notification, a representative list of such works); (c) identification of the material that is claimed to be infringing or the subject of infringing activity, and information reasonably sufficient to allow GrubHub to locate the Submission(s) Sites; (d) the name, address, telephone number and email address (if available) of the complaining party; (e) a statement that the complaining party has a good faith belief that use of the Submission in the manner complained of is not authorized by the copyright owner, its agent or the law; and (f) a statement that the information in the notification is accurate and, under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed. If you believe in good faith that a notice of copyright infringement has been wrongly filed against you, the DMCA permits you to send us a counter-notice. Notices and counter-notices must meet the then-current statutory requirements imposed by the DMCA; see http://www.loc.gov/copyright for details. Notices and counter-notices with respect to the Sites should be sent to GrubHub, Inc., 2211 N. Elston Ste. 400, Chicago, Il 60614. GrubHub suggests that you consult your legal advisor before filing a notice or counter-notice. Also, be aware that there can be penalties for false claims under the DMCA. We reserve the right to terminate the account of any user who is a copyright infringer

f. Proprietary Rights. You acknowledge and agree that the Sites contain proprietary information and content that is protected by intellectual property and other laws, and may not be used except as provided in these Terms of Use without advance, written permission of GrubHub. All GrubHub Site design, text, graphics, interfaces, and images (and the selection and arrangements thereof), and software, hypertext markup language ("HTML"), scripts, active server pages, and other content and software used in the Sites are ï¿½2010 GrubHub, all rights reserved.

4. Termination and Modifications to the Sites

rubHub reserves the right, in its sole and absolute discretion, to modify, suspend, or discontinue at any time, with or without notice, the Sites and/or services offered on or through the Sites (or any part thereof), including but not limited to the Sites' features, look and feel, and functional elements and related services.

5. Indemnity

You agree to indemnify and hold GrubHub, its parents, subsidiaries and affiliates, agents, officers, directors, or other employees harmless from any claim, demand, or damage (whether direct, indirect, or consequential), including reasonable attorneys' fees, made by anyone in connection with your use of the Sites, with your Submissions, with any alleged infringement of intellectual property or other right of any person or entity relating to the Sites, your violation of these Terms of Use, and any other acts or omissions relating to the Sites.

6. Disclaimer of Warranties

THE INFORMATION, CONTENT, PRODUCTS, SERVICES, AND MATERIALS AVAILABLE THROUGH THE SITES (WHETHER PROVIDED BY GRUBHUB, YOU, OTHER USERS OR OTHER AFFILIATES/THIRD PARTIES), INCLUDING WITHOUT LIMITATION, FOOD/BEVERAGE ORDERS, SUBMISSIONS, TEXT, PHOTOS, GRAPHICS, AUDIO FILES, VIDEO, AND LINKS, ARE PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, GRUBHUB DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NONINFRINGEMENT, FREEDOM FROM COMPUTER VIRUS, AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

7. Limitation of Liability

IN NO EVENT SHALL GRUBHUB BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OR DAMAGES WHATSOEVER (EVEN IF GRUBHUB HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER IN AN ACTION UNDER CONTRACT, NEGLIGENCE, OR ANY OTHER THEORY, IN ANY MANNER ARISING OUT OF OR IN CONNECTION WITH THE USE, INABILITY TO USE, PERFORMANCE OF, OR SERVICES PROVIDED ON OR

A-232

CONNECTION WITH THE USE, INABILITY TO USE, OR UNAUTHORIZED USE, OR SERVICES PROVIDED ON OR THROUGH THE SITES. GRUBHUB ASSUMES NO RESPONSIBILITY AND SHALL NOT BE LIABLE FOR ANY DAMAGES TO, OR VIRUSES THAT MAY INFECT, YOUR COMPUTER EQUIPMENT OR OTHER PROPERTY ON ACCOUNT OF YOUR ACCESS TO, USE OF, BROWSING OF, OR DOWNLOADING OF ANY MATERIAL FROM THE SITES. GRUBHUB ASSUMES NO RESPONSIBILITY OR LIABILITY IN ANY MANNER ARISING OUT OF OR IN CONNECTION WITH ANY INFORMATION, CONTENT, PRODUCTS, SERVICES, OR MATERIAL AVAILABLE ON OR THROUGH THE SITES, AS WELL AS ANY THIRD PARTY WEBSITE PAGES OR ADDITIONAL WEBSITES LINKED TO THIS SITE, FOR ANY ERROR, DEFAMATION, LIBEL, SLANDER, OMISSION, FALSEHOOD, OBSCENITY, PORNOGRAPHY, PROFANITY, DANGER, INACCURACY CONTAINED THEREIN OR HARM TO PERSON OR PROPERTY CAUSED THEREBY. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU. IN NO EVENT SHALL GRUBHUB'S TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING BUT NOT LIMITED TO, NEGLIGENCE) OR OTHERWISE, EXCEED (A) THE AMOUNT PAID BY YOU TO GRUBHUB OR A RESTAURANT AFFILIATE, IF ANY, OR (B) $100 (WHICHEVER IS LESS).

YOU AND GRUBHUB AGREE THAT THE WARRANTY DISCLAIMERS AND LIMITATIONS OF LIABILITY IN THESE TERMS OF USE ARE MATERIAL, BARGAINED-FOR BASES OF THIS AGREEMENT, AND THAT THEY HAVE BEEN TAKEN INTO ACCOUNT IN DETERMINING THE CONSIDERATION TO BE GIVEN BY EACH PARTY UNDER THIS AGREEMENT AND IN THE DECISION BY EACH PARTY TO ENTER INTO THIS AGREEMENT. YOU AND GRUBHUB AGREE THAT THE WARRANTY DISCLAIMERS AND LIMITATIONS OF LIABILITY IN THESE TERMS OF USE ARE FAIR AND REASONABLE.

IF YOU ARE DISSATISFIED WITH THE SITE OR DO NOT AGREE TO ANY PROVISIONS OF THESE TERMS OF USE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SITE, EXCEPT AS MAY BE PROVIDED FOR IN THIS SECTION 7.

8. Your account, password, and security

Use of GrubHub services requires that you register and/or create an account with GrubHub or use the Sites as a guest. To register and create an account, you must select an account designation and password and provide certain personal information to GrubHub as set forth in the GrubHub Privacy Policy. In consideration of the use of GrubHub's services, you agree to: (a) provide true, accurate, current and complete information about yourself as prompted by the registration form, and (b) maintain and promptly update the personal information you provide to keep it true, accurate, current and complete. If you provide any information that is untrue, inaccurate, not current or incomplete, or GrubHub has reasonable grounds to suspect that such information is untrue, inaccurate, not current or incomplete, GrubHub has the right to refuse any and all current or future use of GrubHub (or any portion thereof).

You are responsible for maintaining the confidentiality and security of your account and password, and you are fully responsible for all activities that occur under your password or account, and for any other actions taken in connection with the account or password. You agree to (a) immediately notify GrubHub of any known or suspected unauthorized use(s) of your password or account, or any known or suspected breach of security, including loss, theft, or unauthorized disclosure of your password or credit card information; and (b) ensure that you exit from your account at the end of each session. GrubHub will not be liable for any injury, loss or damage of any kind arising from or relating to your failure to comply with (a) and (b) or for any acts or omissions by you or someone else using your account and/or password.

9. Links

As a courtesy to you, the Sites may offer links to other websites. Some of these websites may be affiliated with GrubHub while others are not. GrubHub is not responsible for the contents of any website pages created and maintained by organizations independent of GrubHub. Visiting any such third-party website pages is at your own risk. GrubHub has no control of these third-party website pages, nor can it guarantee the accuracy, completeness, or timeliness of information in third-party website pages. Your use of such information is voluntary, and your reliance on such information should be made only after independent review. References to commercial products or services within any such third-party website pages do not constitute or imply an endorsement by GrubHub. By using the Sites you acknowledge that GrubHub is responsible neither for the availability of, nor the content located on or through any third-party website pages.

10. Trademarks

GrubHub® and GrubHub.com Eating Made Easy® are federally registered trademarks of GrubHub. The Daily Grubï¿½ is a common law trademark of GrubHub. Such trademarks and other marks, logos, and names of GrubHub, used on or in connection with the Sites may not be used in connection with any product or service that is not under GrubHub's ownership or control. Furthermore, such trademarks may not be used in any manner that is likely to cause confusion among customers or in any manner that disparages or discredits GrubHub. All other trademarks not owned by GrubHub

Legal Documents—Terms of Use and Privacy Agreement—GrubHub

(or its affiliates) that appear on the Sites are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by GrubHub or its affiliates.

11. Consideration

You acknowledge that these Terms of Use are supported by reasonable and valuable consideration, the receipt and adequacy of which are hereby acknowledged. Without limiting the foregoing, you acknowledge that such consideration includes, without limitation, your use of the Sites and receipt or use of data, content, products and/or services through the Sites, the possibility of our review, use or display of your Submission(s), and the possibility of publicity and promotion from our review, use or display of your user-generated content.

12. Jurisdiction, Applicable Law, and Limitations

This Site is created and controlled by GrubHub in the State of Illinois, U.S.A. You agree that these Terms of Use will be governed by and construed in accordance with the laws of the United States of America and the State of Illinois, without regard to its conflicts of law provisions. Use of the Sites is unauthorized in any jurisdiction that does not give effect to all provisions of these Terms of Use. GrubHub makes no claims or assurances that the Sites are appropriate or may be downloaded outside of the United States. You agree that all legal proceedings arising out of or in connection with these Terms of Use, or services available on or through the Sites must be filed in a federal or state court located in Chicago, Illinois, within one year of the time in which the events giving rise to such claim began, or your claim will be forever waived and barred. You expressly submit to the exclusive jurisdiction of said courts and consent to extraterritorial service of process.

13. General

a. Enforceability. If any portion of these Terms of Use is found to be void, invalid or otherwise unenforceable, then that portion shall be deemed to be superseded by a valid, enforceable provision that matches the intent of the original provision as closely as possible. The remainder of these Terms of Use shall continue to be enforceable and valid according to terms contained herein.

b. Entire Agreement. Except as expressly provided in a particular "Legal & Privacy" posting or other notice on particular pages of the Sites, these Terms of Use, which hereby incorporate by reference the terms of GrubHub's Privacy Policy, constitute the entire agreement between you and GrubHub, superseding all prior agreements regarding the Sites.

c. No Waiver. The failure of GrubHub to exercise or enforce any right or provision of the Terms of Use shall not constitute a waiver of said right or provision. Neither party hereto shall be deemed to be in default of any provision of the Terms of Use or for failure in performance resulting from acts or events beyond the reasonable control of such party and arising without its fault or negligence, including, but not be limited to, acts of God, civil or military authority, interruption of electric or telecommunication services, civil disturbances, acts of war or terrorists, strikes, fires, floods or other catastrophes.

d. Headings & Construction. The section titles in the Terms of Use are for your convenience only and carry no contractual or legal effect whatsoever. The language in these Terms of Use shall be interpreted in accordance with its fair meaning and shall not be strictly interpreted for or against either party.

e. Contact GrubHub. For purposes of providing notice of cancellation or termination, contact us at webmeister@grubhub.com or GrubHub at GrubHub, Inc., 2211 N. Elston Ste. 400, Chicago, Il 60614

Copyright © 2010 GrubHub, Inc. All Rights Reserved.

*Return to top*

## Privacy Agreement

GrubHub, Inc. ("GrubHub") collects certain information through its website and mobile site, located at www.GrubHub.com, and its blog, located at http://blog.grubhub.com/ ("The Daily Grub")(collectively, "Sites"). Your privacy is important to GrubHub and this Privacy Policy lays out GrubHub's policies and procedures surrounding the collection and handling of such information. This Privacy Policy applies only to the Sites. It does not apply to any restaurant sites, other third party services linked to GrubHub Sites or offline activities related to GrubHub services.

A. Information GrubHub Collects

GrubHub may collect the following information from users of our Sites: first name, last name, street address, city, state, zip code, cross streets, phone number, e-mail address, Sites-specific display name, GPS location (mobile site) and credit card information (collectively, "Personally Identifiable Information" or "PII"). GrubHub is not intended for use by children under the age of 13 and GrubHub does not knowingly collect PII from children under the age of 13.

In addition, GrubHub may collect information regarding GrubHub account holders' past GrubHub orders, favorite restaurants, customer service inquiries, service/restaurant reviews and certain social networking preferences (e.g. pages you "Like" or "Recommend").

A-234

you "Like" or "Recommend").

GrubHub also uses web analytics software to track and analyze traffic on the Sites in connection with GrubHub's advertising and promotion of GrubHub services. GrubHub may publish these statistics or share them with third parties without including PII.

GrubHub may collect additional PII in connection with The Daily Grub blog submissions including professional title, business/personal website, social networking handle/username and the author's photograph.

B. GrubHub's Use Of Collected Information

GrubHub uses PII to create users' GrubHub accounts, to communicate with users about GrubHub services, to offer users additional services, promotions and special offers and to charge for purchases made through GrubHub. Users may affirmatively opt-out of receiving promotional communications from GrubHub by visiting http://www.GrubHub.com and providing GrubHub with their e-mail address via the opt-out link. GrubHub may also use PII to enforce GrubHub terms of use and service.

GrubHub uses PII submitted by authors of The Daily Grub blog content by publishing that information on The Daily Grub, and as otherwise agreed by GrubHub and submitting author. By submitting PII to GrubHub in connection with Daily Grub blog content, the author agrees to GrubHub's publication of that PII, and any other PII included within the blog content, on The Daily Grub.

GrubHub uses cookies to remember users on the Sites and to enhance users' experience on the Sites. For example, when users with GrubHub accounts return to the Sites, cookies identify those users and allow the Sites to provide certain user-specific information such as GrubHub account information, past orders, favorite restaurants and user restaurant reviews. GrubHub does not sell the information it collects to third parties. GrubHub shares collected PII to third-party vendors and service providers with whom GrubHub works to provide application programming interfaces ("APIs") and other functions for the Sites in connection with the delivery of GrubHub services. In addition, GrubHub shares users' GrubHub order content, special order instructions, first and last name, street address and telephone number with restaurants where users' orders are placed to the extent necessary to process those orders. GrubHub may also disclose PII to third parties such as attorneys, collection agencies, tribunals or law enforcement authorities pursuant to valid requests in connection with alleged violations of GrubHub terms of use and service or other alleged contract violations, infringement or similar harm to persons or property.

User generated content posted through the Sites such as service/restaurant reviews and certain social networking preferences (e.g. pages you "Like" or "Recommend") may be viewed by the general public. Accordingly, GrubHub cannot ensure the privacy of any PII included in such user generated content.

C. GrubHub's Protection of PII

GrubHub uses reasonable security measures equal to or exceeding industry standard to protect PII from unauthorized access, destruction, use, modification and disclosure. Unfortunately, even with these measures, GrubHub cannot guarantee the security of PII. By using the Sites, you acknowledge and agree that GrubHub makes no such guarantee, and that you use the Sites at your own risk.

D. Accessing and Correcting Your PII

Registered GrubHub account holders can access and change their own PII using the "Edit" function on the GrubHub website. If you have questions regarding GrubHub's use or collection of your PII, please contact GrubHub's privacy officer at: webmeister@grubhub.com.

E. Privacy Policy Amendments

GrubHub may change this Privacy Policy at any time by posting a new version on this pager or on a successor page. The new version will become effective on the posting date, which will be listed at the top of the page as the effective date.

*Return to top*

## GrubHub Advertising Agreement

- I agree that GrubHub.com shall act as my agent in marketing my restaurant and in advertising, selling, and collecting revenue on behalf of my restaurant. GrubHub.com shall be a disclosed agent to the public in all respects.
- I can cancel at any time and I promise, as does GrubHub.com, to rectify any remaining account balances within 30 days of cancellation.
- I will notify my phone staff they will be recorded.
- I agree to pay the marketing fee circled above for each "order" (such term is defined as the food and beverage subtotal, including delivery fee, placed through GrubHub.com to my restaurant).
- I agree that my restaurant is responsible for all liability associated with the sale of food and any drink, including alcohol, by my restaurant, including, without limitation, computation payment of sales tax to the appropriate taxing authority, delivery service, compliance with appropriate health codes with respect to preparation of food, and all matters concerning quality and

A-235

service, compliance with appropriate health codes with respect to preparation of food, and all matters concerning quality and condition of the food, and further, my restaurant will protect, defend, and indemnify GrubHub.com from any and all claims brought against GrubHub.com as a result of any failure by my restaurant with respect to the foregoing.

- I agree that my restaurant is obligated to notify GrubHub.com in writing of any changes to my restaurant's menu, and my restaurant will protect, defend, and indemnify GrubHub.com from any and all claims brought against GrubHub.com as a result of failure by my restaurant with respect to such notification.

- I agree, as does GrubHub.com, specifically with respect to sales tax, that GrubHub.com shall compute the sales tax charged pursuant to instructions provided by my restaurant, shall collect the sales tax solely as an agent on behalf of my restaurant, shall pay such amount collected to my restaurant, and my restaurant shall be solely responsible for verifying the amount collected, filing the appropriate sales tax returns, and remitting the proper amount to the appropriate taxing authorities. For the purpose of such sales tax payments, my sales tax registration number is listed above. For purposes of this Advertising Agreement, sales tax shall include any sales, use, privilege, gross receipts, restaurant, excise or other tax due in relation to the sale of food or drink by my restaurant.

- Until further written notice, the undersigned hereby provides its unlimited consent, authorization, and assignment to GrubHub.com all rights and privileges necessary or useful to manage all information, including but not limited to menus, pertaining to and describing my restaurant in my name, place, and stead on all 3rd party websites and online data services.

- This agreement shall be governed by and interpreted in accordance with the laws of Illinois without regard to principles of conflicts of laws. Where available, you may sign the Agreement electronically, by selecting the "I Accept" button. In selecting the "I Accept Button", the electronic signature ("E-Signature") is the legal equivalent of your manual signature on this Advertising Agreement. You agree that no certification authority or other third party verification is necessary to validate your E-Signature and that the lack of such will not in any way affect the enforceability of your E-Signature or any resulting contract between you and GrubHub.com. You also represent that you are authorized to enter into this Advertising Agreement.

- Please see GrubHub's website at: www.GrubHub.com/legal/. The terms and conditions are subject to change by GrubHub upon 30 days advance notice. After notice and the expiration of 30 days, I acknowledge that continuing participation and receipt of orders shall bind my restaurant to any new terms and conditions.

*Return to top*

## Guidelines for Reviews
Reviews are approved based on the following criteria:

**RELEVANCY**

Reviewers must have had a firsthand experience with the restaurant. Believe it or not, we can sort of tell…

**ACCEPTABLE CONTENT**

Lesson one: We can reject and remove any comment without warning or explanation. We're not going to as long as you follow our guidelines, but we do reserve that right. As for those guidelines:

- No offensive language.
- Discrimination based on the grounds of race, religion, gender, national origin, age, marital statue, sexual orientation or disability will not be tolerated.
- Referencing illegal activity is not okay.
- Competing restaurants are not allowed to post negative reviews. *Violation of this policy will result in permanent removal from our site without a refund.*
- Allegations of health code violations are not acceptable.

**APPROPRIATE**

Children under 13 are not allowed to use the site. But, hey, like the bright lights of the big city, we know our power to lure the masses does not discriminate. Let's keep it clean, even by younger standards.

**NOT ENDORSED**

GrubHub does not endorse reviews, and they do not represent our views. We also don't assume liability for the content of any review.

**OWNED BY GRUBHUB**

We own all reviews exclusively and forever. We have the right to reproduce, modify, translate, transmit and distribute all

A-236

We own all reviews exclusively and forever. We have the right to reproduce, modify, translate, transmit and distribute all materials relating to reviews. We are under no obligation to pay you for your reviews. All your base are belong to us.

**REMOVABLE**

Each review may be removed if requested by one of our users. If you are offended by something on the site, <u>let us know</u>.

**Helpful Stuff**

About Us
FAQ
Contact Info
Doing Good
Gift Cards

**We're Hiring!**
If you fancy yourself a job with us, <u>step into our office...</u>

**Other Stuff**

Press
Legal & Privacy
Promote Your Restaurant
GrubHub Mobile


Become a fan


Follow us


Read our blog, *The Daily Grub*



© 2004 GrubHub, Inc.

A-237

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARIAM DAVITASHVILI, *et al.*,

                                        Plaintiffs,

            v.

GRUBHUB INC., *et al.*,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-16-23

20-cv-3000 (LAK)
and consolidated case

**MEMORANDUM OPINION**

Appearances:

> Gregory A. Frank
> Marvin L. Frank
> Asher Hawkins
> FRANK LLP
>
> Kyle W. Roche
> Edward Normand
> Stephen Lagos
> ROCHE CYRULNIK FREEDMAN LLP
>
> *Attorneys for Plaintiffs*
>
> David J. Lender
> Eric S. Hochstadt
> Luna Ngan Barrington
> WEIL, GOTSHAL & MANGES LLP
> *Attorneys for Defendant Grubhub Inc.*
>
> Steven C. Sunshine
> Karen M. Lent
> Evan Kreiner
> SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP

2

Derek Ludwin
Stacey K. Grigsby
Andrew A. Ruffino
COVINGTON & BURLING LLP

*Attorneys for Defendant Postmates Inc.*

Derek Ludwin
Stacey K. Grigsby
Andrew A. Ruffino
COVINGTON & BURLING LLP
*Attorneys for Defendant Uber Technologies, Inc.*

LEWIS A. KAPLAN, *District Judge.*

 This matter is before the Court on the motions of Grubhub, Inc. ("Grubhub"), Uber

Technologies, Inc. ("Uber" or "Uber Eats"), and Postmates Inc. ("Postmates") to compel plaintiffs

Mariam Davitashvili, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, and Nathan

Obey (the "Platform Plaintiffs") to arbitrate their claims, based on arbitration provisions in

defendants' respective terms of use. (Dkt 72; Dkt 76)  For the reasons set forth below, defendants'

motions are denied.

### *Facts*

 This matter arises from a putative class action involving the contractual relationships

between restaurants and online ordering platforms for restaurant meals.  The amended complaint

alleges that the defendants each unlawfully has fixed prices for restaurant meals by entering into

restrictive agreements with restaurants that preclude those restaurants from charging lower prices off-

platform.  The no-price-competition clauses ("NPCCs") contained in these agreements prohibit

restaurants that sell through Grubhub or Uber from selling meals at lower prices either directly to

3

consumers or through a competing platform, like Doordash.[1]  Postmates requires a narrower version

of an NPCC, which prohibits restaurants from selling meals at lower prices directly to consumers,

but not through other channels.[2]  Plaintiffs claim that defendants thus have caused them to pay

artificially high prices for restaurant meals.[3]  They seek damages and injunctive relief under Section

1 of the Sherman Act and its state analogues on behalf of themselves and three putative nationwide

classes.  Plaintiffs seek damages for (i) their direct purchases from restaurants bound by defendants'

NPCCs and (ii) their purchases from such restaurants through non-defendant platforms.[4]

On March 30, 2022, the Court denied defendants' joint motion to dismiss these

claims. (Dkt 46)  Approximately two months later, defendants served interrogatories on plaintiffs,

requesting that they "identify the Meal Order Platforms through which" they ordered "at any point

during the Class Period."[5]  In response, the Platform Plaintiffs disclosed that they each had used at

least one of the defendants' platforms, whereas plaintiff Malik Drewey disclosed that he never had

used those platforms.[6]  Defendants move to compel arbitration against the Platform Plaintiffs on the

basis of their use of the defendants' platforms and the arbitration clauses contained within the

defendants' respective "Terms of Use."

---

[1]      Dkt 28, ¶¶ 55-56, 59-61.  All docket citations are to No. 20-cv-3000 (LAK).

[2]      *Id.* ¶¶ 57-58.

[3]      *Id.* ¶¶ 1, 188-216.

[4]      *Id.* ¶¶ 173-75.

[5]      Hochstadt Decl. Ex. B, at 4-5.

[6]      *Id.*

A-240

4

*The Arbitration Clauses in Defendants' Terms of Use*

    A.    *Grubhub's Terms of Use*

Grubhub merged with Seamless North America LLC ("Seamless"), another meal-delivery platform, in August 2013.[7]  It is undisputed that each Platform Plaintiff opened an account with either Grubhub or its predecessor in interest, Seamless, prior to the filing of this action in April 2020.  Grubhub asserts that its terms of use were published on its website "[b]efore this case was filed and during the pendency of the litigation."[8]  However, Grubhub submitted no evidence demonstrating how those terms appeared or could be accessed.[9]

Grubhub claims that it requires customers to agree to its terms of use each time a customer places a pick-up or delivery order.[10]  It is undisputed that the Platform Plaintiffs each have placed orders on Grubhub during the pendency of this action and since Grubhub updated its terms of use on December 14, 2021.

Grubhub argues that the Platform Plaintiffs are bound by the updated terms, which govern consumers "use" of Grubhub's platform.

First, the Terms of Use provide:

"Grubhub Holdings Inc. and its subsidiaries and affiliates ('Grubhub,' 'we,' 'our,' or 'us') own and operate certain websites, including related subdomains; our mobile,

---

[7]    Koreis Decl. ¶ 4.

[8]    *Id.* ¶ 8.

[9]    *See* Dkt 87, at 13.

[10]    *See* Koreis Decl. ¶ 10.

5

tablet and other smart device applications; application program interfaces; in-store kiosks or other online services; other tools, technology and programs (collectively, the 'Platform') and all associated services (collectively, the 'Services'); in each case, that reference and incorporate this Agreement. . . . *This Agreement constitutes a contract between you and us that governs your access and use of the Platform and Services.*"[11]

They also contain a provision entitled "Mutual Arbitration Provision," which states that Grubhub users are required to submit "any" dispute with Grubhub to arbitration:

"You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, *or any other dispute with Grubhub*, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a 'Dispute') *shall be submitted exclusively to binding arbitration*. Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the termination of this Agreement. This Mutual Arbitration Agreement is intended to be broadly interpreted."[12] The Grubhub arbitration clause states also that "issues related

---

[11]

Koreis Decl. Ex. D, at 2 (emphasis added).

[12]

*Id.* at 21 (emphasis added).

to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide."[13]

Part III of the "Dispute Resolution" section is entitled "Class Action and Collective Relief Waiver" and provides in relevant part:

> "You acknowledge and agree that, to the maximum extent allowed by law, except as set out in Section VII below, *there shall be no right or authority for any dispute to be arbitrated or litigated on a class, joint, collective or consolidated basis* or in a purported representative capacity on behalf of the general public, or as a private attorney general or for public injunctive relief."[14]

B.    *Uber's Terms of Use*

The Platform Plaintiffs each created Uber accounts between 2014 and 2018.[15] Uber claims that, in the process of creating their accounts, the Platform Plaintiffs each agreed to Uber's terms of use in effect at that time.

Uber updated its terms of use on December 16, 2021.[16] Uber claims that it notified users of that update via "an in-app blocking pop-up screen that appeared when the user opened an

---

[13]    *Id.*

[14]    *Id.* at 22 [emphasis added].

[15]    Sullivan Decl. ¶ 25.

[16]    *Id.* ¶ 35.

Uber App."[17]   Uber asserts that, "[t]o proceed past the pop-up screen, the user was required to

affirmatively check a box labeled 'By checking the box, I have reviewed and agreed to the Terms of

Use and acknowledged the Privacy Notice' and click 'Confirm.'"[18] Each of the Platform Plaintiffs,

except for Adam Bensimon, provided "check-box consent" via this pop-up screen, and thus are

bound by Uber's December 2021 terms of use.[19]  As to plaintiff Bensimon, Uber asserts that he has

used his "Uber account as recently as November 18, 2021," and that he therefore is bound by Uber's

June 2021 terms of use.[20]

      For purposes of Uber's motion, Uber and the Platform Plaintiffs treat the  July 2021

and December 2021 terms of use as substantially identical.[21]  In both versions, the terms of use

govern consumers' "access or use" of Uber's platform as follows:

      "Uber provides a personalized multipurpose digital marketplace platform ('Uber

      Marketplace Platform') that enables you to conveniently find, request, or receive

      transportation, logistics and/or delivery services from third-party providers that meet

      your needs and interests. *These Terms of Use ('Terms') govern your access or use*,

---

[17]  *Id.* ¶ 39.

[18]  *Id.*

[19]  *Id.* ¶ 40.

  With the exception of plaintiff Bensimon, the Platform Plaintiffs do not dispute that they assented to Uber's December 2021 terms of use.  *See* Dkt 87, at 28-29.

[20]  Sullivan Decl. ¶ 41.

[21]  *See* Dkt 87, at 16.

8

from within the United States and its territories and possessions, of the Uber Marketplace Platform and any related content or services (collectively, the 'Services,' as more fully defined below in Section 3) made available in the United States and its territories and possessions *by Uber Technologies, Inc. and its subsidiaries,* representatives, affiliates, officers and directors (collectively, 'Uber')."[22]

Section 2(a)(1) of Uber's terms of use contains an arbitration provision titled "Covered Disputes," which provides:

"Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to the Terms and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) *your relationship with Uber, will be settled by binding individual arbitration*

---

[22] Sullivan Decl. Ex. F, at 55 (emphasis added).

A-245

9

*between you and Uber, and not in a court of law.*  This Arbitration Agreement
survives after your relationship with Uber ends."[23]

Section 2(a)(2), titled "Class Action Waiver," expands the scope of Uber's arbitration
rights from those expressed in Section 2(a)(1).  It provides in pertinent part: "You acknowledge and
agree that *any and all disputes, claims, or controversies* between the parties shall be resolved only
in individual arbitration."[24] That section provides also:

> "*The parties expressly waive the right to have any dispute, claim, or controversy
> brought, heard, administered, resolved, or arbitrated as a class, collective,
> coordinated, consolidated, and/or representative action,* and neither an arbitrator nor
> an arbitration provider shall have any authority to hear, arbitrate, or administer any
> class, collective, coordinated, consolidated, and/or representative action, or to award
> relief to anyone but the individual in arbitration.  The parties also expressly waive the
> right to seek, recover, or obtain any non-individual relief. . . . The parties further
> agree that if for any reason a claim does not proceed in arbitration, this Class Action
> Waiver shall remain in effect, and *a court may not preside over any action joining,
> coordinating, or consolidating the claims of multiple individuals against Uber in a
> single proceeding*, except that this Class Action Waiver shall not prevent you or Uber

---

[23]  *Id.* at 56-57 (emphasis added).

[24]  *Id.* at 57 (emphasis added).

from participating in a classwide, collective, and/or representative settlement of claims."[25]

Section 2(a)(4) of Uber's terms of use is entitled "Delegation Clause" and provides: "Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. *An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues*, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. However, *only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver* and Mass Action Waiver, including but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable . . . ."[26]

---

[25]
*Id.* (emphasis added).

[26]
*Id.* (emphasis added).

C.    *Postmates' Terms of Use*

Between 2015 and 2018, plaintiffs Boisi, Davitashvili, Obey, and Swaby created user accounts with Postmates.[27]  Postmates was acquired by and became a wholly owned subsidiary of Uber on December 1, 2020.[28]

Uber asserts that Postmates emailed users between March 17, 2021 and mid-April 2021 informing them that "the Postmates App had been updated, and that their accounts would be linked with Uber."[29]  This email included a blue hyperlink to Uber's terms of use and informed Postmates users that they would be subject to an updated arbitration agreement.[30]  Plaintiffs Boisi, Davitashvili, Obey, and Swaby thereafter accepted Uber's December 2021 terms of use, which defined Uber to include "its subsidiaries," including Postmates.[31]  Thus, Uber argues that those plaintiffs agreed to arbitrate "any disputes they may have" with Postmates on an individual, non-class basis through binding arbitration.[32]

---

[27]    *See* Dkt 87, at 15 (citing Sullivan Decl. ¶¶ 7, 9).

[28]    *See* Dkt 90, at 7 (citing Sullivan Decl. ¶ 9; id. Exs. A and B.

Uber claims that these plaintiffs were required to accept Postmates' then-operative terms of use, which included an arbitration clause, in order to create a Postmates account. *See* Dkt 77, at 1 n.1. Use of the term "Postmates" for events prior to December 1, 2020 herein refers to the independent corporation formerly known as Postmates Inc.

[29]    Sullivan Decl. ¶ 21.

[30]    *See id.* ¶¶ 17-23.

[31]    *See* Dkt 90, at 7 (citing Sullivan Decl. Ex. D, at 3-4, 6-7).

[32]    *See* Dkt 77, at 5.

A-248

12

Prior to its acquisition by Uber, Postmates had a terms of service agreement that included an arbitration clause, class action waiver, and delegation clause.[33] Postmates' December 2019 terms of service provided that issues "relating to [] scope, enforceability, and arbitrability" were delegated to the arbitrator.[34]

### Discussion

*Legal Standard*

Section 2 of the FAA provides, in relevant part, as follows:

"A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[35]

Under Section 4 of the Act, a party to "a written agreement for arbitration" may petition a district court "for an order directing that such arbitration proceed in the manner provided

---

[33]

See Sullivan Decl. ¶¶ 15-16; *id.* Ex. B, at 63, 86-91.

[34]

*Id* Ex. B, at 87-88.

[35]

9 U.S.C. § 2.

The Supreme Court has held that express class action waivers also are valid and enforceable. *See DirecTV, Inc. v. Imburgia*, 577 U.S. 47, 55, 58-59 (2015) (enforcing express class action waiver upon holding that the FAA preempted California state law rendering class-arbitration waivers unenforceable); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (enforcing express class action waiver after finding that "[n]o contrary congressional command" overrode the overarching principle that "arbitration is a matter of contract").

A-249

13

for in such agreement."[36]  To decide whether the parties agreed to arbitrate, a court must apply

"ordinary state-law principles that govern the formation of contracts."[37]  Significantly, the FAA was

intended to make arbitration agreements "as enforceable as other contracts, but not more so."[38]  Thus,

"the FAA does not require parties to arbitrate when they have not agreed to do so."[39]  Nor does it

require arbitration when, under generally applicable principles of state law, the agreement would be

unenforceable.[40]

       "In deciding a motion to compel, courts apply a 'standard similar to that applicable

for a motion for summary judgment'" and "draw all reasonable inferences in favor of the non-moving

party."[41]  The movant "bears an initial burden of demonstrating that an agreement to arbitrate was

made."[42]  If the moving party fails to make an adequate showing, the motion to compel arbitration

---

[36]   9 U.S.C. § 4.

[37]   *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[38]   *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

[39]   *Id.* (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985)).

[40]   *See, e.g., Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985); *see also Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

[41]   *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).

[42]   *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).

A-250

14

must be denied.[43]  If, on the other hand, the moving party satisfies this burden "by a showing of evidentiary facts,"[44] the burden shifts to the party "seeking to avoid arbitration" to "show the agreement to be inapplicable or invalid."[45]

Once a court finds that the movant has satisfied its initial burden, "the question of whether the particular dispute [at issue] is subject to an arbitration agreement 'is typically an issue for judicial determination.'"[46]  If, however, the agreement contains a provision that "clearly and unmistakably" delegates the threshold issue of arbitrability to the arbitrator,[47] such a delegation must be enforced "even if the court thinks that the [movant's] arbitrability claim is wholly groundless."[48] That is, unless a non-moving party challenges the validity of the delegation clause itself, in which

---

[43]
    *See Marcus v. Collins*, No. 16-cv-4221(GBD)(BCM), 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016).

[44]
    *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

[45]
    *Sajdlowska v. Guardian Serv. Indus., Inc.*, 16-cv-3947(PAE), 2016 WL 7015755, at *4 (S.D.N.Y. Dec. 1, 2016) (citing *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010)).

[46]
    *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019)).

[47]
    *See All. Bernstein Inv. Rsch. & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

[48]
    *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 526 (2019).

A-251

15

case "the federal court must consider the challenge before ordering compliance with that [delegation clause] under § 4 [of the FAA]."[49]

If a court reaches the arbitrability issue, the Second Circuit instructs courts to "undertake a three-part inquiry" when evaluating a motion to compel arbitration.[50] "First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow."[51] The Circuit has described a "clause submitting to arbitration 'any claim or controversy arising out of or relating to the agreement'" as the "paradigm of a broad [arbitration] clause."[52] "Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause."[53] In general, "[w]here the arbitration clause is narrow, a collateral matter will . . . be ruled beyond its purview."[54] By contrast, "[w]here the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim

---

[49]
    *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2019)).

[50]
    *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).

[51]
    *Id.*

[52]
    *Hatemi v. M & T Bank*, 633 F. App'x 47, 49 (2d Cir. 2016) (summary order) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)).

[53]
    *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224 (internal quotation marks omitted).

[54]
    *Id.*

16

alleged implicates issues of contract construction or the parties' rights and obligations under it."[55]

"When parties use expansive language in drafting an arbitration clause," the Circuit has explained,

"presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated."[56]

*Uber and Postmates Satisfied Their Initial Burden as to All Platform Plaintiffs Except Bensimon*

The Platform Plaintiffs claim that Uber has failed in its initial burden of

"demonstrating that an agreement to arbitrate was made" as to plaintiff Bensimon.[57]  Moreover, they

claim that defendants Postmates and Grubhub have failed to establish that any plaintiff assented to

their terms of use.  Plaintiffs are correct that Uber has not satisfied its initial burden as to plaintiff

Bensimon and that Grubhub has failed as to all plaintiffs.  However, Uber has satisfied its initial

burden that all Platform Plaintiffs, with the exception of Bensimon, agreed to an arbitration clause

covering certain claims against Postmates.

A.      *All Platform Plaintiffs Except Bensimon Assented to Uber's December 2021*
        *Arbitration Clause*

With respect to Uber's December 2021 terms of use, Uber has set forth evidence –

and plaintiffs do not dispute – that plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby expressly

---

[55]     *Id.* (internal quotation marks omitted).

[56]     *Id.* at 225 (internal quotation marks omitted).

[57]     *See Hines, Inc.*, 380 F. App'x at 24.

        Plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby do not dispute that they manifested
        assent to Uber's December 2021 terms of use. *See* Dkt 87, at 28-29.

A-253

17

manifested assent to these terms through clickwrap agreements.[58]  Uber notified users of those updated terms through an in-app blocking pop-up screen that appeared when a user opened an Uber app following the December 2021 update.[59]  The pop-up screen had a header that stated, "We've updated our terms."  Below that, in bigger text, it stated, "We encourage you to read our updated Terms in full."[60]  The pop-up screen provided a hyperlink to Uber's terms of use.[61]  The words "Terms of Use" were displayed in bright blue text that contrasted with the other font colors, indicating they were hyperlinks.  If a user clicked the hyperlink, the terms of use were displayed.[62]  To proceed past the pop-up screen, users were required to check affirmatively a box labeled, "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Notice" and subsequently were required to click a button labeled "Confirm."[63]  It is undisputed that plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby clicked "Confirm" on this pop-up screen,

---

[58]    *See* Dkt 77, at 9-10; Dkt 87, at 28-29.

It is undisputed that plaintiff Bensimon's most recent use of the Uber platform was on November 18, 2021 and the December 2021 terms of use do not apply to him.

[59]    Sullivan Decl. ¶ 39; see *id.* Ex. G.

[60]    *Id.*

[61]    *Id.*

[62]    *Id.*

[63]    *Id.*

18

thereby manifesting assent to Uber's terms of use, which contained an arbitration clause, delegation clause, and class action waiver.[64]

The arbitration clause in Uber's December 2021 terms of use covers certain disputes with Postmates also. Those terms require "Uber" users "to resolve any claim that [they] may have against Uber on an individual basis in arbitration as set forth in the Arbitration Agreement."[65] The December 2021 terms of use expressly define "Uber" to include "its subsidiaries."[66] Postmates has been a wholly owned subsidiary of Uber since December 1, 2020. Accordingly, Postmates has satisfied its initial burden of "demonstrating that an agreement to arbitrate was made" between Postmates and plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby.[67]

In the alternative, Uber argues that all of the Platform Plaintiffs, including plaintiff Bensimon, agreed to arbitrate disputes with Uber or Postmates pursuant to prior versions of Uber's terms of use or Postmates' pre-acquisition terms of use.[68] With respect to all of these alleged

---

64

> *See Hines*, 380 F. App'x at 25 ("[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance.").

65

> Dkt 77, at 10.

66

> Sullivan Decl. Ex. F, at 55.

> The December 2021 agreement "expressly supersede[d] prior agreements or arrangements regarding the use of Services" by users of Uber and its subsidiaries, including both Uber Eats and Postmates users. *See* Sullivan Decl. ¶¶ 19, 23, 36; *id.* Ex. F, at 36, 55.

67

> *See Hines*, 380 F. App'x at 24.

68

> *See* Dkt 90, at 7-8.

19

arbitration agreements, Uber has not satisfied its burden of demonstrating "by a showing of evidentiary facts" that an agreement to arbitrate was made between Uber or Postmates and the Platform Plaintiffs.[69]

Questions concerning whether the Platform Plaintiffs entered into valid arbitration agreements under the various contracts at issue are governed by either New York or California law depending on the particular contract and plaintiff at issue. For example, Uber's July 2021 terms of use, which were in effect when Bensimon last used his Uber account, specified that they would be "governed by and construed in accordance with the laws of the State of California."[70] Uber's December 2021 terms of use, on the other hand, include a general choice of law provision stating that the terms shall be construed in accordance with "the laws of the state in which your dispute arises."[71] In either event, the Second Circuit has found that New York and California apply "substantially similar rules for determining whether the parties have mutually assented to a contract term."[72]

Except with respect to its December 2021 terms of use, Uber has not established that any plaintiff expressly manifested assent to any arbitration agreement with Uber or Postmates.[73] Moreover, Uber has failed to establish that the Platform Plaintiffs were on "reasonable notice" of any

---

[69] *Oppenheimer*, 56 F.3d at 358.

[70] Sullivan Decl. ¶ 34.

[71] *Id.* ¶ 38.

[72] *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017) (citation and internal quotation marks omitted) (applying California law).

[73] *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999) (assent "may be manifested by written or spoken words, or by conduct").

A-256

20

such arbitration agreement.[74]   Uber has not submitted *any* evidence to demonstrate that Uber or Postmates' website or app would have put a reasonable person in the Platform Plaintiffs' position on notice of the existence of any of the alleged arbitration agreements.  For example, Uber has failed to provide sufficient information about what its app or web page looked like when the Platform Plaintiffs initially signed up or at any other relevant time prior to December 2021. Without such information, it is impossible for the Court to conclude that the Platform Plaintiffs were on constructive notice of any arbitration agreement other than the December 2021 terms of use.[75] Thus, with the exception of the December 2021 terms, Uber has failed in its initial burden of "demonstrating that an agreement to arbitrate was made" between Uber or Postmates and the Platform Plaintiffs.[76]

---

[74]

*See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173-79 (9th Cir. 2014) (assent requires only "reasonable notice" of the terms of the agreement for electronic contracts).

[75]

*See Rui Chen v. Premier Fin. All., Inc.*, No. 18-cv-3771(YGR), 2019 WL 280944, at *3 (N.D. Cal. Jan. 22, 2019) (denying motion to compel, where defendants did not offer "evidence explaining the design and content of the webpage or how the AMA appeared on the PFA website"); *In re Stubhub Refund Litig.*, No. 20-md-02951(HSG), 2021 WL 5447006, at *7-8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what the sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice of the User Agreement when they signed up with Stubhub."); *Maree v. Deutsche Lufthansa AG*, No. 20-cv-885(MWF), 2020 WL 6018806, at *3 (C.D. Cal. Oct. 7, 2020) ("The Court agrees with Plaintiff that it would be improper to rule on the existence of an arbitration agreement without first determining, as a factual matter, what the website looked like on the relevant date.").

[76]

*See Hines*, 380 F. App'x at 24.

21

B.    *Grubhub Has Not Established that Any Agreement to Arbitrate Was Made*

Grubhub "bears [the] initial burden" of establishing that the Platform Plaintiffs made an agreement to arbitrate claims against the company.[77]  Grubhub has failed to satisfy its burden as to any plaintiff.[78]

First, Grubhub claims that the Platform Plaintiffs manifested assent to arbitrate based upon a purported "clickwrap" agreement.[79]  Yet, the Grubhub checkout page – where the Platform Plaintiffs allegedly manifested assent – does not require users to check a box or take any affirmative action indicating that they have assented to, let alone read, the Grubhub terms of use.[80]  Rather, Grubhub alleges that the Platform Plaintiffs manifested assent by placing their orders on a page that states, in fine print, "[b]y placing your order you agree to Grubhub's terms of use."[81]  The Second Circuit has held that this does not constitute a "clickwrap" agreement because "clicking 'Place your order' does not specifically manifest assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree.'"[82]  Accordingly, Grubhub's checkout page

---

[77]    *Id.*

[78]    Grubhub's terms of use provide that the terms are governed by New York law.  *See* Koreis Decl. Ex. D.

[79]    Dkt 73, at 8-10.

[80]    *See* Koreis Decl. ¶ 10; *id.* Exs. B, C.

[81]    *Id.*

[82]    *Nicosia*, 834 F.3d at 236.

– as described in the Koreis Declaration – does not constitute a "clickwrap" agreement and Grubhub's case law regarding such agreements is inapposite.

Second, Grubhub fails to provide sufficient evidence that Grubhub's terms of use "were presented" to the Platform Plaintiffs "in a way that would put" them "on inquiry notice of such terms."[83] Grubhub submits "[s]creenshots depicting the Grubhub checkout page" for both its mobile application and website,[84] but it does not specify which method the Platform Plaintiffs used to place orders.[85] Most significantly, Grubhub has not provided sufficient evidence concerning what its app or web page looked like at the time the Platform Plaintiffs placed their orders. Without that information, the Court cannot conclude that the Platform Plaintiffs were on constructive notice of the arbitration clause contained in Grubhub's terms of use.[86]

---

[83]   *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019).

[84]   *See* Koreis Decl. ¶ 10; *id.* Exs. B, C.

[85]   To the extent that plaintiffs placed their orders on Grubhub's website, rather than its mobile application, Grubhub has failed to meet its initial burden also because – much like the Amazon checkout page at issue in *Nicosia* – the link to Grubhub's terms of use "is not bold, capitalized, or conspicuous in light of the whole webpage." 834 F.3d at 237. Moreover, there are "numerous other links on the webpage," in addition to "multiple buttons" and "sufficiently distracting" customer- and order-specific information. *Id.* Under like circumstances, the Second Circuit denied a motion to compel arbitration on the ground that Amazon "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law." *Id.* at 238 (applying Washington law); *compare id.* at 241 (Amazon checkout), *with* Koreis Decl. Ex. C (Grubhub checkout web page).

[86]   *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330-31 (11th Cir. 2016) (denying motion to compel where there was "no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"); *Snow v. Eventbrite, Inc.*, 20-cv-03698(WHO), 2020 WL 6135990, at *4-6 (N.D. Cal. Oct. 19, 2020) ("Eventbrite would only be able to carry its burden if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them.").

23

Finally, Grubhub claims that it "emailed customers, including each plaintiff, to inform them of the updated Terms of Use."[87]  Grubhub submits a "true and correct copy of the email sent to customers to inform them of the [December 2021] updated terms."[88]  This email states that Grubhub had "made changes to . . . [its] dispute resolution and arbitration agreement, which explains how legal disputes are handled," and notifies users, in bold and underlined text, that "continued use of Grubhub will confirm that you have reviewed and agreed to the updated Terms of Use . . . ."[89]  However, Grubhub has not submitted any evidence to demonstrate when this email was sent and whether it was successfully delivered to or opened by any plaintiff.[90]  Furthermore, in contrast to the cases it cited, Grubhub has not established that the Platform Plaintiffs assented to any prior iteration of Grubhub's terms of use.  Accordingly, it has failed to demonstrate a course of dealing by which Platform Plaintiffs could be and have been on reasonable notice that updates to Grubhub's terms of use would be communicated by email notices to the email address affiliated with each plaintiff's Grubhub account.[91]  In deciding defendants' motions to compel, the Court must draw all reasonable

---

[87]    Koreis Decl. ¶ 12.

[88]    *Id.*; *id.* Ex. G.

[89]    *Id.*

[90]    *See Sacchi v. Verizon Online LLC*, No. 14-cv-423(RA), 2015 WL 765940, at *3 (S.D.N.Y. Feb. 23, 2015) (agreement to arbitrate found where defendant submitted evidence that its email notices were successfully delivered to and opened by plaintiff).

[91]    *See Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 886 n.3 (N.D. Ill. 2020) (distinguishing *Pincaro v. Glassdoor, Inc.*, No. 16-cv-6870(ER), 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017), cited by Grubhub, and denying motion to compel on a similar basis); *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 273 n.15 (Maine 2022) (same).

inferences in favor of the non-moving party.[92]   In all the circumstances, Grubhub has failed to demonstrate that an agreement to arbitrate was made between the company and any plaintiff.

*Threshold Issue of Arbitrability*

A.    *The Enforceability of Uber's Arbitration Clause Is an Issue for the Court*

Given that Uber and Postmates have satisfied their initial burden as to plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby, the Court must determine whether the threshold issue of arbitrability has been delegated exclusively to the arbitrator.

Section 2(a)(4) of Uber's December 2021 terms of use provides in relevant part:

"*Only an arbitrator*, and not any federal, state, or local court or agency, *shall have exclusive authority to resolve any dispute* arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable.  *An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues*, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel."[93]

This language clearly and unmistakably provides that "all threshold arbitrability issues," including issues of contract formation or unconscionability, will be decided by an

---

[92]

    *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun*, 316 F.3d at 175).

[93]

    Sullivan Decl. Ex. F, at 59-60 (emphasis added).

arbitrator.[94] However, as in *Gingras v. Think Finance, Inc.*, plaintiffs "mount a convincing challenge to the arbitration clause itself," and their opposition to Uber's motion asserts that "[t]he delegation provision of the [December 2021 terms of use] is also [unconscionable]."[95] "That specific attack on the delegation provision is sufficient to make the issue of arbitrability one for a federal court" and thus the Court is "correct to decide it."[96]

B.    *Grubhub's Terms of Use Expressly Delegate Arbitrability Issues to the Court*

Even if Grubhub had established that the Platform Plaintiffs had assented to its terms of use, the issue of arbitrability would remain with the Court. The Second Circuit instructs that "the issue of whether the parties agreed to arbitrate a matter is to be decided by the courts and not the arbitrators, '[u]nless the parties clearly and unmistakably provide otherwise.'"[97] Grubhub's arbitration clause states that "issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide."[98] Accordingly, the arbitrability of plaintiffs' claims against Grubhub would be decided by the Court.

---

[94]  *Id.*

[95]  *See* Dkt 87, at 34 & n.9; *Gingras*, 922 F.3d at 126.

[96]  *Gingras*, 922 F.3d at 126.

[97]  *Schaffran*, 445 F.3d at 125 (quoting *AT & T Techs.*, 475 U.S. at 649).

[98]  Koreis Decl. Ex. D, at 21.

*Defendants' Infinite Arbitration Clauses Do Not Apply to Plaintiffs' Claims*

Defendants' arbitration clauses are examples of a "'relatively new and untested' species of arbitration clause,"[99] which one scholar aptly has described as an "infinite arbitration clause."[100] If enforced according to their terms, they would require arbitration of *any* claims between defendants and the Platform Plaintiffs, including claims without any nexus to the agreements containing the clauses – i.e., defendants' terms of use.   In *Smith v. Steinkamp*, Judge Posner colorfully illustrated the "absurd results" that would ensue if a payday lender's similarly broad arbitration clause were "read as standing free from any loan agreement."[101]   For example, Judge Posner mused:

> "if Instant Cash murdered [plaintiff] in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash . . . , Instant Cash could insist that the wrongful death claim be submitted to arbitration.  For that matter, if an employee of Instant Cash picked [plaintiff's] pocket when she came in to pay back the loan, and [plaintiff] sued the employee for conversion, he would be entitled to arbitration of her claim.  It would make no difference [if] the conversion had occurred in [plaintiff's] home 20 years after her last transaction with Instant Cash."[102]

---

[99]  *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021) (quoting *Mey v. DIRECTV, LLC*, 971 F.3d 284, 302 (4th Cir. 2020) (Harris, J., dissenting)).

[100]  *See* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639-40 (2020).

[101]  318 F.3d 775, 776-77 (7th Cir. 2003).

[102]  *Id.* at 777.

A-263

27

Since *Smith*, the Ninth Circuit and several district courts have declined to enforce "infinite arbitration clauses" where, as here, the claims at issue lacked any nexus to the agreement containing the clause.[103]  In this district, Judge Furman held as a matter of New York law that an arbitration clause substantially similar to those in defendants' terms of use could not be applied to claims without a nexus to the underlying agreement as a matter of contract formation and unconscionability.[104]  This Court concurs.

Plaintiffs' claims are completely unrelated to their use of defendants' platforms.  To the contrary, their claims specifically exclude any purchases made through defendants' platforms and are based solely on purchases made directly from restaurants or from non-defendant meal-delivery platforms.  The fact that the Platform Plaintiffs at some time used some of the defendants' platforms is purely coincidental, as demonstrated by plaintiff Drewey who has well-plead claims despite never having used any of the defendants' platforms.[105]

As a matter of contract formation, "New York law provides that 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the

---

[103]     *See Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717-21 (9th Cir. 2020); *McFarlane*, 524 F. Supp. 3d at 275; *Hearn v. Comcast Cable Commc'ns, LLC*, 415 F. Supp. 3d 1155, 1161 (N.D. Ga. 2019); *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 503-05 (E.D.N.Y. 2016); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012).

[104]     *McFarlane*, 524 F. Supp. 3d at 279 ("[W]hether as a matter of contract formation or unconscionability, the Court holds that the Arbitration Provision does not apply to Plaintiffs' claims to the extent that they lack any nexus to the cable service agreement.").

[105]     *See* Dkt 46, at 37 (denying defendants' joint motion to dismiss in its entirety).

A-264

28

reasonable expectations of the parties.'"[106]  "[W]here some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part," courts "may as a matter of interpretation carry out the intention of [the] contract by transposing, rejecting, or supplying words to make the meaning of the contract more clear."[107]  Applying these principles here, the Court reaches the same conclusion that the *McFarlane*, *Revitch*, and *Wexler* Courts reached:

> "'Notwithstanding the literal meaning of the clause's language, no reasonable person would think that' agreeing to [defendants' terms of use] 'would obligate [him or her] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of [its] affiliates. . . .  Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the [terms of use] agreement with [defendants].'"[108]

In the alternative, it would be unconscionable to enforce defendants' arbitration clauses with respect to claims untethered to defendants' respective terms of use.  Under New York law, "[a]n unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."[109]  Defendants' arbitration clauses fall within this

---

[106]   *McFarlane*, 524 F. Supp. 3d at 277 (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (App. Div. 1st Dep't 2010) (internal quotation marks omitted)).

[107]   *Jade Realty LLC v. Citigroup Commercial Mortg. Tr. 2005-EMG*, 957 N.Y.S.2d 280, 282 (2012) (internal quotation marks omitted).

[108]   *McFarlane*, 524 F. Supp. 3d at 277 (quoting *Wexler*, 211 F. Supp. 3d at 504).

[109]   *Gillman v. Chase Manhattan Bank, N.A.*, 537 N.Y.S.2d 787, 791 (1988) (internal quotation marks omitted).

A-265

29

definition. If interpreted literally, they would produce grossly unreasonable outcomes that would contravene a reasonable person's expectations. For example, according to their literal terms, defendants' arbitration clauses would require a user of defendants' platforms to arbitrate claims for securities fraud, personal injury, or wrongful termination that have nothing to do with the plaintiff's use of the platform. Accordingly, "as a matter of general unconscionability doctrine, [defendants' arbitration clauses] must be construed to apply only to claims that have some nexus to the contract of which it is part."[110]

In sum, as a matter of either contract formation or unconscionability, the Court holds that defendants' arbitration clauses do not apply to plaintiffs' claims to the extent they lack any nexus to the underlying contracts – i.e., to the extent they are not brought by plaintiffs in their capacities as a current or former users of defendants' platforms.[111]

*Defendants' Infinite Class Action Waivers Do Not Apply to Plaintiffs' Claims*

Defendants' attempts to enforce their expansive class action waivers fail for the same reasons as do their infinite arbitration clauses. Defendants' class action waivers purport to waive the Platform Plaintiffs' right to seek class-wide relief with respect to *any* dispute between the parties, no matter how untethered it is to the defendants' terms of use. As set forth above, whether as a matter of contract formation or unconscionability, defendants cannot enforce such infinitely broad class action waivers against plaintiffs' claims to the extent they lack any nexus with the terms of

---

[110]  *McFarlane*, 524 F. Supp. 3d at 278.

[111]  *See id.* at 279.

A-266

30

use.[112]  Accordingly, the class action waivers contained in defendants' terms of use do not apply to plaintiffs' claims.

### Conclusion

For the foregoing reasons, defendants' motions to compel arbitration (Dkt 72; Dkt 76) are denied in their entirety.  Uber's motion to stay this action pursuant to 9 U.S.C. § 3 is denied as moot.

SO ORDERED.

Dated:        March 16, 2023

Lewis A. Kaplan
United States District Judge

---

[112]

*See Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-cv-1245 (JSR), 2022 WL 6994507, at *6 n.5 (S.D.N.Y. Oct. 12, 2022) (citing *McFarlane*, 524 F. Supp. 3d at 276-77) ("To the extent defendants sought to enforce the [class action] waiver against claims not arising directly out of the MCA agreements -- as might be the case if plaintiffs' Section 1983 claims were still in the case -- there would be a much stronger argument that enforcement of the class action waiver would be unconscionable.").

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAM DAVITASHVILI, ADAM BENSIMON, MIA SAPIENZA, PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY, and MALIK DREWEY, individually and on behalf of all others similarly situated,<br><br>                             Plaintiffs,<br><br>                      v.<br><br>GRUBHUB INC., UBER TECHNOLOGIES, INC., and POSTMATES INC.,<br><br>                             Defendants. | Case No. 1:20-cv-03000 (LAK)<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that defendants Uber Technologies, Inc. ("Uber") and Postmates,

LLC (formerly known as Postmates Inc.) ("Postmates") appeal to the United States Court of

Appeals for the Second Circuit from the Memorandum Opinion and Order entered in the above-

captioned action on March 16, 2023 (ECF No. 103) (the "Order") by the Hon. Lewis A. Kaplan

to the extent the Order denied the motion of Uber and Postmates to compel plaintiffs John Boisi,

Mariam Davitashvili, Philip Eliades, Nathan Obey, and Jonathan Swaby to arbitrate their claims,

and from any and all of the Court's rulings adverse to Uber and Postmates incorporated in,

antecedent to, or ancillary to the Order.  *See* 9 U.S.C. § 16(a)(1).

Dated: April 7, 2023                    Respectfully submitted,

                                        By: s/ Andrew A. Ruffino
                                            Andrew A. Ruffino
                                            COVINGTON & BURLING LLP
                                            The New York Times Building
                                            620 Eighth Avenue
                                            New York, New York 10018
                                            Tel: (212) 841-1097
                                            aruffino@cov.com

Derek Ludwin
Katharine Mitchell-Tombras
Jae Ermilus
Lori Taubman
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Tel: (202) 662-5429
dludwin@cov.com
KMitchellTombras@cov.com

*Counsel for Defendants*
*Uber Technologies, Inc. and Postmates, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2023, a copy of the foregoing Notice of Appeal was filed electronically with the Court using the CM/ECF system.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.

<div align="right">

<u>s/ Andrew A. Ruffino</u>
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1097
aruffino@cov.com

</div>

United States District Court for the Southern
District of New York

File Number 1:20-cv-03000-LAK-JW

Mariam Davitashvili, et al.,                )
                    *Plaintiffs,*           )
                                            )
            v.                                        Notice of Appeal
                                            )
Grubhub Inc., Uber Technologies,            )
Inc., and Postmates Inc.,                   )
                                            )
            *Defendants*.                    )
                                            )
                                            )

  Notice is hereby given that Grubhub Inc., defendant in the above-named case, hereby appeals to
the United States Court of Appeals for the Second Circuit from the memorandum opinion entered
in this action on the 16 day of March, 2023.

                            Dated: April 7, 2023

                            */s/ David J. Lender*

                            David J. Lender
                            Eric S. Hochstadt
                            Luna Ngan Barrington
                            **WEIL, GOTSHAL & MANGES LLP**
                            767 Fifth Avenue
                            New York, New York 10153-0119
                            Telephone: (212) 310-8000
                            Fax: (212) 310-8007